## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORHTERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HOLLY BLAINE VANZANT, and<br>DANA LAND, on behalf of themselves<br>and all others similarly situated, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| vs. | )<br>) | No. 1:17 cv 2535 |
| | )<br>) | Hon. Samuel Der-Yeghiayan |
| HILL's PET NUTRITION INC., and<br>PETSMART, INC., | )<br>) | **JURY DEMAND** |
| | )<br>) | |
| Defendants. | ) | |

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs ("Plaintiffs or "Class Representatives"), individually and on behalf of others similarly situated, file this First Amended Class Action Complaint against Defendants Hill's Pet Nutrition, Inc. ("HPN") and PetSmart, Inc. ("PetSmart") (collectively "Defendants") and allege as follows:

### INTRODUCTION

1.     Plaintiffs bring this class action on behalf of themselves and all other similarly situated Illinois consumers for, *inter alia*, damages, injunctive relief, and all other relief this Court deems just and proper based on Defendants' violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*. Defendants HPN and PetSmart engaged in deception by making false representations and omissions of material facts in manufacturing, distributing, marketing, advertising, labeling, and/or selling "prescription" pet food at above-market prices. In addition, Defendants engaged in unfair business practices in violation of the ICFA by manufacturing, distributing, marketing, advertising, labeling, and/or

selling "prescription" pet food in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FDCA"). Defendants' actions caused reasonable consumers, including Plaintiffs, to overpay and make purchases they otherwise would not have made without Defendants' deceptive and unfair business practices.

## PARTIES

2.      Plaintiff / Class Representative Holly Blaine Vanzant ("Ms. Vanzant") is a resident of Cook County, Illinois.

3.      Plaintiff / Class Representative Dana Land ("Ms. Land") is a resident of Cook County, Illinois.

4.      Defendant HPN is a Delaware corporation with its principal place of business in Topeka, Kansas.

5.      Defendant PetSmart is a Delaware corporation with its principal place of business in Phoenix, Arizona.

## JURISDICTION AND VENUE

6.      This action was originally filed in the Circuit Court of Cook County, Illinois, Chancery Division. Defendants HPN and PetSmart removed this case to the United States District Court for the Northern District of Illinois Court on April 3, 2017. Jurisdiction is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1332(d) because this is a civil action where (a) members of the putative class of plaintiffs are citizens of a different State from a defendant, i.e., there is minimal diversity; (b) the number of members of all proposed plaintiff classes in the aggregate is not less than 100; and (c) the amount in controversy for the aggregated claims of putative class members exceeds the sum or value of $5,000,000, exclusive of interest and costs. 28 U.S.C. §§ 1332(d)(2)(A), (d)(5)(B), (d)(6).

7.     Venue is appropriate in the Northern District of Illinois because this case was removed to the district court of the United States for the district and division embracing the place the original action was pending (in Cook County, Illinois). 28 U.S.C. § 1441(a). In addition, venue is appropriate in the Northern District of Illinois because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A. Defendants Manufacture, Distribute, Market, Label And/Or Sell Prescription Pet Food.**

8.     Pet food sold at retail by "prescription" (referred to herein as "Prescription Pet Food") is marketed and sold across the United States, including in Illinois.

9.     Defendant HPN is in the business of manufacturing, distributing, marketing, labeling, and selling Prescription Pet Food under various brands or labels, including, but not limited to, HPN "Prescription Diet" cat and dog food.  HPN markets, distributes, and sells Prescription Pet Food to consumers in Illinois. Defendant HPN also manufactures, distributes, markets, labels, and sells several lines of non-prescription pet food to consumers in Illinois.

10.     Defendant PetSmart is the largest pet goods retailer in the United States. A majority of its nationwide stores include an onsite Banfield Pet Hospital. PetSmart markets and sells Prescription Pet Food, including HPN "Prescription Diet" cat and dog food, to consumers in Illinois who present a prescription from a veterinarian.  PetSmart also sells other non-prescription cat and dog food manufactured by Defendant HPN and other pet food manufacturers.

11.     PetSmart also owns pet360.com, an e-commerce business that sells pet food. Through pet360.com, PetSmart sells Prescription Pet Food to consumers in Illinois who present a prescription from a veterinarian.

12. Prescription Pet Food is prescribed by a veterinarian, similar to a drug that a veterinarian would prescribe for a cat or dog.

13. To fulfill this prescription, a veterinarian may (a) sell Prescription Pet Food directly to the retail consumer with whom the veterinarian-client-patient relationship exists or (b) provide the consumer a written prescription that can be presented at a business that sells Prescription Pet Food, such as PetSmart stores.

14. Prescription Pet Food may be prescribed only for a finite period of time or may be prescribed indefinitely, such as for the remainder of the pet's life.

**B. Each Defendant Has Engaged In Deceptive Conduct In Violation Of The ICFA.**

15. The Food and Drug Administration ("FDA") regulates foods and drugs, including pet foods and drugs.

16. The FDA does not require that Prescription Pet Food be sold by prescription.

17. No other governmental body or agency requires that Prescription Pet Food be sold by prescription.

18. Prescription Pet Food:

a. has not been subjected to the FDA process for evaluating the quality of drug ingredients and manufacturing processes;

b. has not been subjected to the FDA process for evaluating the efficacy of claims and propriety of representations;

c. does not contain any drug approved by the FDA; and

d. does not bear the mandatory legend borne by those items required by the FDA to be sold by prescription (for example, "Caution: federal law restricts this drug to use by or on the order of a licensed veterinarian.")

4

19.     Each Defendant restricts the sale of Prescription Pet Food to those with a prescription from a veterinarian. Thus, retail consumers, including Plaintiffs, cannot purchase Prescription Pet Food without a prescription from a veterinarian.

20.     The prescription required to purchase Prescription Pet Food is hereafter referred to as the "Prescription Requirement."

21.     Prescription Pet Food is not required to be sold by prescription other than as imposed by Defendant HPN and those acting in concert with Defendant HPN to advance and perpetuate the Prescription Requirement, including Defendant PetSmart.

22.     Defendant HPN imposed the Prescription Requirement because it profits from selling Prescription Pet Food at above-market prices.

23.     Defendant PetSmart adheres to, advances, and perpetuates the Prescription Requirement for Prescription Pet Food by restricting the sale of Prescription Pet Food to those with a prescription from a veterinarian because it profits from selling Prescription Pet Food at above-market prices.

24.     The Prescription Requirement enables Defendants HPN and PetSmart to market and/or sell Prescription Pet Food at above-market prices that would not otherwise exist without the Prescription Requirement.

25.     The Prescription Requirement is false, deceptive, and misleading. Each Defendant participates in this deceptive conduct by imposing, adhering to, advancing, and/or perpetuating the Prescription Requirement for Prescription Pet Food.

26.     Defendants HPN and PetSmart repeatedly represent to consumers, including Plaintiffs, that Prescription Pet Food requires a prescription in the distribution, marketing, advertising, labeling, and/or sale of Prescription Pet Food pursuant to the Prescription

5

Requirement. But that representation is false because Prescription Pet Food is not legally required to be sold by prescription.

