## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HOLLY BLAINE VANZANT, and SHERRY NEVIUS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:17-cv-02535 |
| v. | |
| HILL'S PET NUTRITION, INC., and PETSMART, INC. | Hon. Jorge Alonso |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF
## THEIR MOTION FOR CLASS CERTIFICATION

i

## TABLE OF CONTENTS

TITLE PAGE ...........................................................................................................................i

TABLE OF CONTENTS...........................................................................................................ii

TABLE OF AUTHORITIES ....................................................................................................iv

I.     FACTS ...........................................................................................................................2

    A.  Plaintiffs purchased PD products prescribed by their veterinarians believing
        that the products contain medicine to treat or prevent diseases
        in their sick pets ...........................................................................................................2

    B.  Defendants imposed and enforced the prescription requirement and made standard
        misrepresentations and omissions about PD products ....................................................3

    C.  The prescription requirement and Defendants' misrepresentations and omissions about
        PD products are likely to deceive reasonable consumers and are material ....................5

    D.  Defendants illegally market and sell PD as therapeutic pet food intended for use in the
        diagnosis, treatment, cure, mitigation, and prevention of disease ..................................5

    E.  Plaintiffs and other reasonable consumers were damaged as a result of Defendants'
        deceptive and unfair conduct ........................................................................................6

II.    LEGAL STANDARD AND CLASS/SUB-CLASS DEFINITIONS ...........................6

III.   ARGUMENT .................................................................................................................7

    A.  Plaintiffs easily satisfy Rule 23(a) ...............................................................................7

        1.   The class is so numerous that joinder of all members is impracticable...............7

        2.   The proposed class and sub-class meet the commonality requirement ..............8

        3.   Plaintiffs' claims are typical ...............................................................................8

        4.   Adequacy is met ..................................................................................................9

    B.  Rule 23(b)(3) is satisfied...............................................................................................9

        1.   Common questions predominate .........................................................................9

            a.  Deceptive conduct.........................................................................................10

       b.  Unfair conduct ............................................................................................13

       c.  Defendants' intent under both ICFA claims is another
           common question .....................................................................................15

   2.     A class action is superior under Rule 23(b)(3) ..................................................15

IV.    CONCLUSION...........................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Al Haj v. Pfizer Inc.,* No. 17 C 6730, 2019 WL 3202807
(N.D. Ill. Jul. 16, 2019) ................................................................10

*Arenson v. Whitehall Convalescent & Nursing Home, Inc.,*
164 F.R.D. 659 (N.D. Ill. 1996) .......................................................7

*Cavin v. Home Loan Ctr., Inc.,* 236 F.R.D. 387 (N.D. Ill. 2006) ...........................9

*Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482 (1996) ...............................11

*Geske v. PNY Techs., Inc.,* 503 F. Supp. 3d 687 (N.D. Ill. 2020) ............................9

*Kleen Prods. LLC v. Int'l Paper Co.,* 831 F.3d 919 (7th Cir. 2016) ........................9

*Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802 (7th Cir. 2012) ...........................10

*Messina v. Green Tree Servicing, LLC,* 210 F. Supp. 3d 992 (N.D. Ill. 2016) .......................13

*Moore v. Mars Petcare US, Inc.,* 966 F.3d 1007 (9th Cir. 2020) .....................................11, 14

*Mullins v. Direct Dig., LLC,* 795 F.3d 654 (7th Cir. 2015) ........................6

*Rosario v. Livaditis,* 963 F.2d 1013 (7th Cir. 1992) ................................8

*Robinson v. Toyota Motor Credit Corp.,* 201 Ill. 2d 403, 775 N.E.2d 951 (2002) ................10

*Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750 .............................. 7, 8, 10, 12-13, 15

*Vanzant v. Hill's Pet Nutrition, Inc.,* 934 F.3d 730 (7th Cir. 2019) ........................10

