# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

HOLLY BLAINE VANZANT, and SHERRY
NEVIUS, individually and on behalf of all others
similarly situated,

               Plaintiffs,

v.

HILL'S PET NUTRITION, INC., and
PETSMART LLC.

               Defendants.

Case No. 1:17-cv-02535

Hon. Jorge L. Alonso

Hon. Jeffrey Cole

## DEFENDANT HILL'S PET NUTRITION, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 4

    I.    Hill's Makes PD, a Portfolio of Pet Foods That Vets Recommend for Sick Pets ......................................................................................................... 4

    II.    Vets Use Their Clinical Judgment to Recommend Specific Therapeutic Foods ............................................................................................................... 6

    III.    Hill's, the FDA, AAFCO, and Vets Agree That Therapeutic Pet Food Should Be Used Under Veterinary Supervision. ................................................ 7

    IV.    Consumers Consider Many Factors, but Most Buy PD Based on Their Vets' Recommendations ............................................................................... 9

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

    I.    No Common Evidence of Deceptive Conduct ................................................ 12

        A.    Questions About the Vet's Advice to Individual Clients Will Predominate. ................................................................................... 12

        B.    Individual Issues of Deception, Causation, and Harm Overwhelm Any Common Evidence. ...................................................................... 15

            1.    Plaintiffs present no common evidence that reasonable consumers were deceived ................................................. 15

            2.    Individual issues of causation and materiality predominate ........ 17

    II.    *Comcast* Precludes Certification Because Plaintiffs' Damages Model Does Not Match Their Theory of Harm. ...................................................... 18

    III.    No Common Evidence of Illegal Marketing ..................................................... 21

    IV.    Plaintiffs Are Atypical and Inadequate Class Representatives Because They Have Continued to Buy Therapeutic Foods ......................................... 23

    V.    Plaintiffs Cannot Sue Over Products They Never Purchased. ........................... 24

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

Page

## CASES

*Al Haj v. Pfizer Inc.*,
    2019 WL 3202807 (N.D. Ill. July 16, 2019) ........................................................... 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .................................................................................................... 17

*Anthony v. Country Life Mfg., L.L.C.*,
    2002 WL 31269621 (N.D. Ill. Oct. 9, 2002), *aff'd sub nom. Anthony v.*
    *Country Life Mfg., LLC.*, 70 F. App'x 379 (7th Cir. 2003) ....................................... 21

*Bakopoulos v. Mars Petcare US, Inc.*,
    2021 WL 2915215 (N.D. Ill. July 12, 2021) ....................................................... 3, 24

*Batson v. Live Nation Ent., Inc.*,
    746 F.3d 827 (7th Cir. 2014) ..................................................................................... 22

*Bausch v. Stryker Corp.*,
    630 F.3d 546 (7th Cir. 2010) ..................................................................................... 21

*Bell v. Bimbo Food Bakeries Distrib., Inc.*,
    2013 WL 6253450 (N.D. Ill. Dec. 3, 2013) ............................................................. 23

*CE Design Ltd. v. King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011) ..................................................................................... 24

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................................................. passim

*Dhamer v. Bristol-Myers Squibb Co.*,
    183 F.R.D. 520 (N.D. Ill. 1998) .......................................................................... 13, 14

*Flaherty v. Clinique Labs. LLC*,
    2021 WL 5299773 (N.D. Ill. Nov. 15, 2021) .................................................... 24, 25

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
    29 F.4th 839 (7th Cir. 2022) ..................................................................................... 12

*In re Sears, Roebuck & Co.*,
    2007 WL 4287511 (N.D. Ill. Dec. 4, 2007) ............................................................. 15

*Lipton v. Chattem, Inc.*,
    289 F.R.D. 456 (N.D. Ill. 2013) .......................................................................... 23, 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................... 24

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Mednick v. Precor, Inc.*,
   2014 WL 6474915 (N.D. Ill. Nov. 13, 2014)...................................................................25

*Oliveira v. Amoco Oil Co.*,
   201 Ill. 2d 134 (2002)......................................................................................................20

*Oshana v. Coca-Cola Bottling Co.*,
   225 F.R.D. 575 (N.D. Ill. 2005), *aff'd sub nom. Oshana v. Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006)......................................................................................13, 14

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014)..........................................................................................18

*Payton v. Cnty. of Kane*,
   308 F.3d 673 (7th Cir. 2002).............................................................................................25

*Ryan v. Wersei Elec. GmbH & Co.*,
   59 F.3d 52 (7th Cir. 1995).................................................................................................17

*Siegel v. Shell Oil Co.*,
   612 F.3d 932 (7th Cir. 2010).............................................................................................22

*Smith-Brown v. Ulta Beauty, Inc.*,
   335 F.R.D. 521 (N.D. Ill. 2020)........................................................................................25

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014).............................................................................................17

*Thorogood v. Sears, Roebuck & Co.*,
   547 F.3d 742 (7th Cir. 2008).............................................................................................15

*Toulon v. Cont'l Cas. Co.*,
   877 F.3d 725 (7th Cir. 2017).............................................................................................13

*Vizcarra v. Unilever U.S., Inc.*,
   339 F.R.D. 530 (N.D. Cal. 2021).......................................................................................16

*Wal-Mart v. Dukes*,
   564 U.S. 338 (2011)..........................................................................................................11

*Willard v. Tropicana Mfg. Co.*,
   577 F. Supp. 3d 814 (N.D. Ill. 2021)................................................................................24

## STATUTES

21 U.S.C. § 321(g)(1)(B)..........................................................................................................23

## TABLE OF AUTHORITIES
### (continued)

**Page**

21 U.S.C. § 321(g)(1)(C) ........................................................................................................ 23

815 Ill. Comp. Stat. Ann. 505/10b(1) ..................................................................................... 23

## INTRODUCTION

For more than 75 years, Hill's has made Prescription Diet pet food ("PD") to help sick pets. Each PD line is formulated and clinically tested to be the sole source of food for pets suffering from specific health conditions. While PD foods can help when used correctly, without vet supervision, they can be misused. Pet parents might reach for PD when their pets really need to see a vet. And giving the wrong food to a pet can be harmful. That is why Hill's—consistent with longstanding FDA policy and model regulations—limits PD sales to pet owners who have received a vet's recommendation for a specific PD food. Other therapeutic nutrition manufacturers impose the same requirement. Vets prefer this practice because they can examine each pet, control for other conditions, recommend other therapies, and evaluate progress.