27.     HPN sells a "Prescription Diet" line of food that is Prescription Pet Food. This Prescription Pet Food is purportedly meant to treat, mitigate, or prevent conditions, including, but not limited to, those related to the following: "weight management," "digestive care," "skin/food sensitivities," "urinary care," "kidney care," "dental care," "aging care," "glucose management," "heart care," "joint care," "liver care," "skin sensitivity," "thyroid care," and "urgent care."

28.     HPN represents: "No matter what health issues your dog is facing, our alliance with veterinarians puts us in a unique position to find a solution.  Ask your vet how the Prescription Diet® dog foods can help his weight, mobility, kidney, digestive, urinary and skin and coat health." HPN also represents: "No matter what health issues your cat is facing, our alliance with veterinarians puts us in a unique position to find a solution. Ask your vet how Prescription Diet® can help your cat's weight, kidney, digestive and urinary health." In addition, bags and cans of HPN "Prescription Diet" dog and cat food represent that the contents are "Clinical Nutrition" and bear an image of a stethoscope.

29.     On PetSmart's website, PetSmart designates Prescription Pet Food with the language "RX Required." For example, for HPN Prescription Diet i/d Canine Gastrointestinal Health Dog Food and HPN Prescription Diet c/d Multicare Feline Bladder Health Cat Food, *inter alia*, PetSmart represents that "this brand of food requires a vet prescription. Product is only available for purchase in our PetSmart stores or online at our Pet360 Pharmacy site." PetSmart includes a link entitled "shop pet360 pharmacy," which directs consumers to its pet360.com website when the link is activated.

30.     On its pet360.com website, PetSmart designates Prescription Pet Food with an "Rx" symbol and represents "this item is an Rx Food or medication and requires a prescription. Once you place the order, the Pet360 Pharmacist will work directly with your veterinarian to verify the prescription and dosage information."

31.     PetSmart also advances and perpetuates the false and misleading Prescription Requirement by requiring consumers, including Plaintiffs, to obtain a prescription card from PetSmart's onsite veterinarian – Banfield Pet Hospital. PetSmart requires consumers, including Plaintiffs, to present their pet's prescription card, which includes an RX # and RX date, to the cashier in order purchase Prescription Pet Food in PetSmart stores.

32.     At all relevant times, each Defendant knew that Prescription Pet Food is not legally required to be sold by prescription. Accordingly, each Defendant knew that their repeated representations that Prescription Pet Food is required to be sold by prescription were false.

33.     Each Defendant manufactures, markets, labels, and/or sells one or more non-prescription pet foods, which are marketed to treat, mitigate or cure the same or similar conditions as Prescription Pet Food and are sold at significantly lower prices than Prescription Pet Food.

34.     The Prescription Pet Food manufactured, marketed, and/or sold by Defendants contains no drug or other ingredient that is not also common in non-prescription pet food.

35.     There are no material differences between Prescription Pet Food and non-prescription pet food except for the Prescription Requirement in order to purchase Prescription Pet Food.  To the extent there are any differences, they are not sufficient to explain the price disparity between Prescription Pet Food and non-prescription pet food.

36.     By manufacturing, marketing, and/or selling Prescription Pet Food pursuant to the false and misleading Prescription Requirement, Defendants HPN and PetSmart engaged in

7

deception by omitting the following material facts: (a) Prescription Pet Food is not legally required to be sold by prescription; (b) Prescription Pet Food does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (c) Prescription Pet Food does not contain a substance medically necessary to the health of the pet for which it was prescribed; (d) Prescription Pet Food is not materially different than non-prescription pet food; (e) Prescription Pet Food has not been evaluated or approved by the FDA as a drug; and/or (f) Defendant HPN's representations regarding the intended uses and effects of Prescription Pet Food have not been evaluated by the FDA. The forgoing omissions are omissions of material fact because Plaintiffs would not have purchased Prescription Pet Food had they known any of the omitted facts set forth in this paragraph.

37.     While HPN and PetSmart distribute, market, label, and/or sell a variety of different types of prescription cat and dog food products that fall within the definition of Prescription Pet Food, the characteristics of these products are substantially similar because Defendant HPN's and PetSmart's false representations and omissions of material fact are the same across the board for all Prescription Pet Food. In addition, the products themselves are substantially similar because all Prescription Pet Food marketed and sold by HPN and PetSmart is marketed to diagnose, cure, mitigate, treat, or prevent diseases or other conditions, yet none of this Prescription Pet Food: (a) contains a drug, medicine or other ingredient that is not also common in non-prescription pet food; (b) contains a substance medically necessary to the health of the pet for which it was prescribed; and/or (c) is materially different than non-prescription pet food.

**C. Each Defendant Has Engaged In Unfair Practices In Violation Of The ICFA.**

38.     Defendants HPN and PetSmart have manufactured, marketed, labeled, and/or sold adulterated and misbranded substances to consumers by failing to comply with the regulatory requirements of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FDCA").

39.     Under section 201(g)(1)(B) of the FDCA, dog and cat food products that are intended to diagnose, cure, mitigate, treat, or prevent diseases are drugs, even if they also provide nutrients in support of the animal's total required daily nutrient needs.

40.     Prescription Pet Food falls within the statutory definition of a "drug" under the FDCA because it is marketed to diagnose, cure, mitigate, treat, or prevent diseases or other conditions.

41.     Pursuant to the FDCA, in general, new drugs are unsafe unless they have an approved application, a conditional approval, or an index listing.

42.     None of the Prescription Pet Food manufactured, marketed, labeled, and/or sold by Defendants HPN and PetSmart is an approved or listed new drug. Thus, Prescription Pet Food is adulterated and misbranded under the FDCA and its introduction into interstate commerce is a prohibited act under the FDCA.

43.     The FDCA requires that all drug manufacturers register and list drugs with the Food and Drug Administration ("FDA").

44.     None of the Prescription Pet Food manufactured, marketed, labeled, and/or sold by Defendants HPN and PetSmart complies with the drug registration and listing requirements of the FDCA.  Thus, Prescription Pet Food is further misbranded under the FDCA and its introduction into interstate commerce is a prohibited act under the FDCA.

45.     Because Prescription Pet Food falls within the statutory definition of a "drug" under the FDCA, Defendant HPN has manufactured, marketed, labeled, and sold adulterated and

misbranded substances in violation of the FDCA and Defendant PetSmart has marketed and sold adulterated and misbranded substances in violation of the FDCA.

46.     The FDA has issued a non-binding Compliance Policy Guide (the "CPG"), attached hereto as Exhibit 1, to its staff on how to address dog and cat food diets that are labeled and/or marketed as intended for use to diagnose, cure, mitigate, treat, or prevent diseases ("treat or prevent disease") and are also labeled and/or marketed to provide all or most of the nutrients in support of meeting the animal's total required daily nutrient requirements by serving as the pet's sole diet.