**Statutes and Regulations**

21 U.S.C.§ 321(g)(1)(B) ................................................................10

21 U.S.C.§ 331(a) and (c) ................................................................14

21 U.S.C.§ 351(a)(5) ................................................................14

21 U.S.C. § 352(f)(1) ................................................................14

21 U.S.C. § 360b(a)(1) ................................................................14

410 ILCS 620/10(a)(iv)(D) ................................................................14

410 ILCS 620/15 ................................................................14

410 ILCS 620/3-3.3 ...............................................................................................14

815 ILCS 505/2 ....................................................................................................11

**Other Authorities**

Fed. R. Civ. P. 23 ...................................................................................................6

Fed. R. Civ. P. 23(a). ........................................................................................6, 15

Fed. R. Civ. P 23(b) ..........................................................................................6, 15

Federal Trade Commission Statement on Deception............................................11

Compliance Policy Guide (CPG) Sec. 690.150, Labeling and Marketing
      of Dog and Cat Food Diets Intended to Diagnose,
      Cure, Mitigate, Treat, or Prevent Diseases ................................................14

This case is about Defendants' use of a false and misleading prescription requirement for Hill's Pet Nutrition, Inc's ("Hill's") "Prescription Diet" pet food products ("PD"), and their material misrepresentations and omissions about these products, which deceived Plaintiffs and other reasonable consumers into believing that PD products contain a drug or medicine necessary for their sick pets. Defendants market and sell products labeled "Prescription Diet," improperly restrict the sale of these products to consumers with a "prescription" from a veterinarian, impliedy represent that PD products contain a drug or medicine (when they do not), falsely represent that PD products are prescription products and that a prescription is required to purchase these products, and fail to disclose to consumers on the product labels or elsewhere that PD products are not legally required to be sold by prescription and that they do not contain a drug or medicine. Defendants' self-imposed prescription requirement and their material misrepresentations and omissions about PD products constitute deceptive practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). As a result of Defendants' deceptive conduct, Plaintiffs and other reasonable consumers overpaid and made purchases they would not have otherwise made.

This case is also about Defendants' illegal marketing and sale of PD products as therapeutic products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. Because Defendants market and sell PD products as therapeutic products intended for such uses, they fall within the definition of "new animal drugs" under the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and the Illinois Food, Drug, and Cosmetic Act ("IL FD&C Act") (collectively, the "FD&C Acts"). As such, the marketing and sale of these products is prohibited unless the products have undergone the review and approval process set forth in the FD&C Acts. None of Defendant Hill's PD products have undergone that approval process.

1

Defendants' illegal marketing and sale of PD products as therapeutic products: (1) violates public policy by violating a standard of conduct contained in existing statutes, *i.e.*, the FD&C Acts; (2) is unethical and unscrupulous because pet parents with sick pets are vulnerable and will reasonably gravitate toward a "prescription" product – especially because Hill's message that PD products are needed to help their sick pet is communicated through a veterinarian; and (3) causes substantial harm to consumers because this conduct allows Defendants to charge substantially higher prices for PD products than they could charge for non-therapeutic pet food. Defendants' illegal marketing and sale of PD products as therapeutic products constitutes an unfair-practices violation of the ICFA. As a result of this unfair conduct, Plaintiffs and other reasonable consumers overpaid and made purchases they would not have otherwise made.

## I. FACTS

### A. Plaintiffs purchased PD products prescribed by their veterinarians believing that the products contain medicine to treat or prevent diseases in their sick pets.