Plaintiffs Holly Vanzant and Sherry Nevius take issue with this vet-approval practice. They both bought PD based on their vets' clinical determination that the food would help their sick pets. Plaintiffs do not dispute the science showing that PD provides therapeutic benefits or that their pets benefited from their vets' nutritional recommendation. Yet they sued Hill's, asserting that having to get a prescription for PD made them overpay because they thought the food was medicine. They contend that this Court should certify a class because other reasonable consumers allegedly overpaid for PD. But Plaintiffs' argument overlooks the obvious: Like every pet parent who has purchased PD, Plaintiffs and putative class members first had an individual discussion with their vets about their pets' health and which therapeutic pet food—if any—was best based on their vets' clinical judgment. Other practical considerations, like budget and appetite, factored into each Plaintiff's and each putative class member's purchase decision. These factors require individual inquiries that preclude certification. Plaintiffs' damages model also fails to account for the benefits Plaintiffs and other PD purchasers received—including the health benefits to pets and their vets' informed judgment. Plaintiffs' motion for class

certification should be denied.

*First*, individual inquiries into the advice PD consumers got from their vets will predominate. Because no one can buy PD without vet authorization, each putative class member's exposure to the allegedly deceptive and unfair practice will vary based on their own encounter with their vet, on their own pet's health, dietary needs, and medical history, as well as other individual considerations.

*Second*, common evidence cannot answer whether consumers are deceived by the "prescription" requirement or PD's marketing and labeling. Plaintiffs themselves confirm this. According to their own testimony, they both bought PD because their vets recommended it. Neither asked if or what "medicine" was in the food, or if it was FDA-approved. And they both continued buying therapeutic pet foods long after learning that these foods contain no medicine and are not FDA-approved. Plaintiffs' survey expert did not test whether reasonable consumers would act the same way, and her survey does not account for the effect of consumers' interactions with their vets—the most important factor for PD consumers.

*Third*, individualized materiality inquiries will predominate. Plaintiffs failed to present common evidence of materiality, and their testimony explains why. They bought PD *because their vets recommended it—not* because it was a "prescription only" food and *not* because they thought it contained drugs. Plaintiffs did not submit expert evidence on this issue, but Defendants did. Hill's expert showed that while consumers buy therapeutic pet foods for many reasons, practically no consumers buy the foods because they think they contain medicine. Plaintiffs try to duck the issue by conflating two separate concepts: the "prescription" itself—*i.e.*, the vet's independent clinical judgment to recommend the food—and the "prescription requirement"—*i.e.*, the gatekeeping role vets serve. But while evidence shows that an individual

vet's "prescription" of PD for a particular pet *is* material to consumers, the same evidence shows that Hill's imposition of that "prescription requirement"—the practice Plaintiffs allege is deceptive and unfair—is *not* material to consumers. In fact, Hill's imposition of a "prescription requirement" could not have been material to the many putative class members who were entirely unaware of the requirement. The only way to know is to ask each class member: a classic individualized inquiry.

*Fourth*, Plaintiffs' damages model does not match their theory of harm and therefore precludes certification under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Plaintiffs must put forth a model capable of measuring the alleged price premium they associate with the allegedly deceptive and unfair practice. But Plaintiffs' damages model does no such thing. Their damages expert concedes that she has not controlled for key distinctions between PD and her chosen benchmark food, as would be necessary to isolate the price effect of the allegedly deceptive and unfair conduct. She also concedes that PD delivers benefits that her chosen benchmark does not. Under Plaintiffs' damages model, consumers would get these undisputed benefits for free.

*Fifth*, Plaintiffs have no common evidence to support their "unfair practices" claim. Each prong of this claim requires a showing of causation and injury, which will require individualized inquiries. Plaintiffs have also failed to present common evidence that their purported injuries outweigh the substantial benefits that PD purchasers—and their pets—received.

*Sixth*, Plaintiffs are atypical and inadequate representatives of the proposed class. They both admitted that they continued to buy PD after learning of the alleged "deception" and "illegal marketing," so they are not in the same boat as absent class members who allegedly paid a price premium based on the presumption that the food contained medicine.

*Lastly*, Plaintiffs have no standing to sue over the vast majority of PD products. They

purchased only two of the more than 40 products in the PD brand and cannot have suffered an "injury-in-fact caused by products that they did not buy." *Bakopoulos v. Mars Petcare US, Inc.*, 2021 WL 2915215, at *3 (N.D. Ill. July 12, 2021). Nor can Plaintiffs represent a class of consumers who bought PD foods that Plaintiffs never purchased because each food is formulated to address different health conditions and prompts different purchase considerations.

## FACTUAL BACKGROUND

I. **Hill's Makes PD, a Portfolio of Pet Foods That Vets Recommend for Sick Pets.[1]**

Just as people with diabetes or high blood pressure manage their conditions by limiting how much sugar or salt they consume, pets can benefit from diets tailored to their specific health conditions. While therapeutic foods like PD contain no pharmaceutical drugs, they are useful tools for vets in managing pets' health. In some cases, dietary changes can be the primary method for managing certain conditions, such as food allergies, obesity, and chronic kidney disease. Ex. A (Gross Decl.) ¶¶ 8, 10, 12; Ex. B (Rollins Report) ¶ 13. Vets also use therapeutic nutrition as part of broader treatment plans that may include medicine, surgery, and other interventions. Ex. A ¶ 10. Hill's makes more than 45 different PD foods, each of which is the result of years of research into specific health conditions, testing of nutritional approaches to manage those conditions, clinical research on efficacy, and state-of-the-art innovation. *Id.* ¶ 12.

Hill's also makes a portfolio of wellness products, called Science Diet ("SD"), designed for healthy pets. No PD formula is used in SD pet foods. *Id.* ¶ 26. While some SD foods may contain overlapping ingredients with some PD foods, they are not interchangeable. *Id.*; Ex. B ¶ 14. For example, Hill's sells PD r/d—a food aimed at rapid weight loss in obese pets—and SD

---

[1] Exhibit letters refer to those attached to the concurrently filed Declaration of Hannah Y. Chanoine. Citations to numbered exhibits refer to those attached to Plaintiffs' Motion for Class Certification ("Mot."). Unless otherwise noted, all emphasis in quoted passages is added by Hill's, and all internal quotation marks and original alterations are omitted from quoted passages.

Adult Light, a wellness food aimed at maintaining healthy weight in less active pets. Both foods use some of the same ingredients, but they have significantly different caloric loads, fiber content, and fat levels. While a healthy pet could safely maintain body weight while eating SD Adult Light, it could not do the same while eating PD r/d. Ex. A ¶¶ 26-28. Similarly, while pets with kidney disease might benefit from PD k/d—a protein-restricted therapeutic food—a young, healthy pet fed the same food could experience inhibited growth, bone pain, and muscle wasting. Ex. C (Bleem Tr.) at 60:8-61:14; Ex. B ¶ 17. Indeed, Plaintiffs' vets testified that they would not recommend a therapeutic pet food for a healthy pet. Ex. D (Frazho Tr.) at 24:14-25:5; Ex. C at 60:8–61:14.