47.     The CPG recognizes that dog and cat food diets intended to treat or prevent disease, but which are not approved as new drugs, "have not been evaluated by FDA for safety, efficacy, or nutritional adequacy."

48.     But the CPG provides a clear route to compliance – Defendants HPN and PetSmart could submit Prescription Pet Food at issue in this lawsuit for FDA approval and otherwise comply with the laws and regulations pertaining to prescription products. But they have not done so.

49.     The CPG is about illegal conduct – including conduct such as the violations of the FDCA by Defendants HPN and PetSmart as alleged herein. More importantly, the CPG about the allocation of enforcement resources in light of such illegal conduct.

50.     The CPG "does not establish any rights for any person and is not binding on the FDA or the public." Instead, it provides the current thinking of the FDA on the topic of labeling and marketing of dog and cat food diets intended to treat or prevent disease.

51.     The CPG states that "one of the factors FDA will consider in exercising enforcement discretion is whether the product is made available to the public exclusively through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian."

52.     But the CPG does not use the word "prescription" or the symbol "Rx." And it does not indicate that involvement of a veterinarian makes HPN's and PetSmart's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food lawful.

53.     Neither the CPG, nor the FDA, specifically authorizes HPN or PetSmart to impose the Prescription Requirement for Prescription Pet Food, to label or market Prescription Pet Food as "Prescription Diet," or to label or market Prescription Pet Food as "RX Required" or "Rx Food or medicine."

54.     The CPG does not use the statutory language that describes a legal prescription requirement for veterinary prescription drugs under 21 U.S.C. § 353(f) (stating that certain drugs "shall be dispensed only by or upon the lawful written or oral order of a licensed veterinarian in the court of the veterinarian's professional practice.").

55.     The CPG only indicates that the FDA is less likely to initiate enforcement action against dog and cat food products intended to be fed as the pet's sole diet that claim to treat or prevent disease when the eleven factors set forth in the CPG are present. HPN and PetSmart disregard several of those eleven factors.

56.     HPN's and PetSmart's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food is against public policy because it violates a standard of conduct contained in an existing statute – the FDCA.

57.     HPN's and PetSmart's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food is immoral, unethical, oppressive, or unscrupulous because these Defendants charge above-market prices for Prescription Pet Food despite the fact that: (1) they are selling adulterated and misbranded substances in violation of the FDCA; (2) Prescription Pet Food is not legally required to be sold by prescription; (3) Prescription Pet Food contains no drug or

other ingredient that is not also common in non-prescription pet food; and/or (4) they manufacture, market, and/or sell one or more non-prescription pet foods, which are marketed to treat, mitigate, cure or prevent the same or similar conditions as Prescription Pet Food and are sold at significantly lower prices than Prescription Pet Food.

58.     When Plaintiffs purchased Prescription Pet Food, as reasonable consumers, they expected to receive a substance that: (a) is legally required to be sold by prescription; (b) contains a drug, medicine or other ingredient that is not common in non-prescription pet food; (c) is medically necessary to the health of the pet for which it was prescribed; (c) has been evaluated and approved by the FDA as a drug; and/or (d) as to which Defendant HPN's representations regarding intended uses and effects have been evaluated by the FDA. But Plaintiffs did not receive such a substance when they purchased Prescription Pet Food.

59.     HPN's and PetSmart's conduct has caused substantial harm to consumers, including Plaintiffs, because Plaintiffs paid above-market prices for Prescription Pet Food for a significant period of time and because Plaintiffs did not receive what they expected to receive when they purchased Prescription Pet Food.

60.     Accordingly, the manufacture of, marketing, labeling, and sale of Prescription Pet Food by HPN and PetSmart constitutes an unfair business practice in violation of the ICFA.

61.     While HPN and PetSmart distribute, market, label, and/or sell a variety of different types of prescription cat and dog food products that fall within the definition of Prescription Pet Food, the characteristics of these products are substantially similar because Defendant HPN's and PetSmart's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food in violation of the FDCA is the same across the board for all Prescription Pet Food. In addition, the products themselves are substantially similar because all Prescription Pet Food marketed and sold

12

by HPN and PetSmart is marketed to diagnose, cure, mitigate, treat, or prevent diseases or other conditions, yet none of this Prescription Pet Food: (a) contains a drug, medicine or other ingredient that is not also common in non-prescription pet food; (b) contains a substance medically necessary to the health of the pet for which it was prescribed; and/or (c) is materially different than non-prescription pet food.

### D. Plaintiffs Would Not Have Purchased Prescription Pet Food Absent Defendants' Deceptive Conduct And Unfair Practices.

62.     Plaintiff / Class Representative Vanzant has a cat named Tarik. On or about January 24, 2013, Tarik underwent emergency surgery for bladder stones at Blue Pearl Vet Hospital in Skokie, Illinois. At a follow up appointment on or about February 13, 2013, the veterinarian at Blue Pearl Vet Hospital, Dr. Jean Frazho, wrote a prescription for HPN Prescription Diet c/d Multicare Feline Bladder Health Cat Food for Tarik.

63.     That same day, Ms. Vanzant went to PetSmart to purchase the prescribed HPN Prescription Diet c/d Multicare Feline Bladder Health Cat Food for Tarik. In order to purchase the HPN Prescription Diet food from PetSmart, Ms. Vanzant had to transfer the prescription from Blue Pearl Vet Hospital to Banfield Pet Hospital.

64.     On or about February 13, 2013, Banfield Pet Hospital provided Ms. Vanzant with a pet prescription card containing her cat's name, RX # and RX date.

65.     Ms. Vanzant purchased the prescribed HPN Prescription Diet c/d Multicare Feline Bladder Health Cat Food for Tarik from PetSmart in Illinois for the first time on or about February 13, 2013 and she continued to do so for approximately the next three years. Each time she purchased the HPN Prescription Diet cat food, Ms. Vanzant was required to show the prescription card she had obtained from Banfield Pet Hospital to the cashier at PetSmart.

13

66.     Prior to the first time she purchased the prescribed HPN Prescription Diet c/d Multicare Feline Bladder Health Cat Food for Tarik, Ms. Vanzant saw marketing materials indicating that the cat food she was purchasing was "prescription only," including the label on the bag stating that the cat food was "Prescription Diet" and PetSmart's designation of a separate section of its store for prescription cat food.

67.     Plaintiff / Class Representative Land has a cat named Chief. On or about October 27, 2013, Chief was diagnosed with diabetes and his veterinarian prescribed HPN Prescription Diet m/d Feline Glucose / Weight Management Cat Food to manage his diabetes. Ms. Land's cat experienced loss of use in his hind legs due to diabetic neuropathy.

68.     Within a few weeks of his diagnosis, Ms. Land went to PetSmart to purchase the prescribed Prescription Diet m/d Feline Glucose / Weight Management Cat Food for Chief. In order to purchase the HPN Prescription Diet food from PetSmart, Ms. Land had to transfer the prescription from Chief's veterinarian to Banfield Pet Hospital.