Ms. Vanzant's cat, Tarik, had feline lower urinary tract disease and needed surgery in 2013 to remove life-threatening bladder stones. (Ex. 1 at 68-69; 76-77; Ex. 2 at -127). Tarik's vet prescribed Hill's Prescription Diet c/d cat food to prevent future stones; Ms. Vanzant believed there was medication in the food to keep stones from recurring. (Ex. 1 at 81-83; 103-04; 112; Ex. 3 at Resp. No. 6 ). The vet gave Ms. Vanzant a written prescription, which Defendant PetSmart, LLC ("PetSmart") required her to present to PetSmart's in-store vet clinic, Banfield Pet Hospital ("Banfield"), in order to obtain a "MedCard." (Ex. 1 at 99-100; 122-25). Banfield issued a "MedCard" for Tarik, which Ms. Vanzant had to present at the PetSmart register each time she purchased the PD food. (*Id.* at 122-25). PetSmart's MedCard requirement reinforced Ms. Vanzant's belief that the PD food contained medicine. (*Id*. at 271-72).

Ms. Vanzant bought Tarik this expensive food for three years, renewing the prescription

as each MedCard expired. (Ex. 1 at 137-39, 149, 151). In late 2015, Tarik was again diagnosed with bladder stones and needed another surgery. (*Id.* at 152-54). Following Tarik's second surgery, Ms. Vanzant learned that there was no medicine in the PD c/d cat food. (*Id.* at 167-68). Ms. Vanzant would not have purchased the PD c/d food if she had known that it did not contain a drug or medicine. (*Id.* at 271-25; Ex. 3, Resp. No. 8).

Ms. Nevius' Labrador retriever, Moose, had diarrhea and possible irritable bowel syndrome ("IBS"). (Ex. 4 at 28-30, 40). In June 2019, Moose's vet prescribed Hill's Prescription Diet i/d dry dog food to treat Moose's diarrhea. (*Id.* at 102). Ms. Nevius bought the PD i/d food from Moose's vet because she believed there was medicine in the food that would help with Moose's gastrointestinal issues and because Moose's vet had recommended and prescribed it for him. (*Id.* at 28-30, 99-100, 102; Ex. 5, Resp. No. 6). Her vet's office sold only "prescription" food. (Ex. 4 at 102). And Moose's vet told Ms. Nevius that the PD i/d food required a prescription to purchase. (Ex. 5, Resp. No. 9). At the time, Ms. Nevius believed that PD was prescription food. (Ex. 4 at 105-06). As Ms. Nevius explained, the label makes it clear that a prescription is required, and she assumed the food contained medication. (*Id.* at 154). Moose's vet later switched him to another brand of "prescription" pet food. (*Id.* at 126). Ms. Nevius purchased PD i/d wet dog food in January 2020 after Moose ingested some plastic, again because she believed there was medicine in the food that would help with Moose's gastrointestinal issues and because his vet had recommended and prescribed it. (*Id.* at 194-95; Ex. 5, Resp. No. 6). Nevius would not have purchased the PD products if she had known that they did not contain a drug or medicine. (Ex. B, Resp. No. 8).

**B. Defendants imposed and enforced the prescription requirement and made standard misrepresentations and omissions about PD products.**

Hill's, which trademarked the name "Prescription Diet" for its "therapeutic" products for

sick pets, implemented a business model to require veterinary prescriptions for its PD products. (Ex. 6 at 42, 79). Hill's requires all PD retailers to sell PD products pursuant to a valid veterinary-client-patient relationship and pursuant to a prescription ███████████████ ████████████ (Ex. 7). Consumers cannot buy PD products without a prescription.[1]

PetSmart adheres to and enforces Hill's prescription requirement by requiring consumers nationwide to ████████████████████████████████████████ ███████████████████████ (Ex. 15 at 15-17; Ex. 16 at 46-48; Ex. 17 at 17-19, 23-25, 30, 36-45, 60-66, 90, 96-97, 144-47). To obtain a MedCard, consumers must present a valid prescription from their vet for the PD product or obtain one from a Banfield vet. (Ex. 17 at 17-19, 23-25). The MedCard, like a legal prescription, includes the product name, "Rx" Number, and expiration date. (*Id*. at 39-41, 43).