The specific foods Plaintiffs purchased are clinically shown to help manage the specific health conditions for which they were designed. Vanzant bought c/d Multicare Feline based on her vet's recommendation, because it provides urinary health nutrition that can help feline idiopathic cystitis symptoms, dissolve struvite stones, and decrease the risk of recurrent stones. Ex. A ¶ 13(a-b); *see also* Ex. E (HILLS-VANZ-0000071); Ex. F (HILLS-VANZ-0000113); Ex. G (HILLS-VANZ-0000124); Ex. B ¶ 76. Nevius bought i/d Canine based on her vet's recommendation, because it is a nutritional aid for dogs with a variety of gastrointestinal issues, including diarrhea, vomiting, constipation, and inflammatory bowel disease. Ex. A ¶ 13(c-d); *see also* Ex. B ¶ 91.

Other foods in the PD portfolio use different formulations for other conditions. For example, vets recommend m/d Feline—the food that former plaintiff Land bought—because it is formulated to help manage diabetes mellitus and obesity.[2] Ex. A ¶¶ 17, 19. This high-protein, high-fat, low-carbohydrate diet encourages a cat's body to fuel itself with its own energy stores

---

[2] The Court granted Land's request to withdraw as a Plaintiff on August 30, 2021. ECF No. 137.

rather than glucose. *Id.* Cats eating m/d Feline should remain under veterinary care because they can experience rapid weight loss and increased risk of liver disease. *Id.*

## II. Vets Use Their Clinical Judgment to Recommend Specific Therapeutic Foods.

Vets rely on PD and other therapeutic foods as part of their everyday practice to help manage the health of dogs and cats suffering from various conditions. Ex. C at 24:3-25:21; Ex. B ¶ 12; Ex. H (Smedley Report) ¶¶ 21-22. Before recommending a therapeutic food, vets assess many factors. Ex. C at 24:3-25:21; Ex. D at 31:7-32:7. The unrebutted expert evidence tells the same story. As board-certified veterinary nutritionist Dr. Angela Rollins explained, each nutritional recommendation "must be tailored to the needs of the individual pet in order to balance the needs of the pet's condition, manage co-morbidities, and formulate a plan that is practical and feasible for both the pet and pet owner." Ex. B ¶ 13; *see also* Ex. H ¶ 21. A survey conducted by Sarah Butler, Defendants' survey expert, confirms that vets consider many factors before recommending therapeutic foods, including the pets' nutritional needs, immediate relief from symptoms, efficacy, palatability, and co-morbidities. Ex. I (Butler Report) ¶¶ 171, 175.

Just as each decision to recommend a specific PD food varies, so do vets' interactions with pet parents, who might ask questions about clinical benefits, ingredients, allergic responses, and dietary intolerance. Ex. B ¶ 23. Others may ask about cost, duration, and whether all pets in the household can eat therapeutic pet foods. Ex. I ¶¶ 177, 209-13; Ex. C at 77:6-78:11.

Among these variables, there is one constant: PD works. Its efficacy is supported by decades of clinical research and experience, and Plaintiffs did not submit any expert testimony to refute that science. Ex. A ¶¶ 3-7; Ex. B ¶¶ 24-93; Ex. 25a (Product Key) at HILLS-VANZ-0033234-40, HILLS-VANZ-0033165-69. As Nevius's vet, Dr. Bleem testified, "[T]he research behind these diets, the experts that I can call when trying to organize my treatment plan, and the outcomes that I've seen outweigh any other supportive care measures that I can offer these pets

beyond medication and certain therapies." Ex. C at 24:3-25:21; *see also* Ex. D at 23:16-24:24. Nevius agrees, admitting that her dog, Moose, "was doing better after he got the prescription dog food." Ex. 4 (Nevius Tr.) at 119:17-120:10; 116:3-15.  In fact, *Plaintiffs'* own damages expert, Dr. Janet Netz, admits that she buys PD because her cat thrives on it—and suffers when she switches to different food.  Ex. J (Netz Tr.) at 210:19-215:24.

### III.   Hill's, the FDA, AAFCO, and Vets Agree That Therapeutic Pet Food Should Be Used Under Veterinary Supervision.

To ensure that its PD foods are not misused, Hill's requires—and has always required— that pet parents receive veterinary authorization before purchasing those foods. Ex. A ¶ 22.  This is exactly what a published FDA Compliance Policy Guide ("CPG") tells pet food manufacturers to do: therapeutic pet foods, like PD, should be sold only under the direction of a vet because they may "affect physiological processes to extents that may not be tolerated by all animals." *See* Ex. 34 (CPG 690.150) at 5.  The CPG carries forward the FDA's longstanding recognition that selling therapeutic foods under vet direction protects pet health, because vets can explain how the foods work, ensure that pets are getting other appropriate therapies, and eliminate the risks inherent in pet owners' independent diagnosis of their pets' health needs. *See id.*  The FDA recognizes in the CPG that the same nutrition that benefits pets with certain conditions can be unhealthy for other pets, even pets with similar conditions. *Id.*

In the CPG, the FDA identifies other risks to pet health and safety if therapeutic pet foods were to be sold without a veterinary authorization.  The FDA states, for example, that pet owners may: (1) fail to appreciate the foods' "effectiveness, possible side effects, and contraindications for use," leading them to choose the wrong diets for their pet's specific nutritional needs; (2) "misinterpret claims" and conclude the foods are "the sole treatment required" for their pet's condition; and (3) draw inaccurate conclusions about the foods' "effectiveness in both treatment

outcome and provision of adequate nutrition for the animal." *Id.* These "concerns are reduced when such dog and cat food diets are marketed only through and used under the direction of a licensed veterinarian." *Id.* To "help ensure animal safety," the FDA enumerates 11 conditions for the sale of therapeutic pet foods, the first of which is that those foods be "made available to the public only through licensed vets" or "under the direction of a veterinarian." *Id.* at 7.

The Association of American Feed Control Officials ("AAFCO") is a non-governmental advisory body comprised of members from academia, government, and industry—but with only state and federal regulators as voting members—that provides model guidance on laws regulating animal food, including pet foods. Ex. B ¶ 10. AAFCO's 2023 Model Regulations for Pet Food and Specialty Pet Food adopt the FDA's guidance on therapeutic pet foods, including that these products should be "made available to the public only through a valid veterinarian-client-patient relationship" or "under the direction of a veterinarian." Ex. K (AAFCO 2023 Official Publication). AAFCO recommends that states adopt these guidelines. *Id.*

Vets also agree with the FDA's guidance that selling therapeutic pet foods only under vet guidance benefits pets and pet parents. Unrebutted expert evidence shows that "veterinary supervision is clinically beneficial to ensure that a patient's disease and potential co-morbidities are being appropriately managed, that the client and patient are appropriately complying with therapy, and the response to therapy is appropriate," and therefore "[t]herapeutic diets are typically, and should only be, available through direct purchase from a veterinarian or with veterinary authorization." Ex. B ¶ 15.

Vets agree, as Butler's survey shows. More than 75% of the 403 vets surveyed believe that therapeutic pet foods should not be available without veterinary authorization. Ex. I ¶ 180. These vets agree that therapeutic pet foods may not be safe, balanced, or appropriate for healthy

pets and that, without veterinary supervision, pet parents may select the wrong therapeutic foods.
*Id.* ¶¶ 181-82. Plaintiffs' own vets similarly agree that therapeutic pet foods should be used only
with vet supervision for pet safety. Ex. D at 35:18-36:9; Ex. C at 58:16-59:23.