69.     In or around mid to late November 2013, Banfield Pet Hospital provided Ms. Land with a pet prescription card containing her cat's name, RX # and RX date.

70.     Ms. Land purchased the prescribed HPN Prescription Diet m/d Feline Glucose / Weight Management Cat Food for Chief from PetSmart in Illinois for the first time in or around mid to late November 2013 and she continued to do so for approximately the next two years. Each time she purchased the HPN Prescription Diet cat food, Ms. Land was required to show the prescription card she had obtained from Banfield Pet Hospital to the cashier at PetSmart.

71.     Prior to the first time she purchased the prescribed HPN Prescription Diet m/d Feline Glucose / Weight Management Cat Food for Chief, Ms. Land saw marketing materials from HPN indicating that the cat food was prescription food meant to treat or control diabetes. Prior to

14

purchasing the prescribed HPN Prescription Diet m/d Feline Glucose / Weight Management Cat Food, Ms. Land also saw marketing materials indicating that the cat food she was purchasing was "prescription only," including the label on the bag stating that the cat food was "Prescription Diet" and PetSmart's designation of a separate section of its store for prescription cat food.

72.     To reasonable consumers, including Plaintiffs, Prescription Pet Food is prescribed and purchased by veterinarian's orders—in the exact same manner as a prescription drug for a dog or cat.

73.     Plaintiffs, as reasonable consumers, reasonably expect and believe that a substance that requires a prescription is: (a) a substance legally required to be sold by prescription; (b) a drug or medicine; (c) a substance medically necessary to the health of the pet for which it was prescribed; (d) a substance that has been evaluated and approved by the FDA as a drug; and/or (e) a substance as to which Defendant HPN's representations regarding intended uses and effects have been evaluated by the FDA.

74.     But Plaintiffs did not receive what they expected to receive when they purchased Prescription Pet Food because the Prescription Pet Food manufactured and distributed by HPN and sold by PetSmart to Plaintiffs is not: (a) a substance legally required to be sold by prescription; (b) a drug or medicine; (c) a substance medically necessary to the health of the pet for which it was prescribed; (d) a substance that has been evaluated and approved by the FDA as a drug; and/or (e) a substance as to which Defendant HPN's representations regarding intended uses and effects have been evaluated by the FDA.

75.     Plaintiffs, as reasonable consumers, would not have purchased Prescription Pet Food, or would not have purchased Prescription Pet Food when priced so excessively relative to

similar non-prescription pet foods absent each Defendant's deceptive conduct and unfair practices, including the false, deceptive, and misleading Prescription Requirement.

76.     Retail consumers, including Plaintiffs, have overpaid and made purchases for Prescription Pet Food that they otherwise would not have made without the Prescription Requirement and each Defendant's related false representations and omissions of material facts as detailed above, e.g. ¶¶ 25, 26 and 36.

## CLASS ALLEGATIONS

77.     Plaintiffs / Class Representatives Vanzant and Land bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and seek to represent a statewide Class of all similarly situated Illinois residents who purchased Prescription Pet Food from any retailer in Illinois.

78.     Excluded from the Class are: (a) Defendants, and their legal representatives, officers, directors, assigns and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) the attorneys involved in this matter; and (d) all persons or entities that purchased Prescription Pet Food for resale. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

79.     The proposed Class is so numerous that individual joinder of all members in this case is impracticable.  While the exact number and identities of Class members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe the Class is likely to consist of hundreds, if not thousands, of individuals.

80.     There are several questions of law and fact that are common to the claims of Plaintiffs and the Class members, and those questions predominate over any questions that may

affect individual class members. The common questions of law and fact for Plaintiffs and all Class members include, but are not limited to, whether:

    a.  Each Defendant may impose, advance, and/or perpetuate the Prescription Requirement in order to purchase Prescription Pet Food despite the fact that Prescription Pet Food is not legally required to be sold by prescription;

    b.  Defendants HPN and PetSmart falsely represented to consumers, including Plaintiffs, that Prescription Pet Food requires a prescription in the distribution, marketing, advertising, labeling, and/or sale of Prescription Pet Food;

    c.  By manufacturing, marketing, and/or selling Prescription Pet Food pursuant to the Prescription Requirement, Defendants HPN and PetSmart engaged in deception by omitting the following material facts: (a) Prescription Pet Food is not legally required to be sold by prescription; (b) Prescription Pet Food does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (c) Prescription Pet Food does not contain a substance medically necessary to the health of the pet for which it was prescribed; (d) Prescription Pet Food is not materially different than non-prescription pet food; (e) Prescription Pet Food has not been evaluated or approved by the FDA as a drug; and/or (f) Defendant HPN's representations regarding the intended uses and effects of Prescription Pet Food have not been evaluated by the FDA;

    d.  Prescription Pet Foods manufactured, marketed, and/or sold by Defendant HPN and PetSmart are adulterated and misbranded in violation of the FDCA;

e. Each Defendant engaged in deceptive conduct and/or unfair business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

f. Each Defendant should be required to pay damages, make restitution, and/or disgorge profits as a result of the above-described practices;

g. Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

h. Plaintiffs and Class members are entitled to compensatory damages and the amount of such damages;

i. Plaintiffs and Class members are entitled to restitution and/or disgorgement and the amount of such restitution or disgorgement;

j. Plaintiffs and Class members are entitled to punitive damages and the amount of such punitive damages;

81. Plaintiffs' claims are typical of the claims of the Class.

82. Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class action litigation. Plaintiffs' counsel have vast experience in consumer class action cases and have previously been certified as class counsel. Plaintiffs have no interest adverse to those of the Class, and Defendants have no defenses unique to Plaintiffs.

83. This class action is a superior method for the fair and efficient adjudication of the claims involved. The damages suffered by individual Class members are likely not substantial enough for any one class member to incur the costs and expenses of this litigation. Even if Class members were able or willing to pursue such individual litigation, a class action would still be

preferable due to the potential for inconsistent or contradictory judgments and the additional delay and expense to all parties and the court system if individual cases are pursued.

## COUNT I
## Against HPN
## (Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act)

84.     Plaintiffs restate and incorporate by reference paragraphs 1 - 83 of this First Amended Class Action Complaint as paragraph 84 as if fully set forth herein.

85.     The ICFA prohibits unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" in the conduct of any trade or commerce. 815 ILCS 505/2.

86.     Plaintiffs and each Class member are "consumers" as defined by Section 505/1(e) of the ICFA.

87.     Defendant HPN is a "person" as defined by Section 505/1(c) of the ICFA.

88.     Defendant HPN's conduct alleged herein occurred in "trade" or "commerce" as defined by Section 505/1(f) of the ICFA.

89.     Defendant HPN manufactures, distributes, markets, advertises, labels, and/or sells Prescription Pet Food to consumers in Illinois.

90.     For the entire time period during which Plaintiffs purchased Prescription Pet Food, Defendant HPN repeatedly represented to Plaintiffs that Prescription Pet Food requires a prescription in the distribution, marketing, advertising, labeling, and/or sale of Prescription Pet

Food pursuant to the Prescription Requirement. But that representation is false because Prescription Pet Food is not legally required to be sold by prescription.