Defendants impose and enforce the prescription requirement, despite the fact that PD products contain no medicine (Ex. 18 at 112-15), have not been approved by the FDA (Ex. 6 at 158-60), and are not legally required to be sold pursuant to a prescription. (*Id*. at 33-34).

Defendants market and sell products labeled "Prescription Diet." (Ex. 19, Resp. 7). But Defendants do not disclose to consumers on the labels or elsewhere in their marketing or advertising that PD products contain no medicine and are not legally required to be sold by prescription. (*Id.*, Resp. 2). By marketing and selling "Prescription Diet" labeled products pursuant to the prescription requirement and without disclosing these material facts, Defendants falsely represent to all consumers that PD products contain medicine and are prescription

---

[1] Although Defendants have, at times, used the terms veterinarian "authorization" or "recommendation" when describing a "prescription," Defendants use these terms interchangeably and view them as synonymous. (See, e.g., Ex. 8 at -224; Ex. 9 at -444-445; Ex. 10 at -060, -699; Ex. 11 at 34-35, 50-57, 59, 119-20; Ex. 12; Ex. 13; Ex. 14, ¶ 12).

products for their sick pets.

**C. The prescription requirement and Defendants' misrepresentations and omissions about PD products are likely to deceive reasonable consumers and are material.**

Expert survey evidence demonstrates that between 22% and 46% of actual or likely potential PD purchasers believe that PD products contain a drug or medicine based on the way in which the products are sold (*i.e.*, pursuant to a prescription or pursuant to PetSmart's MedCard) and labeled. (See Ex. 14, ¶¶ 20-24, 88-110; see also, Ex. 20, ¶12). ████████████

███████████████████████████████████████████████

████████████████████████████ (Ex. 20, ¶¶ 105-08). ████████████

███████████████████████████████████████████████

███████████████████ (Ex. 21 at -927).

████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ (Ex. 20,

¶ 128), terms that Defendants use interchangeably, *supra*, n.1. ████████████

███████████████████████████████████████

███████████████████ (Ex. 22 at -234; see also, Ex. 23 at -172; Ex. 24).

**D. Defendants illegally market and sell PD as therapeutic pet food intended for use in the diagnosis, treatment, cure, mitigation, and prevention of disease.**

PD is designed and advertised as a "therapeutic" product for certain medical conditions in sick pets. (Ex. 18 at 119; Ex. 6 at 149-51; Ex. 11 at 21). Defendants market and sell PD products as therapeutic products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of diseases in pets. (*See, e.g.*, Ex. 25; Ex. 26 at 9-10 & Table 1; Ex. 20, ¶¶ 119-23).

███████████████████████████████████████████████



(*See, e.g.*, Ex. 25). ███████████

███████████████████ (Ex. 18 at 65-67).

███████████████████

███████████████████ (Ex. 27

at 422-23, 448). ██████████████

███████████████████

███████████████ (Ex. 20 at 42; Ex. 22 at -234).

### E. Plaintiffs and other reasonable consumers were damaged as a result of Defendants' deceptive and unfair conduct.

Defendants' unfair and deceptive conduct caused Plaintiffs and the putative Classes to overpay for PD products. Plaintiffs' expert has calculated classwide damages based on common evidence using an accepted statistical methodology. Restitutionary damages in the amount that Illinois consumers overpaid due to Defendants' unfair and deceptive conduct, calculated by common benchmarking methods, reviewing common evidence, exceed $80 million. (Ex. 28 at 3-4, 20-33; Ex. 29 at 6-8, 31).

## II. LEGAL STANDARD AND CLASS/SUB-CLASS DEFINITIONS

To be certified, a class action must satisfy the Fed. R. Civ. P. 23(a) requirements—numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b). Fed. R. Civ. P 23. Plaintiffs seek certification under Rule 23(b)(3), and thus must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs' proposed class and sub-class are clearly defined, with membership determined by objective criteria, thus satisfying *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 657 (7th Cir. 2015).