## IV. Consumers Consider Many Factors, but Most Buy PD Based on Their Vets' Recommendations.

Plaintiffs each bought multiple therapeutic pet foods before and after learning that PD
and other therapeutic pet foods do not contain drugs or medicine. Vanzant purchased c/d in
January 2013 for her cat, Tarik, who suffered from urinary stones (Ex. 1 (Vanzant Tr.) at 104:10-
12, 122:9-16) and fed it to him for nearly three years (*id.* at 152:14-154:23, 161:1-10). She later
bought k/d for her cat, Diablo, in February 2017 (*id.* at 204:21-206:12), and a/d for Tarik in
December 2019 (*id.* at 185:5-187:16). Nevius purchased i/d for her dog, Moose, in June 2019
(Ex. 4 at 117:23-118:2), and fed it to him for a month before switching to a Royal Canin
therapeutic pet food in July 2019 (*id.* at 126:3-127:23).

Plaintiffs bought PD based *solely* on their vets' recommendations, because they believed
and trusted their vets' professional opinions. Ex. 1 at 132:10-133:5, 245:12-19 ("I trusted that
they had been to veterinary school, that they must have received some sort of education on this,
and I was going to defer to their expertise."); Ex. 4 at 43:19-44:2, 102:11-24; 63:4-10 ("I take his
word. He is a veterinarian. It's his recommendation."). Accordingly, neither Plaintiff reviewed
the packaging or label before purchasing PD. Ex. 1 at 134:21-135:2, 135:23-136:4, 140:1-21;
Ex. 4 at 114:15-20. If they had, they would have seen from the ingredient list that PD does not
contain medicine. Ex. 4 at 153:19-21, 155:5-157:9.

Plaintiffs twisted themselves into knots trying to explain how this was deceptive.
Vanzant says that she thought c/d contained medication that would prevent urinary stones based
on her vet's recommendation that "c/d was appropriate for this type of stone, that the c/d would

prevent this type of stone from recurring." Ex. 1 at 111:15-112:10. But she had to admit that she did not know—and never even asked—what medication the food contained (*id.* at 104:5-7, 111:13-112:13), and that the information she received from her vet about food and medicine differed significantly (*e.g.*, *id.* at 202:23-204:9). Even though Vanzant "learned" in February 2016 that PD contained no medicine and claims that she would never have bought it had she known (*id.* at 176:1-24, 177:1-13), she purchased k/d in 2017—despite "suspect[ing] that it did not contain medication" (*id.* at 194:19-196:21) and knowing that it did not have FDA approval as a drug (*id.* at 207:13-24). And after filing this lawsuit she bought *another* PD food—a/d, a high-calorie food for pets with critical care needs—which she fed to Tarik after his surgery. *Id.* at 186:7-187:16.

Nevius admitted that purchasing PD was nothing like buying medicine (Ex. 4 at 201:10-204:17) and that she could tell "from reading the label" that it did not contain medicine (*id.* at 153:14-21, 155:5-157:9). Like Vanzant, Nevius bought therapeutic pet foods (subject to the same veterinary authorization requirement) *for years* even after learning about the "deceptive" conduct—not because she thought the food contained medicine but because it helped Moose. *Id.* at 157:3-158:9; Ex. L (Nevius Tr. Vol. II) at 335:12-337:14.

Former plaintiff Dana Land (still a putative class member) also gave contradictory testimony about her experience with PD. Land says she assumed there was medicine in the m/d that her vets recommended for her diabetic cat, Chief (Ex. M (Land Tr.) at 175:1-9), but she could not say what medicine was in it, never asked her vet about it despite her practice of researching her vet's recommendations (*id.* at 176:16-19, 99:24-100:4), could not identify any medicine when she read the ingredient panel (*id.* at 181:11-182:7), and understood that nutrition could be used to help manage diabetes (*id.* at 92:7-94:12). She also knew that she could not use

10

her CareCredit card—a financing program for pet health needs—to purchase m/d because that card could be used only for medical visits and medicine, not pet food. *Id.* at 98:16-99:14.

While Plaintiffs focused on different criteria when deciding whether to buy PD, there is no evidence that *anyone* relied on PD's labeling. Rather, like consumers generally, they acted differently based on their individual circumstances after speaking with their vets. Vanzant bought c/d for Tarik because her vet recommended it to help keep a particular type of urinary stone from forming. Ex. 1 at 111:6-112:20. Nevius bought i/d because Moose had diarrhea and her vet said it could help. Ex. 4 at 99:11-103:6. It did. *Id.* at 120:5-10, 116:3-15. Netz still feeds her pet PD, notwithstanding her participation in this case. Ex. J at 210:19-215:24.

The expert evidence on materiality bears this out. Butler, the only expert to affirmatively opine on materiality, conducted a "purchase intention survey" of 600 purchasers of therapeutic pet foods that evaluated whether PD labeling changes would affect consumers' willingness to purchase PD, and a survey of 411 PD purchasers that evaluated what they considered when they bought PD and what they asked their vets. The latter survey confirms what Plaintiffs and other experts say: Pet parents buy PD for different reasons, but the primary one is that their vet recommended it for a health need. Ex. I ¶ 218; *see also* Ex. B ¶¶ 19-23. Butler's purchase intention survey found that the "prescription" status of the food is immaterial to consumers: Changing "Prescription Diet" to "Preferred Diet" had no statistical impact on consumers' likelihood of purchasing.; nor did adding an all-caps disclosure stating "CONTAINS NO DRUGS. NO LAW REQUIRES A PRESCRIPTION FOR THIS PRODUCT," i.e., the very information Plaintiffs allege is lacking. Ex. I ¶ 156.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart v. Dukes*, 564 U.S. 338, 348 (2011). For

that reason, Plaintiffs must "affirmatively demonstrate" that they meet *all* Rule 23 requirements: numerosity, commonality, typicality, and adequacy, and—in cases like this one—predominance and superiority. *Comcast*, 569 U.S. at 33; *see also Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022). The Court must "probe behind the pleadings" and conduct a "rigorous analysis" of the evidence in support of and opposition to the certification motion, which "will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 569 U.S. at 33–34.

## ARGUMENT

## I. No Common Evidence of Deceptive Conduct.

### A. Questions About the Vet's Advice to Individual Clients Will Predominate.

Plaintiffs do not dispute that (1) decades of science support vets' use of nutrition, like PD, to help sick pets (Ex. B ¶¶ 13-14, 24-93); (2) veterinarians highly value these foods when managing a pet's illness (Ex. C at 25:12-21); and (3) these foods *work* (Ex. 4 at 119:17-120:10; 116:3-15).[3] Plaintiffs' deception theory instead boils down to the notion that because *authorization* is required to buy these foods, that authorization—or "prescription requirement"— *itself* deceives consumers into believing that the foods contain medicine, or that the prescription is required by law, and that consumers are somehow duped into paying higher prices as a result.[4] Second Am. Compl. ("SAC") ¶¶ 19-20, 25, 36, 59, 74; Mot. 1, 2-4, 10.