91.     By manufacturing, distributing, marketing, advertising, labeling and/or selling Prescription Pet Food pursuant to the false and misleading Prescription Requirement, Defendant HPN engaged in deception by omitting the following material facts: (a) Prescription Pet Food is not legally required to be sold by prescription; (b) Prescription Pet Food does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (c) Prescription Pet Food does not contain a substance medically necessary to the health of the pet for which it was prescribed; (d) Prescription Pet Food is not materially different than non-prescription pet food; (e) Prescription Pet Food has not been evaluated or approved by the FDA as a drug; and/or (f) Defendant HPN's representations regarding the intended uses and effects of Prescription Pet Food have not been evaluated by the FDA.

92.     Defendant HPN made these omissions of material fact for the entire time period during which Plaintiffs purchased Prescription Pet Food.

93.     Each of Defendant HPN's false representations and omissions are representations and omissions of material fact because Plaintiffs and the Class, as reasonable consumers, would have acted differently had they been aware of these facts, and because the facts concerned the type of information upon which Plaintiffs would be expected to rely in making their decisions to purchase Prescription Pet Food.

94.     Defendant HPN intended Plaintiffs and the Class to rely on its false representations and omissions of material fact.

95.     Plaintiffs and the Class, as reasonable consumers, would not have purchased Prescription Pet Food, or would not have purchased Prescription Pet Food when priced so

excessively relative to similar non-prescription pet food absent the deceptive conduct and unfair practices by Defendant HPN, including the false, deceptive, and misleading Prescription Requirement.

96.     As a result of Defendant HPN's false representation and omissions of material fact, HPN has engaged in, and continues to engage in, deception in violation of the ICFA.

97.     In addition, Defendant HPN has manufactured, marketed, labeled, and/or sold Prescription Pet Food in violation of the FDCA. HPN's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food is against public policy because it violates a standard of conduct contained in an existing statute – the FDCA.

98.     HPN's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food is immoral, unethical, oppressive, and/or unscrupulous.

99.     HPN's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food has caused substantial harm to consumers, including Plaintiffs, because Plaintiffs paid above-market prices for Prescription Pet Food for a significant period of time and because Plaintiffs did not receive what they expected to receive when they purchased Prescription Pet Food.

100.    Accordingly, HPN's conduct in manufacturing, marketing, labeling, and/or selling Prescription Pet Food constitutes an unfair business practice in violation of the ICFA.

101.    Plaintiffs and the Class have suffered damages as a direct and proximate result of Defendant HPN's deceptive conduct and/or unfair acts and practices.

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action under Federal Rule of Civil Procedure 23(b)(3), and certifying the Class defined herein;

B. Designating Plaintiffs as representatives of the Class, and their undersigned counsel as Class Counsel;

C. Entering Judgment in favor of Plaintiffs and the Class and against Defendant HPN;

D. Enjoining Defendant HPN's unlawful conduct alleged herein and ordering disgorgement of any of its ill-gotten gains;

E. Awarding Plaintiffs and the Class all compensatory damages and punitive damages to the extent permitted under the Illinois Consumer Fraud and Deceptive Business Practices Act, in addition to their reasonable attorneys' fees and costs; and

F. Granting all such further relief and other relief as the Court deems just and appropriate.

**COUNT II**
**Against PetSmart**
**(Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act)**

102.    Plaintiffs restate and incorporate by reference paragraphs 1 - 83 of this First Amended Class Action Complaint as paragraph 102 as if fully set forth herein.

103.    The ICFA prohibits unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" in the conduct of any trade or commerce. 815 ILCS 505/2.

104.    Plaintiffs and each Class member are "consumers" as defined by Section 505/1(e) of the ICFA.

105.    Defendant PetSmart is a "person" as defined by Section 505/1(c) of the ICFA.

106.    Defendant PetSmart's conduct alleged herein occurred in "trade" or "commerce" as defined by Section 505/1(f) of the ICFA.

107.    Defendant PetSmart markets, advertises, and/or sells Prescription Pet Food to consumers in Illinois.

108.    For the entire time period during which Plaintiffs purchased Prescription Pet Food, Defendant PetSmart repeatedly represented to Plaintiffs that Prescription Pet Food requires a prescription in the marketing, advertising, and/or sale of Prescription Pet Food pursuant to the Prescription Requirement. But that representation is false because Prescription Pet Food is not legally required to be sold by prescription.

109.    By marketing, advertising, and/or selling Prescription Pet Food pursuant to the false and misleading Prescription Requirement, Defendant PetSmart engaged in deception by omitting the following material facts: (a) Prescription Pet Food is not legally required to be sold by prescription; (b) Prescription Pet Food does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (c) Prescription Pet Food does not contain a substance medically necessary to the health of the pet for which it was prescribed; (d) Prescription Pet Food is not materially different than non-prescription pet food; (e) Prescription Pet Food has not been evaluated or approved by the FDA as a drug; and/or (f) Defendant HPN's representations regarding the intended uses and effects of Prescription Pet Food have not been evaluated by the FDA.

110.    Defendant PetSmart made these omissions of material fact for the entire time period during which Plaintiffs purchased Prescription Pet Food.

111.    Each of Defendant PetSmart's false representations and omissions are representations and omissions of material fact because Plaintiffs and the Class, as reasonable

consumers, would have acted differently had they been aware of these facts, and because the facts concerned the type of information upon which Plaintiffs would be expected to rely in making their decisions to purchase Prescription Pet Food.

112.    Defendant PetSmart intended Plaintiffs and the Class to rely on its false representations and omissions of material fact.

113.    Plaintiffs and the Class, as reasonable consumers, would not have purchased Prescription Pet Food, or would not have purchased Prescription Pet Food when priced so excessively relative to similar non-prescription pet food absent the deceptive conduct and unfair practices by Defendant PetSmart, including the false, deceptive, and misleading Prescription Requirement.

114.    As a result of Defendant PetSmart's false representation and omissions of material fact, PetSmart has engaged in, and continues to engage in, deception in violation of the ICFA.

115.    In addition, Defendant PetSmart has marketed, advertised and/or sold Prescription Pet Food in violation of the FDCA. PetSmart's conduct in marketing, advertising and/or selling Prescription Pet Food is against public policy because it violates a standard of conduct contained in an existing statute – the FDCA.

116.    PetSmart's conduct in marketing, advertising and/or selling Prescription Pet Food is immoral, unethical, oppressive, and/or unscrupulous.

117.    PetSmart's conduct in marketing, advertising and/or selling Prescription Pet Food has caused substantial harm to consumers, including Plaintiffs, because Plaintiffs paid above-market prices for Prescription Pet Food for a significant period of time and because Plaintiffs did not receive what they expected to receive when they purchased Prescription Pet Food.

118.    Accordingly, PetSmart's conduct in marketing, advertising and/or selling Prescription Pet Food constitutes an unfair business practice in violation of the ICFA.