Plaintiffs Vanzant and Nevius seek certification of:

6

(1) a statewide Class of all similarly situated Illinois residents who, within the statute of limitations, purchased Hill's Prescription Diet dog or cat food from any retailer (including any veterinarian or veterinary clinic) in Illinois (the "Class"); and

(2) a statewide subclass of all similarly situated Illinois residents who, within the statute of limitations, purchased Hill's Prescription Diet dog or cat food from PetSmart in stores or online through PetSmart.com, Pet360.com, or any other website operated or controlled by PetSmart (the "PetSmart Subclass").[2]

## III. ARGUMENT

### A. Plaintiffs easily satisfy Rule 23(a).

#### 1. The class is so numerous that joinder of all members is impracticable.

The crux of numerosity is the impracticality of joining all class members into a single suit. *Arenson v. Whitehall Convalescent & Nursing Home, Inc*., 164 F.R.D. 659, 663 (N.D. Ill. 1996). PetSmart sales data, which reflects sales by just one of many PD retailers, demonstrate that there were thousands of PD purchasers throughout Illinois during the class period. (*See* Ex. 30). Joinder here is plainly impracticable. *See Arenson*, 164 F.R.D. at 663.

#### 2. The proposed class and sub-class meet the commonality requirement.

Commonality requires the existence of "questions of law or fact common to the class." *Suchanek v. Sturm Foods, Inc*., 764 F.3d 750, 755 (7th Cir. 2014). For Rule 23(a)(2) purposes, even a single common question will do. *Id.* Where the same conduct or practice by the same defendant gives rise to the same kind of claims by all class members, there is a common question. *Id.* at 756. Here, Plaintiffs have all suffered the same injury: they overpaid for Prescription Diet pet food based on Defendants' deceptive and unfair practices. Common questions, answers to which resolve issues central to Plaintiffs' (and the class) claims include:

---

[2] Excluded are: (a) Defendants, their legal representatives, officers, directors, assigns, and successors; (b) Judges to whom this case is assigned and their staffs; (c) the attorneys involved in this matter; and (d) all persons or entities that purchased Prescription Diet pet food for resale.

i. Whether Defendants have engaged in deceptive conduct by marketing and selling "Prescription Diet" labeled products pursuant to the prescription requirement and without disclosing that the products are not legally required to be sold by prescription and do not contain medicine.

ii. Whether Defendants' representations and omissions regarding PD products were material or likely to deceive a reasonable consumer;

iii. Whether Defendants' marketing and sale of PD products as therapeutic products intended for use in the diagnosis, treatment, mitigation, cure, and prevention of diseases in pets violates public policy (by violating the federal and IL FD&C Acts), is unethical or unscrupulous, and/or causes substantial harm to consumers and thus, is unfair;

iv. Whether each Defendant should be required to pay damages, make restitution, and/or disgorge profits as a result of the above-described practices, and if so, in what amount.

Whether Defendants' representations were likely to deceive a reasonable consumer is common as to the ICFA deceptive-conduct claim. *See Suchanek*, 764 F.3d at 757. Materiality presents another common question as to deception. Further, whether Defendants' illegal marketing of Prescription Diet products violates the federal or IL FD&C Act or otherwise violates public policy, is unethical or unscrupulous, and whether such conduct substantially harmed consumers are common questions as to the ICFA unfair practices claims.

### 3. Plaintiffs' claims are typical.

Typicality is satisfied when a plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Rule 23(a)(3) typicality should be determined with reference to the defendants' actions, not with respect to particularized defenses that may exist as to certain class members. *See id*.