But the same authorization process that underpins Plaintiffs' theory also precludes class certification. Consumers receive different information before purchasing PD—from their vet in highly individualized and personal discussions about their pets' health, from the label, which

---

[3] *See also* Ex. A ¶¶ 8-12; Ex. 25a; Ex. D at 24:4-24; Ex. B ¶¶ 13-14; Ex. J at 210:19-215:24.
[4] Plaintiffs were forced to jettison a third theory of deception—that the act of authorization implies FDA approval (e.g., SAC ¶¶ 36, 59, 74)—because they have no evidence in support. Ex. 14 (Reed-Arthurs Report) Exs. 6a-9b.

they may or may not read, and from their own knowledge. It is therefore "impossible" to fix liability "[w]ithout determining what each member heard, saw, or knew," which unavoidably "requires an individual analysis of the extent to which [Hill's] marketing played a role in each class member's decision to purchase" PD. *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2005), *aff'd sub nom. Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006); *see also Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 739 (7th Cir. 2017) (noting that "allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff").

*Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 532 (N.D. Ill. 1998), is on point. There, the court denied certification to a proposed class of individuals who purchased prescription nasal spray and asserted ICFA claims that the spray was deceptively marketed as safe. Finding that the "role of the prescribing physician" was "central" to plaintiffs' claims about "product warnings, claimed misrepresentations, and proximate causation," the court recognized that a doctor's advice necessarily alters the information presented to each individual consumer, posing "highly individualistic factual determinations" that "preclude certification." *Id.*

The same is true here. Plaintiffs got different information from their vets before buying PD. Dr. Frazho recommended c/d to help Vanzant's cat after his bladder stone removal surgery, and Vanzant received prescriptions for antibiotics and pain medication at the same time. Ex. 1 at 99:13-100:12. Before making her first purchase, Vanzant discussed with her vet the instructions for both the medications and the PD. *Id.* at 102:24-104:12. Dr. Bleem recommended i/d for Nevius, along with a prescription for tapeworm medicine, when Moose had tapeworms and diarrhea. Ex. 4 at 96:15-97:20, 99:11-25. Dr. Bleem told her that the medication was for the tapeworms (*id.* at 103:7-12), and the i/d would help with his diarrhea (*id.* at 100:11-102:24).

13

Plaintiffs and their experts also admit that class members may deviate from a vet's recommendation. As Netz explained, "[j]ust because my vet says, 'Buy them such and such food, or such and such drug,' I may not do that. It's up to me as to whether or not I have the income to afford such treatment, and I may not agree with the risks." Ex. J at 70:2-15; *see also* Ex. M at 213:12-214:21 (describing decision to deviate from vet recommendation); Ex. N (Fincham Tr.) at 18:8-14, 19:24-20:9; Ex. B ¶ 20. These decisions—which happen within the confines of the vet-client-patient relationship—defeat certification because they are deeply personal and necessarily individualized. *See Dhamer*, 183 F.R.D. at 532.

Hill's expert evidence confirms that consumer exposure and responses to the alleged deception varies. Butler's surveys show that conversations between vets and therapeutic pet food purchasers vary widely. Ex. I ¶¶ 177-79, 210-13. And Rollins opined that different consumers have different conversations with their vets, in which consumers hear different information about the food. Ex. B ¶¶ 20, 23. The vet authorization process also varies depending on where consumers buy PD. Many authorizations for therapeutic foods are simply noted in a pet's chart, without pet parents ever even seeing the written "prescription" that Plaintiffs claim is deceptive. Ex. I ¶¶ 217, 187, 189. Even Plaintiffs' survey expert acknowledges that the alleged deception will vary based on purchase conditions. Ex. 14 ¶¶ 21, 94-95; *see also* Ex. I ¶¶ 73-74 (Reed-Arthurs' surveys show that "respondents do not have a uniform and consistent perception" of whether PD contains medicine and that perception varies based on "questions asked" and "information presented").

Because consumers cannot purchase PD without having a highly individualized interaction with their vets, individual questions about putative class members' exposure to the alleged misrepresentations will predominate and prohibit certification. *Dhamer*, 183 F.R.D. at

14

532; *Oshana*, 225 F.R.D. at 586 ("Identification of the individuals properly included in the class would constitute a massive fact-specific inquiry virtually involving millions of putative class members.").

**B.** **Individual Issues of Deception, Causation, and Harm Overwhelm Any Common Evidence.**

**1.** **Plaintiffs present no common evidence that reasonable consumers were deceived.**

Plaintiffs' own testimony does not support their theory that the prescription requirement makes reasonable consumers pay more for PD because they believe it contains medicine. By their own accounts, Plaintiffs understood that therapeutic pet food like PD is food—not a drug—and they continued to buy it anyway. *See supra* Background, Sec. IV. Neither Plaintiff asked her vet whether or what medicine was in the food, despite discussing actual medications prescribed at the same time. *Id.* Nor did they look at the packaging—which they admit would have informed them there was no "medicine" in the food—before making their first purchases. *Id.* Plaintiffs have no evidence that reasonable consumers would assume, as Plaintiffs claim they did, that dog and cat food is medicine based *solely* on the fact that their vet recommended the food with a "prescription," without first asking their vets what is in the food or without reviewing the label. *See Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746-48 (7th Cir. 2008) (denying certification where each class member's claim turned on "what he understands to be the meaning of a label or advertisement"); *In re Sears, Roebuck & Co.*, 2007 WL 4287511, at *5 (N.D. Ill. Dec. 4, 2007) (denying certification of ICFA claims based on allegedly false made-in-USA advertising where class included people who bought tools knowing that they were not made in the USA).

Butler confirms this. Her purchase intention survey showed 200 respondents the PD labeling at issue; only *two* (1%) assumed that PD contains medication. Ex. I ¶ 151. And of 131

respondents in the same survey who identified the "Prescription Diet" name as a reason they would buy the food, only *one* (0.8%) believed the name suggests that PD contains medicine. *Id.* ¶ 157. Butler's survey of actual PD purchasers likewise shows that only two purchasers out of 411 surveyed (0.5%) believed PD contained drugs or medicine when they first purchased it. *Id.* ¶ 201. Reasonable consumers do not share Plaintiffs' claimed assumptions.

Plaintiffs claim that the findings of their survey expert, Rebbecca Reed-Arthurs, show class-wide deception. Mot. 10-11. But her survey did not test the theory of deception that Plaintiffs are pursuing and therefore cannot support certification. *See* Defs.' Mot. to Exclude Reed-Arthurs at 9-15; *see also Comcast*, 569 U.S. at 34-38; *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 547-48 (N.D. Cal. 2021) (consumer survey that "did not test the effect of" at-issue representations was not common proof of deception).