119.    Plaintiffs and the Class have suffered damages as a direct and proximate result of Defendant PetSmart's deceptive conduct and/or unfair acts and practices.

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for an Order as follows:

G.  Finding that this action satisfies the prerequisites for maintenance as a class action under Federal Rule of Civil Procedure 23(b)(3), and certifying the Class defined herein;

H.  Designating Plaintiffs as representatives of the Class, and their undersigned counsel as Class Counsel;

I.  Entering Judgment in favor of Plaintiffs and the Class and against Defendant PetSmart;

J.  Enjoining Defendant PetSmart's unlawful conduct alleged herein and ordering disgorgement of any of its ill-gotten gains;

K.  Awarding Plaintiffs and the Class all compensatory damages and punitive damages to the extent permitted under the Illinois Consumer Fraud and Deceptive Business Practices Act, in addition to their reasonable attorneys' fees and costs; and

L.  Granting all such further relief and other relief as the Court deems just and appropriate.

### COUNT III
### Against HPN - In the alternative
### (Restitution/Unjust Enrichment)

120.    Plaintiffs restate and incorporate by reference paragraphs 1 - 83 of this First Amended Class Action Complaint as paragraph 120 as if fully set forth herein.

121.    Defendant HPN has unjustly acquired and retained a benefit to the detriment of Plaintiffs and the Class because it has retained revenues derived from Plaintiffs' and the Class members' purchases of Prescription Pet Food.

122.    Defendant HPN appreciates and is aware of the benefit it has acquired and retained from its conduct.

123.    Retention of monies under these circumstances violates the fundamental principles of justice, equity, and good conscience because Defendant HPN repeatedly represented to Plaintiffs that Prescription Pet Food requires a prescription in the distribution, marketing, advertising, labeling, and/or sale of Prescription Pet Food pursuant to the Prescription Requirement. But that representation is false because Prescription Pet Food is not legally required to be sold by prescription.

124.    In addition, by manufacturing, distributing, marketing, advertising, labeling and/or selling Prescription Pet Food pursuant to the false and misleading Prescription Requirement, Defendant HPN engaged in deception by omitting the following material facts: (a) Prescription Pet Food is not legally required to be sold by prescription; (b) Prescription Pet Food does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (c) Prescription Pet Food does not contain a substance medically necessary to the health of the pet for which it was prescribed; (d) Prescription Pet Food is not materially different than non-prescription pet food; (e) Prescription Pet Food has not been evaluated or approved by the FDA as a drug; and/or (f) Defendant HPN's representations regarding the intended uses and effects of Prescription Pet Food have not been evaluated by the FDA.

125.    Under the principles of justice, equity, and good conscience, Defendant HPN should not be allowed to keep the money belonging to Plaintiffs and the Class members.

126.    Plaintiffs and the Class have suffered damages as a direct result of Defendant HPN's conduct.

127.    Plaintiffs, on behalf of themselves and the Class, seek restitution for Defendant HPN's unjust and inequitable conduct, as well as interest and attorneys' fees and costs.

128.    Plaintiffs and the Class do not have an adequate remedy at law to redress their damages.

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for an Order as follows:

A.  Finding that this action satisfies the prerequisites for maintenance as a class action under Federal Rule of Civil Procedure 23(b)(3), and certifying the Class defined herein;

B.  Designating Plaintiffs as representatives of the Class, and their undersigned counsel as Class Counsel;

C.  Entering Judgment in favor of Plaintiffs and the Class and against Defendant HPN;

D.  Enjoining Defendant HPN's unlawful conduct alleged herein and ordering disgorgement of any of its ill-gotten gains;

E.  Awarding Plaintiffs and the Class restitution in addition to their reasonable attorney's fees and costs; and

F.  Granting all such further relief and other relief as the Court deems just and appropriate.

**COUNT IV**
**Against PetSmart - In the alternative**
**(Restitution/Unjust Enrichment)**

129.    Plaintiffs restate and incorporate by reference paragraphs 1 - 83 of this First Amended Class Action Complaint as paragraph 129 as if fully set forth herein.

130. Defendant PetSmart has unjustly acquired and retained a benefit to the detriment of Plaintiffs and the Class because it has retained revenues derived from Plaintiffs' and the Class members' purchases of Prescription Pet Food.

131. Defendant PetSmart appreciates and is aware of the benefit it has acquired and retained from its conduct.

132. Retention of monies under these circumstances violates the fundamental principles of justice, equity, and good conscience because Defendant PetSmart repeatedly represented to Plaintiffs that Prescription Pet Food requires a prescription in the distribution, marketing, advertising, labeling, and/or sale of Prescription Pet Food pursuant to the Prescription Requirement. But that representation is false because Prescription Pet Food is not legally required to be sold by prescription.

133. In addition, by manufacturing, distributing, marketing, advertising, labeling and/or selling Prescription Pet Food pursuant to the false and misleading Prescription Requirement, Defendant PetSmart engaged in deception by omitting the following material facts: (a) Prescription Pet Food is not legally required to be sold by prescription; (b) Prescription Pet Food does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (c) Prescription Pet Food does not contain a substance medically necessary to the health of the pet for which it was prescribed; (d) Prescription Pet Food is not materially different than non-prescription pet food; (e) Prescription Pet Food has not been evaluated or approved by the FDA as a drug; and/or (f) Defendant HPN's representations regarding the intended uses and effects of Prescription Pet Food have not been evaluated by the FDA.

134. Under the principles of justice, equity, and good conscience, Defendant PetSmart should not be allowed to keep the money belonging to Plaintiffs and the Class members.

28

135.   Plaintiffs and the Class have suffered damages as a direct result of Defendant PetSmart's conduct.

136.   Plaintiffs, on behalf of themselves and the Class, seek restitution for Defendant PetSmart's unjust and inequitable conduct, as well as interest and attorneys' fees and costs.

137.   Plaintiffs and the Class do not have an adequate remedy at law to redress their damages.

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for an Order as follows:

G.   Finding that this action satisfies the prerequisites for maintenance as a class action under Federal Rule of Civil Procedure 23(b)(3), and certifying the Class defined herein;

H.   Designating Plaintiffs as representatives of the Class, and their undersigned counsel as Class Counsel;

I.   Entering Judgment in favor of Plaintiffs and the Class and against Defendant PetSmart;

J.   Enjoining Defendant PetSmart's unlawful conduct alleged herein and ordering disgorgement of any of its ill-gotten gains;

K.   Awarding Plaintiffs and the Class restitution in addition to their reasonable attorney's fees and costs; and

L.   Granting all such further relief and other relief as the Court deems just and appropriate.


**JURY DEMAND**

Plaintiffs and the members of the Class demand a trial by Jury on any issues triable by a Jury.