Hill's business practice of requiring a veterinary "prescription" as a mandatory prerequisite to purchase any PD product, as imposed on and applied by PetSmart, other retailers, and veterinarians, is at the heart of Plaintiffs' and the proposed class' deceptive-conduct claims. Hill's uniform prohibition against the sale of PD absent a prescription exposed all Plaintiffs to

this misleading corporate conduct. Purchasers of all PD products suffered a substantially similar harm from similar products about which Defendants made similar misrepresentations; thus Plaintiffs can represent them all. *See Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 700 (N.D. Ill. 2020). Further, as to their ICFA unfair-practices claim, Plaintiffs and the class all purchased products that were both adulterated and misbranded under the FD&C Acts. Because the class alleges the same claims, based on the same legal theories and the same conduct by Defendants, typicality is satisfied. *See id.*

### 4. Adequacy is met.

Adequacy requires a showing that: (1) the representative does not have conflicting or antagonistic interests compared with the class as a whole; (2) the representative is sufficiently interested in the case outcome to ensure vigorous advocacy; and (3) class counsel is experienced, competent and able to conduct the litigation vigorously. *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392-93 (N.D. Ill. 2006).

There are no conflicting or antagonistic interests where, as here, the representatives seek damages under the same statute. *See id.* Plaintiffs have both demonstrated knowledge of the claims and, as conscientious representatives, fully participated in discovery. (*See id.* at 394; Ex. 31 ¶¶ 2-3). They are represented by local and national counsel with experience in consumer class actions and complex litigation. (*See* Exs. 31-32).

### B. Rule 23(b)(3) is satisfied.

### 1. Common questions predominate.

"Predominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016). Predominance analysis begins with the

elements of the claims. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). The ICFA "protect[s] consumers . . . against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 775 N.E.2d 951, 960 (2002). To recover, a plaintiff must prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019). An ICFA claim may be premised on either deceptive or unfair conduct (or both). *Id.* at 738.

### a. Deceptive Conduct

An ICFA deceptive conduct claim requires "proof that a statement is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer" in a material way. *Suchanek*, 764 F.3d at 762. Thus, the standard is objective. Whether Defendants' representations and omissions regarding PD products are literally false, likely to mislead, and/or material to reasonable consumers are key, classwide questions answered through common evidence. Here, by marketing and selling "Prescription Diet" labeled products pursuant to the prescription requirement, Defendants represent to consumers that a prescription is required to purchase PD products and that the products are prescription products. But these representations are literally false and clearly misleading on their face because, as Defendants admit, PD products are not legally required to be sold by prescription. *See, e.g., Al Haj v. Pfizer Inc.,* 2019 WL 3202807, at *4 (N.D. Ill. Jul. 16, 2019) (deception demonstrated if a statement is literally false or likely to mislead through a statement or material omission).

Defendants also represent to consumers implicitly or by omission that PD products contain a drug or medicine when they do not. Expert survey evidence ██████████████

10

████████demonstrate that reasonable consumers are likely to be misled by Defendants'

marketing and sale of "Prescription Diet" labeled products pursuant to the prescription

requirement because consumers believe that prescription-restricted pet food contains a drug or

medicine. (Ex. 14, ¶¶ 20-24; Ex. 21 at -927). ████████████████████████

██████████████████████████████████████████. (Ex. 20,

¶¶ 11-12). Defendants' uniform misrepresentations as to and imposition of the false and

misleading prescription requirement applies to the whole class, and the classwide evidence is

further detailed in sections I.B.-C., *supra*.

Materiality is also evaluated objectively, considering whether reasonable person would

have acted differently based on the representation or if it concerned the type of information upon

which a buyer would be expected to rely in making a decision whether to purchase. *Connick v.

Suzuki Motor Co.,* 174 Ill. 2d 482, 504 (1996). Clearly, a representation that a product contains a

drug or medicine is "the type of information upon which a buyer would be expected to rely in

making a decision whether to purchase" that product for their sick pet. Furthermore, expert

survey evidence ████████████████ provide classwide proof that the veterinary

prescription is material to consumers' decisions to purchase PD products. *See* section I.C., *supra*.