While Plaintiffs initially tried to make this a labeling case, their new theory is that the *total* purchase process—including PD's labeling, vets' independent medical advice and recommendations, the clinical setting, and the veterinary authorization requirement—misleads consumers. Mot. 1. But Reed-Arthurs did not test this "total purchase process" theory. Instead, she concocted unrealistic scenarios that eliminated the one thing every PD purchaser must do: talk to their vet. *See, e.g.*, Ex. B ¶ 23; Ex. I ¶¶ 177, 209-13; Ex. C at 77:6-78:11. Unlike Plaintiffs, Reed-Arthurs' survey participants did not get the benefit of a vet's advice and clinical judgment, other treatment options, or the opportunity to ask questions about why they should buy PD or whether it contained medicine. Indeed, Reed-Arthurs did not even "try[ ] to disentangle the impact of the vet in the decision to buy the food." Ex. O (Reed-Arthurs Tr.) at 127:12-14, 141:18-24. Her survey fails to capture the reality of the allegedly deceptive purchase process.

Plaintiffs' fallback argument, that they do not need to show common evidence of

deception because the "prescription" representation is "literally false," also fails. Mot. 10. The "prescription" representation is not literally false because, as Plaintiffs admit, consumers cannot buy PD without a "prescription." SAC ¶ 19; Mot. 3-4. Nor do Plaintiffs point to *any* representation by Hill's that a prescription is required by law. And the cases they cite for this flawed proposition do not support it. In *Suchanek v. Sturm Foods, Inc.*, the Seventh Circuit found that plaintiffs' expert surveys were sufficient to survive summary judgment—not that they proved the statements at issue were literally false. 764 F.3d 750, 756 (7th Cir. 2014); *see also Al Haj v. Pfizer Inc.*, 2019 WL 3202807, at *4 (N.D. Ill. July 16, 2019) (questions of material fact as to consumer deception).

## 2. Individual issues of causation and materiality predominate.

Plaintiffs must demonstrate that the alleged deception was material to the proposed class, but they did not even try to develop common evidence of materiality. *Ryan v. Wersei Elec. GmbH & Co.*, 59 F.3d 52, 54 (7th Cir. 1995) ("To be material under Illinois law, the misrepresented fact must be essential to the transaction between the parties."); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 474 (2013) ("[T]he failure of common proof on the issue of materiality ends the case for the class and for all individuals alleged to compose the class."). Plaintiffs' testimony explains why: They bought PD because their vets recommended it—*not* because they believed it contained medicine. *See supra* Background Sec. IV; Ex. 1 at 245:12-19; Ex. 4 at 43:19-44:2.

Plaintiffs' did not conduct a materiality study. Ex. P (Reed-Arthurs Rebuttal Tr.) at 62:12-16, 63:1-8, 16-22, 64:11-65:7. And for good reason. As Butler's survey shows, therapeutic pet food consumers do not—and cannot—buy the food simply because they want food that is "prescription only." Ex. I ¶ 218. Wanting to buy PD is not enough; a vet must make a determination, based on her clinical judgment and ethical obligations, that a specific

therapeutic food will help the patient. Ex. B ¶¶ 13-15. If consumers follow that recommendation, they do so because they trust their vets. Ex. I ¶ 218. For that reason, changing the name from "Prescription Diet" to "Preferred Diet" has no statistical impact on consumers' likelihood of purchasing PD. Nor does adding a disclaimer with the "missing" information change consumer purchase behavior. *Id.* ¶ 156.

Attempting to manufacture common evidence of materiality, Plaintiffs conflate the effects of the allegedly deceptive *prescription requirement* (the vet's gatekeeping role recognized by FDA and AAFCO) with the effects of the *prescription itself* (the vet's nutritional recommendation for a specific pet) on consumers' purchasing decisions. Mot. 5, 11. But these are separate concepts. Naturally, many consumers buy PD because their vets prescribe it. Ex. I ¶ 218. That does *not* mean that the gatekeeping "prescription requirement" *causes* consumers to purchase PD.

Plaintiffs also misstate Butler's findings, claiming that her surveys show that some vets believe PD foods contain drugs or medicine. Mot. 5. But only five out of 403 vets surveyed—a statistically insignificant 1.2%—gave that response. Ex. I ¶ 170. And while Plaintiffs claim that vets prescribe PD to diagnose, treat, mitigate, and prevent disease (Mot. 6), they do so only by misrepresenting responses to questions that were about PD's efficacy in supporting pets with specific health conditions, not about disease-treatment claims (Ex. I ¶¶ 162-63).

## II. *Comcast* Precludes Certification Because Plaintiffs' Damages Model Does Not Match Their Theory of Harm.

Plaintiffs also cannot certify a class because their damages model does not match their theory of liability. *Comcast*, 569 U.S. at 34-38; *see also Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (stating that the district court must consider arguments against a damages model that relate to the propriety of class certification). Plaintiffs claim consumers overpaid for

PD because of the prescription requirement and what Plaintiffs believe is an implied representation that PD contains medicine, so their damages model must measure how much those allegedly unfair and deceptive practices caused consumers to overpay. But the model created by Plaintiffs' proffered damages expert, Netz, cannot measure that injury, because Netz admits that consumers would get the undisputed benefits of PD for free under her model.

The error stems from Netz's choice of a benchmark that is not a therapeutic food and does not provide the same therapeutic benefits as PD. Netz assumed a but-for world in which PD foods are sold without veterinary authorization and without marketing to vets about their therapeutic effects. She then assumed that PD would be sold at prices comparable to Hill's wellness foods, SD. Setting aside that Netz's assumptions reject FDA guidance and would jeopardize the lives and health of pets (*see supra* Background Sec. III), they also ignore that SD—formulated for *healthy* pets—is not comparable to PD. Netz admits as much. She agrees that PD foods deliver benefits that SD foods do not and that she did not account for those differences in her damages model. Ex. Q (Netz Rebuttal Tr.) at 270:22-272:19, 252:14-17; Ex. V (Ugone Report) ¶¶ 78-82. Netz's model therefore cannot isolate the alleged premium and would result in a windfall to consumers who obtain PD's therapeutic benefits for the same cost as foods that do not offer those benefits.

Netz ignores other critical differences between PD and SD, too. She does not account for (1) Hill's significant development and testing costs for each specific PD food (Ex. J at 169:7-19); (2) the cost of educating vets about the nutritional profiles of each PD food (*id.* at 168:18-169:5); and (3) the role vets play in a particular consumer's decision to purchase PD (*id.* at 114:17-116:2; *see also* Ex. V ¶¶ 83-94). Netz's benchmark choice does not control for these key factors because SD does not require the same research, development, and vet education costs as PD and

because SD can be purchased without a vet's authorization. Netz's damages model therefore "fail[s] to measure damages resulting from the particular" injury on which "liability in this action is premised." *Comcast*, 569 U.S. at 36.