Dated:  June 20, 2017                    Respectfully submitted,


                                            By: */s/ Ellen M. Carey*
                                                One of Plaintiffs' Attorneys

Kevin M. Forde
Michael K. Forde
Ellen M. Carey
Forde Law Offices LLP
111 West Washington Street
Suite 1100
Chicago, IL  60602
(312) 641-1441

30

# Exhibit 1

*Contains Nonbinding Recommendations*

# Guidance for FDA Staff

## Compliance Policy Guide

### Sec. 690.150 Labeling and Marketing of Dog and Cat Food Diets Intended to Diagnose, Cure, Mitigate, Treat, or Prevent Diseases

*Additional copies are available from:*
*Food and Feed Policy Staff*
*Office of Policy and Risk Management*
*Office of Regulatory Affairs*
*Food and Drug Administration*
*12420 Parklawn Drive*
*Rockville, MD 20857*
*http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/default.htm*

Submit comments on this guidance at any time. Submit written comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Room 1061, Rockville, MD 20852. Submit electronic comments to http://www.regulations.gov. All comments should be identified with the Docket No. FDA-2012-D-0755.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Regulatory Affairs**
**and**
**Center for Veterinary Medicine**

**April 2016**

*Contains Nonbinding Recommendations*

## Table of Contents

I.   Introduction .................................................................................................................3

II.  Background....................................................................................................................3

III. Discussion .....................................................................................................................5

   A.   Marketing Unapproved New Animal Drugs to Pet Owners ..............................5

   B.   Animal Food Ingredients ..................................................................................6

IV.  Enforcement Policy.......................................................................................................6

V.   Regulatory Action Guidance ........................................................................................8

*Contains Nonbinding Recommendations*

# COMPLIANCE POLICY GUIDE

## Sec. 690.150 Labeling and Marketing of Dog and Cat Food Diets Intended to Diagnose, Cure, Mitigate, Treat, or Prevent Diseases

*This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.*

## I. Introduction

This document provides guidance to Food and Drug Administration (FDA) staff on how to address dog and cat food diets that are labeled and/or marketed as intended for use to diagnose, cure, mitigate, treat, or prevent diseases and are also labeled and/or marketed to provide all or most of the nutrients in support of meeting the animal's total daily nutrient requirements by serving as the pet's sole diet. Section IV below lists the factors FDA intends to consider in determining whether to exercise enforcement discretion with regard to animal drug approval requirements for dog and cat food diets that claim to treat or prevent disease. This guidance does not apply to products intended for nutritional supplementation of foods for animals and/or products marketed as dietary supplements for animals.

In general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, they describe the agency's current thinking on various topics and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in agency guidances means that something is suggested or recommended, but not required.

## II. Background

For more than fifty years, dog and cat food manufacturers have marketed diets identified on their labels or in labeling or other communications disseminated by or on behalf of the manufacturers ("manufacturer communications") as being intended to diagnose, cure, mitigate, treat, or prevent diseases ("treat or prevent disease"). These products are intended to provide all or most of the nutrients in support of meeting the animal's daily nutrient needs, serving as the animal's sole source of nutrients or diet other than water. By virtue of their intended use to treat or prevent disease, such products meet the statutory definition of a drug in section 201(g)(1)(B) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) [21 U.S.C. 321(g)(1)(B)]. In addition, these products meet the definition of food in section 201(f) of the FD&C Act [21 U.S.C. 321(f)] because they are articles used for food for animals. Consequently, under the FD&C Act, dog and cat food products that are intended to treat or prevent disease and to provide nutrients in support

3

*Contains Nonbinding Recommendations*

of the animal's daily nutrient needs can be regulated as drugs (section 201(g) of the FD&C Act [21 U.S.C. 321(g)]), foods (section 201(f) of the FD&C Act [21 U.S.C. 321(f)]), or both.

Section 512(a)(1) [21 U.S.C. 360b(a)(1)] of the FD&C Act provides, in general, that new animal drugs are unsafe unless they have an approved New Animal Drug Application (NADA), an approved Abbreviated New Animal Drug Application (ANADA) under section 512 of the FD&C Act [21 U.S.C. 360(b)], a conditional approval under section 571 of the FD&C Act [21 U.S.C. 360ccc], or an index listing under section 572 of the FD&C Act [21 U.S.C. 360ccc-1] ("approved" or "index listed").[1] Unsafe new animal drugs are adulterated within the meaning of section 501(a)(5) of the FD&C Act [21 U.S.C. 351(a)(5)], misbranded under section 502(f)(1) for lacking adequate directions for use [21 U.S.C. 352(f)(1)], and their introduction into interstate commerce is a prohibited act as specified in section 301(a) of the FD&C Act [21 U.S.C. 331(a)].

The FD&C Act also places other requirements on the manufacture of drugs. For example, it requires that all drug manufacturers register and list drugs with FDA (section 510 of the FD&C Act [21 U.S.C. 360]). This requirement applies regardless of whether the drug at issue is approved or index listed. Drugs that are manufactured in an unregistered facility, or are not drug listed, are misbranded within the meaning of section 502(o) of the FD&C Act [21 U.S.C. 352(o)], and their introduction into interstate commerce is a prohibited act as specified in section 301(a) of the FD&C Act [21 U.S.C. 331(a)].

In addition, section 501(a)(2)(B) of the FD&C Act [21 U.S.C. 351(a)(2)(B)] requires that any animal drug product be manufactured in accordance with current good manufacturing practices applicable to drugs. Drugs that are not manufactured in accordance with current good manufacturing practices are adulterated within the meaning of section 501(a)(2)(B) of the FD&C Act [21 U.S.C. 351(a)(2)(B)], and their introduction into interstate commerce is a prohibited act as specified in section 301(a) of the FD&C Act [21 U.S.C. 331(a)].

At the time of this CPG issuance, most dog and cat food products that claim on their labels or in their labeling or other manufacturer communications to treat or prevent disease are not approved new animal drugs, and do not comply with drug registration and listing requirements, or with current good manufacturing practices applicable to drugs even though the products are drugs under the FD&C Act. Nevertheless, in the past, FDA generally exercised enforcement discretion with regard to these requirements for dog and cat food diets that claim to treat or prevent disease when 1) those products provided all or most of the nutrients in support of the animal's total required daily nutrient needs, 2) product labels and labeling and other manufacturer communications that were available to the general public (i.e., non-veterinary professionals) did not contain claims to treat or prevent disease, and 3) those products were distributed only through licensed veterinarians.

---

[1] Products intended for use in dogs or cats are not eligible to be index listed new animal drugs because dogs and cats are considered major species under the FD&C Act, and index listing is limited to products for minor species.

4

*Contains Nonbinding Recommendations*

FDA has observed an increase in the number of dog and cat food products that manufacturers offer for use in the treatment or prevention of disease and an increase in the number of such products that are being sold directly to consumers. Because of this increase, and to help ensure animal safety, FDA is issuing this CPG to provide guidance to FDA staff with respect to factors to consider in determining whether to take regulatory action against dog and cat food products intended to be fed as the pet's sole diet and intended for use in the treatment or prevention of disease.