Further, looking to Federal Trade Commission ("FTC") guidance, as the ICFA instructs,

815 ILCS 505/2, the FTC's Statement on Deception supports materiality. The FTC Statement

considers the "target group" for marketing and sales practices – here, consumers with sick pets –

and presumes that express claims (*e.g.,* Defendants' representation that a prescription is required)

and claims or omissions that "significantly involve health, safety, or other areas with which the

reasonable consumer would be concerned" (*e.g.*, Defendants' representation that PD products

contain medicine) to be material. (Ex. 33 at 5). *See also Moore v. Mars Petcare US, Inc.*, 966

F.3d 1007, 1021 (9th Cir. 2020) (misrepresenting prescription pet food "as medicine or FDA-controlled can be a material fact for a reasonable consumer—particularly for a pet owner who is dealing with possibly a sick or unhealthy pet. . . . it is reasonable for a consumer to rely on the prescription requirement and labeling in her purchasing decision for an ailing pet.")

In addition, while deceptive-practices cases involve individual issues of causation, "100% commonality" is not required, as that "would eviscerate consumer-fraud class actions." *Suchanek*, 764 F.3d at 759. Accordingly, the *Suchanek* Court set forth an approach for district courts to follow when determining whether to certify a consumer-fraud class under Rule 23(b)(3). *Id*. at 760-61. The first step is a rigorous analysis of whether damages are susceptible of measurement across the entire class. *Id.* at 760 (noting that individualized damages are least likely to defeat predominance where damages can be computed via formula, statistical analysis, or other essentially mechanical method). Here, Plaintiffs' damages expert utilized a common benchmark analysis to calculate the amount the class overpaid for Hill's PD products as a result of Defendants' deceptive conduct. (Ex. 28 at 20-33; Ex. 29 at 12-28). Classwide damages have been calculated to exceed $80 million based on classwide evidence and a well-accepted damages methodology. *See Suchanek*, 764 F.3d at 760 (crediting damages model computing difference between inflated price paid and product's actual value).

The next step is to assess the difficulty and complexity of the classwide issues as compared with the individual issues. *Id*. at 760. "The class issues often will be the most complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." *Id*. As in *Suchanek*, while it would be a straightforward matter for each purchaser to present evidence on causation in this case, costly survey evidence and expert testimony, like that offered in support of this motion, may be needed

to prove that some of Defendants' representations are likely to mislead reasonable consumers.

Next, the court should assess whether the class allegations are satisfied through evidentiary proof such as survey or other evidence suggesting the relevant common traits of the class members, or expert testimony supporting the classwide allegations. *Id.* at 760-61. As discussed above, survey evidence, expert testimony, and Defendants' market research provide classwide proof that Defendants' representations and omissions are false, likely to mislead, and material to reasonable consumers. (*Supra*, at I.B.-C.).

Finally, classwide resolution of common questions as to whether Defendants' representations and omissions are false, likely to mislead, and material to reasonable consumers would substantially advance the case. *Suchanek*, 764 F.3d at 761.

### b. Unfair Conduct

As to unfairness, courts consider: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. *Id.* at 739-40. These are common, predominant questions, which are answered by common evidence here. A practice may be unfair because of the degree to which it meets a single criterion or because to a lesser extent it meets all three. *Id.* at 740. Conduct can offend public policy if it violates a standard of conduct set out by an existing statute or common law doctrine. *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1004 (N.D. Ill. 2016). A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to injure a large number of consumers. *Id.*

Common evidence demonstrates that Defendants' marketing and sale of PD products as therapeutic products is unfair under all three prongs. First, it violates public policy because it violates a standard of conduct set out in the federal and IL FD&C Acts. Defendants market and