Netz's but-for world is also inconsistent with the relief Plaintiffs seek because it is "one in which there would be no therapeutic pet food." Ex. Q at 159:11-13. Plaintiffs do not dispute that therapeutic pet foods—and their vets' nutritional recommendations—benefit pets and that pet health would suffer if therapeutic foods were unavailable or sold without vet involvement. *See supra* Background Secs. I-IV; *see also* Ex. 4 at 120:5-10. Netz even admits that "consumers would be further harmed [in her but-for world] because they would not be able to buy the product that they prefer that has the higher-quality ingredients." Ex. J at 132:6-14. Sick pets would be harmed too because they would not get the right foods to support their health. *See supra* Background Secs. I, III.

Plaintiffs also use Netz's model to gloss over the individual issues of proximate causation that predominate. Mot. 12. Her model cannot support certification because it necessarily includes consumers who were not deceived, did not rely on the alleged misrepresentations, and were not harmed by Hill's conduct. *E.g.*, Ex. J at 101:7-10 ("[M]y analysis does not in any way tie the number or proportion of consumers who are under the misconception. That does not explicitly impact the damages in my analysis."); Ex. Q at 77:20-80:24. This is nothing more than a "market theory" of class-wide causation, which Illinois courts have explicitly rejected in consumer fraud cases. *See Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 155 (2002) (rejecting "'market theory' of causation" because it would mean that consumers "who saw the ads but never believed them, *i.e.*, those who 'knew the truth,' nevertheless have valid claims [and that] purchasers . . . who never saw the ads and, thus, were 'not deceived' also have valid claims").

### III.     No Common Evidence of Illegal Marketing.

Plaintiffs also allege that Hill's violated ICFA's unfair practices prong based on their contention that each PD product is a statutory drug under the FD&C Acts and thus misbranded or adulterated under the Acts.  Plaintiffs further theorize that PD's allegedly illegal marketing (1) offends public policy; (2) is "immoral, unethical, oppressive, or unscrupulous"; and (3) causes substantial injury to consumers.  Mot. 13-15.  Setting aside the obvious problems with a private plaintiff attempting to assert a cause of action that exists solely because of an alleged FD&C Act violation,[5] Plaintiffs have failed to generate common evidence of unfair practices.

*First*, Plaintiffs cannot prove with common evidence that any allegedly illegal marketing harmed consumers.  *See Anthony*, 2002 WL 31269621, at *2 (dismissing unfair practices claim for marketing of adulterated food for failure to show proximate cause).  Plaintiffs do not allege *any* harm tied to their illegal marketing theory, and any attempt to show that marketing was material to consumers would run into the same individualized issues that preclude certification of their deceptive-practices claim.  *See supra* Argument Sec. I; *see also Anthony*, 2002 WL 31269621, at *2 (unfair practices claim alleging deception must demonstrate materiality).

Netz's damages model cannot rescue Plaintiffs' illegal marketing claim.  Her single but-for world is premised on removing Defendants' alleged deceptive conduct (Ex. Q at 117:12-118:19), but as Netz admitted, the illegal marketing claim does not turn on proof of deceptive conduct (*id.* at 117:18-21).  Netz cannot articulate—let alone express in her damages model—

---

[5] "[T]he plaintiff must not be suing *because* the conduct violates the [FD&C Act] (such a claim would be impliedly preempted under *Buckman* [531 U.S. at 350])."  *Bausch v. Stryker Corp.*, 630 F.3d 546, 557–58 (7th Cir. 2010) (emphasis in original); *see also Anthony v. Country Life Mfg., L.L.C.*, 2002 WL 31269621, at *2 (N.D. Ill. Oct. 9, 2002), *aff'd sub nom. Anthony v. Country Life Mfg., LLC.*, 70 F. App'x 379 (7th Cir. 2003) ("The mere act of marketing adulterated food, by itself," is not an unfair practice that "offends public policy" under the ICFA.).

where the allegedly deceptive conduct ends and the unfair conduct begins. *Id.* at 118:21-121:23, 124:25-125:9. As explained in Defendants' concurrently filed motion to exclude (Hill's Mot. to Exclude Netz, at 8-12), these concessions make Netz's model unreliable for measuring damages under the unfair practices claim. It cannot support class certification for the same reasons. *See Comcast*, 569 U.S. at 36-38.

*Second*, Plaintiffs have no common proof that the alleged overpayment was unavoidable. *See Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (plaintiffs must show that conduct is "so oppressive as to leave the consumer with little alternative except to submit to it"). Whether "a class member could have avoided the defendants' conduct is an individualized question of fact." *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (denying certification of unfair practices claim). Plaintiffs have not attempted to show that they can prove a class-wide unavoidable injury. That would require individual inquiries into whether (1) consumers were willing to reject their vet's advice, as Vanzant, Land, and Fincham did (Ex. 1 at 161:1-163:7; Ex. M at 210:1-24; Ex. N at 18:8-14, 19:24-20:9), and (2) other foods would provide the same benefits as PD for each class member's pets (Ex. 4 at 126:3-129:25).

*Third*, Plaintiffs have no common evidence of a "substantial injury" under the ICFA's third prong, which requires common evidence that the alleged injury outweighs the countervailing benefits to consumers. *Batson*, 746 F.3d at 834. Again, Plaintiffs have not even tried to show that the alleged class-wide monetary injury outweighs the health benefits of each PD product's unique nutritional formulations or the prescription requirement. This, too, will require individual inquiry. Some consumers, like Vanzant and Nevius, would purchase PD knowing that it has not been approved by the FDA as a drug (Ex. 1 at 207:13-24; Ex. J at 214:23-215:24); others, like Fincham, will not (Ex. N at 18:8-14, 19:24-20:9). Likewise, many

consumers will agree with FDA and AAFCO that consulting with their vets before buying therapeutic foods does not hurt their pets—it protects them. *See supra*, Background Sec. III; Ex. B ¶¶ 14-17; Ex. C at 58:16-60:7. The only way to know is to ask each proposed class member.

*Finally*, individualized issues preclude certification on Plaintiffs' illegal marketing claim because each PD product differs in—among other things—its marketing claims, labeling, targeted health condition, formulation, and substantiation. Ex. A ¶ 12; Ex. 25a. Plaintiffs assert that all PD products are statutory drugs under the FD&C Acts. Mot. 12-13. The FDA has made no such finding—it has recognized that therapeutic foods like PD can be regulated as drugs, food, or both.[6] Ex. 34 at 3-4. A factfinder would need to conduct an individual review of the more than 40 different PD foods to determine on a product-by-product basis whether each food is a "drug" under the Act. *See* Ex. H ¶¶ 104-09; 21 U.S.C. § 321(g)(1)(B). This precludes certification of a portfolio-wide class for the unfair practices claim.[7]

## IV. Plaintiffs Are Atypical and Inadequate Class Representatives Because They Have Continued to Buy Therapeutic Foods.