## III. Discussion

### A. Marketing Unapproved New Animal Drugs to Pet Owners

Animal health may suffer when dog and cat food diets intended to treat or prevent disease, but which are not approved as new animal drugs, are fed to pets. These products have not been evaluated by FDA for safety, efficacy, or nutritional adequacy. Many of these products affect physiological processes to extents that may not be tolerated by all animals, may not achieve effective treatment, and/or may not provide adequate daily nutrition if fed as a sole diet.

These concerns are heightened when these products are put into use by pet owners without the direction of a licensed veterinarian. When these products are marketed directly to pet owners, there is a greater potential for product misuse and/or misunderstanding of the role of the product in the disease treatment. These products are commonly labeled or marketed for use in dogs or cats with diseases or conditions that cannot be accurately diagnosed by pet owners. In addition, the labeling or other materials may lack sufficient information, particularly for pet owners, on the effectiveness, possible side effects, and contraindications for use. For example, owners of diabetic dogs and cats may misinterpret claims to "control blood glucose" to represent that the product is the sole treatment required for diabetic dogs and cats when, in fact, these animals may require insulin therapy or other treatments to adequately control blood glucose. Also, some dog and cat food diets intended to treat obesity may not be formulated to meet daily requirements for nutrients other than calories, which pet owners may not understand without guidance from a veterinary professional.

These concerns are reduced when such dog and cat food diets are marketed only through and used under the direction of a licensed veterinarian. Veterinarians typically discuss an animal's nutritional needs with the pet owner, make periodic assessments of the animal's health, and provide direction to the pet owner for how to use the product. Veterinarians can also help ensure that animals diagnosed as suffering from a disease or other health condition receive other appropriate treatments for their condition. Because these products have not been evaluated for safety and efficacy, veterinary oversight is especially important to provide periodic assessment of how the animal is reacting to the diet and to discontinue the product's use when warranted. Accordingly, one of the factors FDA will consider in exercising enforcement discretion is whether the product is made available to the public exclusively through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian.

5

*Contains Nonbinding Recommendations*

FDA will consider whether the product is responsibly marketed in other respects as well. For example, a therapeutic claim that is not scientifically substantiated would be considered false or misleading, thus making the product misbranded. FDA does not intend to exercise enforcement discretion when such products present a known safety risk (e.g., when a product labeled for use in dogs or cats with a particular disease would be unsafe in such animals) or if the labeling of the product or other manufacturer communications regarding the product contain false or misleading claims (e.g., dog food labeled and promoted for the treatment of cancer with no basis for the claim). See Compliance Policy Guide, Sec. 120.500: Health Fraud - Factors in Considering Regulatory Action. FDA also does not intend to exercise enforcement discretion when a product is marketed as an alternative to approved new animal drugs.

## B. Animal Food Ingredients

Ingredients added to food must be either approved food additives or generally recognized as safe (GRAS) for their intended use in food. Title 21, Code of Federal Regulations, section 570.30 [21 C.F.R. 570.30] sets out the eligibility for classification of food ingredients to be GRAS. A partial listing of substances that are GRAS for an intended use in animal food appears in 21 C.F.R. 582 and 584; 21 C.F.R. 573 contains approved food additives permitted in animal food. Section 409 of the FD&C Act [21 U.S.C. 348] provides that food additives are unsafe unless they are the subject of a food additive regulation prescribing the conditions under which the food additive may be safely used [21 C.F.R. 573]. In addition, section 402(a)(2)(C) of the FD&C Act [21 U.S.C. 342(a)(2)(C)] deems foods that contain an unapproved food additive to be adulterated.

FDA does not generally intend to recommend or initiate regulatory actions against food products containing unapproved food additives if those unapproved food additives are included as a food ingredient definition in the 2015 *Official Publication* of the Association of American Feed Control Officials (AAFCO), unless there are data indicating that safety or suitability issues exist with an AAFCO defined ingredient.[2]

## IV. Enforcement Policy

Under section 201(g)(1)(B) of the FD&C Act, dog and cat food products that are intended to treat or prevent disease are drugs, even if they also provide nutrients in support of the animal's total required daily nutrient needs.

Unless these products are approved as new animal drugs, these products are adulterated under section 501(a)(5) and misbranded under 502(f)(1) of the FD&C Act. In addition, in the absence of compliance with current good manufacturing practice requirements, these products are adulterated under section 501(a)(2)(B) of the FD&C Act. Unless these products are

---

[2] Although food containing these unapproved food additives is adulterated within the meaning of section 402(a)(2)(c)(i), FDA is unlikely to initiate enforcement action solely on this basis if the food additive in question is included in the 2015 edition of the *Official Publication* of the Association of American Feed Control Officials. As part of its efforts to work with State partners, FDA has reviewed safety information related to many of these listed products, and those listed in the 2015 *Official Publication* generally do not fall within our current enforcement priorities.

*Contains Nonbinding Recommendations*

manufactured in and listed by a facility that is registered under section 510 of the FD&C Act, they are misbranded under section 502(o) of the FD&C Act. However, FDA is less likely to initiate enforcement action against dog and cat food products intended to be fed as the pet's sole diet that claim to treat or prevent disease when all of the following factors are present:

1. The product is made available to the public only through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian.

2. The product does not present a known safety risk when used as labeled (e.g., when a product labeled for use in dogs or cats with a particular disease would be unsafe in such animals).

3. The product *label* does not include representations that it can be used to treat or prevent disease (e.g., obesity, renal failure).

4. Distribution of labeling and other manufacturer communications that contain representations that the product is intended for treatment or prevention of disease is limited so that it is provided only to veterinary professionals.

5. Electronic resources for the dissemination of labeling information and other manufacturer communications related to the intended use of the product are secured so that they are available only to veterinary professionals.

6. The label and labeling of the product is not false or misleading in other respects (e.g., dog food labeled and promoted for the treatment of cancer with no basis for the claim).

7. The product is not marketed as an alternative to approved new animal drugs.

8. The manufacturer is registered under section 415 of the FD&C Act.

9. The product is manufactured in accordance with CGMPs applicable to animal food (see 21 CFR part 507 subpart B)[3] and other regulations applicable to animal food manufacturing.

10. The product's labeling complies with all food labeling requirements for such products (see 21 CFR part 501).

11. The product contains only ingredients that are GRAS ingredients, approved food additives, or ingredients defined in the 2015 *Official Publication* of the Association of American Feed Control Officials.

---

[3]Compliance with 21 CFR part 507, subpart B, begins on September 19, 2016, for certain animal food facilities. Other facilities are required to comply on September 18, 2017, and September 17, 2018. For more information on these compliance dates, see the preamble for Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based Preventive Controls for Food for Animals (80 FR 56170 at 56328-30).

*Contains Nonbinding Recommendations*

## V. Regulatory Action Guidance

Districts should consult with the CVM, Division of Compliance, Post-Market Compliance Team (HFV-232) prior to taking regulatory action against dog and cat food products intended to be fed as the pet's sole diet and intended for use to treat or prevent disease.

Districts should consider enforcement action against a product when one or more of the factors listed in Section IV of this CPG are not present.

8