13

sell PD products as therapeutic products intended for use in the diagnosis, treatment, prevention, mitigation or cure of disease in pets, and therefore, the products are "drugs" under the FD&C Acts. (Section I.D, *supra*). Indeed, the FDA has determined that PD products meets the statutory definition of a "drug" under the FD&C Act, 21 U.S.C.§ 321(g)(1)(B). (Ex. 26 at 3-13; Ex. 34 at 3). In the absence of FDA approval, such drugs are "unsafe," "adulteratred," and "misbranded" under the FD&C Acts. 21 U.S.C. §§ 360b(a)(1), 351(a)(5), and 352(f)(1); 410 ILCS 620/10(a)(iv)(D); 410 ILCS 620/15; (*see also,* Ex. 34 at 3-4). The federal and IL FD&C Acts prohibit the sale of adulterated or misbranded products. 21 U.S.C. § 331(a) and (c); 410 ILCS 620/3-3.3.

Common evidence also shows that Defendants' conduct is unethical and unscrupulous. Pets are valued family members and, in caring for a sick pet, pet "parents" are vulnerable and will reasonably gravitate toward a "prescription" product. *See Moore*, 966 F.3d at 1021. Hill's message that PD products are needed to treat a consumer's sick pet is communicated through a veterinarian. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████ (*See* Ex. 22 at -254).

In addition, common evidence shows that Defendants' illegal marketing of PD products as therapeutic products caused substantial injury to Plaintiffs and thousands of other Illinois consumers and proximately caused Plaintiffs and the Class damages. ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ (Ex. 20,

14

¶¶ 124-27; *see also*, section I.B, *supra*). Classwide evidence also demonstrates that the class overpaid $80 million for PD products as a result of Defendants' unfair conduct. (Ex. 28 at 20-33; Ex. 29 at 12-28).

### c. Defendants' intent under both ICFA claims is another common question.

Finally, as to the intent element of both claims, again the question is common, proven by common evidence. Defendants fully intend consumers to rely on the veterinary prescription's implications and their illegal marketing of PD products as therapeutic products, as Plaintiffs did, and purchase the costly food to treat their sick pets. Defendants know the name "Prescription Diet" implies medicine, they impose and enforce the prescription requirement as a business model because veterinary prescriptions are the number one driver of sales for PD products, and Hill's illegally markets the products to vets as "efficacious" and "clinically proven" (even though the FDA has not evaluated either contention) to treat, mitigate, and prevent disease in pets because they know vets will prescribe them on that basis and consumers will purchase what the vet prescribes. *See* sections I.B.-D., *supra*.

### 2. A class action is superior under Rule 23(b)(3).

Class actions are superior where potential individual damages are too insignificant to incentivize class members to pursue claims individually. *See Suchanek,* 764 F.3d at 759. The prosecution of this case has entailed hundreds of thousands of dollars in expert costs. (Ex. 31 at ¶ 10). Thus, "the class device is superior, because no rational individual plaintiff would be willing to bear the costs of this lawsuit." *Suchanek,* 764 F.3d at 760.

## IV.   CONCLUSION:

As described in detail above, Plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3). Accordingly, Plaintiffs request that the Class and sub-class be certified.

Dated:  January 20, 2023    Respectfully submitted,


         By:  */s/ Ellen M. Carey*_____
         One of Plaintiffs' Attorneys

Ellen M. Carey
Brian P. O'Meara
FORDE & O'MEARA LLP
191 North Wacker Drive, 31st Floor
Chicago, IL 60606
Tel: (312) 399-2377
ecarey@fordellp.com
bomeara@fordellp.com

Michael L. McGlamry
POPE MCGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, Georgia 30326
Tel: (404) 523-7706
mmcglamry@pmkm.com

Michael P. Morrill
POPE MCGLAMRY, P.C.
1200 6th Avenue
Columbus, Georgia 31901
Tel: (760) 3240050
mikemorrill@pmkm.com


## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **Plaintiffs' Memorandum of Law In Support of Their Motion for Class Certification** was filed electronically with the Clerk of the Court using the CM/ECF system this 20th day of January, 2023, and served electronically on all counsel of record.


         *s/ Ellen M. Carey*
         _____