Vanzant and Nevius cannot represent the proposed class because they continued to buy PD after becoming aware of the alleged deception and illegal marketing. *See, e.g.*, *Lipton v.*

---

[6] For example, because PD foods serve as the sole nutrition for the pet, and have been specially formulated to manage an animal ailment through their nutritional content to enable animal functionality, FDA could find that these products fall under FD&C Act section 321(g)(1)(C)'s structure-function exception to the definition of a "drug." Ex. H ¶¶ 98-103.

[7] Plaintiffs cannot base their illegal marketing claim on alleged violations of the Illinois FD&C Act (Mot. 13-14), because they did not plead it, even after two amendments. *See Bell v. Bimbo Food Bakeries Distrib., Inc.*, 2013 WL 6253450, at *9 n.8 (N.D. Ill. Dec. 3, 2013) (plaintiffs could not rely on unpleaded claims to support class certification). In any event, the state agency with authority to regulate pet food and enforce the Illinois FD&C Act authorized the conduct underpinning Plaintiffs' claim, triggering ICFA's safe harbor. *See* 815 Ill. Comp. Stat. Ann. 505/10b(1) (exempting from liability actions "authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States"); Ex. R (emails between Hill's and Ill. Dept. of Agriculture explaining that department "followed the guidance recommended by FDA for the [PD] brands and these are approved for registration in Illinois").

*Chattem, Inc.*, 289 F.R.D. 456, 459–60 (N.D. Ill. 2013). Though the complaint alleges that Plaintiffs "would not have purchased" PD absent "the false, deceptive, and misleading Prescription Requirement," SAC ¶ 76, that is exactly what Plaintiffs did, continuing to buy PD products even after filing this suit. Ex. 1 at 185:5-187:16, 194:19-196:11; Ex. 4 at 156:11-158:9.

This Court's decision in *Lipton* is instructive. There, the plaintiffs brought an ICFA claim based on the omission of hexavalent chromium as an ingredient in Dexatrim—but the plaintiff also "testified that she would have bought Dexatrim even if hexavalent chromium had been listed as an ingredient." *Lipton*, 289 F.R.D. at 459–60. That testimony rendered her inadequate because "a jury easily could find that she has not proved materiality, causation, reliance, or a connection between the detriment to her and the benefit to [the defendant] arising from [the] alleged misconduct." *Id.* at 460. As in *Lipton*, Plaintiffs' testimony could "sink" the claims of absent members who would be better served by a plaintiff without their "baggage." *Id.*; *see also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (unique defenses "may destroy" typicality and "bring into question" plaintiffs' adequacy).

**V.    Plaintiffs Cannot Sue Over Products They Never Purchased.**

Plaintiffs' alleged injuries have nothing to do with the dozens of PD products their vets never recommended and that Plaintiffs never purchased. Article III limits federal court jurisdiction to cases or controversies in which the plaintiff has suffered an injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The majority of courts in this District have found that class action plaintiffs lack standing to sue over unpurchased products because they have no injury-in-fact caused by products that they did not buy, particularly where "the purchased products [had] different formulations than the unpurchased products." *See Flaherty v. Clinique Labs. LLC*, 2021 WL 5299773, at *3–5 (N.D. Ill. Nov. 15, 2021) (plaintiff lacked standing for unpurchased products); *Bakopoulos*, 2021 WL 2915215, at *3; *see also Willard v. Tropicana*

24

*Mfg. Co.*, 577 F. Supp. 3d 814, 823 (N.D. Ill. 2021) (collecting cases). The complaint alleges that Vanzant and Nevius purchased only two PD foods: c/d Multicare Feline and i/d Canine. Plaintiffs cannot use Rule 23 as a back door to obtain standing to sue over different products that they never purchased. *See Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002).

While some courts in this Circuit have held that named plaintiffs can represent purchasers of products that are "substantially similar" to those purchased by named plaintiffs, *e.g.*, *Mednick v. Precor, Inc.*, 2014 WL 6474915, at *3 (N.D. Ill. Nov. 13, 2014), no PD food is substantially similar to another. Each PD product is specially formulated to address specific health needs (*e.g.*, Ex. A ¶ 12) and requires its own veterinary authorization (*e.g.*, Ex. 1 at 130:7-133:5, 197:2-199:11) (describing receiving separate veterinary recommendations for c/d, a/d, and k/d)). *See Flaherty*, 2021 WL 5299773, at *3–5. Indeed, to buy a *different* PD food, Plaintiffs' vets would need to recommend it—something they would not do unless they thought it was nutritionally indicated for the pets' health condition. *E.g.*, Ex. D at 24:14-25:5; Ex. C at 60:8-61:14.

Plaintiffs are not typical of purchasers of different PD products for the same reasons. As this Court has recognized, plaintiffs are atypical and inadequate class representatives where the "products they purchased varied widely" and those "differences in the products affected" the conduct at issue. *Smith-Brown v. Ulta Beauty, Inc.*, 335 F.R.D. 521, 528-30 (N.D. Ill. 2020) (Alonso, J.). A consumer like Vanzant, for example, who purchased c/d to help her cat recover from bladder stone surgery, went through a different purchase process than a consumer whose vet recommended r/d to help an obese cat lose weight. Each consumer would receive different information from the vet, would weigh different considerations, and would have different health goals for the food.

25

## CONCLUSION

For the foregoing reasons, Plaintiff's motion should be denied.


Dated: March 20, 2023        **O'MELVENY & MYERS LLP**

BY: */s/ Hannah Y. Chanoine*
      Hannah Y. Chanoine (*pro hac vice*)
      Jeffrey A. Kopczynski (*pro hac vice*)
      Gerard A. Savaresse (*pro hac vice*)
      O'MELVENY & MYERS LLP
      Times Square Tower
      7 Times Square
      New York, NY 10036-6524
      Telephone: (212) 326-2000
      hchanoine@omm.com
      jkopczynski@omm.com
      gsavaresse@omm.com

      Richard B. Goetz (*pro hac vice*)
      Justine M. Daniels (*pro hac vice*)
      O'MELVENY & MYERS LLP
      400 South Hope Street
      18th Floor
      Los Angeles, CA 90071
      Telephone: (213) 430-6000
      rgoetz@omm.com
      jdaniels@omm.com

      Amy J. Laurendeau (*pro hac vice*)
      O'MELVENY & MYERS LLP
      610 Newport Center Drive, 17th
      Floor
      Newport Beach, CA 92660
      Telephone: (949) 823-6900
      alaurendeau@omm.com

      John C. Gekas
      SAUL EWING LLP
      161 N. Clark, Suite 4200
      Chicago, IL 60601
      Telephone: (312) 876-7124
      john.gekas@saul.com

      *Attorneys for Hill's Pet Nutrition, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing, Defendant Hill's Pet Nutrition, Inc.'s Opposition to Plaintiffs' Motion for Class Certification, was filed electronically with the Clerk of the Court using the CM/ECF system this 20th day of March, 2023, and served electronically on all counsel of record.

*/s/ Hannah Y. Chanoine*
Hannah Y. Chanoine (*pro hac vice*)
