# EXHIBIT I

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

HOLLY BLAINE VANZANT, and
SHERRY NEVIUS, on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

HILL'S PET NUTRITION, INC., and
PETSMART, LLC,

Defendants.

Case No. 1:17-CV-2535

# EXPERT REPORT OF SARAH BUTLER

**August 26, 2022**

# Table of Contents

I.   QUALIFICATIONS ................................................................. 3

II.   DOCUMENTS REVIEWED ................................................. 4

III.  ASSIGNMENT AND SUMMARY OF OPINIONS ............... 4

IV.  BACKGROUND ................................................................ 19

V.   RESPONSE TO DR. REED-ARTHURS' SURVEY ............. 21
    A.   Summary of Dr. Reed-Arthurs' Survey ................................ 21
    B.   Response to Dr. Reed-Arthurs' Survey ................................ 27

VI.  BUTLER SURVEYS ......................................................... 43

VII. SURVEY METHODOLOGY ............................................... 44
    A.   Purchase Intention Survey ................................................... 44
    B.   Veterinarian Survey ............................................................. 67
    C.   Hill's Prescription Diet Customer Survey ........................... 76

VIII.    SURVEY RESULTS ....................................................... 84
    A.   Purchase Intention Survey Results ...................................... 84
    B.   Veterinarian Survey Results ................................................ 91
    C.   Hill's Prescription Diet Customer Survey Results ............ 111

IX.  CONCLUSIONS ............................................................. 118

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# I.    QUALIFICATIONS

1.      I am a Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property and Antitrust Practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

2.      Among my responsibilities, I conduct survey research, market research, and sampling analysis on a wide range of topics regarding business and consumer decision making, consumer perceptions, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues of trademark and trade dress confusion, secondary meaning, and false advertising, as well as in antitrust and employment-related litigation. I am a member of the American Association of Public Opinion Research, the American Statistical Society, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3.      I have also worked as a market researcher conducting surveys and other forms of research, including personally conducting focus groups and in-depth interviews with consumers and professionals. I have worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

4.      I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including brand awareness, purchase

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

processes, product attributes, market segmentation, new product research, and advertising strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including surveys, focus groups, and in-depth interviews.

5.      I have submitted expert reports, been deposed, and have testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

6.      NERA is being compensated for my services in this matter at my standard rate of $700 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## II.     DOCUMENTS REVIEWED

7.      As part of my work, I reviewed the *Complaint* in this matter and the expert report submitted by Dr. Rebbecca Reed-Arthurs.[1] A list of the specific materials I reviewed can be found in **Exhibit B**.

## III.     ASSIGNMENT AND SUMMARY OF OPINIONS

8.      I was retained by counsel of Defendants, Hill's Pet Nutrition, Inc. ("HPN") and PetSmart, LLC ("PetSmart") (collectively, "Defendants"), to review and respond to the report submitted by Dr. Reed-Arthurs in this matter. I have reviewed and provide a response to the

---

[1] Second Amended Class Action Complaint, *HOLLY BLAINE VANZANT, and SHERRY NEVIUS, on behalf of themselves and all others similarly situated v. HILL's PET NUTRITION INC., and PETSMART, INC.*, United States District Court for the Northern District of Illinois, Case No. 1:17-CV-02535, dated August 31, 2021 (hereinafter, "*Complaint*"); Expert Report of Rebbecca Reed-Arthurs, Ph.D., dated June 3, 2022 (hereinafter, "*Reed-Arthurs Report*").

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

survey Dr. Reed-Arthurs conducted of purchasers of "specialty" pet foods. There are a number of methodological flaws in Dr. Reed-Arthurs' research that render her survey's findings unreliable. In addition to my review of Dr. Reed-Arthurs' survey, I have conducted my own surveys. I designed an experiment to evaluate whether changes in the labeling for Hill's Prescription Diet pet foods would have an impact on consumers' willingness to purchase the product. I also surveyed veterinarians because I understand they play a key role in recommending therapeutic pet foods (indeed, these products cannot be purchased without veterinarian authorization). I surveyed veterinarians to understand why they recommend therapeutic pet foods, what information they convey to pet parents when recommending these foods, what questions or concerns about therapeutic foods are raised by pet parents, and whether veterinarians believe therapeutic foods should be available without authorization. I also surveyed pet parents who have purchased therapeutic foods (specifically Hill's Prescription Diet pet foods) to verify that they rely on veterinarians' recommendations and instructions and to understand, from the consumer perspective, what questions are asked of veterinarians. Below I briefly summarize my response to Dr. Reed-Arthurs' survey and present the results of my three surveys.

### A. Dr. Reed-Arthurs' Survey

9.      Dr. Reed-Arthurs surveyed 1,409 pet owners who have purchased "specialty" dog or cat food in the past six years. Based on her data, Dr. Reed-Arthurs opines that "a substantial number of actual or prospective 'prescription-only' pet food purchasers are led to believe that these products contain a drug or medicine by the way they are marketed and sold."[2]

10.      Based on my review of the Reed-Arthurs Report, I conclude this survey is methodologically flawed and unreliable. First, the design implemented by Dr. Reed-Arthurs lacks

---

[2] *Reed-Arthurs Report*, ¶ 20.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

internal validity. Internal validity characterizes the extent to which the researcher can definitively assert that the observed change in the dependent variable (belief that the product contains drugs) can only be attributed to manipulations in the independent variable (identifying the product as "prescription"). Dr. Reed-Arthurs' survey fails to meet the standards for internal validity in a number of ways:

- Dr. Reed-Arthurs does not adhere to proper experimental design. In her survey, all respondents are first presented with a juxtaposition between a "test" product described as a "prescription-only" product and a "control" product described as an "over-the-counter" product. Since all respondents see the same juxtaposition, there is no way to determine the extent to which *any* comparison between two products would have caused respondents to believe one product contains drugs and the other does not. Dr. Reed-Arthurs cannot use the "control" respondents to test and isolate the impact of any of the characterizations in her survey scenarios because all respondents have seen both test and control product descriptions. Simply asking different sets of respondents about only one half of the comparison they have already seen is not a proper control. Without a properly designed experiment, Dr. Reed-Arthurs has no way to tell whether consumers believe therapeutic pet food contains drugs due to the word "prescription" (which she purports to test), because they have been presented with the specific juxtaposition of "prescription-only" to "over-the-counter," or because the questions lead respondents to guess or attempt to infer the difference between the two products being compared.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- The use of the juxtaposition between "prescription-only" and "over-the-counter" for all respondents also creates a priming and framing bias. Again, because all respondents are shown this comparison first, all subsequent questions are answered with this relative comparison in mind. In other words, Dr. Reed-Arthurs' survey "teaches" respondents to understand there are two separate products that differ only in the way she has emphasized. Respondents are therefore attuned to identifying possible differences (based on what the survey has already shown them) far more than they otherwise would if they were simply asked to evaluate a product on its own.

11.     Dr. Reed-Arthurs' survey also fails to meet the standards for external validity. External validity is the extent to which the study's finding can be said to be applicable to the real world beyond the survey. Dr. Reed-Arthurs' survey does not represent the manner in which consumers purchase the at-issue products in the real world. The highly contrived "prescription-only" versus "over-the-counter" scenarios presented by Dr. Reed-Arthurs fail to approximate the way consumers first encounter therapeutic pet food. Pet owners who purchase therapeutic foods must have authorization from a veterinarian. Further, despite her repeated use of "prescription-only" and "over-the-counter" throughout each survey, Dr. Reed-Arthurs presents no data to demonstrate that this is how consumers understand and describe these products, and no real-world (or hypothetical) scenario in which consumers would actually encounter this binary description. Dr. Reed-Arthurs did not conduct any research with veterinarians or otherwise endeavor to understand the circumstances under which veterinarians recommend therapeutic foods.

12.     Dr. Reed-Arthurs' universe is also overly broad and therefore does not represent the characteristics of the putative class. Dr. Reed-Arthurs qualified respondents as those who have

purchased any "specialty" pet food, including food that is age or breed specific. Notably, no variety of Hill's Prescription Diet food is age or breed specific. As a consequence, purchasers of food for puppies or for poodles, for example, are being asked to opine about products they have never used, have no experience with, and are not likely to consider trying absent the recommendation of their veterinarian. Such respondents are likely to be overly reliant on the biased juxtaposition and scenario wording provided in the survey.

13.     Setting aside failures of both internal and external validity, Dr. Reed-Arthurs' survey does not address a number of Plaintiffs' key claims. In particular, her results provide no evidence that consumers' purchasing behavior has been or would be affected by the at-issue package labeling. She does not provide any evidence that individuals who have purchased therapeutic pet food would purchase anything different or pay any less for a food without the "prescription" label, nor does she demonstrate that behavior would change if the consumer was informed that the product did not contain drugs (*i.e.*, if the alleged deception was corrected). She also fails to provide any evidence that consumers' purchasing behavior has been or would be affected by any advertising or marketing seen in-store, whether in a PetSmart store, or in another retail location.

14.     Further, Dr. Reed-Arthurs' survey results directly contradict Plaintiffs' assertions that the inclusion of the word "prescription" on product packaging causes consumers to believe that at-issue products are FDA approved. As shown by her own data, nearly identical rates of respondents indicated that "The product has been reviewed and approved by the FDA or other government regulatory agency" regardless of whether they saw a "prescription" label or the "preferred" label (which did not use the "prescription" term).

15.     Additionally, with respect to the one issue she did purport to test – consumer perceptions of drug or medicinal content – Dr. Reed-Arthurs' results do not demonstrate that respondents have a uniform and consistent perception of the "prescription" product's ingredients. In fact, Dr. Reed-Arthurs' data suggest that perceptions about the presence of "drugs or medicine" vary by the question format and the information she presented to her respondents. Despite the variability in perceptions, overall, across all scenarios, between 54 and 80 percent of respondents do *not* believe the products contain "drugs or medicine," or "similar" substances.[3]

16.     For all of these reasons, Dr. Reed-Arthurs' survey is methodologically flawed, invalid, unreliable, and does not establish that any consumer would have purchased a different pet food or would have paid less for it, absent the conduct challenged in the *Complaint*.

## B. Butler Surveys

17.     As part of my work in this case, I designed and conducted three surveys. I understand that Plaintiffs have claimed that the product packaging for Hill's Prescription Diet pet food and the required veterinarian authorization mislead consumers into believing that the products contain drugs (or some "similar" substance), and this belief causes consumers to pay more than they otherwise would. Dr. Reed-Arthurs has not evaluated whether consumers would pay less for a product labeled in some other way. To evaluate Plaintiffs' claims as to the materiality of the product packaging, I conducted a survey to determine whether changes in the labeling for Hill's Prescription Diet pet foods would have an impact on consumers' willingness to purchase the product. Specifically, I examined whether the name "Prescription Diet" and references to clinical nutrition would impact purchase intent. Using a properly constructed experimental design, this survey compared the purchase intentions for three separate groups of

---

[3] See Table 1, highlighting these fluctuating results.

respondents; one shown the at-issue product labeling, one shown the same product with "Prescription" replaced with "Preferred,"[4] and one shown the packaging with a statement indicating that the product doesn't contain drugs.[5]

18.     I also understand that the role of the veterinarian is pivotal when pet parents are evaluating and considering therapeutic foods and that Plaintiffs have claimed the authorization requirement is misleading. I therefore conducted a survey of veterinarians. This survey was designed to understand how veterinarians implement the authorization requirement, why they recommend therapeutic pet food(s), what questions they receive from pet parents when recommending therapeutic pet food, what information they communicate to pet parents when recommending therapeutic pet food, and whether they would prefer therapeutic pet food be available to pet parents without an authorization. My survey of veterinarians also included questions about whether professionals receive any compensation or financial incentives for recommending therapeutic pet food and which retailer(s), if any, they recommend to pet parents for the purchase of therapeutic pet foods.

19.     Finally, to evaluate whether pet parents rely on the advice of their veterinarians (as opposed to relying on labels or making determinations based on in-store experiences or materials reviewed in-store), I also conducted a survey of purchasers of Hill's Prescription Diet pet foods. I asked these respondents what information they relied on when they first purchased Hill's Prescription Diet pet food, where they first purchased it, and what questions and concerns, if any, they raised with their veterinarian when the therapeutic pet food was first recommended/prescribed.

---

[4] Additional changes in accordance with Plaintiffs' allegations were made to this packaging.

[5] As described in greater detail below, the statement also indicated a prescription was not legally required.

20.     My survey results provide direct, empirical evidence contradicting the methodologically flawed and invalid survey put forward by Dr. Reed-Arthurs. I surveyed 600 purchasers of therapeutic pet food, 403 veterinarians, and 411 consumers of Hill's Prescription Diet pet food.[6] My results demonstrate the following:

## 1. Purchase Intention Survey

21.     I conducted a survey of 600 purchasers of therapeutic pet food to examine whether the at-issue labeling would affect purchase intentions. Respondents in my survey were randomly assigned to one of three separate groups – the Test Group, shown the at-issue packaging; Control Group 1, shown the same packaging but with "Prescription" replaced with "Preferred;"[7] and Control Group 2, shown the at-issue packaging with a statement[8] indicating that the product contains no drugs and a prescription is not legally required.[9]

- When asked what messages were mainly communicated by the product packaging, most respondents—regardless of group – indicated that the product was simply a pet food for specific health issues. Only two out of the total 200 respondents

---

[6] The sample sizes for each of my surveys are generally accepted as sufficiently large to draw reasonable conclusions about the population. As one author writes, "There are no hard-and-fast rules dictating the minimum number of survey respondents, other than to be derived from the cases. In the authors' experience, each cell of a survey (test and control) usually has at least 200 validated responses, although surveys with fewer numbers in each cell have been admitted and received weight." Edwards, G. K. & Mayberry, J. D. (2022). "The Daubert Revolution and Lanham Act Surveys," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., p. 351.

[7] Additional changes were made to this packaging including the removal of the following phrases from the product package: "Veterinary Exclusive," "Clinical Nutrition," and "Use only as directed by your veterinarian." I also removed the image of the stethoscope and flask associated with the phrase "Clinical Nutrition."

[8] By testing this language, I am not suggesting that a statement like the one tested is or should be required, or that the information "disclosed" in the statement (*i.e.,* that no law requires a prescription) is, in fact, true.

[9] The price shown was the same for each group and the details as to how the product and price were selected are described in footnote 83.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

shown the at-issue packaging (1.0 percent) gave a response that might indicate they understood the product to contain drugs or medication.[10]

- The likelihood of purchasing Hill's Prescription Diet is not affected by product labeling changes. When shown the real-world packaging with "Prescription" on the label (Test Group), 53.0 percent of respondents indicated that they would be likely to purchase the product. When shown the same product labeled with "Preferred Diet," instead of "Prescription Diet" (Control Group 1), 54.0 percent of respondents indicated that they would be likely to purchase. When shown the Hill's Prescription Diet pet food with a statement indicating that the product contains no drugs and does not legally require a prescription (Control Group 2), 58.0 percent of respondents indicated that they would be likely to purchase the product.

- When asked an open-ended question about why they would or would not purchase the pet food, respondents across all three groups were most likely to indicate that "veterinarian recommended" and the "price of the product" were the primary factors.

- Of those who indicated that they were likely to purchase the product, similar numbers in the Test and Control Groups indicated that the name of the product influenced their purchase intention (even though the name and/or package information differed across groups). A total of 38.7 percent of respondents in the Test Group indicated that the words "Prescription Diet" on the label positively

---

[10] See **Exhibit C.3**, Q2, Respondent 794, "Ingredients and medicine in it" and Respondent 1073, "The product has very specific feeding instructions that must be followed, just as any human medicated supplement would require."

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

influenced their likelihood of purchasing the product. In Control Group 1, 32.4 percent of respondents indicated that the words "Preferred Diet" on the label positively influenced their likelihood of purchasing the product. In Control Group 2, 49.1 percent indicated that the words "Prescription Diet" on the label positively influenced their likelihood of purchasing the product even though the label also included explicit information that the product did not contain drugs and a prescription was not legally required. These results demonstrate that use of the product name "Preferred" relative to "Prescription" has no statistical impact on consumers' likelihood of purchasing the product and the importance of the "Prescription" label is not affected when the product also includes a statement containing allegedly omitted information.

- Respondents indicating that "Prescription Diet" on the product label influenced their willingness to purchase the product generally believed that this meant the product was designed to meet a particular health purpose. In the Test Group, no respondents indicated that the word "Prescription" meant the food contained drugs or medication. Only one respondent in Control Group 2 indicated that the word "Prescription" meant the product contains drugs or medication,[11] and no respondents in Control Group 1 stated that "Preferred Diet" indicated that the product contained drugs or medication.

22.     The results of my purchase intention survey demonstrate that the "Prescription" labeling does not affect consumers' purchasing behavior. Consumers are no less likely to purchase a therapeutic product when it is labeled "Preferred," instead of "Prescription" or when it

---

[11] See, **Exhibit C.3**, Respondent 2794.

13

contains a statement indicating it contains no drugs compared to a product labeled "Prescription" without such a statement. Contrary to Plaintiffs' claims, the results of this study demonstrate that relevant purchasers would not change their purchasing behavior if the at-issue products were labeled differently.

## 2. Veterinarian Survey

23. I conducted a study of 403 veterinarians. Based on the results of this study, I find:

- Veterinarians recommend therapeutic pet foods for the nutritional management of specific health conditions.

- Veterinarians distinguish therapeutic pet food from non-therapeutic pet food. Commonly, veterinarians said that therapeutic foods differ from non-therapeutic foods because the formulations are designed for specific medical conditions, the formulations and ingredients are more exacting and of higher quality, and therapeutic foods are backed by scientific studies. Many veterinarians indicated that therapeutic foods can be harmful if improperly consumed and require oversight to ensure proper use.

- Veterinarians indicated that they primarily recommend therapeutic foods because pet patients have nutritional needs associated with chronic conditions (e.g., diabetes, joint pain), to reduce acute symptoms (e.g., vomiting, diarrhea), and because therapeutic food is effective.

- While veterinarians indicated that pet parents have questions about therapeutic food, only 15.9 percent reported that they are asked whether the product contains drugs or medications and 90 percent of veterinarians indicated that they do *not* communicate to pet parents that therapeutic pet food contains drugs or

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

pharmaceutical medications. In contrast, 82.4 percent of veterinarians indicated that they *do* inform pet parents that therapeutic pet food contains a special balance of nutrients designed to support a pet's specific condition and 63.0 percent tell pet parents that diet has a proven connection to health. The majority of vets (71.7 percent) also tell their pet parents that the therapeutic food can be returned for a replacement or a refund if the pet owner is not satisfied.

- Over three quarters of veterinarians (78.4 percent) indicated that therapeutic pet food should *not* be available for purchase without a veterinarian's authorization. These respondents indicated that the wrong food could cause harm, that pet parents may misdiagnose a pet's condition, that pet parents may confuse similar sounding foods, and/or noted that without authorization they would not have the ability to monitor the pet's health effectively. Of the small proportion of respondents who indicated that they believed therapeutic foods should be available without an authorization, a number indicated that the necessity of authorization may depend on the particular health condition (i.e., some conditions like weight loss may not warrant regular veterinary supervision while others, like renal disease, may). Others suggested that once the pet is seen, an authorization may no longer be needed. A few also expressed concern that the costs of a veterinarian visit may be a challenge for some pet parents, and seven respondents indicated that because the substance is not a drug or medication, they believe pet parents should be able to purchase it without authorization.

- The majority of veterinarians (89.1 percent) indicated that they have therapeutic pet food available for purchase in their office. When veterinarians offer

therapeutic food for purchase at their office (as opposed to at a retailer), most (55.8 percent) indicated that they will simply note the therapeutic food has been authorized and inform the pet owner/clinic staff that the food can be purchased. Only a small proportion of respondents (5.7 percent) reported that they routinely provide pet parents making purchases in-office with a written copy of the authorization to take to the front desk. When providing authorization for therapeutic pet food purchase outside the clinic/hospital, 61.8 percent of the veterinarians surveyed indicate that they will provide a written authorization for the pet parent to take with them. When writing an authorization for therapeutic pet food, the vast majority of veterinarians include information about the type of food to be purchased (90.8 percent), as well as a recommendation of a specific brand to be purchased (82.9 percent), refill information and duration of authorization (79.7 percent), and information about whether the authorized food is wet, dry, or both (75.4 percent).

24.     The results from the veterinarian survey demonstrate that professionals view therapeutic pet food as beneficial for their patients and believe that requiring authorization is important for keeping pets healthy and safe. These data also indicate that veterinarians recommend specific brands when authorizing therapeutic food (suggesting that consumers are unlikely to review and rely on packaging labels or in store product displays), and that consumers purchasing in-office may never receive a written authorization. Finally, these results demonstrate that veterinarians generally do not receive questions about whether therapeutic foods contain drugs and are not conveying such information to pet parents.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### 3.   Hill's Prescription Diet Customer Survey Results

25.      Finally, I conducted a survey of 411 pet parents who have purchased Hill's Prescription Diet pet food to evaluate whether pet parents rely on the advice of their veterinarians (as opposed to relying on labels or making determinations based on in-store experiences or materials reviewed in-store). These results demonstrate that:

- In open-ended responses, respondents report purchasing Hill's Prescription Diet pet food because it was recommended by their veterinarian. Few respondents, when asked why they purchased the product, use the language of "prescription" in their open-ended response. The fact that actual purchasers do not use the language of "prescription" reinforces my critique of the scenarios presented in Dr. Reed-Arthurs' survey, which do not represent how consumers have learned about and think about these products in the real world.

- When asked to select reasons for purchasing from a list, 81.5 percent indicated their veterinarian "recommended" or "prescribed" this pet food as a reason for why they first purchased the product.

- A total of 38.2 percent of respondents indicate that authorization from their veterinarian or recommendations from their veterinarian's staff were the only sources of information they consulted prior to purchasing the at-issue products.

- More than half of all surveyed respondents (52.1 percent) indicated that they did not review the product online, in a store, or at their veterinarian's office when first purchasing Hill's Prescription Diet pet food.

- Of the minority who indicated that they did look at the bag or cans of food online, in-store, or at their veterinarian's office, 57.8 percent received the authorization

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

first, before looking at the food. Furthermore, when looking at the food, consumers were generally seeking information about the product type (dry or wet food), flavor, or ingredients.

- Finally, the data from this survey confirms the results from my veterinarian survey regarding the types of questions pet parents ask about therapeutic pet foods. Generally, pet parents ask about feeding regimes, product safety, and product benefits. Only seven respondents, out of the 411, mention asking anything about "prescription" or "medicine," and a number of these respondents simply seem to be referencing the fact that they are placing their pet on a "prescription" diet. None of the respondents in this survey mention asking their veterinarian questions about "drugs."

26.     In sum, Dr. Reed-Arthurs' survey lacks both internal and external validity and is methodologically flawed and invalid. Moreover, her results are limited and provide no data demonstrating that consumers rely on product packaging or in-store product displays and no evidence that consumer behavior would change given any alternative labeling.

27.     The surveys I conducted are designed in accordance with generally accepted scientific principles for valid and reliable scientific evidence, and my surveys address Plaintiffs' key claims. First, because I understand Plaintiffs have claimed that the product packaging and labeling have misled consumers and have caused consumers to pay more for the product than they otherwise would, I tested the at-issue label. I compared consumers' perceptions and purchase intentions for a product labeled "Prescription" to the same product labeled "Preferred" and the same product with a statement indicating that it contains no drugs and does not require a prescription. Each product was shown with the same price. The results show that changes in the

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

product labeling had no impact on consumers' willingness to purchase and interest in purchasing the products.

28.     I also understand that Plaintiffs have claimed the authorization process (or "prescription requirement") is misleading, therefore I have surveyed veterinary professionals to better understand the more about this requirement and the communications that occur between veterinarians and pet parents. The results of this survey demonstrate that veterinarians provide authorizations to pet parents in different ways. It also demonstrates that veterinarians believe therapeutic foods are efficacious and should not be available without authorization as this may pose a health risk to pets. Finally, few veterinarians are asked by pet parents whether therapeutic foods contain drugs or medicine, and 90 percent of veterinarians are not telling their pet parents that therapeutic foods contain drugs or medication.

29.     My survey of Hill's Prescription Diet purchasers finds consumers of Hill's Prescription Diet pet food generally rely on the recommendation or authorization of their veterinarian. More than half of respondents indicate that when they first purchased Hill's Prescription Diet pet food, they did not look at the bag/can in the store, online, or at their veterinarian's office for any information. The data from this survey confirms the data from the veterinarian survey – purchasers are not asking whether the food contains drugs or medicine.

30.     The remainder of this report includes a discussion of my general understanding of the background in this matter, a response to the survey conducted by Dr. Reed-Arthurs, the details of the surveys I conducted, and presents the results of my surveys.

## IV.  BACKGROUND

31.     Defendant HPN manufactures, distributes, markets, labels, and sells therapeutic pet foods, or therapeutic diets, under the brand or label "Prescription Diet." These foods are

19

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

designed specifically for pets facing health conditions.[12] These pet foods require a veterinarian's authorization prior to purchase.[13]

32.     Defendant PetSmart is a brick-and-mortar and online retailer of pet goods. PetSmart sells therapeutic pet foods, including Hill's Prescription Diet pet food, to consumers in Illinois.[14] I understand that PetSmart sells Hill's Prescription Diet pet food in its stores and online pursuant to veterinary authorization (what Plaintiffs call a "prescription").[15]

33.     Plaintiffs allege that "[t]he Prescription Requirement is false, deceptive, and misleading"[16] because therapeutic pet food is not legally required to be sold by prescription and does not contain any drugs or medicine.[17] Plaintiffs further allege consumers were harmed because "consumers paid above-market prices for Prescription Pet Food – many for a significant period of time – and because Plaintiffs did not receive what they expected to receive when they purchased Prescription Pet Food."[18]

34.     In support of their allegations, Plaintiffs hired Dr. Reed-Arthurs to design and conduct a survey.

---

[12] https://www.hillspet.com/prescription-diet, last accessed August 18, 2022. See also, *Complaint*, ¶ 28. However, Plaintiffs contend that prescription pet food is not materially different than non-prescription pet food, *Complaint*, ¶ 35.

[13] HILLS-VANZ-0543778-0543779.

[14] *Complaint*, ¶¶ 10–11.

[15] *Complaint*, ¶ 23.

[16] *Complaint*, ¶ 25.

[17] *Complaint*, ¶¶ 32, 34.

[18] *Complaint*, ¶ 60.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## V.  RESPONSE TO DR. REED-ARTHURS' SURVEY

### A.  Summary of Dr. Reed-Arthurs' Survey

35.     Dr. Reed-Arthurs designed a survey to assess whether or not consumers believe that "prescription-only" pet food contains a drug or medication based on the way it is marketed and sold.[19] Dr. Reed-Arthurs surveyed 1,409 cat and dog owners. To qualify for the survey, respondents had to indicate that they have purchased one of the following types of "specialty" foods in the past six years: age-specific (*e.g.,* senior care, kitten/puppy care), breed-specific (*e.g.*, American Shorthair or Siamese/Golden Retriever, Large Breed, or Small Breed), health-specific (*e.g.*, weight management, urinary health, kidney support, or digestive care), or any other foods offering unique attributes (*e.g.*, those labeled as grain-free, gluten-free, high protein/fiber, low glycemic, non-GMO, natural, or organic).[20] Respondents were also asked (but were not qualified based on a particular answer) the brand(s) of pet food they had purchased.[21] Respondents were also asked to indicate where they had purchased the "specialty" pet food.[22]

36.     Once qualified, respondents were assigned to a pet type (cat or dog) for the remainder of the survey.[23] Next, respondents were asked the following open-ended question, "What are the most important factors that you considered when selecting a [dog/cat] food for a specific characteristic, attribute, or health issue?"

37.     All respondents were then provided with the following instructions:

Imagine you are considering two different [cat/dog] foods that are both marketed for [urinary health in cats/digestive health in dogs].

---

[19] *Reed-Arthurs Report*, ¶ 20.

[20] *Reed-Arthurs Report*, Attachment D, Questions 4a & 4b.

[21] *Reed-Arthurs Report*, Attachment D, Questions 3a & 3b. This list included Hill's, but Hill's Prescription Diet was not listed.

[22] *Reed-Arthurs Report*, Attachment D, Questions 7a & 7b.

[23] *Reed-Arthurs Report*, ¶ 43.

21

Product A is a prescription-only [cat/dog] food product. You must have a prescription from your veterinarian to purchase this item for your pet.

Product B is an over-the-counter [cat/dog] food product. Anyone can buy this food without checking in with a vet. There is no restriction on the sale of this product.

38.     This description, provided to all respondents, is described as Scenario 1 by Dr. Reed-Arthurs. After reviewing this information, respondents were asked, "Do you think there is a difference between a pet food product that requires a vet's prescription to purchase the product and an over-the-counter product that does not require a prescription?" with response options "Yes," "No," and "I don't know."[24] Respondents who answered "Yes" or "I don't know" were then asked an open-ended follow-up question "In your opinion, what is that difference / are those differences?"[25]

39.     Next, all respondents were assigned to see a question either about the "prescription-only" food (treatment group) or the "over-the-counter" food (control group) and were asked to select from a list of statements which they believe apply to the product.[26] Specifically, respondents were asked "Which of the following statements do you think apply to [cat / dog] pet foods that [require a vet's prescription to purchase / are sold over-the-counter]?" Included in the list of response options were: "the product contains a medicine or drug" and "the product has been reviewed and approved by the FDA or other government regulatory agency."

40.     Next, respondents were presented with Scenario 2. Respondents were reassigned to a treatment or control group. Treatment group respondents saw product packaging for Hill's Prescription Diet or Royal Canin Veterinary Diet as they exist in the marketplace. Control group

---

[24] *Reed-Arthurs Report*, Attachment D, Question 9.

[25] *Reed-Arthurs Report*, Attachment D, Question 10.

[26] *Reed-Arthurs Report*, Attachment D, Question 11.

respondents saw the same products as those in the treatment groups, except the stimuli were edited to remove references to "prescription" (and similar terms) and the name on the product was changed to "Preferred Diet." Any references to the product being available under the direction of a vet were removed as well.[27]

41.    As respondents were presented with the pet food product, they were provided with the following instructions:[28]

**Now consider a <u>new and different</u> scenario....**

Imagine during a recent visit to the vet you were told that your [[IF HILL'S PIPE "cat has a urinary health issue" or "dog has a digestive health issue"/ IF ROYAL CANIN PIPE "cat has a blood glucose issue" or "dog has a gastrointestinal issue"]], and your vet prescribed [cat / dog] food to support your pet's health.

[TREATMENT GROUP] You are about to view product information associated with a <u>prescription-only</u> pet food product. <u>You must have a prescription from your veterinarian to purchase this food for your pet.</u>

[CONTROL GROUP] You are about to view product information associated with an <u>over-the-counter</u> pet food product. Anyone can buy this food <u>without</u> checking in with a vet. There are <u>no restrictions</u> on the sale of this food.

Please take as much time reviewing this product information as you would if your vet [TREATMENT/CONTROL: prescribed/suggested] the food, and you were considering making a purchase.

42.    All respondents were then asked an open-ended question: "Based on the <u>prescription-only / over-the-counter</u> product information you just viewed what, if any, messages were conveyed to you about this pet food?"[29]

43.    Next, respondents were asked: "Thinking specifically about the <u>content and ingredients</u> of the food, does the [<u>prescription-only</u> / <u>over-the-counter</u>] product information you

---

[27] *Reed-Arthurs Report*, ¶ 57.

[28] *Reed-Arthurs Report*, Attachment D, pp. 16-20.

[29] *Reed-Arthurs Report*, Attachment D, Question 12.

just viewed, convey anything to you about the content and ingredients of the pet food?"[30]

Respondents who answered "Yes" were asked to explain what information was conveyed.[31]

44.    Next, all respondents were asked "Based on the [prescription-only / over-the-counter] product information you just viewed, do you agree, disagree, or not know whether the following statements describe the pet food you just viewed?" Included in the list of response options were the following statements: "I think this pet food contains a medicine or drug" and "I think this pet food has been reviewed and approved by the Food and Drug Administration ("FDA") or other government regulatory agency."[32]

45.    Finally, respondents were taken to the final scenario, Scenario 3. In Scenario 3, respondents were again re-randomized into either the treatment or control group. Based on their assignment, respondents were assigned to see one of the following two PetSmart related scenarios: [33]

**Treatment Group Scenario**

**Now consider a new and different scenario.…**

Now imagine that you have walked into a pet specialty store like PetSmart to purchase a pet food prescribed by your vet. You are told by the cashier that you need a MedCard to purchase the product.

You are directed to the onsite veterinarian counter. The staff behind the counter collects information about your pet, requests a written prescription from your vet and/or the contact information for your vet to verify the pet food prescribed and expiration date of the prescription, and then issues you a MedCard for your pet that includes an RX# and an RX expiration date.

---

[30] *Reed-Arthurs Report*, Attachment D, Question 13.

[31] *Reed-Arthurs Report*, Attachment D, Question 14.

[32] *Reed-Arthurs Report*, Attachment D, Question 15.

[33] *Reed-Arthurs Report*, Figures 5a and 5b.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

You select the prescribed food from the veterinary product section of the store. At check out, the cashier asks you to present your MedCard which is required to purchase this prescription-only product.

 

**Control Group Scenario**

**Now consider a <u>new and different scenario</u>.…**

Now imagine that you have walked into a pet specialty store like PetSmart to purchase a pet food suggested by your vet.

You are told that the food is available over-the-counter. You are directed to the specialized nutrition section of the store.

You select the suggested product off the shelf and take it to the cashier. The cashier scans the food and allows you to pay without asking for any information regarding your pet or your vet's suggestion.

46.     After being presented with either the treatment or control group scenario, respondents in the treatment group were first asked what the MedCard requirement conveys and what the MedCard requirement specifically conveys about the content and ingredients of the food. In the control group, respondents were asked what selling over-the-counter products in the specialized nutrition pet food section of the store conveys and what this conveys about the content and ingredients of the pet food.[34]

---

[34] *Reed-Arthurs Report*, Attachment D, Questions 16, 17, 18.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

47.     Lastly, respondents were asked "Based on the fact that PetSmart

**[TREATMENT**: requires you to obtain a MedCard for your pet's food, and requires you to

present the card at checkout / **CONTROL**: sells the suggested pet food over-the-counter and does

not require any additional information at checkout**]**, do you agree, disagree, or not know whether

the following statements describe the pet food you purchased?"[35] Included in the list of response

options were the following statements: "I think this pet food contains a medicine or drug" and "I

think this pet food has been reviewed and approved by the Food and Drug Administration

("FDA") or other government regulatory agency."

48.     The final question asked respondents to select from a list of possible brand(s)

which, if any, they purchased for a specific characteristic, attribute, or health issue in the last six

years.[36]

49.     Based on these foregoing three scenarios, Dr. Reed-Arthurs opines that "almost

20% of respondents provided unprompted open-ended responses that indicated that they believed

the difference between a prescription-only and an over-the-counter pet food product was that the

prescription-only product contained a drug, medicine, regulated or controlled substance, or

similar."[37] After assigning respondents to conditions in Scenario 1 and asking respondents about

which statements apply to pet foods that require a vet's prescription to purchase (treatment) or pet

foods that are sold over-the-counter (control), Dr. Reed-Arthurs concludes that "marketing pet

food as prescription-only as opposed to selling it over-the counter, causes 46% of actual or

prospective prescription-only pet food purchasers to believe those products contain a drug or

---

[35] *Reed-Arthurs Report*, Attachment D, Question 19.

[36] *Reed-Arthurs Report*, Attachment D, Questions 20a and 20b.

[37] *Reed-Arthurs Report,* ¶ 21.

medicine."[38] Dr. Reed-Arthurs opines that "the answers received in scenario 1 are the most general and broadly applicable evidence of the impact of marketing a pet food as prescription-only as opposed to selling it over-the-counter."[39] From Scenario 2, she concludes that the labels convey to a net 22% of respondents that the pet food contains a drug or medicine.[40] From Scenario 3, she concludes that the purchase process from PetSmart conveys to a net 46% of respondents that the pet food contains a drug or medicine.[41] In sum, Dr. Reed-Arthurs concludes that a substantial number of actual or prospective "prescription-only" pet food purchasers are led to believe that these products contain a drug or medicine by the way they are marketed and/or sold.[42]

## B. Response to Dr. Reed-Arthurs' Survey

### 1. Survey Lacks Internal Validity

50.     Validity is a critical foundation of proper, reliable research. Internal validity refers to the extent to which a researcher can confidently assert that the observed or measured effect is caused by the intended treatment variable and is not due to some extraneous factor(s). For example, when a researcher wants to determine whether A (*e.g.*, "prescription labeling") causes B (*e.g.*, a belief that the product contains drugs) the researcher must carefully control for all other variables within the experiment that could have had an effect on B. Within any survey being used to evaluate a causal proposition, a wide range of extraneous variables may influence the results and undermine the reliability of the researcher's conclusions. These extraneous variables (*e.g.*,

---

[38] *Reed-Arthurs Report,* ¶ 22.

[39] *Reed-Arthurs Report,* ¶ 52.

[40] *Reed-Arthurs Report,* ¶ 23.

[41] *Reed-Arthurs Report,* ¶ 24.

[42] *Reed-Arthurs Report,* ¶ 20.

questions which suggest or lead respondents to provide particular answers, pre-existing beliefs, guessing, and other forms of survey noise) can impact the way in which a respondent behaves and responds in the survey.[43] When failing to account for such extraneous variables, the resulting estimates are unreliable, and the researcher cannot determine the extent to which the estimate is truly causal or is simply an artifact of "noise." The design implemented by Dr. Reed-Arthurs lacks internal validity because her survey exposes all respondents to the same treatment, lacks a true control, and suffers from framing and priming effects (discussed more below). Each of these flaws individually renders her results unreliable and, taken together they undermine any reasonable conclusions about the extent to which consumers perceive that the at-issue products contain drugs or medication.

51.     The first way Dr. Reed-Arthurs' design lacks internal validity is because all respondents are first presented with a juxtaposition between a product described as a "prescription-only" product and a product described as an "over-the-counter" product.[44] While different groups are later randomly assigned to answer questions about only one of the types of products described, *all groups* have already been presented with the treatment (*i.e.,* Scenario 1) that explicitly articulates differences between "prescription-only" and "over-the-counter" products. Due to this methodological flaw, Dr. Reed-Arthurs has designed an experiment in which there is *only* a treatment effect and no control. The fact that some respondents are later only

---

[43] For a review of preexisting psychological tendencies of survey respondents, biases of the survey content or survey sequencing, and/or a review of biases that may originate from a specific survey question that may affect the way a survey respondent behaves see discussion in Neal, D. T. (2022). "Psychological Considerations in Designing Trademark and False Advertising Survey Questionnaires," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., (hereinafter, "*Neal*"), pp. 273–290.

[44] As discussed below, this juxtaposition also lacks external validity as there is not a real-world scenario in which the same products, one described as "prescription-only" and one described as "over-the-counter," would appear together.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

asked about the "over-the-counter" product does not serve as an appropriate control since this product has already been described within the context of the prescription product and vice versa.

52.     There is no way to use Dr. Reed-Arthurs' survey results to determine what share of respondents are affected by the word "prescription" versus the share of respondents affected by a contrasting of two products. Incorrectly, Dr. Reed-Arthurs claims that because she randomizes the product asked about in later Scenarios (*i.e.,* only half get asked about "prescription-only" and half get asked about "over-the-counter") she is "netting out" the impact of any bias introduced by the contrast.[45] But, this later randomization does not "net" or control for the effect of the specific juxtaposition of two products. In other words, because all respondents are first exposed to the *same* treatment scenario (*i.e.,* all respondents are told there are "prescription-only" products and "over-the-counter" products), Dr. Reed-Arthurs cannot use the later answers from those being asked about the "over-the-counter" products to isolate the impact of the word "prescription." Since every respondent sees the juxtaposition of "prescription-only" products and "over-the-counter" products, there is simply no way to measure or account for the share of respondents who are simply guessing as to the intended product differences.

53.     Dr. Reed-Arthurs presents no methodological justification as to why respondents needed to be presented with a description juxtaposing these two characterizations of the products. Dr. Reed-Arthurs does not present any evidence that consumers perceive of pet food products as "prescription-only" versus "over-the-counter." Nor, as she admitted at her deposition, does she know whether the terms "prescription-only" or "over-the-counter" are juxtaposed – or even appear – in the evidence available in this case.[46] By designing a survey which first "teaches" all

---

[45] Deposition of Rebbecca Reed-Arthurs, Ph.D., dated July 8, 2022, (hereinafter, "*Reed-Arthurs Deposition*"), 271: 12-21.

[46] *Reed-Arthurs Deposition*, 181:5-13.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

respondents to be sensitized to product differences with this manufactured juxtaposition, Dr. Reed-Arthurs ensures all of her subsequent survey questions (regardless of being asked about "prescription-only" or "over-the-counter only") are informed by this framing. The forced comparison also means it is impossible to understand what consumer perceptions would have been absent framing, *i.e.,* there is no way to determine what any consumers independently believe about a prescription product.

54. Had Dr. Reed-Arthurs insisted on using a juxtaposition, a proper control would have assigned a separate group of respondents to review a different comparison to evaluate the extent to which any comparison would suggest to respondents that one of the products described contained medication or drugs. The importance of including the comparative element in a separate control is explained by one author as follows:[47]

> A good control should match the tested advertisement as closely as possible in every respect other than the aspect of the test stimulus alleged to contain the misinformation. One court held that if the allegedly misleading advertisement is comparative, the control advertisement also must be comparative, because consumers are predisposed to take away claims of superiority from any comparative presentation.

55. Using a design that has a separate control group shown a different juxtaposition would properly control for and isolate the extent to which *the word* "prescription" (what Plaintiffs allege is misleading), as opposed to simply a *comparison between* "prescription-only" and "over-the-counter" (the framing posed to all respondents in Dr. Reed-Arthurs' survey), causes respondents to believe a particular product contained drugs or medication. As designed, there is no way for Dr. Reed-Arthurs to know how much the word "prescription" caused the belief that the product contains drugs or medicine because all respondents saw the same juxtaposition.

---

[47] Bernstein, D. H. & Keller, B. P. (2022). "Survey Evidence in False Advertising Cases," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., (hereinafter, "*Bernstein*"), pp. 216–217.

## 2.   Survey Suffers from Framing and Priming Bias

56.     Dr. Reed-Arthurs' survey design is again problematic as the use of an explicit product juxtaposition means that all respondents will frame their answers to subsequent questions in terms of product differences first described in the survey, regardless of whether they are later sorted into putative treatment and control groups and asked about "prescription" or "over-the-counter" products. This framing introduces bias which likely increased the rate at which respondents indicated that "prescription-only" products contain drugs or medication and depressed the rate when respondents were asked about "over-the-counter" products. For example, a survey in which the researcher contrasts diet soda to regular soda and asks questions about how "healthy" either product is will likely generate very different results from research in which respondents are simply asked to indicate how healthy diet soda is.

57.     Further problematic in Reed-Arthurs' survey is the fact that the descriptor "prescription-only" (and its contrast to "over-the-counter") primes respondents at the very start of the survey to attend to product differences that might be related to this term. This is particularly the case since Scenario 1 includes no packaging images, or other ingredient information that might provide context.[48] As explained by one author, "Priming refers to a generally nonconscious process in which exposure to one piece of information influences (i.e., primes) the interpretation of other information that a person subsequently encounters."[49] This author later explained why priming can be problematic:[50]

---

[48] Additionally, while the introduction to the question indicates that both products are "marketed" for a particular condition, the question itself does not include this information and simply asks whether there is a difference between products that require a prescription and those that do not. It is hardly surprising that the majority of respondents in Dr. Reed-Arthurs' survey simply repeat back the information that was just provided to them – *i.e.,* that one product requires a prescription, and one does not.

[49] *Neal*, p. 284.

[50] *Neal,* pp. 284–285.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Priming can become a source of bias, however, when a survey makes certain mental content more or less salient in people's thinking than plausibly occurs in the relevant real-world context. This is especially problematic when a logical case can be made that, by making certain mental content more or less salient, the survey has tilted the results in favor of the side sponsoring the survey. Design flaws of this kind can be fatal to a survey because they make it impossible to know whether the results are driven by improper priming or by the defendant's alleged infringing or deceptive behavior.

58.     Dr. Reed-Arthurs characterizes this bias as "focalism bias"[51] and asserts that any such bias is remedied by her use of a treatment and control design.[52] But of course, rather than offsetting focalism or priming, Dr. Reed-Arthurs' design exacerbates these biases by exposing every respondent to the same juxtaposition between "prescription-only" and "over-the-counter" pet food. Again, there is simply no way to net out the impact of the juxtaposition because all respondents are exposed to it and answer subsequent questions with this frame of reference in mind. Simply randomly asking respondents to answer questions about only one half of the product comparison does not alter the fact that the comparison was shown to all respondents and serves as the baseline for answering subsequent questions. Dr. Reed-Arthurs reinforces the bias throughout the survey. For example, rather than allow respondents to review the product packaging and formulate their own opinions of what is being communicated, in her Scenario 2, Dr. Reed-Arthurs tells respondents what information they should focus on. The instructions are shown below in Figure 1.

---

[51] *Reed-Arthurs Deposition*, 67:25–68:5. One author noted focalism bias causes respondents "to give too much weight to one particular piece of information when making judgments and predictions" which leads them to make "inaccurate judgments as a result." Hanko, K. (2007). "Focalism," *Encyclopedia of Social Psychology,* edited by Baumeister, R. F. &Vohs, K. D., p. 352.

[52] *Reed-Arthurs Deposition*, 68:21–72:19.

**Figure 1. Reed-Arthurs' Scenario 2 Instructions**[53]

Imagine during a recent visit to the vet you were told that your [[IF HILL'S PIPE "cat has a urinary health issue" / IF ROYAL CANIN PIPE "cat has a blood glucose issue"]], and your vet prescribed cat food to support your pet's health.

You are about to view product information associated with a <u>prescription-only</u> pet food product. <u>You must have a prescription from your veterinarian to purchase this food for your pet.</u>

59.     The "prescription-only" language is repeated again in the next question, and again for each of the following four questions in this section. Therefore, in no uncertain terms, Dr. Reed-Arthurs repeats and focuses the respondent on "prescription-only."[54] Scenario 2 is not a test of what respondents believe the packaging to convey or communicate because Dr. Reed-Arthurs has informed respondents what information they should attend to and how they should contextualize their answers.

60.     By the time a respondent has reached Scenario 3, asking about the MedCard, she has been told to consider the "prescription-only" or (if in the putative control group) "over-the-counter" characteristic of the product in question approximately seven times.[55] It is then no surprise that a respondent would understand the MedCard to be affiliated with a prescription product. Like Scenario 2, Scenario 3 is not a test of what respondents believe the MedCard to convey (Dr. Reed-Arthurs did not even ask respondents what they believed a MedCard was) or communicate because Dr. Reed-Arthurs has already informed respondents what it should mean to them. Again, absent a properly designed, separate control group there is no way to determine the extent to which this signaling affected Dr. Reed-Arthurs' estimates, signaling that becomes more

---

[53] *Reed-Arthurs Report,* Attachment C.

[54] For respondents asked about "over-the-counter" products, the focusing bias is the same simply in the opposite direction. Respondents are reminded again and again that no authorization is needed.

[55] Respondents are told to consider the product as an "over-the counter" or "prescription-only" product twice at Scenario 1, at questions 9 and 11, and five times at Scenario 2, at both the intro to the scenario and questions 12, 13, 14, and 15.

entrenched in respondents' mind as the survey progresses. Dr. Reed-Arthurs also testified that to the extent respondents are becoming fatigued throughout the survey (particularly due to the repetitive nature of the questions), they may respond to questions less carefully, which would be most likely to occur in Scenario 3 as this is the last Scenario in the survey.[56]

61.     Dr. Reed-Arthurs is similarly unable to accurately test what the MedCard conveys or communicates to consumers independent of the differences between the "treatment" scenario and "control" in Scenario 3. For example, the "treatment" scenario requires a "prescription" for the pet food, states the food has been "prescribed" by a veterinarian, directs respondents to the "onsite veterinarian counter," directs respondents to the "veterinary product section of the store" to purchase the product, and states the pet food is "prescription-only."[57] In contrast, the "control" scenario does not require a "prescription," states the food has been "suggested" by the veterinarian, does not direct respondents to any veterinarian counter, directs consumers to the "specialized nutrition section of the store" to purchase the product, and states the pet food is available "over-the-counter."

62.     In sum, Dr. Reed-Arthurs' survey lacks internal validity. Because all respondents were exposed to the juxtaposition between "prescription-only" and "over-the-counter" products at the outset of the survey, there is no true control group and no way to measure what proportion of respondents would have endorsed one of any juxtaposed products as having drugs or medication (or what proportion of respondents would have affiliated the MedCard with drugs or medication), what share of respondents were influenced by the repetitive emphasis on "prescription-only," and what share of respondents were guessing or were otherwise influenced by survey noise. For this

---

[56] *Reed Arthurs Deposition*, 263:3-18; 264:3-9.

[57] *Reed Arthurs Deposition*, 275:17-279:23.

reason, Dr. Reed-Arthurs' survey is fundamentally methodologically flawed, and her estimates are unreliable.

### 3. Survey Lacks External Validity

63.     Another key measure of the usefulness and reliability of research is the extent to which the research has external validity. External validity is a measure of whether the results of the study can be generalized to a population beyond the study participants. A survey experiment with superior internal validity, but little to no external validity, is extremely limited and is not reliable for estimating real-world behaviors or perceptions.

64.     Dr. Reed-Arthurs' survey lacks external validity because her survey does not represent the manner in which consumers purchase the at-issue products. In her survey, respondents are first presented with a short, text-only description of two types of hypothetical products, "prescription-only," and "over-the-counter" (which frames and primes the remainder of the survey). Dr. Reed-Arthurs cites no evidence that any consumer would see such a comparison in the real world, nor any evidence that any consumer of Hill's Prescription Diet brand pet foods encountered the products described or juxtaposed in this way.

65.     In contrast, in the real world, a consumer who ultimately purchases one of the at-issue products would necessarily have visited or at least talked to their veterinarian,[58] potentially with an acute or long-term pet health condition.[59] To attain the therapeutic food, including food sold at PetSmart, a pet owner would need authorization from a licensed veterinarian. As my survey results illustrate, consumers who are confused or unsure about the ingredients of the food

---

[58] HILLS-VANZ-0543778 – 0543779; See also, Compliance Policy Guide Sec. 690.150: Labeling and Marketing of Dog and Cat Food Diets Intended to Diagnose, Cure, Mitigate, Treat, or Prevent Diseases, available at https://www.fda.gov/media/83998/download, last accessed August 18, 2022.

[59] E.g., See Hill's Prescription Diet webpages, which address the various conditions these foods are recommended for https://www.hillspet.com/prescription-diet/dog-food, last accessed August 24, 2022; https://www.hillspet.com/prescription-diet/cat-food, last accessed August 24, 2022.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

would have the opportunity to receive information from their veterinarian. Moreover, consumers purchasing food at the veterinarian's office may not actually receive a written authorization or review the packaging before deciding to purchase the food.

66.     Despite the fact that owners with sick pets would see their veterinarian and would have to undergo this step to actually purchase the product, Dr. Reed-Arthurs does no research with this population.

67.     Dr. Reed-Arthurs' survey also lacks external validity because Dr. Reed-Arthurs includes irrelevant respondents in her survey designed to assess the beliefs of relevant Class members. Specifically, Dr. Reed-Arthurs qualified individuals who had purchased specialty pet foods in the past six years, which included age-specific (*e.g.*, senior care, kitten/puppy care), breed-specific (*e.g.*, American Shorthair or Siamese/Golden Retriever, Large Breed or Small Breed), health-specific (*e.g.*, weight management, urinary health, kidney support, or digestive care), and other foods offering unique attributes (*e.g.*, those labeled as grain-free, gluten-free, high protein/fiber, low glycemic, non-GMO, natural, or organic).[60] Notably, Hill's Prescription Diet does not include age or breed specific foods and does not include some of the foods Dr. Reed-Arthurs characterized as having a "unique attribute" (*e.g.*, Hill's does not advertise an "organic" variety of Hill's Prescription Diet).[61] In fact, only 37.0 percent of her survey respondents have purchased a therapeutic pet food in the past six years, and only 196, or 13.9 percent, indicated they had purchased Hill's Prescription Diet.

68.     As noted by Professor Diamond in her chapter on survey research in the *Reference Manual on Scientific Evidence* (a source Dr. Reed-Arthurs cites), "[t]he definition of

---

[60] *Reed-Arthurs Report*, Attachment D, Question 4a.

[61] See, https://www.hillspet.com/prescription-diet, last accessed August 18, 2022.

the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers."[62] Dr. Diamond further notes that a survey of an irrelevant population is itself irrelevant,[63] and in this case there is no basis to conclude that the opinions of Dr. Reed-Arthurs' respondents are representative of the putative Class.

### 4. Survey Does Not Address Plaintiffs' Key Claims

69.     Setting aside the concerns with both internal and external validity, and framing and priming biases, Dr. Reed-Arthurs' survey results are further limited and do not address Plaintiffs' key claims. In particular, Dr. Reed-Arthurs does nothing to test or evaluate the claim that pet owners paid more than they otherwise would or that they would not have purchased the products in the absence of defendants' challenged conduct.[64] She does not provide any evidence that individuals who have purchased "specialty" pet food (much less, Hill's Prescription Diet pet food) would purchase anything different or pay any less for a food without the challenged labeling features, nor does she demonstrate that consumer behavior would change if consumers were informed that the product did not contain drugs. She also does nothing to evaluate the extent to which respondents expected the food to contain a substance that is legally required to be sold by prescription and/or contain ingredients that are not commonly found in other non-therapeutic pet foods.[65]

70.     In fact, responses from her open-ended question, which asked what the difference is between "a pet food product that requires a vet's prescription to purchase the product and an

---

[62] Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council (hereinafter, "*Diamond*"), p. 377.

[63] *Diamond*, p. 377.

[64] *Complaint*, ¶ 77.

[65] *Complaint*, ¶ 58.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

over-the-counter product," suggest that respondents would be equally willing to purchase the

product, even if it were not labeled "prescription," (and regardless of any marketing materials

encountered in-store or elsewhere) because they would defer to their veterinarians' judgment:[66]

- One is prescribed specifically from the doctor because of blood works to better understand what types of foods they need to eat.   The other one it all depends on the owner to get what is best for the dog so long they don't have any issues with it. (Respondent 1019)

- I am not a canine nutritionist, so I am not qualified to assess this. Someone who has studied canine nutrition and/or veterinary medicine has been paid to develop the prescription food and it is regulated in order to require a prescription in order to purchase it. (Respondent 1068)

- I feel there is a fine difference between the two because one of the scenarios involves an expert opinion which should be taken seriously since he or she is highly recommending something that could help your furry friend. (Respondent 1476)

- I pay a veterinarian to tell me that because they've had the schooling and they have the knowledge more than I do (Respondent 1696)

- I  am not qualified to answer as I do not know exactly what constitutes urinary heath except maybe lower quantities of ingredients that may cause kidney damage. (Respondent 1872)

- Stores and corporations market and sell all kinds of junk because there aren't any FDA regulations or inspections when it comes to pet food. Vets usually become that profession of a veterinarian because they actually care about animals and there well being so I trust them to give actual real food ( as I know from experience ) (Respondent 1935)

- I will trust a veterinarian over just normal products on a shelf. (Respondent 1966)

- I think the vets office one is what my cats need .   The one without a vets approval might not be good for your cat (Respondent 2920)

- I think that a pet food sold only with a prescription from the vet might have more specific ingredients that would be helpful for my dog. It also would probably be more expensive. I would think that if a vet sold it, he or she would truly trust the product. A dog food off of the shelf at a store may be good, and it may be cheaper, but it might not be as specialized. When the vet prescribes it, I think that there is a degree of accountability with him or her. (Respondent 4463)

- I take my veterinary's advice I don't read labels. (Respondent 4725)

- I would asume that the perscription food has been researched more by vets and food scientists (Respondent 4886)

---

[66] *Reed-Arthurs Report*, Final Data - With BRG Screened Variable.xlsx.

- I would always get what is recommended and and/or prescribed by a vet. (Respondent 4912)
- I think that it is important to obtain your vet's opinion. You always want to be sure you are giving your cat healthy food. (Respondent 5422)

71.    Despite noting that the challenged conduct in this matter includes, among other things, the practice of marketing and advertising Hill's Prescription Diet pet food,[67] Dr. Reed-Arthurs similarly fails to test Plaintiffs' claims that consumers were misled by Hill's and PetSmart's marketing of Hill's Prescription Diet pet food.[68] She does not include any questions in her survey on marketing and advertising materials, whether in-store or otherwise. She does nothing to evaluate, which, if any, in-store marketing and advertising materials influenced consumer purchasing behavior. Even in Scenario 3 in which Dr. Reed-Arthurs attempts to replicate the in-store MedCard experience at PetSmart, respondents are not presented with any in-store advertising materials.

72.    Further, Dr. Reed-Arthurs' survey results directly contradict Plaintiffs' assertions that the inclusion of the word "prescription" on product packaging and selling therapeutic foods pursuant to a prescription or authorization causes consumers to believe that at-issue products are FDA approved. As shown by her own data, nearly identical rates of respondents indicated that "The product has been reviewed and approved by the FDA or other government regulatory agency" regardless of whether they saw a "Prescription Diet" label or a "Preferred Diet" label. Dr. Reed-Arthurs testified that this response item was a "filler item,"[69] but Plaintiffs have alleged that products that require an authorization/prescription imply that the products have been evaluated

---

[67] *Reed-Arthurs Report*, ¶ 12.

[68] Aside from her flawed testing of the product packaging.

[69] *Reed Arthurs Deposition*, 121:21–123:3.

and approved by the FDA.[70] The survey results from Plaintiffs' own expert contradict this claim and demonstrate that labeling a product "prescription" does not cause consumers to believe the product is reviewed and approved by the FDA.

73.     Finally, Dr. Reed-Arthurs' results do not demonstrate that respondents have a uniform and consistent perception of the products' ingredients. In fact, just the opposite, Dr. Reed-Arthurs' data suggest that perceptions about the presence of "drugs or medicine" vary by the questions asked and the information presented in her different scenarios. In the Scenario 1, prior to assignment to the experimental condition, Dr. Reed-Arthurs reports that "almost 20% of respondents provided unprompted open-ended responses that indicated they believed the difference between a prescription-only and an over-the-counter pet food product was the prescription-only product contained a drug, medicine, regulated or controlled substance, or similar."[71] In the second half of Scenario 1, respondents were asked a closed-ended question, to ascertain whether they thought certain statements applied to the dog/cat foods that require a vet's prescription (treatment group), or over-the-counter pet food (control group). Using the control group to subtract out survey noise, Dr. Reed-Arthurs reports that a net 46% of respondents selected the statement "The product contains a medicine or drug."[72] In Scenario 2, this estimate becomes 22 percent. In Scenario 3, this percentage is 46 percent. These fluctuating results are summarized below in Table 1.

---

[70] *Complaint*, ¶ 74.

[71] *Reed-Arthurs Report*, ¶ 21.

[72] *Reed-Arthurs Report*, ¶¶ 94–95.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 1. Fluctuating Results Reported by Dr. Reed-Arthurs**

| Response | Percent |
|---|---|
| Open-ended response flag (Q10) | 20% |
| The product contains a medicine or drug (Q11) | 46% [1] |
| I think this pet food contains a medicine or drug (Q15) | 22% [1] |
| I think this pet food contains a medicine or drug (Q19) | 46% [1] |

*Q10. In your opinion, what is that difference / are those differences?*
*Q11. Which of the following statements do you think apply to [cat/dog] foods that [are <u>sold over-the-counter</u> / <u>require a vet's</u> <u>prescription to purchase</u>]?*
*Q15. Based on the [<u>over-the-counter</u> / <u>prescription-only</u>] product information you just viewed, do you agree, disagree, or not know whether the following statements describe the pet food you just viewed?*
*Q19a/b. Based on the fact that PetSmart [requires you to obtain a MedCard for your pet's food, and requires you to present the card / sells the suggested pet food over-the-counter and does not require any additional information] at checkout, do you agree, disagree, or not know whether the following statements describe the pet food you purchased?*

Note: [1] Reflects the net percentage.

Source: *Reed-Arthurs Report,* ¶¶ 92-109.

74.     In contrast to Plaintiffs' allegations, these results demonstrate that (i) respondents do not have a uniform and consistent perception of whether "prescription" pet food contains medicine, drugs, or a "similar" substance, and (ii) the perception is largely dependent on what scenario or information is presented (or omitted)[73] from the survey question.

75.     Moreover, the 20% estimate from the open-ends in Scenario 1 is inflated because Dr. Reed-Arthurs relied on a highly subjective coding scheme in which any respondent mentioning anything deemed related to "drugs," "medicine," "controlled ingredient," or "regulated ingredient" was counted toward the total percentage.[74] In her deposition, Dr. Reed-Arthurs acknowledged that coding of open-ended responses can be subjective. For example, upon

---

[73] Of course, none of the scenarios presented in Dr. Reed-Arthurs' survey include an actual interaction with a veterinarian, and she has not surveyed or conducted any research with this population.

[74] *Reed-Arthurs Report*, ¶ 91.

reviewing a few of her open-ends, Dr. Reed-Arthurs agreed that some were coded incorrectly.[75] In addition to the open-ends presented to Dr. Reed-Arthurs in her deposition, several other responses appear to be mischaracterized as evidence that respondents believed the product contained drugs or medication:[76]

- One probably has vet approved nutritional value that can only be given with a prescription like a doctor would do for a human. (Respondent 600)
- There may be some kind of ingrediant in the vet recommended food that the dog does not need a lot of or only a certain amount of. (Respondent 603)
- I think the prescription dog food has specific ingredients for specific needs, kind of like a prescription for medicine (Respondent 672)
- I would imagine the vet-prescribed food would have more of the active ingredients, or would be for a condition that requires close monitoring." (Respondent 762)
- It's like medicine for people. Something that requires a prescription versus over the counter is usually more serious (Respondent 1445)

76.    In sum, Dr. Reed-Arthurs' survey lacks validity. Her survey lacks internal validity because she cannot establish causality (*i.e.*, she cannot identify whether describing a food as "prescription-only" causes consumers to believe the product contains drugs) since all respondents saw the "prescription-only" versus "over-the-counter" juxtaposition prior to being assigned to the treatment/control cells. Her results are further marred by framing and priming biases. Additionally, her study lacks external validity because she created a survey environment so devoid of marketplace reality there is no way to evaluate whether the survey results generalize to the real-world scenario of how pet parents purchase the at-issue products, and because she surveyed respondents who may not represent the views and opinions of relevant Class members. Moreover, her survey fails to assess key allegations, including whether individuals would pay less

---

[75] *Reed-Arthurs Deposition*, 212:9–23 and 212:24–213:21.

[76] *Reed-Arthurs Report*, Final Data - With BRG Screened Variable.xlsx.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

or purchase something different if the food was not sold pursuant to an authorization/prescription or if they were affirmatively told the product did not contain drugs, and her results contradict Plaintiffs' assertion that "prescription" labeling would cause consumers to believe that the at-issue products are FDA approved. Her results also demonstrate that consumers do not have a consistent and uniform perception about the products' ingredients. For these reasons, Dr. Reed-Arthurs' study is methodologically flawed and invalid and does not support Plaintiffs' allegations in the *Complaint*.

## VI.   BUTLER SURVEYS

77.     In contrast to the methodologically flawed survey conducted by Dr. Reed-Arthurs, I designed and implemented three separate surveys. I understand that Plaintiffs have alleged that the product packaging and veterinarian authorization requirement misleads consumers and causes them to believe the product contains drugs and/or pharmaceutical medicine, and that this belief causes consumers to pay more for the product than they otherwise would. To determine whether information on the product packaging would impact consumer behavior, I conducted a survey of past and prospective purchasers of therapeutic pet foods to examine whether changes in the package labeling for Hill's Prescription Diet would affect purchase intention. I also conducted a survey of veterinarians because I understand that veterinarians are pivotal in recommending and authorizing therapeutic foods. Finally, I surveyed pet parents who have purchased Hill's Prescription Diet pet food to verify that they rely on veterinarians' recommendations and instructions (as opposed to relying on packaging or reviewing in-store displays) and to understand from these consumers what questions, if any, they ask their veterinarians. My survey results provide direct, empirical evidence contradicting the survey put forward by Dr. Reed-Arthurs and

demonstrate that Plaintiffs' claims that consumers would not have purchased the products had they known products did not contain drugs are false.

## VII.  SURVEY METHODOLOGY

78.     The design of my research follows the generally accepted principles for the design of surveys to be used as evidence in litigation.[77] In general, the design of a reliable survey requires careful attention to the following key areas:

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used;

- The stimuli shown to respondents; and

- The protocol for calculating the results from the survey.[78]

79.     The discussion of the surveys I conducted is organized around each of the key areas.

### A.  Purchase Intention Survey

80.     I conducted a survey of 600 purchasers of therapeutic pet food to examine whether alterations to the product labeling would affect consumers' willingness to purchase Hill's Prescription Diet pet food. Specifically, I tested whether the likelihood of purchasing Hill's Prescription Diet pet food would be affected if references to "Prescription," "Veterinary

---

[77] *Diamond*, pp. 359–423.

[78] The Federal Judicial Center's (2004) *Manual for Complex Litigation, Fourth Edition*, §11.493, p. 103 phrases these key areas as such:
  • the population was properly chosen and defined;
  • the sample chosen was representative of that population;
  • the data gathered were accurately reported; and
  • the data were analyzed in accordance with accepted statistical principles.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Exclusive," and related messaging were removed. I also examined whether the likelihood of purchasing would be affected by the inclusion of a statement indicating that the product does not contain drugs and a prescription is not legally required.

### 1. Survey Population

81.     The relevant population for this matter is composed of U.S. adult consumers who own a cat(s) or dog(s) and have at least some responsibility for purchasing pet food for their cat(s) and/or dog(s). Respondents qualified if they indicated they had purchased or would consider purchasing pet food to support a pet with an acute or short-term health problem, a chronic or long-term health problem, or have/would purchase such pet food if a veterinarian advised them to do so.

### 2. Sampling of the Relevant Population

82.     Potential survey respondents were contacted by Veridata Insights ("Veridata"), an online panel and data collection services company.[79] Veridata is an independent data collection company that I have prior experience working with, and that is not associated with NERA in any way. Veridata uses a variety of quality control measures to ensure the reliability and integrity of the respondents and the responses they provide. Veridata complies with the standards and ethics for online survey data panels set forth by the Insights Association.[80] Veridata's standard quality control measures were applied in this study.

83.     A total of 2,625 potential respondents opened the invitation and began the survey and of these, 600 respondents in the relevant population qualified for and completed the survey.

---

[79] Additional information about Veridata Insights is available on their website at https://www.veridatainsights.com, last accessed August 18, 2022.

[80] The Insights Association is an organization representing the industry and profession of market research and analytics (https://www.insightsassociation.org/About-Us, last accessed August 25, 2022).

The survey invitation, complete questionnaire, and screenshots of the survey as it appeared to respondents are provided in **Exhibit C.2**.

84.    Data for the survey were collected between July 6, 2022 and July 11, 2022.

### 3.    Quality Control Measures for the Survey

85.    To ensure that my data are of the highest quality, I implemented quality control measures in addition to those undertaken by Veridata:

a.  As is standard survey practice for litigation, the survey was conducted in a "double-blind" fashion; that is, neither the staff at Veridata nor any of the respondents were aware of the survey sponsor or the ultimate intention of the survey.[81]

b.  Respondents were able to take the survey either on a desktop, laptop, or tablet computer, or on their mobile phone or cell phone. The survey program was tested separately on both a computer and mobile phone or cell phone in order to ensure that the survey questions and stimuli appeared correctly on the different device types.

c.  Respondents were also required to enter their state of residence and zip code, and if these data conflicted with one another, the respondent was excluded.

d.  Respondents who indicated that they did not understand or were unwilling to adhere to the survey instructions were also screened out of the survey.

e.  Click-balancing was implemented to ensure the group of people who clicked into the survey (not to be confused with those who qualified and completed the

---

[81] *Diamond*, pp. 410–411.

survey) were representative of the United States Census in terms of age, gender, and region.

    f.   In addition to these measures, I also conducted a pre-test of the survey instrument. The pre-test is described in more detail below.

## 4. Screening Questionnaire

86.    To ensure that panel respondents were part of the relevant population, a series of screening questions were asked. Only respondents who met these qualifying conditions continued with the main survey.

87.    To qualify for the survey, respondents had to live in the United States, be 18 years old or older, and own at least one cat or dog. Respondents were asked what role they have in purchasing food for their cat(s) and/or dog(s). Respondents who indicated that they are "the only person in the household responsible for purchasing the pet food" and those who indicated that they "share responsibility for purchasing the pet food with others in the household" were permitted to continue.

88.    Respondents were then screened on the basis of past experience with therapeutic foods *or* potential future interest in such foods. First, respondents were asked to select, from a list, the reasons they had purchased pet food for their dog(s) and/or cat(s) in the past six years. Respondents who indicated that they had purchased pet food (i) "to support a pet with an acute or short-term health problem," (ii) "to support a pet with a chronic or long-term health problem," or (iii) because their "veterinarian advised I purchase a therapeutic food" were qualified for the survey and asked to indicate the health reasons for which they had purchased this type of food. Second, respondents were asked to select, from a similar list, the reasons they would consider

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

purchasing pet food. Respondents who indicated that they would consider purchasing a pet food for any of the three reasons mentioned above qualified for the survey.

89.     Once qualified for the study, respondents were taken to the main questionnaire.

### 5. Main Questionnaire

90.     In the main portion of the questionnaire, all qualified respondents were provided with the following instruction:

> On the next screen, you will be shown an image of a bag of pet food. Please look at the product as you would if you were considering purchasing it.

91.     Following this instruction, respondents were randomly assigned to an experimental group. First, based on their answer to the screener about which type of animal they own, respondents were assigned to see cat food or dog food in a manner consistent with whichever type of qualifying animal they own. Respondents who owned both cat(s) and dog(s) were assigned to the least filled cell. Respondents were then assigned one of two different types of Hill's Prescription Diet pet foods: either the Prescription Diet k/d (kidney care) or c/d Multicare (urinary care). Finally, respondents were assigned to the Test Group, Control Group 1, or Control Group 2. In total, respondents were assigned to one of 12 cells shown below in Table 2.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 2: Purchase Intention Survey Groups**

| Response | Count | Percent |
|---|---|---|
| Dog k/d Test | 60 | 10.0% |
| Dog k/d Control 1 | 50 | 8.3% |
| Dog k/d Control 2 | 46 | 7.7% |
| Dog c/d Test | 54 | 9.0% |
| Dog c/d Control 1 | 42 | 7.0% |
| Dog c/d Control 2 | 49 | 8.2% |
| Cat k/d Test | 45 | 7.5% |
| Cat k/d Control 1 | 47 | 7.8% |
| Cat k/d Control 2 | 52 | 8.7% |
| Cat c/d Test | 41 | 6.8% |
| Cat c/d Control 1 | 61 | 10.2% |
| Cat c/d Control 2 | 53 | 8.8% |
| **Total Respondents** | **600** | **100.0%** |

Source: NERA Consumer Purchase Intention Survey, July 2022

92.     Test Group respondents were shown the actual product packaging as it appears in stores and online. Control Group 1 respondents were shown images of the product packaging with the following modifications: (1) the name of the product was altered to "Preferred Diet," (2) all instances of "Prescription" were replaced with "Preferred," (3) the phrase "Veterinary Exclusive" was removed, (4) the phrase "Clinical Nutrition" was removed, (5) the image of the stethoscope and flask associated with the "Clinical Nutrition" statement were removed from the front and back of the product packaging, and (6) the statement "Use only as directed by your veterinarian" was removed. Control 2 respondents saw the same product packaging as those in the Test Group with an additional statement at the top of the product package that read: "CONTAINS NO DRUGS. NO LAW REQUIRES A PRESCRIPTION FOR THIS PRODUCT." As an example, the fronts of the product packaging shown to those in the Dog k/d (kidney care) groups are shown below in **Figure 2**. Note that the black circles in the images below were not shown in the images seen by survey respondents. Full-size versions of all images can be found in **Exhibit C.2**.

**Figure 2: Product Packaging for Dog k/d (kidney care) Groups**



CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Clinically tested nutrition to improve & lengthen quality of life

Une nutrition testée et clinique pour améliorer et prolonger la qualité de vie
Nutrición clínicamente probada para mejorar y prolongar la calidad de vida



### How this product will help your pet:
Comment ce produit aidera votre animal:
Cómo ayudará este producto a su mascota:

• Supports your dog's natural ability to build lean muscle daily
Soutient la capacité naturelle de votre chien de développer sa masse musculaire chaque jour
Apoya la habilidad natural de su perro para desarrollar músculos magros diariamente

• Enhances appetite & increases food intake
Améliore l'appétit et augmente l'apport en nourriture
Mejora el apetito e incrementa el consumo de alimento

• Protects vital kidney & heart function
Protège la fonction vitale des reins et du coeur
Protege la función vital del riñón y corazón

FORMULATED TO PROMOTE A URINARY ENVIRONMENT THAT REDUCES THE RISK OF DEVELOPING STRUVITE AND CALCIUM OXALATE CRYSTALS
FORMULÉ POUR FAVORISER UN MILIEU URINAIRE QUI RÉDUIT LE RISQUE DE DÉVELOPPER DES CRISTAUX DE STRUVITE ET D'OXALATE DE CALCIUM
FÓRMULADO PARA PROMOVER UN AMBIENTE URINARIO QUE REDUZCA EL RIESGO DE DESARROLLAR CRISTALES DE ESTRUVITA Y DE OXALATO DE CALCIO

### How this product works:
Comment ce produit agit:
Cómo funciona este producto:

• More essential amino acids* for building muscle protein (*compared to AAFCO minimum)
Plus d'acides aminés essentiels* pour développer des protéines musculaires (*comparativement au minimum de l'AAFCO)
Más aminoácidos esenciales* para proteínas que construyen músculos (*comparado con mínimos de AAFCO)

• Enhanced Appetite Trigger (E.A.T.)™ Technology for dogs
Technologie Enhanced Appetite Trigger (E.A.T.)™ pour chiens
Tecnología Enhanced Appetite Trigger (E.A.T.)™ para perros



• High levels of L-Carnitine
Teneurs élevées en L-carnitine
Niveles altos de L-carnitina

• Controlled phosphorus & low sodium
Une teneur contrôlée en phosphore et faible en sodium
Fósforo controlado y bajo en sodio

### DAILY FEEDING GUIDE
GUIDE D'ALIMENTATION QUOTIDIEN
GUÍA DE ALIMENTACIÓN DIARIA

| Weight of Dog Poids du chien Peso del perro | | cups tasses tazas | grams grammes gramos |
|---|---|---|---|
| lb | kg | | |
| 5 | 2.3 | 1/2 | 50 |
| 10 | 4.5 | 7/8 | 85 |
| 15 | 6.8 | 1 1/8 | 110 |
| 20 | 9.1 | 1 1/2 | 150 |
| 30 | 14 | 2 | 200 |
| 40 | 18 | 2 1/2 | 250 |
| 50 | 23 | 3 | 295 |
| 60 | 27 | 3 1/3 | 330 |
| 70 | 32 | 3 3/4 | 370 |
| 80 | 36 | 4 | 395 |
| 100 | 45 | 4 3/4 | 470 |
| 120 | 54 | 5 1/2 | 545 |

At Hill's, we believe that great nutrition can transform the lives of pets, and the pet parents and vets that care for them. We are dedicated to pioneering research and groundbreaking formulas that nourish the sick, sustain the healthy and change the lives of millions of pet families everyday.

Chez Hill's, nous croyons qu'une excellente nutrition peut transformer la vie des animaux, ainsi que celle de ses parents et des vétérinaires qui s'en occupent. Nous faisons tout notre possible pour être à l'avant-garde de la recherche et de formules révolutionnaires qui nourrissent les animaux malades, maintiennent ceux en santé et changent chaque jour la vie de millions de familles comptant des animaux.

En Hill's, creemos que una buena nutrición puede transformar las vidas de las mascotas, de sus dueños y de los veterinarios que cuidan de ellas. Estamos dedicados a liderar investigaciones y fórmulas innovadoras que nutran a las mascotas enfermas, mantienen a las sanas y cambian las vidas de millones de familias de mascotas todos los días.

### IMPORTANT FEEDING INFORMATION
**Use only as directed by your veterinarian.**
Adjust feeding amounts as necessary to maintain optimal weight. If you are unsure, ask your veterinarian.
**For best results:**
− Gradually transition to this new food over a 7 day period.
− Exclusively feed the recommended Prescription Diet™ dry food, wet food and treats.

### INFORMATION IMPORTANTE SUR L'ALIMENTATION
**N'utilisez que selon les directives de votre vétérinaire.**
Ajustez les quantités au besoin pour maintenir un poids optimal. En cas de doute, consultez votre vétérinaire.
**Pour de meilleurs résultats :**
− Effectuez une transition graduelle à cette nouvelle nourriture sur une période de 7 jours.
− Servez exclusivement la nourriture sèche, la nourriture humide et les gâteries Prescription Diet™ recommandées.

### INFORMACIÓN IMPORTANTE SOBRE LA ALIMENTACIÓN
**Úselo solo según lo indique su veterinario.**
Ajuste las cantidades de alimento según sea necesario para mantener el peso óptimo. Si tiene dudas, consulte a su veterinario.
**Para mejores resultados:**
− Haga una transición gradual hacia este nuevo alimento durante un período de 7 días.
− Administre exclusivamente el alimento Prescription Diet™ seco, húmedo y premios, recomendado.

Made in USA with global ingredients you can trust
Fabriqué aux É.-U. avec des ingrédients du monde entier dignes de confiance
Hecho en los E.U.A. con ingredientes internacionales en los que puede confiar

**100% SATISFACTION GUARANTEE**
100% satisfaction guarantee or your money back. If you are unsatisfied for any reason, return the unused portion to the place of purchase for a full refund or replacement
Satisfaction garantie à 100 % ou argent remis. Si vous êtes insatisfait pour quelque raison que ce soit, retournez la portion inutilisée à l'endroit où vous avez acheté le produit pour obtenir un remboursement complet ou un remplacement.
100% satisfacción garantizada o le devolvemos su dinero. Si no está satisfecho por cualquier razón, regrese la porción sin usar al lugar de compra para un reembolso total o una reposición.

51

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER





CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Control 1**





CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER





**Control 2**



CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER



## Clinically tested nutrition to improve & lengthen quality of life
Une nutrition testée en clinique pour améliorer et prolonger la qualité de vie
Nutrición clínicamente probada para mejorar y prolongar la calidad de la vida

### How this product will help your pet:
Comment ce produit aidera votre animal :
Cómo ayudará este producto a su mascota :

- Supports your dog's natural ability to build lean muscle daily
  Soutient la capacité naturelle de votre chien de développer sa masse musculaire chaque jour
  Apoya la habilidad natural de su perro para desarrollar músculos magros diariamente

- Enhances appetite & increases food intake
  Améliore l'appétit et augmente l'apport en nourriture
  Mejora el apetito e incrementa el consumo de alimento

- Protects vital kidney & heart function
  Protège la fonction vitale des reins et du cœur
  Protege la función vital del riñón y el corazón


S+OX SHIELD

FORMULATED TO PROMOTE A URINARY ENVIRONMENT THAT REDUCES THE RISK OF DEVELOPING STRUVITE AND CALCIUM OXALATE CRYSTALS
FORMULE POUR FAVORISER UN MILIEU URINAIRE QUI RÉDUIT LE RISQUE DE DÉVELOPPER DES CRISTAUX DE STRUVITE ET D'OXALATE DE CALCIUM
FORMULADO PARA PROMOVER UN AMBIENTE URINARIO QUE REDUZCA EL RIESGO DESARROLLAR CRISTALES DE ESTRUVITA Y DE OXALATO DE CALCIO

### How this product works:
Comment ce produit agit :
Cómo funciona este producto:

- More essential amino acids* for building muscle protein (*compared to AAFCO minimum)
  Plus d'acides aminés essentiels* pour développer des protéines musculaires (*comparativement au minimum de l'AAFCO)
  Más aminoácidos esenciales* para proteínas que construyen músculos (*comparado con mínimos de AAFCO)

- Enhanced Appetite Trigger (E.A.T.)™ Technology for dogs
  Technologie Enhanced Appetite Trigger (E.A.T.)™ pour chiens
  Tecnología Enhanced Appetite Trigger (E.A.T.)™ para perros

- High levels of L-Carnitine
  Teneurs élevées en L-carnitine
  Niveles altos de L-carnitina

- Controlled phosphorus & low sodium
  Une teneur contrôlée en phosphore et faible en sodium
  Fósforo controlado y bajo en sodio

ENHANCED APPETITE TRIGGER
EAT
TECHNOLOGY

### DAILY FEEDING GUIDE
### GUIDE D'ALIMENTATION QUOTIDIEN
### GUÍA DE ALIMENTACIÓN DIARIA

| Weight of Dog / Poids du chien / Peso del perro | | cups tasses tazas | grams grammes gramos |
|---|---|---|---|
| lb | kg | | |
| 5 | 2.3 | 1/2 | 50 |
| 10 | 4.5 | 7/8 | 85 |
| 15 | 6.8 | 1 1/8 | 110 |
| 20 | 9.1 | 1 1/2 | 150 |
| 30 | 14 | 2 | 200 |
| 40 | 18 | 2 1/2 | 250 |
| 50 | 23 | 3 | 295 |
| 60 | 27 | 3 1/3 | 330 |
| 70 | 32 | 3 3/4 | 370 |
| 80 | 36 | 4 | 395 |
| 100 | 45 | 4 3/4 | 470 |
| 120 | 54 | 5 1/2 | 545 |

### IMPORTANT FEEDING INFORMATION
Use only as directed by your veterinarian.
Adjust feeding amounts as necessary to maintain optimal weight. If you are unsure, ask your veterinarian.
For best results:
- Gradually transition to this new food over a 7 day period.
- Exclusively feed the recommended Prescription Diet™ dry food, wet food and treats.

### RENSEIGNEMENTS IMPORTANTS SUR L'ALIMENTATION
N'utilisez que selon les directives de votre vétérinaire.
Ajustez les quantités au besoin pour maintenir un poids optimal. En cas de doute, consultez votre vétérinaire.
Pour de meilleurs résultats :
- Effectuez une transition graduelle à cette nouvelle nourriture sur une période de 7 jours.
- Servez exclusivement la nourriture sèche, la nourriture humide et les gâteries Prescription Diet™ recommandées.

### INFORMACIÓN IMPORTANTE DE ALIMENTACIÓN
Usar sólo según lo indique su veterinario.
Ajuste las cantidades de alimento según sea necesario para mantener el peso óptimo. Si no está seguro, pregunte a su veterinario.
Para mejores resultados:
- Haga una transición gradual hacia este nuevo alimento durante un período de 7 días.
- Administre exclusivamente el alimento Prescription Diet™ seco, enlatado y premios, recomendado.


Hill's

At Hill's, we believe that great nutrition can transform the lives of pets, and the pet parents and vets that care for them. We are dedicated to pioneering research and groundbreaking formulas that nourish the sick, sustain the healthy and change the lives of millions of pet families everyday.

Chez Hill's, nous croyons qu'une excellente nutrition peut transformer la vie des animaux, ainsi que celle de ses parents et des vétérinaires qui s'en occupent. Nous faisons tout notre possible pour être à l'avant-garde de la recherche et de formules révolutionnaires qui nourrissent les animaux malades, maintiennent ceux en santé et changent chaque jour la vie de millions de familles comptant des animaux.

En Hill's, creemos que una buena nutrición puede transformar las vidas de las mascotas, de sus dueños y de los veterinarios que cuidan de ellas. Estamos dedicados a liderar investigaciones y fórmulas innovadoras que nutren a las mascotas enfermas, mantienen a las sanas y cambian las vidas de millones de familias de mascotas todos los días.


Made in USA with global ingredients you can trust
Fabriqué aux É.-U. avec des ingrédients du monde entier dignes de confiance
Hecho en los E.U.A. con ingredientes internacionales en los que puede confiar

100% SATISFACTION GUARANTEE
100% satisfaction guarantee or your money back. If you are unsatisfied for any reason, return the unused portion to the place of purchase for a full refund or replacement
Satisfaction garantie à 100 % ou argent remis. Si vous êtes insatisfait pour quelque raison que ce soit, retournez la portion inutilisée à l'endroit où vous avez acheté le produit pour obtenir un remboursement complet ou un remplacement.
100% satisfacción garantizada o le devolvemos su dinero. Si no está satisfecho por cualquier razón, regrese la porción sin usar al lugar de compra para un reembolso total o a una reposición.





61

93.     Respondents assigned to one of the "Kidney Care" product groups were presented

with the following scenario:[82]

> Imagine the following scenario:  At a check-up with your veterinarian, a routine blood screening shows your [cat/dog] has elevated renal values.  After several follow-up screenings, your veterinarian diagnoses your [cat/dog] with chronic kidney disease and explains this will be a lifelong condition for you to monitor and manage.  Your veterinarian recommends testing your [cat/dog]'s blood and urine every 3-6 months, having fluids at home that you can administer via injection, and switching to a therapeutic diet to protect your [cat/dog]'s kidney function and decrease the frequency of renal-related complications.

> Now, please look at the bag of therapeutic pet food recommended by your veterinarian below as you normally would if you were considering purchasing it. Take as much time as you would like to look at the product. You may use the arrows on the left and right of the product to see the various views of the product's packaging. When you are finished looking, select the "Continue" button to move forward in the survey.

> Please note there will be a short delay before you can select "Continue."

94.     Respondents assigned to one of the "Urinary Care" products were presented with

the following scenario:

> Imagine the following scenario: Your [cat/dog] is urinating more frequently than usual and appears to be uncomfortable.  You take your [cat/dog] to the veterinarian for a check-up. After testing your [cat/dog]'s urine and taking images of their bladder, your veterinarian diagnoses your [cat/dog] with urinary stones.  Your veterinarian explains that, based on the type of stone, surgery may be required to remove it.  Your veterinarian recommends starting [your dog on antibiotics / your cat on painkillers], switching to a therapeutic diet designed to reduce the risk of stone formation, and returning for a follow-up appointment to see how your [cat/dog] is doing.

> Now, please look at the bag of therapeutic pet food recommended by your veterinarian below as you normally would if you were considering purchasing it. Take as much time as you would like to look at the product. You may use the arrows on the left and right of the product to see the various views of the product's packaging. When you are finished looking, select the "Continue" button to move forward in the survey.

> Please note there will be a short delay before you can select "Continue."

---

[82] I confirmed with Dr. Mike Robbins, a veterinarian employed by Hill's, that the scenarios I used in my survey were reasonable and fair descriptions. Conversation with Dr. Mike Robbins, August 16, 2022.

95.     Respondents were then presented with four images of the pet food product including the front, back, and two sides, of the product. In addition to the product images, all respondents were shown the price and size information of the product.[83]

96.     After confirming that they were able to view the product images clearly, respondents were asked an open-ended question: "What are the main messages communicated by this product packaging?"[84] Those who typed a response were subsequently asked, "Any other messages?"[85]

97.     Respondents were next asked about their willingness to purchase the product shown. The question format is shown below.[86]

Q. Based on the product packaging and the price of [**INSERT PRICE**], how likely or unlikely would you be to purchase this product?

| Extremely unlikely | Very unlikely | Somewhat unlikely | Neither likely nor unlikely | Somewhat likely | Very likely | Extremely likely |
|---|---|---|---|---|---|---|
| ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |

1.  Don't know / unsure

98.     Respondents who selected the "Don't know / unsure" checkbox skipped to the final question series. All other respondents were asked, "You indicated that you would be [**INSERT RESPONSE FROM Q3**] to purchase this product. What made you provide that

---

[83] Prices were as follows: Dog k/d "78.99 for 17.6 lb. bag," Dog c/d Multicare "$75.99 for 17.6 lb. bag," Cat k/d "$60.99 for 8.5 lb. bag," and Cat c/d Multicare "$88.99 for 17.6 lb. bag." The prices presented to respondents reflect product pricing available as of June 9, 2022, on PetSmart.com, Chewy.com, and Amazon.com.

[84] Respondents could select a "Don't know / no opinion" checkbox.

[85] Respondents were also able to select "No other reasons."

[86] Ends of the scale were rotated to guard against order effects.

answer?"[87] Those who provided an open-ended response were subsequently asked, "What else, if anything, made you provide that answer?"[88]

99.    Respondents were then asked to select, from a list, what factors influenced their willingness to purchase the product they were shown. The question is shown below.

Q. You may have already mentioned this, but which of the following, if any, influenced your response that you would be [**INSERT RESPONSE FROM Q3**] to purchase this product?[89]
  1.  Size of the product
  2. Price of the product
  3. Image of animal on bag
  4. Veterinarian Recommended
  5. [TEST AND CONTROL 2 PIPE: Prescription; CONTROL 1 PIPE: Preferred] Diet on the product label
  6. Information on how the product works
  7. Information on how the product helps
  8. Made in the USA
  9. Daily feeding guide
  10. I have purchased the brand before
  11. Flavor of the pet food
  12. Recommendations from groomers, handlers, or breeders
  13. Other
  14. None of these
  15. Don't know / unsure

100.    Respondents who selected "Prescription/Preferred Diet on the product label" from the list were then asked an open-ended question: "Based on the product packaging, what does [TEST AND CONTROL 2 PIPE: Prescription; CONTROL 1 PIPE: Preferred] Diet mean to you?"[90]

101.    All respondents were then asked the final question series. First, they were asked, "Do you currently have pet insurance?" with response options "Yes," "No," and "Don't know /

---

[87] Respondents could select a "Don't know / no opinion" checkbox.

[88] Respondents could select a "Nothing else" checkbox.

[89] Response options on this list were randomized.

[90] Respondents could select a "Don't know / no opinion" checkbox.

unsure."[91,92] Then, respondents were asked whether they or anyone in their household worked in any of the industries listed, and whether or not they had taken a survey on any of the topics listed. Respondents who indicated that they worked for a relevant industry and those who indicated they had taken a survey on pet food in the past six months were flagged for review.[93] The survey was analyzed with and without these respondents and because no meaningful differences/conclusions were observed, these respondents remained as part of the final sample. These questions are shown below. Following these final questions, respondents were thanked for their time, and the survey ended.

Q. Do you or does anyone in your household work in any of the following professions or businesses?[94]
1. A company that makes or manufactures pet food
2. A veterinarian
3. A pet food / pet supply store
4. A marketing research or advertising company
5. None of these
6. Don't know / unsure

Q. In the past six months, have you taken any surveys on the following?[95]
1. Pet food
2. Kitchenware
3. Athletic footwear or apparel
4. Office furniture or supplies
5. Skin care products
6. Playground equipment
7. Smartphones

---

[91] Response options Yes and No were rotated. This question was included because willingness to purchase a therapeutic product may be correlated with whether the pet parent has insurance, and I wanted the ability to evaluate this possible effect. Moreover, I understand some pet insurance policies cover therapeutic foods (https://www.forbes.com/advisor/pet-insurance/what-does-pet-insurance-cover/, last accessed August 24, 2022) and some policies may differentiate therapeutic foods and drugs for coverage purposes, thus indicating to pet parents that therapeutic foods are not "drugs." See, Deposition of Sherry Lynn Nevius, dated February 22, 2022, 78:9-79:12.

[92] The survey was analyzed for those with and without pet insurance and, as a whole, those with pet insurance indicated they were more likely to purchase the product than those without pet insurance. The preferences of those with and without insurance did not differ across the Test and Control Groups.

[93] Respondents were also flagged if they selected "Don't know / unsure" on either of these questions.

[94] Response options on this list were randomized.

[95] Response options on this list were randomized.

8.  Sporting equipment
9.  None of these
10. Don't recall / unsure

## 6. Survey Pre-Test

102.    As an additional quality control measure and to ensure that respondents would understand the survey and be able to provide reliable data, I conducted a pre-test of my survey instrument including both the screener and the full questionnaire. The pre-test included a total of four respondents who completed the survey and answered a series of follow-up questions with a live interviewer. The interviewer asked respondents several questions about the clarity and ease of answering the survey items. Additionally, respondents were specifically asked if the list provided to them when asked, "You may have already mentioned this, but which of the following, if any, influenced your response that you would be [**INSERT RESPONSE FROM Q3**] to purchase this product?" was complete, or if anything was missing.

103.    The pre-test interviews revealed that respondents had no difficulty understanding the questions, could easily respond to the questions, and reported no technical issues with the survey. I concluded that in general, respondents found the survey easy to understand.

104.    As a result of the pre-test, three small changes were made to the survey prior to launching the main study.[96] The pre-test interviewer script, as well as the pre-test data are attached as **Exhibit C.1**.

---

[96] On screening question S5 (year of birth), I clarified that respondents should enter a "four-digit" year. When presenting the stimuli, I added information about the size of bag of pet food after the price information (*e.g.*, "$78.99 for a 17.6 lb. bag). I added an additional response option to question Q6 to be more comprehensive: "Recommendations from groomers, handlers, or breeders."

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## B. Veterinarian Survey

105.    It is my understanding that the role of the veterinary professional is important when pet parents are evaluating and considering therapeutic foods. I also understand that Plaintiffs have claimed that the veterinarian authorization requirement misleads consumers into believing that the product contains drugs or is FDA-approved. Therefore, I conducted a survey of veterinarians to understand how veterinarians provide pet parents with authorizations, why they recommend therapeutic pet food(s), what questions they receive from pet parents when recommending therapeutic pet food, what information they communicate to pet parents when recommending therapeutic pet food, and whether they would prefer therapeutic pet food to be available without authorization. My survey of veterinarians also included questions about whether professionals receive any compensation or financial incentives for recommending therapeutic foods and which retailer(s), if any, they recommend to pet parents.

### 1.   Survey Population

106.    The relevant population for this matter is composed of U.S. veterinarians who currently treat cats and/or dogs and make recommendations for therapeutic pet food (*i.e.*, food that requires consumers to obtain authorization from a licensed veterinarian in order to purchase) for the dogs and cats they treat.

### 2.   Sampling of the Relevant Population

107.    The veterinarians who completed the survey were recruited by Survey Healthcare Global (SHG), a professional marketing and research firm that maintains a panel of healthcare professionals, including veterinarians. SHG regularly updates and validates their sample from a set of standard core sources, including the AVMA (American Veterinary Medical Association)

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

among others.[97] To ensure only qualified panelists are part of their panel, prospective members must go through a series of verification steps when enrolling with SHG. SHG also confirms the accuracy of respondents' selections against state license records, directories, and publicly available verified healthcare portals, as well as the AVMA database. In addition, SHG requests and collects copies of medical credentials and calls enrollees to verify them.

108.    SHG implements a variety of quality control measures to ensure the reliability and integrity of the respondents and responses they provide. For example, SHG embeds quality checks (*e.g.*, speed traps, attention/focus checks) to flag poor quality respondents. SHG also uses IP addresses to identify duplicate responses and flag those whose IP information is incongruent with expectation. SHG complies with healthcare industry standards and ethics for data collection. SHG's standard quality control measures were applied in this study.

109.    A total of 565 potential respondents opened the invitation and began the survey and of these, 403 qualified for and completed the survey. The survey invitation, the complete questionnaire, and screenshots of the survey as it appeared to respondents are provided in **Exhibit D.2**.

110.    Data for the survey were collected between June 16, 2022 and June 29, 2022.

### 3.  Quality Control Measures for the Survey

111.    To ensure that my data are of the highest quality, I implemented quality control measures in addition to those undertaken by SHG:

---

[97] Information about SHG's panel and quality assurance measures can be found on their website: https://www.surveyhealthcareglobal.com/about/quality-assurance/, last accessed August 18, 2022; https://www.surveyhealthcareglobal.com/our-panel/, last accessed August 18, 2022.

a. As is standard survey practice for litigation, the survey was conducted in a "double-blind" fashion; that is, neither the staff at SHG nor any of the respondents were aware of the survey sponsor or the ultimate intention of the survey.[98]

b. Respondents were able to take the survey either on a desktop, laptop, or tablet computer, or on their mobile phone or cell phone. The survey program was tested separately on both a computer and mobile phone or cell phone in order to ensure that the survey questions appeared correctly on the different device types.

c. Respondents were also required to enter their state of residence and zip code, and if these data conflicted with one another, the respondent was excluded.

d. Respondents who indicated that they did not understand or were unwilling to adhere to the survey instructions were also screened out of the survey.

e. In addition to these measures, I also conducted a pre-test of the survey instrument. The pre-test is described in more detail below.

### 4. Screening Questionnaire

112.    To ensure that panel respondents were part of the relevant population, a series of screening questions was asked. Only respondents who met these qualifying conditions continued with the main survey.

113.    To qualify for the survey, respondents had to indicate that they were 21 years old or older and that they currently work as a licensed veterinarian in the United States. In addition, I oversampled veterinarians who work in California, Kansas, and Illinois as I understand Plaintiffs are seeking to represent a statewide class of Illinois purchasers of Hill's Prescription Diet pet food, and that there are similar matters pending in California and Kansas. Respondents were also

---

[98] *Diamond*, pp. 410–411.

screened to ensure that they currently treat dogs and/or cats. Additionally, only respondents who indicated that they make food/nutritional recommendations for therapeutic pet food were qualified.

114.     Respondents were also asked, as additional background information, whether they currently practice in a privately owned or corporate owned veterinary clinic or hospital, what brand(s) of therapeutic pet food have they recommended, whether their hospital or clinic carries therapeutic pet food, and if so, to indicate which brand(s). Once qualified for the study, respondents were taken to the main questionnaire.

### 5.  Main Questionnaire

115.     In the main portion of the questionnaire, all qualified respondents were provided with the following instruction:

> For the next few questions, I want you to think about the therapeutic pet food recommendations you make for ["dogs" / "cats" / "dogs and cats"].

116.     Respondents were first asked a series of open-ended questions about the reasons why they recommend therapeutic pet food and to explain, in their own words, what makes therapeutic pet food different from non-therapeutic pet food.

117.     Next, respondents were provided with a list of response options and were asked to select which, if any, were reasons they have recommended therapeutic pet food. This question is shown below.

> Q. Aside from the pet's specific medical condition, which of the following, if any, are reasons you have recommended therapeutic pet food?[99]
> 1.  Diet has direct impact on animal health
> 2.  Efficacy of therapeutic pet food
> 3.  Nutritional needs associated with chronic conditions (e.g., diabetes, joint pain)
> 4.  To reduce acute symptoms (e.g., vomiting, diarrhea)
> 5.  Palatable/pets like it

---

[99] Response options were randomized.

6. Safer than non-therapeutic pet food
7. Therapeutic pet food has different nutritional composition compared to non-therapeutic pet food
8. Allows for monitoring of patient condition / response to change in diet
9. Past experience with therapeutic pet food
10. Reduces probability of poor future health outcomes (e.g., developing kidney stones)
11. Does not interfere with medication
12. My clinic or hospital receives a commission when selling particular brand(s) of therapeutic pet food
13. My clinic or hospital makes a profit on the sale of therapeutic pet food
14. Recommendations from other colleagues/specialists
15. Pet owner request
16. Need to replace nutritional deficiencies
17. Other (***Please specify***)
18. None of the above
19. Don't know / no opinion

118.     Respondents who selected "My clinic or hospital receives a commission when selling particular brand(s) of therapeutic pet food" were asked to identify the brand(s) for which they receive a commission. Respondents who selected "My clinic or hospital makes a profit on the sale of therapeutic pet food" were similarly asked to identify the brand(s).

119.     Next, all respondents who selected more than one reason for recommending therapeutic pet food were taken to a point allocation task. Respondents were instructed to allocate 100 points to the response options they selected at the previous question, such that items of greater importance received the greatest number of points, and those of lesser importance received fewer points. Under the question prompt, all response options selected at the prior question were shown with a textbox to enter the point values. Respondents were required to enter point values that totaled 100. The question prompt is shown below.[100]

Please again think about the features you indicated are reasons you have recommended therapeutic pet food. Of the items you selected (shown below), please allocate 100 points, such that items that are the most important have the greatest number of points and items that are less important have a smaller number of points.

---

[100] Respondents could select a "Don't know / no opinion" checkbox.

You must use all the points so the total is 100. An item can receive all the points or you can allocate none of the points to an item if you wish by entering a value of zero ("0"). Please enter values as whole numbers only.

120.     Respondents were asked to identify the conditions for which they have recommended therapeutic pet food and then were asked what they believe are important considerations when recommending therapeutic pet food. Respondents were also asked to indicate what sources of information they consult when recommending therapeutic pet food. These questions are shown below.

Q. When recommending therapeutic pet food, which of the following, if any, are important considerations?[101]
1. Multi-pet household
2. Pet's health symptoms
3. Preexisting health conditions or comorbidities
4. Pet owner's budget
5. Breed
6. Pet's ability to tolerate the diet after trying it
7. Taste/palatability
8. Availability of food
9. Brand of food
10. Pet's life-stage
11. Food's scientific support
12. Severity of pet condition
13. Food's ingredients
14. Past experience with the therapeutic pet food
15. Efficacy of therapeutic pet food
16. Feeding routine
17. Making a sale for the clinic
18. Other (***Please specify***)
19. None of the above
20. Don't know / no opinion

Q. When considering which therapeutic pet food to recommend, which of the following sources of information, if any, have you consulted?[102]
1. Representative for food brand
2. My veterinarian colleagues
3. Hotlines for food brands

---

[101] Response options were randomized.

[102] Response options were randomized.

    4. Brand websites
    5. Retailer website
    6. Product packaging
    7. Empirical / clinical studies
    8. Veterinarian publications
    9. Brand marketing materials
    10. Retailer marketing materials
    11. Continuing education classes in nutrition
    12. Past experience with therapeutic pet food
    13. Conferences
    14. Other ***(Please specify)***
    15. Don't know / no opinion

121.    I also wanted to understand what questions veterinarians received from and what they communicated to pet parents about therapeutic pet food. These questions provide insight into the extent to which conversations between veterinarians and pet parents about therapeutic foods involved drugs or medicines.[103] These two questions are shown below.

Q. When recommending therapeutic pet food, which of the following, if any, are questions or concerns raised by your pet owners? [104]
    1. What if my pet won't eat it?
    2. Will my pet have to be on this food for the rest of their lifetime?
    3. Why does this food cost more?
    4. What makes this food different from non-therapeutic pet food?
    5. Can all of the pets in my household eat the therapeutic pet food?
    6. Where can I purchase this food?
    7. Can I mix therapeutic and non-therapeutic pet food?
    8. Does this food contain drugs or medications?
    9. Can I give my pet a different brand of therapeutic pet food?
    10. Can I give my pet non-therapeutic pet food instead?
    11. When should I expect to see results with the therapeutic pet food?
    12. Other (***Please specify***)
    13. Don't know / no opinion

Q. When recommending therapeutic pet food, which of the following, if any, do you communicate to pet owners? [105]
    1. If you are not satisfied with the therapeutic pet food, you <u>can return</u> the bag for a refund or replacement

---

[103] As discussed in paragraph 143, I verified these data by also asking pet parents what kinds of questions they asked their veterinarians.

[104] Response options were randomized.

[105] Response options were randomized.

2. Therapeutic pet food <u>does</u> contain drugs or pharmaceutical medications
3. Therapeutic pet food <u>is approved</u> by nutritionists
4. Adding or mixing other foods can make therapeutic foods less effective
5. Therapeutic pet food contains a special balance of nutrients designed to support your pet's specific condition
6. Diet has a proven connection to health
7. Therapeutic pet food can help to avoid or decrease the likelihood of long-term or chronic health conditions
8. Pets tolerate therapeutic pet food well
9. Pets generally like the taste of therapeutic pet food
10. Other (***Please specify***)
11. Don't know / no opinion

122.    Respondents were next asked if they believe therapeutic pet food should be available for pet parents to purchase without authorization. Those who said "Yes" or "No" were also asked, "What makes you say that therapeutic pet food [should/should not] be available for pet parents to purchase without a veterinarian's authorization?"[106]

123.    Respondents were then taken to the final series of questions which asked, for those carrying therapeutic pet food for purchase on site at their clinic/hospital, whether they provided written authorizations (or simply note the food is authorized in the chart) and why. Respondents were also asked if they provide written authorizations for purchases outside of the hospital or clinic. Respondents were also asked what information was included in the written authorization, as shown below.

Q. When writing an authorization for therapeutic food, which of the following pieces of information, if any, is typically included with the authorization?[107]
1. Type of food (e.g., k/d. Urinary SO, etc.)
2. Specific brand recommendation
3. Refill information and duration of authorization
4. Wet, dry, or both
5. Feeding instructions
6. Other information (***Please specify***)
7. Don't know / no opinion

---

[106] Respondents could type in a response or select the "Don't know / no opinion" checkbox.

[107] Response options 1-5 were randomized.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

124.    Respondents were then asked three final questions, regarding whether they make suggestions or recommendations on where to purchase therapeutic food not purchased at their office and if so, what retailers they suggest or recommend and an open-ended question to assess why they suggest or recommend these retailers.

125.    After this, respondents were thanked for their time, and the survey ended.

### 6. Survey Pre-Test

126.    As an additional quality control measure and to ensure that respondents would understand the survey and be able to provide reliable data, I conducted a pre-test of my survey instrument including both the screener and the full questionnaire. The pre-test included a total of four veterinarians who completed the survey and answered a series of follow-up questions with a live interviewer. The interviewer asked respondents several questions about the clarity and ease of answering the survey items. Respondents were also specifically probed on the following questions: "When recommending therapeutic pet food, which of the following, if any, are questions or concerns raised by your pet owners?" and "When recommending therapeutic pet food, which of the following, if any, do you communicate to pet owners?" to ensure that the response options included in the survey were comprehensive.

127.    The pre-test interviews revealed that respondents had no difficulty understanding the questions, could easily respond to the questions, and reported no technical issues with the survey. I concluded that in general, respondents found the survey easy to understand.

128.     As a result of the pre-test, several small changes were made to the survey prior to launching the main study.[108] The pre-test interviewer script and pre-test data are attached as **Exhibit D.1.**

## C.     Hill's Prescription Diet Customer Survey

129.     I conducted a survey of 411 purchasers of Hill's Prescription Diet to verify whether consumers rely on veterinarians' recommendations and instructions (as opposed to relying on packaging or reviewing in-store displays or other in-store materials) and to understand from these consumers what questions or concerns, if any, they have for their veterinarians when they are first recommended therapeutic pet food.

---

[108] Based on the feedback and review of Dr. Reed-Arthurs' survey results, the following edits were made to the survey after pretesting:

- On S6 and S7, I clarified that I was requesting information about the state and zip in which they work (not where they live).
- On S9, I removed examples of corporate owned veterinary clinics as a respondent indicated they work at a smaller corporate clinic and was unsure whether the examples were representative.
- On S14, I removed a response option that asked "Something else" as a respondent indicated this list is not comprehensive of all the things she recommends, but she did not know how many answers to provide.
- On Q4, I updated the question stem to encourage respondents to provide responses other than specific medical reasons. I also removed response option "Trusted brand."
- I added Q5a, to capture the brands of therapeutic pet food that respondents make a profit from selling.
- On Q8, I removed a response option "Pet's dietary needs."
- On Q9, I added a response option "Representative for food brand."
- On Q10, I added a question that vets indicated they get often from pet parents "What if my pet won't eat it?" I also removed "Is this food approved by the FDA?" based on a review of Dr. Reed-Arthurs' FDA data.
- On Q11, I added a response option "If you are not satisfied with the therapeutic pet food, you can return the bag for a refund or replacement." I underlined "does" and "is approved" in response options 2 and 3. I also removed the response option that "Therapeutic pet food has undergone an FDA drug approval process" based on Dr. Reed-Arthurs' FDA data.
- On Q14, I modified the response options to better reflect the information that was conveyed by veterinarians.
- Based on the changes to response options in Q14, I also updated the wording of Q15 to accurately reflect response options provided in the modified Q14.
- On Q17, I removed a response option "Description of the health condition (e.g., weight management, renal care, etc.)" and added another "Refill information and duration of authorization."

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### 1. Survey Population

130.     The relevant population for this survey is composed of U.S. adult consumers who have purchased Hill's Prescription Diet pet food in the past six years.

### 2. Sampling of the Relevant Population

131.     Potential survey respondents were contacted by Veridata Insights ("Veridata"), an online panel and data collection services company.[109]

132.     A total of 6,221 potential respondents opened the invitation and began the survey and of these, 411 respondents in the relevant population qualified for and completed the survey. The survey invitation, the complete questionnaire, and screenshots of the survey as it appeared to respondents are provided in **Exhibit E.2**.

133.     Data for the survey were collected between August 8, 2022 and August 16, 2022.

### 3. Quality Control Measures for the Survey

134.     To ensure that my data are of the highest quality, I implemented the same quality control measures listed above in paragraph 85.

### 4. Screening Questionnaire

135.     To ensure that panel respondents were part of the relevant population, a series of screening questions was asked. Only respondents who met these qualifying conditions continued with the main survey.

136.     To qualify for the survey, respondents had to live in the United States, be 18 years old or older, and own at least one cat or dog. Respondents were asked what role they have in purchasing food for their cat(s) and/or dog(s). Respondents who indicated that they are "the only

---

[109] Additional information about Veridata Insights is available on their website at https://www.veridatainsights.com, last accessed August 18, 2022.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

person in the household responsible for purchasing the pet food" and those who indicated that they "share responsibility for purchasing the pet food with others in the household" were permitted to continue.

137.　　Respondents were asked to select, from a list, the reasons they had purchased pet food for their dog(s) and cat(s) in the past six years. Respondents who indicated that they had purchased pet food "to support a pet with an acute or short-term health problem," "to support a pet with a chronic or long-term health problem," and those who had purchased pet food because their "veterinarian advised I purchase a therapeutic food" were then asked to indicate which brands of pet food they had purchased for one of the reasons listed above. Those who indicated they had purchased Hill's in the past six years were then asked to indicate which brand of Hill's pet food they had purchased. Those who selected Hill's Prescription Diet qualified and proceeded to the main questionnaire.

### 5. Main Questionnaire

138.　　In the main portion of the questionnaire, all qualified respondents were asked to select, from a list, the Hill's Prescription Diet formulations they had purchased in the past six years.[110] Next, respondents were asked two open-ended questions about the reasons they <u>first</u> purchased Hill's Prescription Diet pet food. This series of questions is shown below:

Q.　Why did you <u>first</u> purchase <u>Hill's Prescription Diet</u> pet food?[111]

Q.　Any other reasons you <u>first</u> purchased <u>Hill's Prescription Diet</u> pet food?[112]

---

[110] Respondents who selected "None of these" or "Don't know / don't recall" were screened out to ensure that respondents had not confused which Hill's brand they had purchased. The list of Hill's Prescription Diet formulations was compiled using the Hill's website. See, https://www.hillspet.com/products/dog-food#pd and https://www.hillspet.com/products/cat-food#pd, last accessed August 18, 2022.

[111] Respondents could type in a response or select the "Don't know / don't recall" checkbox. Respondents who selected Don't know / don't recall" skipped the next question.

[112] Respondents could type in a response or select the "No other reasons" checkbox.

139.     Next, respondents were provided with a list and were asked which of the

following items from the list were reasons they first purchased Hill's Prescription Diet pet food.

This question is shown below.

Q.  Which of the following, if any, describes why you <u>first</u> decided to purchase <u>Hill's
Prescription Diet</u> pet food?[113]
 1.  My veterinarian recommended this pet food
 2.  My veterinarian prescribed this pet food
 3.  I looked at the bags/cans of food online
 4.  I looked at the bags/cans of food in a store
 5.  I looked at the bags/cans of food at my veterinarian's office
 6.  I got a recommendation from staff at my veterinarian's office or pet clinic
 7.  I got a recommendation from a family member or friend
 8.  I got a recommendation from a salesperson at pet food store
 9.  I received advertising for this food
10. Something else (***Please specify***)
11. Don't recall / unsure

140.     Respondents who indicated *both* that their veterinarian recommended or

prescribed the food, or that they got a recommendation from staff at the veterinarian's office or

pet clinic, *and* that they looked at the bags/cans of food online, in a store, or at their veterinarian's

office were asked to specify which came first. Specifically, respondents were asked:

Q.  You said you received **[INSERT ACCORDING TO Q4 (IF R1 OR R6)** "a
recommendation" **[and] IF R2** "a prescription"] and looked at the food **[INSERT
FROM Q4** "online," "in store," "at your veterinarian's office"]. Which of the
following is most accurate?[114]
 1.  I <u>first looked at the food</u> and then got a recommendation / prescription
 2.  I <u>first got a recommendation / prescription</u> and then looked at the food
 3.  Something else (***Please specify***)
 4.  Don't know / don't recall

141.     Respondents who indicated that they looked at the bag of food online, in a store,

or at the veterinarian's office were also asked to indicate what information helped them to decide

to purchase the food the first time. Respondents who selected "the name of the food" were asked

---

[113] Response options were randomized.

[114] Response options 1 and 2 were randomized.

a follow-up question about what information the name conveyed to understand how the name of

the food helped them decide to purchase the food the first time. These questions are shown below.

> Q. When evaluating the <u>Hill's Prescription Diet</u> pet food **[INSERT FROM Q4** "online,"
> "in store," "at your veterinarian's office,"**]** what information helped you to decide to
> purchase the food the <u>first</u> time?[115]
> 1. Price
> 2. The list of ingredients
> 3. Description of how the food works
> 4. Feeding instructions
> 5. Look and design of the package
> 6. Flavor of pet food (e.g., chicken, venison, fish)
> 7. Type of pet food – wet or dry
> 8. Clinical nutrition statement on label
> 9. Made in the U.S.A. with global ingredients you can trust
> 10. Hill's U.S. #1 Veterinarian Recommended statement on label
> 11. The name of the food
> 12. Reviews from other pet owners
> 13. Something else (***Please specify***)
> 14. Don't know / don't recall

> Q. When deciding to purchase the food, did the name …?[116]
> 1. Help you identify the specific food recommended by your vet or veterinarian staff
> **2.** Help you identify the specific food recommended by family/friends
> 3. Help you identify the specific food recommended by salesperson at petfood store
> 4. Provide information about the quality of the ingredients as compared to other
> brands
> 5. Provide information about the price of the food
> 6. Provide information about the flavor of the food
> 7. Provide some other information (***Please specify***)
> 8. Don't know / don't recall

142.    Next, respondents were asked a series of questions about where they first

purchased Hill's Prescription Diet pet food. If respondents purchased from a retailer and not a

---

[115] Response options were randomized.

[116] Response options were randomized. Response option one only appeared if a respondent previously indicated that
one reason they first purchased this product was because a veterinarian had recommended or prescribed this food
or if they indicated a staff member at the veterinarian's office or pet clinic recommended this food. Response
option two only appeared if a respondent previously indicated that one reason they first purchased the food was
because a family member or friend recommended the food. Response option three only appeared if a respondent
previously indicated that one reason they first purchased the product was because a sales person at the pet food
store recommended this food. Response options four, five, and six always appeared regardless of prior responses.

veterinarian's office, they were then asked what they recall needing to do the first time they made

a purchase.[117] These questions are below.

> Q. Where did you <u>first</u> purchase <u>Hill's Prescription Diet </u>pet food?[118]
>   1. At my veterinarian's office
>   2. Petco
>   3. PetSmart
>   4. PetSmart.com
>   5. Chewy.com
>   6. Amazon.com
>   7. Somewhere else (***Please specify***) _____
>   8. Don't know / don't recall
>
> Q. When purchasing <u>Hill's Prescription Diet </u>pet food from **[INSERT RETAILER FROM Q8]** which of the following, if any, did you do?[119]
>   1. Provide a veterinarian authorization
>   2. Provide a prescription from my veterinarian
>   3. Get a card from the retailer allowing me to purchase the food
>   4. Something else (***Please specify***)
>   5. None of these
>   6. Don't know / don't recall

143.    Next, respondents were asked about whether they had raised any questions or

concerns with their veterinarians prior to purchasing Hill's Prescription Diet pet food.

Respondents who indicated they raised questions or concerns were asked to indicate what those

questions / concerns were. This question set is below.

> Q. Before purchasing, did you ask any questions or raise any concerns about <u>Hill's Prescription Diet </u>pet food with your veterinarian?[120]
>   1. Yes
>   2. No
>   3. Don't know / don't recall

---

[117] Those who selected Don't know / don't recall were also not asked the follow up question shown below.

[118] Response options were randomized.

[119] Response options were randomized.

[120] Response options Yes and No were rotated.

Q.  What questions or concerns about <u>Hill's Prescription Diet</u> pet food did you raise with your veterinarian?[121]

Q.  Any other questions or concerns that you raised about <u>Hill's Prescription Diet</u> pet food?[122]

144.    All respondents were then asked the final question series. First, they were asked, "Do you currently have pet insurance?" with response options "Yes," "No," and "Don't know / unsure."[123,124] Then, respondents were asked whether they or anyone in their household worked in any of the industries listed, and whether or not they had taken a survey on any of the topics listed. Respondents who indicated that they worked for a relevant industry and those who indicated they had taken a survey on pet food in the past six months were flagged for review.[125] The survey was analyzed with and without these respondents and because no meaningful differences/conclusions were observed, these respondents remained as part of the final sample. These questions are shown below. Following these final questions, respondents were thanked for their time, and the survey ended.

Q.  Do you or does anyone in your household work in any of the following professions or businesses?[126]
    1. A company that makes or manufactures pet food
    2. A veterinarian
    3. A pet food / pet supply store
    4. A marketing research or advertising company
    5. None of these
    6. Don't know / unsure

Q.  In the <u>past six months</u>, have you taken any surveys on the following?[127]

---

[121] Respondents could type in a response or select the "Don't know / don't recall" checkbox.

[122] Respondents could type in a response or select the "Don't know / don't recall" checkbox.

[123] Response options Yes and No were rotated.

[124] The survey was analyzed for those with and without pet insurance no meaningful differences/conclusions were observed.

[125] Respondents were also flagged if they selected "Don't know / unsure" on either of these questions.

[126] Response options on this list were randomized.

[127] Response options on this list were randomized.

1. Pet food
2. Kitchenware
3. Athletic footwear or apparel
4. Office furniture or supplies
5. Skin care products
6. Playground equipment
7.  Smartphones
8.  Sporting equipment
9.  None of these
10. Don't recall / unsure

## 6.  Survey Pre-Test

145.     As an additional quality control measure and to ensure that respondents would understand the survey and be able to provide reliable data, I conducted a pre-test of my survey instrument including both the screener and the full questionnaire. The pre-test included a total of four respondents who completed the survey as they typically would, and subsequently answered a series of follow-up questions with a live interviewer. The interviewer asked respondents several questions about the clarity and ease of answering the survey items. Additionally, they were specifically asked if the list provided to them when asked, "When evaluating the Hill's Prescription Diet pet food ["online," "in store," "at your veterinarian's office,"] what information helped you to decide to purchase the food the first time?" was complete, or if anything was missing.

146.     The pre-test interviews revealed that respondents had no difficulty understanding the questions, could easily respond to the questions, and reported no technical issues with the survey. I concluded that in general, respondents found the survey easy to understand.

147.     As a result of the pre-test, no changes were made to the survey prior to launching the main study. The pre-test interviewer script, as well as the pre-test data are attached as **Exhibit E.1**.

# VIII. SURVEY RESULTS

## A. Purchase Intention Survey Results[128]

148.    I surveyed a total of 600 U.S. adult dog/cat parents who have purchased or would consider purchasing pet food for a health problem or who would purchase therapeutic food if advised to do so by a veterinarian.

149.    Respondents reported owning both types of pets, with 459 respondents (76.5 percent) reporting owning a dog, and 348 respondents (58.0 percent) reporting that they owned a cat. A total of 207 respondents (34.5 percent) indicated that they own both a dog and cat. Respondents reported purchasing pet food for their pets at a variety of locations, namely, at the grocery store (58.0 percent), in the pet supply store (49.3 percent), and from an online pet supply store (39.0 percent).

150.    After being shown the Hill's Prescription Diet product (or one of the altered Control products) and the price, and being presented with the scenario in which their pet is ill and their vet recommends the diet, respondents were first asked to indicate the main messages communicated by the product packaging. Respondents provided a variety of responses, with most respondents simply noting that the product was a food to help their pet's health or noting the specific health issue it was designed for based on bag shown (*i.e.*, kidney or urinary issues):

- Food designed for dogs urinary care by helping to dissolve stones in the bladder. (Respondent 412)
- That it is beneficial, healthy, and safe for your cat. It will help your cats kidney problems (Respondent 567)
- The product is formulated to optimize health for cats with this particular condition. (Respondent 701)
- That this food is for cats to help with better kidney care. (Respondent 1815)
- It's a therapeutic dog food to help with your dogs urinary track. (Respondent 1865)
- The  main message is that the product provides a healthy and safe food based remedy for dogs with kidney issues. (Respondent 2027)

---

[128] The data for the Purchase Intention Survey are included as **Exhibit C.3**.

- A cat food that would help with urinary and kidney stone problems by at least 89 percent and help your cat feel much better and not be in pain (Respondent 2044)
- The main message is helping the cat to maintain prime health, most importantly, to keep kidney disease at bay. (Respondent 2114)

151.    Only two out of the total 200 respondents shown the at-issue packaging (1.0 percent) gave an answer to the main message questions that might indicate they understood the product to contain drugs or medication. Specifically, Respondent 794 said "Ingredients and medicine in it" and Respondent 1073 indicated "The product has very specific feeding instructions that must be followed, just as any human medicated supplement would require."

152.    Next, respondents were asked to indicate how likely they would be to purchase the product. As shown in Table 3, the likelihood of purchasing Hill's Prescription Diet is not affected by product labeling changes. When shown the real-world packaging with "Prescription Diet" on the label (Test Group), 53.0 percent of respondents indicated they would be likely to purchase the product. When shown the same product labeled with "Preferred Diet" (instead of "Prescription Diet" – Control Group 1), 54.0 percent of respondents indicated that they would be likely to purchase. Finally, when shown the Hill's Prescription Diet pet food with a statement indicating that the product contains no drugs and does not legally require a prescription (Control Group 2), 58.0 percent of respondents indicated they would be likely to purchase the product.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 3: Purchase Intention Survey**
**Respondents' Likelihood of Purchasing Product**

| Response[1] | Test (a) | | Control 1 (b) | | Control 2 (c) | | Net 1 (a-b) | Net 2 (a-c) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Count | Percent | Count | Percent | Count | Percent | | |
| Unlikely | 74 | 37.0% | 75 | 37.5% | 67 | 33.5% | -0.5% | 3.5% |
| Neither likely nor unlikely | 15 | 7.5% | 13 | 6.5% | 13 | 6.5% | 1.0% | 1.0% |
| Likely | 106 | 53.0% | 108 | 54.0% | 116 | 58.0% | -1.0% | -5.0% |
| Don't know / unsure | 5 | 2.5% | 4 | 2.0% | 4 | 2.0% | -- | -- |
| **Total Respondents** | **200** | **100.0%** | **200** | **100.0%** | **200** | **100.0%** | | |

*Q3. Based on the product packaging and the price of [**INSERT PRICE SHOWN UNDER PRODUCT/DEPENDING ON GROUP**], how likely or unlikely would you be to purchase this product?*

Note: [1] Response categories "Extremely unlikely" "Very unlikely" and "Somewhat unlikely" are included in "Unlikely." Response categories "Extremely likely" "Very likely" and "Somewhat likely" are included in "Likely."

Source: NERA Consumer Purchase Intention Survey, July 2022

153.    These differences between the Test and Control 1 and Test and Control 2 are not statistically significant, indicating that there is no significant difference in respondents' willingness to purchase the product, whether or not it is labeled as "prescription" pet food, or if respondents are told in a prominent statement that the product did not contain any drugs, and that a prescription was not required by law to purchase the product.[129]

154.    In response to an open-ended question asking why they would be likely (or unlikely) to purchase the product, respondents provided a range of answers. Respondents who indicated that they would be likely to purchase the product noted that they would take all necessary steps if told their pet was suffering with a health issue. For example, respondents who stated that they would be likely to purchase the product (either "Somewhat likely," "Very likely," or "Extremely likely") gave answers such as:

- Be worth it if it helps my cat feel better (Respondent 794)
- The cat is part of the family and the doc said to follow these directions. You do whatever is necessary to help get the animal healthy (Respondent 896)
- If it helps my pet live comfortably. (Respondent 1124)
- I would do anything to help my dog in need. (Respondent 1834)
- Price seems high for that amount but if it helps my dog I would likely purchase it. (Respondent 1944)
- If my dog needed this special type of food I would gladly buy it. (Respondent 2569)

155.    Respondents who indicated that they would not be likely to purchase the product also provided a range of reasons, with most stating that the price was a deterrent. For example, those who indicated that they were "Very unlikely" or "Extremely unlikely" to purchase the product noted:

- Too expensive (Respondent 284)
- The price is too expensive. (Respondent 358)

---

[129] A z-test of significance between the Test and Control 1 respondents who were unlikely to purchase the product yields a p-value of .92. This p-value is higher than 0.05, indicating there is no statistically significant difference between the two groups. A z-test of significance between the Test and Control 2 respondents who were unlikely to purchase the product yields a p-value of .47, which is also higher than.05, indicating that there is no statistically significant difference between the two groups.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- The price is very high. I get food for $20 dollars cheaper (Respondent 473)
- I couldn't afford the price (Respondent 2038)
- Cost to much (Respondent 2136)
- too expensive (Respondent 2484)

156.    In the closed-ended version of this question, respondents selected varied reasons for their willingness to purchase response. Across all conditions, respondents were largely consistent with their reasons for willingness to purchase. Here, I focus on those respondents who indicated that they were likely to purchase the product. As shown below in Table 4, respondents shown the at-issue "Prescription"-branded product were no more likely to indicate that the brand name influenced their willingness to purchase the product than those shown the "Preferred"-branded product. Specifically, a total of 38.7 percent of respondents in the Test Group indicated that the words "Prescription Diet" on the label positively influenced their likelihood of purchasing the product. In Control Group 1, 32.4 percent of respondents indicated that the words "Preferred Diet" on the label positively influenced their likelihood of purchasing the product. In Control Group 2, 49.1 percent indicated that the words "Prescription Diet" on the label positively influenced their likelihood of purchasing the product even though the label also included an explicit, conspicuous statement that the product did not contain drugs and that a prescription was not legally required. These results demonstrate that "Preferred" relative to "Prescription" has no statistical impact on consumers' likelihood of purchasing and the importance of the "Prescription" label is not affected when the product also includes a "disclaimer" of information Plaintiffs allege is lacking.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 4: Purchase Intention Survey**
**Why Respondents Were Likely to Purchase Product**

| Response | Test | | Control 1 | | Control 2 | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Veterinarian Recommended | 68 | 64.2% | 80 | 74.1% | 83 | 71.6% |
| Information on how the product helps | 56 | 52.8% | 62 | 57.4% | 68 | 58.6% |
| Information on how the product works | 50 | 47.2% | 50 | 46.3% | 60 | 51.7% |
| [Prescription/Preferred] Diet on the product label | 41 | 38.7% | 35 | 32.4% | 57 | 49.1% |
| Made in the USA | 38 | 35.8% | 38 | 35.2% | 38 | 32.8% |
| Price of the product | 31 | 29.2% | 30 | 27.8% | 25 | 21.6% |
| Daily feeding guide | 29 | 27.4% | 29 | 26.9% | 39 | 33.6% |
| Size of the product | 28 | 26.4% | 26 | 24.1% | 25 | 21.6% |
| Flavor of the pet food | 25 | 23.6% | 20 | 18.5% | 29 | 25.0% |
| Recommendations from groomers, handlers, or breeders | 17 | 16.0% | 15 | 13.9% | 26 | 22.4% |
| I have purchased the brand before | 14 | 13.2% | 22 | 20.4% | 27 | 23.3% |
| Image of animal on bag | 11 | 10.4% | 11 | 10.2% | 16 | 13.8% |
| Other | 2 | 1.9% | 2 | 1.9% | 2 | 1.7% |
| None of these | 1 | 0.9% | 1 | 0.9% | 1 | 0.9% |
| Don't know / unsure | 1 | 0.9% | 0 | 0.0% | 0 | 0.0% |
| **Total Respondents[1]** | **106** | | **108** | | **116** | |

*Q3. Based on the product packaging and the price of [**INSERT PRICE SHOWN UNDER PRODUCT/DEPENDING ON GROUP**], how likely or unlikely would you be to purchase this product?*

*Q6. You may have already mentioned this, but which of the following, if any, influenced your response that you would be [**INSERT RESPONSE FROM Q3**] to purchase this product?*

Note: [1] Total is restricted to respondents who indicated that they were either "Extremely likely" "Very likely" or "Somewhat likely" to purchase the product.

Source: NERA Consumer Purchase Intention Survey, July 2022

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

157.     Respondents who selected "Prescription/Preferred Diet on the product label" at the previous question were asked to explain what the name on the product packaging meant to them. While respondents in all conditions were likely to mention that this was a food to address a particular ailment/illness/medical issue, respondents who saw "Prescription Diet" (Test and Control 2) were more likely to note vet involvement and that a prescription was required to purchase, for example:

- A diet prescribed by a vet (Respondent 505)
- need a prescription to get (Respondent 561)
- that it is prescribed by vets (Respondent 1323)
- It means I can't purchase it without my vet prescribing it for my dog (Respondent 1971)
- Prescription from a doctor (Respondent 2039)
- It's a diet that is prescribed (Respondent 2065)

158.     Only one respondent, a respondent in Control Group 2, indicated that the name of the product "Prescription Diet" meant the product contains drugs or medication.[130]

159.     The results from my purchase intention survey demonstrate that the "Prescription" labeling and related packaging features challenged by Plaintiffs do not affect consumers' purchasing behavior. Consumers are no less likely to purchase a therapeutic product when it is labeled "Preferred," or when it contains a statement indicating it contains no drugs compared to a product labeled "Prescription." Contrary to Plaintiffs' claims, the results of this study demonstrate that relevant purchasers would not change their purchasing behavior if the at-issue products were labeled differently.

---

[130] See, **Exhibit C.3**, Respondent 2794.

90

## B.  Veterinarian Survey Results[131]

160.     I surveyed a total of 403 licensed veterinarians who currently treat cats and/or dogs and practice in either a privately owned or corporate owned veterinary clinic or hospital in the United States. Respondents also had to indicate that, as part of their work, they make food/nutritional recommendations for the pets they treat, and that they specifically make recommendations for therapeutic pet food.

161.     Respondents were from a mix of states across the United States, with an oversample from California (39.0 percent), Illinois (16.9 percent) and Kansas (9.4 percent). Most of the veterinarians in my sample had a number of years of experience with the most common response indicating practice experience of 20 to 29 years (31.5 percent).

### 1.  Therapeutic Food Recommended for Health-Related Reasons

162.     When asked why they recommend therapeutic pet food, respondents reported a variety of reasons. Many veterinarians gave responses that suggested they recommend therapeutic foods to help support pets with specific health conditions. Examples are below:

- For acute and /or chronic diseases that would benefit from diet therapy (Respondent 401)
- May help prevent or treat current medical condition (Respondent 405)
- I prescribe them for helping treat specific medical dx. (Respondent 436)
- To help with treatment of specific underlying diseases. (Respondent 458)
- To help treat an illness by slowing it's progression or preventing recurrence. (Respondent 1113)
- As either a primary or auxiliary support for medical issues. (Respondent 1642)

163.     Other veterinarians listed specific medical conditions for which they recommend therapeutic foods:

- Urinary Issues, Cancer, Bladder stones, IBD (Respondent 369)
- Urinary, renal, intestinal allergy, and behavior issues. (Respondent 372)

---

[131] The data for the Veterinarian Survey are included as **Exhibit D.3**.

- Recommended these diets  to aid in treatment for urinary bladder stones, allergy, renal disease, obesity. (Respondent 398)
- allergies, gi issues, kidney disease, diabetes, urinary issues, overweight (Respondent 404)
- Kidney disease, liver disease, arthritis, pancreatic, diarrhea (Respondent 2270)
- Renal disease, gi issues, weight loss, liver disease, diabetes (Respondent 2347)

164.    Some veterinarians cited to the scientific evidence that supports therapeutic diets as tools for helping manage pet health as a reason for their recommendations:

- Proven scientific research shows the food works as treatment for specific conditions (Respondent 478)
- Some diets are specifically for specific diseases and disorders by high quality, well established  companies backed by quality control, research, and testing. (Respondent 669)
- Quality ingredients, research backed (Respondent 728)
- The research that has gone into these diets, and the quality control that ensures consistency in the product allows me to feel confident that a specific diet will be beneficial to help manage a specific medical condition in a specific patient. (Respondent 1125)
- Proven results with research and previous use. (Respondent 2156)
- Because there is scientific evidence that it will improve their health (Respondent 2260)

165.    Notably, only three respondents tied their recommendation of therapeutic pet food to profitability.[132]

166.    Veterinarians were then asked what, if anything, makes therapeutic food different from non-therapeutic pet food. Again, a range of responses were observed. Some veterinarians focused on the fact that therapeutic diets are designed for pets with certain health conditions:

- Prescription diets are nutritionally balanced to treat certain disease processes (Respondent 331)
- For a specific reason/disease (Respondent 366)
- They are for specific medical conditions. (Respondent 369)
- They are designed to treat certain medical conditions and are proven to help (Respondent 397)
- These diets have been formulated and are intended to benefit specific medical conditions in addition to medications or as stand alone treatments. (Respondent 402)

---

[132] See, **Exhibit D.3** Respondents 1029, 1031, and 2250.

- It is designed for a specific disease condition that should be evaluated as an overall therapeutic plan (Respondent 478)

167.    Other veterinarians commented on the exacting formulations and ingredients,

often noting that therapeutic diets benefit from higher quality control and nutritional balance:

- specific ingredients and concentrations of the ingredients (Respondent 442)
- Guaranteed ingredients, higher quality, less risk of contamination. (Respondent 445)
- Different types of ingredients and levels of nutrients that can help specific conditions. (Respondent 453)
- Levels of things like fat protein and trace minerals are in different levels and in regular non therapeutic pet foods or other attitudes that are in higher levels than non therapeutic pet foods. (Respondent 482)
- The amount of control over specific ingredients and ingredient ratios. Better quality control to prevent cross contamination (Respondent 483)
- The balance of ingredients for a particular disease. Tighter regulations in manufacturing of the diet and more accurate ingredients levels. More research showing benefit of the diet in clinic trials. (Respondent 597)
- Balance of ingredients, supplements, pH, fat content, etc. (Respondent 1783)

168.    Veterinarians also noted that therapeutic foods are backed by research:

- more research (Respondent 333)
- More research behind it  Better ingredients   Formulated for certain disease processes (Respondent 368)
- Usually, more research behind it, involvement of veterinary nutritionists and other scientists. (Respondent 435)
- Therapeutic pet foods have the research behind it, and not just the biggest advertising budget. (Respondent 440)
- Truely evidenced based and proven if fed according to directions. High quality ingredients. (Respondent 451)
- Studies that back up the results (Respondent 464)
- Gone through the appropriate research (Respondent 466)
- Research shows that it works for the problem. (Respondent 468)
- More research goes into the therapeutic food, less marketing. (Respondent 472)

169.    Many veterinarians indicated that care must be taken with therapeutic foods

because they can be harmful if given to the wrong animal, do not support growing animals, and

require oversight from a trained professional to ensure safety:

- There could be harm done to a patient if Rx to the wrong patient (Respondent 436)

- Therapeutic pet foods are specifically deficient or enhanced with certain nutrients taking them outside of the recommended requirements for cats and dogs and as such should be used under a veterinarian's direction. (Respondent 439)
- therapeutic diets are researched and have quality control at a level that over-the-counter diets do not. therapeutic diets could be detrimental when fed to a pet that did not have the condition it was intended for. (Respondent 446)
- Prescription diets are specially formulated and processed in a particular way by board-certified veterinary nutrition specialists. For example, prescription renal diets are lower in protein compared to any over-the-counter food. People shouldn't feed low protein food to their pets that don't have kidney disease because it can adversely affect their health. (Respondent 447)
- Food that is required for a very specific medical condition that could be detrimental if used under the wrong conditions (Respondent 448)
- Normal animals shouldn't eat it (Respondent 497)
- Veterinary supervision important to ensure pets with medical conditions are receiving the appropriate diet to treat their conditions. Inappropriate use of diets (ie diet too high in fat in pancreatitis prone pet or inappropriate use of derm diet) can lead to harm or apparent food trial failure. (Respondent 663)
- It is not appropriate for all life stages. And it needs a diagnosis to recommend it. (Respondent 1114)
- I think it needs to Remain in the hands of a professional to prescribe because people tend to TRY the foods without any knowledge as to how it affects the animals. (Respondent 1651)
- A lot of research goes into the formulation of the prescription diets. Not every pet should eat a prescription diet, since they are formulated specifically for a certain medical condition. There are certain instances where a particular prescription diet may be harmful to a pet. (Respondent 1685)
- It helps to make sure a diet is being used in the best manner possible. Some owners would "self" diagnose and try diets before getting the appropriate vet care first. (Respondent 2266)

170.    Notably, only five of the total 403 veterinarians surveyed gave responses that

therapeutic foods differ from non-therapeutic foods because of drugs/medicine, or FDA

involvement:

- It is medicine. It treats diseases. It's crucial to treatment (Respondent 487)
- There are no drugs. (Respondent 982)
- We use prescription diets as a drug. Should be controlled by veterinarian (Respondent 1030)
- It's a medication like any other thing we prescribe (Respondent 2199)
- Clinical trials proving the safety and effectiveness of the diet, and recognition by the FDA of being a prescription grade product. (Respondent 2235)

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

171.    Respondents were then asked to select, from a list of reasons, which (if any) were reasons that they have recommended therapeutic pet food. A total of 328 respondents (81.4 percent) indicated that they have recommended therapeutic pet food due to "nutritional needs associated with chronic conditions (e.g., diabetes, joint pain)," and 314 respondents (77.9 percent) indicated that they recommended therapeutic pet food "to reduce acute symptoms (e.g., vomiting, diarrhea)," followed by 301 respondents (74.7 percent) who recommended therapeutic pet food based on the "efficacy of therapeutic pet food." These results are shown below.

### Table 5: Veterinarian Survey
### Reasons Respondents Recommend Therapeutic Pet Food

| Response | Count | Percent[1] |
|---|---|---|
| Nutritional needs associated with chronic conditions (e.g., diabetes, joint pain) | 328 | 81.4% |
| To reduce acute symptoms (e.g., vomiting, diarrhea) | 314 | 77.9% |
| Efficacy of therapeutic pet food | 301 | 74.7% |
| Diet has direct impact on animal health | 291 | 72.2% |
| Reduces probability of poor future health outcomes (e.g., developing kidney stones) | 286 | 71.0% |
| Past experience with therapeutic pet food | 244 | 60.5% |
| Therapeutic pet food has different nutritional composition compared to non-therapeutic pet food | 238 | 59.1% |
| Allows for monitoring of patient condition / response to change in diet | 206 | 51.1% |
| Palatable/pets like it | 128 | 31.8% |
| Pet owner request | 123 | 30.5% |
| Recommendations from other colleagues/specialists | 121 | 30.0% |
| Need to replace nutritional deficiencies | 113 | 28.0% |
| Does not interfere with medication | 93 | 23.1% |
| Safer than non-therapeutic pet food | 81 | 20.1% |
| My clinic or hospital makes a profit on the sale of therapeutic pet food | 57 | 14.1% |
| My clinic or hospital receives a commission when selling particular brand(s) of therapeutic pet food | 21 | 5.2% |
| Other | 7 | 1.7% |
| None of the above | 2 | |
| Don't know / no opinion | 0 | 0.0% |
| **Total Respondents** | **403** | |

*Q4. Aside from the pet's specific medical condition, which of the following, if any, are reasons you have recommended therapeutic pet food?*

Note: [1] Percent does not add to 100 because respondents could select multiple responses.

Source: NERA Veterinarian Survey, June 2022

172.     As shown in Table 5 above, only 21 respondents (5.2 percent) indicated that their clinic or hospital receives a commission when selling a particular brand of therapeutic pet food. The brands most frequently cited by respondents were Purina Pro Plan Veterinary Diets (2.5 percent) and Hill's Prescription Diet (2.0 percent).[133]

173.     Table 5 also shows that only 57 respondents (14.1 percent) noted that their clinic or hospital makes a profit on the sale of therapeutic pet food. Respondents indicated that their clinic or hospital makes a profit on various brands, with 47 respondents (11.7 percent) indicating that their clinic or hospital makes a profit off the sale of Hill's Prescription Diet, 40 respondents (9.9 percent) indicating Royal Canin Veterinary Diet, and 33 respondents (8.2 percent) indicating Purina Pro Plan Veterinary Diets. These results demonstrate that the large majority of veterinarians do not feel financially incentivized to recommend therapeutic diets.

174.     After selecting reasons why they recommend therapeutic pet food (as shown in Table 5), respondents were asked to allocate points to these reasons, such that the most important reasons received more points, and the less important reasons received fewer points. Respondents were given a total of 100 points to allocate amongst the reasons. As shown below in Figure 3, "Nutritional needs associated with chronic conditions (e.g., diabetes, joint pain)" received the

---

[133] I understand that Hill's Prescription Diet does not offer commissions so these respondents were likely guessing. See, Deposition of Dr. Karen Shenoy, dated February 2, 2022, 138:18-140:5.

most points by respondents, followed by "Diet has direct impact on animal health" and "Efficacy of therapeutic pet food."[134,135]

---

[134] The following response options received less than 4.0 percent of the total points allocated by respondents and are therefore included in "Other": Palatable/pets like it, Safer than non-therapeutic pet food, Pet owner request, Need to replace nutritional deficiencies, Recommendations from other colleagues/specialists, Does not interfere with medication, My clinic or hospital makes a profit on the sale of therapeutic pet food, My clinic or hospital receives a commission when selling particular brand(s) of therapeutic pet food, and "Other."

[135] Figure 3 reflects the share of the total points allocated to each reason by respondents. The two respondents who selected "None of the above" at Q4, and the three respondents who selected the "Don't know / no opinion" checkbox at Q6 are not included in the calculations below.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Figure 3: Veterinarian Survey: Point Allocation**



Source: NERA Veterinarian Survey, June 2022

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

175.     Respondents were also asked to indicate, from a list, what were important considerations when recommending therapeutic pet food. As shown in Table 6 below, 318 respondents (78.9 percent) noted that the efficacy of therapeutic pet food was an important consideration, and 286 respondents (71.0 percent) noted taste/palatability as an important consideration. Other important considerations were pet's health symptoms (69.2 percent), food's scientific support (66.5 percent), and preexisting health conditions or comorbidities (63.8 percent).

**Table 6: Veterinarian Survey**
**Important Considerations When Recommending Therapeutic Pet Food**

| Response | Count | Percent[1] |
|---|---|---|
| Efficacy of therapeutic pet food | 318 | 78.9% |
| Taste/palatability | 286 | 71.0% |
| Pet's health symptoms | 279 | 69.2% |
| Food's scientific support | 268 | 66.5% |
| Preexisting health conditions or comorbidities | 257 | 63.8% |
| Pet's ability to tolerate the diet after trying it | 243 | 60.3% |
| Availability of food | 238 | 59.1% |
| Severity of pet condition | 234 | 58.1% |
| Past experience with the therapeutic pet food | 233 | 57.8% |
| Pet's life-stage | 184 | 45.7% |
| Pet owner's budget | 173 | 42.9% |
| Food's ingredients | 167 | 41.4% |
| Brand of food | 145 | 36.0% |
| Multi-pet household | 139 | 34.5% |
| Feeding routine | 83 | 20.6% |
| Breed | 50 | 12.4% |
| Making a sale for the clinic | 20 | 5.0% |
| Other | 1 | 0.2% |
| None of the above | 0 | 0.0% |
| Don't know / no opinion | 1 | 0.2% |
| **Total Respondents** | **403** | |

*Q8. When recommending therapeutic pet food, which of the following, if any, are important considerations?*

Note: [1] Percent does not add to 100 because respondents could select multiple responses.

Source: NERA Veterinarian Survey, June 2022

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

176.     In sum, veterinarians recommend therapeutic food for health-related reasons. Whether it be to support overall health in ill pets, to reduce acute symptoms, or to help manage long-term chronic disease, veterinarians recommend therapeutic diets to help get pets healthy and keep them that way. Therapeutic foods are not recommended by veterinarians because of the profits received or commission earned.

## 2. Conversations About Therapeutic Food Do Not Focus on Drugs or Medicine

177.     Respondents noted that pet parents ask a number of different questions when recommended therapeutic pet food. For example, 322 respondents (79.9 percent) noted that pet parents frequently ask, "Can all of the pets in my household eat the therapeutic pet food?" and 313 respondents (77.7 percent) indicated that pet parents ask, "What if my pet won't eat it?" Respondents noted that pet parents also ask questions such as "Will my pet have to be on this food for the rest of their lifetime?" (76.9 percent) and "Where can I purchase this food?" (75.2 percent). Of note, only 64 respondents (15.9 percent) reported that pet parents ask, "Does this food contain drugs or medications?" These results are shown below in Table 7.

**Table 7: Veterinarian Survey**
**Questions Raised by Pet Parents**

| Response | Count | Percent[1] |
|---|---|---|
| Can all of the pets in my household eat the therapeutic pet food? | 322 | 79.9% |
| What if my pet won't eat it? | 313 | 77.7% |
| Will my pet have to be on this food for the rest of their lifetime? | 310 | 76.9% |
| Where can I purchase this food? | 303 | 75.2% |
| Can I give my pet non-therapeutic pet food instead? | 270 | 67.0% |
| Why does this food cost more? | 267 | 66.3% |
| Can I mix therapeutic and non-therapeutic pet food? | 249 | 61.8% |
| When should I expect to see results with the therapeutic pet food? | 240 | 59.6% |
| What makes this food different from non-therapeutic pet food? | 233 | 57.8% |
| Can I give my pet a different brand of therapeutic pet food? | 191 | 47.4% |
| Does this food contain drugs or medications? | 64 | 15.9% |
| Other | 2 | 0.5% |
| Don't know / no opinion | 0 | 0.0% |
| **Total Respondents** | **403** | |

*Q10. When recommending therapeutic pet food, which of the following, if any, are questions or concerns raised by your pet owners?*

Note: [1] Percent does not add to 100 because respondents could select multiple responses.

Source: NERA Veterinarian Survey, June 2022

178. After being asked what questions pet parents have about therapeutic pet food, respondents were asked to indicate what they communicate to pet parents regarding therapeutic pet food. Respondents communicate an array of information to pet parents, such as "Therapeutic pet food contains a special balance of nutrients designed to support your pet's specific condition" (82.4 percent), "Therapeutic pet food can help to avoid or decrease the likelihood of long-term or chronic health conditions" (78.9 percent), "If you are not satisfied with the therapeutic pet food, you can return the bag for a refund or replacement" (71.7 percent), and "Adding or mixing other foods can make therapeutic foods less effective" (71.0 percent). Notably, only 39 respondents (9.7 percent) indicated that they communicate "Therapeutic pet food does contain drugs or pharmaceutical medications."

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 8: Veterinarian Survey**
**What Respondents Communicate to Pet Parents**

| Response | Count | Percent[1] |
|---|---|---|
| Therapeutic pet food contains a special balance of nutrients designed to support your pet's specific condition | 332 | 82.4% |
| Therapeutic pet food can help to avoid or decrease the likelihood of long-term or chronic health conditions | 318 | 78.9% |
| If you are not satisfied with the therapeutic pet food, you can return the bag for a refund or replacement | 289 | 71.7% |
| Adding or mixing other foods can make therapeutic foods less effective | 286 | 71.0% |
| Diet has a proven connection to health | 254 | 63.0% |
| Therapeutic pet food is approved by nutritionists | 210 | 52.1% |
| Pets tolerate therapeutic pet food well | 199 | 49.4% |
| Pets generally like the taste of therapeutic pet food | 186 | 46.2% |
| Therapeutic pet food does contain drugs or pharmaceutical medications | 39 | 9.7% |
| Other | 1 | 0.2% |
| Don't know / no opinion | 0 | 0.0% |
| **Total Respondents** | **403** | |

*Q11. When recommending therapeutic pet food, which of the following, if any, do you communicate to pet owners?*

Note: [1] Percent does not add to 100 because respondents could select multiple responses.

Source: NERA Veterinarian Survey, June 2022

179.     These data demonstrate that veterinarians receive many, variable, questions from pet parents. When receiving a recommendation for therapeutic pet food, pet parents are concerned with practical information such as what to do if the pet will not eat it, whether all animals in a household can eat the food, whether their pet will need to be on the food for an extended period of time, or where to purchase the food. Pet parents also ask questions about cost of the product and when they should see results from the product. Veterinarians are not generally receiving questions about whether the products contain drugs or medication, and veterinarians are not conveying such information to pet parents.

### 3.  Veterinarians Do Not Believe Therapeutic Food Should Be Available without Authorization

180.     Respondents were also asked to indicate whether or not therapeutic pet food should be available without a veterinarian's authorization. Of the total 403 respondents, the

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

majority, more than three quarters of those surveyed (78.4 percent) indicated that they believed

therapeutic pet food *should not* be available for purchase without a veterinarian's authorization.

181.    Veterinarians who indicated that therapeutic food should not be available without

a prescription/authorization indicated that therapeutic foods may not be safe, balanced, or

appropriate for general use. For example:

- Because certain diets like kidney diet can have adverse effect on health pets. For example, cats are carnivores and need a high protein diet with the exception of cats with underlying kidney disease and/or geriatric age. (Respondent 447)
- not all are appropriate for all pets (Respondent 476)
- not all diets are appropriate for all pets (Respondent 477)
- certain food can be inadequate for certain patients (Respondent 371)
- Some foods may not be as nutritional enough for some pets that require more (Respondent 400)
- The altered nutrient content makes some diets NOT complete and balanced and should be used under a veterinarian's direction. (Respondent 439)
- Because they can make their pets health worse if they use the wrong diet (Respondent 482)

182.    Others cited concerns that pet parents may select the wrong food:

- Because people may assume their pet has a condition without doing any of the testing to confirm it (Respondent 331)
- General public are not veterinarians and do not understand the consequences of putting a pet on some of these foods long term. (Respondent 369)
- Owners pick the wrong food.  They pick urinary when they need renal, or they use an intestinal diet when the problem is metabolic or neoplastic (Respondent 372)
- Because owners self diagnose their pets incorrectly. Or will conduct diet trials incorrectly. I have had cat owner think that food for hyperthyroidism was a great idea because her cat was overweight!!!! She ordered it and I declined the request of course. Explained to her kitty was not hyperthyroid etc. We need to be in control of how these diets are utilized. (Respondent 398)
- therapeutic diets are not appropriate for pets without the condition being used for.  If o are allowed to pick out their own foods, there will be much more chance of inappropriate treatment / detrimental health consequences. (Respondent 446)
- Some specialized foods, such as Hill's y/d for hyperthyroid cats, could be misused in pets without the illness. (Respondent 453)
- Clients might consult  Dr. Google,  but that doesn't mean they are right or will make good decisions. (Respondent 1120)

183.    Of the small number of veterinarians who did indicate that the food should be available without a prescription/authorization, some indicated that this availability should only apply to certain conditions or that a specific diet should be available for purchase after being prescribed initially:[136]

- Not all therapeutic food, but some for more general conditions (dental disease, behavior, obesity, etc) (Respondent 448)
- it depends on the condition honestly - things like kidney or liver or urinary disease should need Rx but other things like joint, weight loss or GI foods should not in my opinion (Respondent 1519)

184.    A small number also indicated that visiting the veterinarian to get the food may be inconvenient or expensive for some parents or that writing prescriptions/authorizations is time consuming for the veterinarian.

- It's been a very slow process sometimes, especially recently for anyone to get diets that their pet requires so fewer roadblocks might be necessary at this time…not always (Respondent 471)
- Sometimes veterinarian's is too expensive. Pet parents knows better about their pets nutritional needs. (Respondent 1406)
- In some cases parents can't afford veterinarian's fees. (Respondent 1418)
- Because they are complete and balanced. Writing prescriptions for clients is time-consuming. (Respondent 2147)

185.    Finally, a very small number (seven total) indicated that they believed therapeutic food should be available without a prescription/authorization and noted that therapeutic foods do not have drugs/medication/prescription.[137]

186.    In sum, most veterinarians expressed that therapeutic food should not be available without a prescription or authorization. Veterinarians worried that pet parents would select the wrong food, which could be unsafe or dangerous to the pet. Even amongst the few veterinarians who felt that therapeutic food should be available without a prescription or authorization, some

---

[136] See, **Exhibit D.3** Respondent 2247.

[137] See, **Exhibit D.3** Respondents 406, 465, 485, 1640, 2047, 2158, and 2198.

limited their opinions to certain medical conditions or suggested it should only be available once it has been prescribed for use initially. Others simply wanted to simplify the process for obtaining therapeutic foods, noting that veterinarian fees can sometimes be prohibitive.

### 4. Form of Authorization Varies

187.　　　Respondents were asked whether or not they provide pet parents with written authorization when recommending therapeutic pet food that is available at their clinic/hospital. The majority of respondents (55.8 percent) indicated that they simply note in the patient chart that therapeutic food has been authorized and inform the pet owner/clinic staff that the food can be purchased at the clinic/hospital. A total of 90 respondents (22.3 percent) indicated that whether they provide a written copy or note in the chart depends on circumstance, and 23 respondents (5.7 percent) indicated that they provide a written copy of the authorization for the pet parent to take to the front desk. In addition, a total of 44 respondents (10.9 percent) indicated that their clinic/hospital does not carry therapeutic pet food. These results (shown below in Table 9) indicate that veterinarians provide authorization for therapeutic pet food in their clinic to pet parents in a variety of ways.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 9: Veterinarian Survey**
**Whether Respondents Provide Written Authorization for Therapeutic Pet Food Purchase**
**at Clinic/Hospital**

| Response | Count | Percent |
|---|---|---|
| I note in patient chart that therapeutic food has been authorized and inform the pet owner/clinic staff that the food can be purchased | 225 | 55.8% |
| Whether I provide a written copy or only note in chart only depends on the circumstance | 90 | 22.3% |
| I provide a written copy of the authorization for the pet parent to take to the front desk | 23 | 5.7% |
| Other | 19 | 4.7% |
| Don't know / unsure | 2 | 0.5% |
| Hospital/clinic does not carry therapeutic pet food | 44 | 10.9% |
| **Total Respondents** | **403** | **100.0%** |

*Q14. You indicated that therapeutic pet food is available for purchase at your clinic/hospital. When you recommend a therapeutic pet food that is available at your clinic/hospital, do you or do you not provide a written authorization for the pet owner?*

Source: NERA Veterinarian Survey, June 2022

188.    Respondents were asked an open-ended question as to why they do (or do not) provide a pet owner with a written copy of the authorization for therapeutic pet food available for purchase in their hospital/clinic.[138] Respondents gave a variety of answers. Those who indicated that they do provide a written copy of the authorization gave responses such as "So they cannot confuse the food" (Respondent 1032) and "In case they want to go other retailers" (Respondent 1625). Those who indicated that they do not provide a written authorization, but simply note it in the chart and communicate this to pet parents, stated that they do so because "Not necessary if they are specifically purchasing in my clinic. If they want to buy elsewhere then I give them a written prescription" (Respondent 448) and "Most people just get the food if it is in stock." (Respondent 1486).

---

[138] For those who indicated "Whether I provide a written copy or only note in chart only depends on the circumstance" the question read, "What affects whether you do or do not typically provide the pet parent with a written copy of the authorization?"

106

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

189.     Respondents were asked a comparable question regarding whether or not they provide written authorization for therapeutic pet food being purchased outside the clinic/hospital where they work. Respondents varied in whether they were likely to provide written authorization for therapeutic pet food purchased outside the office. Overall, 63.3 percent of respondents indicated they typically note that the food has been authorized and inform the pet owner to contact the retailer, 61.8 percent indicated they typically provide a written authorization for the pet parent to take with them, and 118 respondents (29.3 percent) indicated that they both note the authorization in the chart and provide it is writing. Several respondents who indicated that they do "something else" indicated they authorize prescription requests, sometimes by fax, when they receive them from an online retailer.[139] These results show that veterinarians provide authorization for out-of-clinic therapeutic pet food purchases in a variety of ways –with a written authorization (sometimes faxed after the fact), by making a note in the pet's chart, or both. These results are shown below in Table 10.

---

[139] See, **Exhibit D.3** Respondents 401, 436, 446, 447, 669, 797, 1456.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 10: Veterinarian Survey**
**Whether Respondents Provide Written Authorization Therapeutic Pet Food Purchase**
**Outside Clinic/Hospital**

| Response | Count | Percent[1] |
|---|---|---|
| Note that therapeutic food has been authorized and inform the pet owner that the retailer can contact the clinic to validate the authorization | 255 | 63.3% |
| Provide a written authorization for the pet parent to take with them | 249 | 61.8% |
| Other | 22 | 5.5% |
| Don't know / no opinion | 5 | 1.2% |
| **Total Respondents** | **403** | |

*Q16. When a pet owner is going to purchase therapeutic pet food [outside your clinic/hospital], do you...*

Note: [1] Percent does not add to 100 because respondents could select multiple responses.

Source: NERA Veterinarian Survey, June 2022

190.     Respondents indicated that the information included in these written authorizations typically includes the type of food (90.8 percent), a specific brand recommendation (82.9 percent), refill information and duration of authorization (79.7 percent), and whether the food comes as wet food, dry food, or both (75.4 percent).

191.     The majority of respondents (73.2 percent) also indicated that they generally provide pet parents with a recommendation on where they can purchase therapeutic pet food. Respondents indicated that they recommend a variety of locations such as Chewy.com (48.4 percent), PetSmart retail store (27.0 percent), the brand/manufacturer's website (23.1 percent), as well as at the Petco retail store (16.4 percent). These results are shown below in Table 11.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 11: Veterinarian Survey**
**Location(s) Respondents Recommend for Purchase of Therapeutic Pet Food**

| Response | Count | Percent[1] |
|---|---|---|
| Chewy.com | 195 | 48.4% |
| PetSmart retail store | 109 | 27.0% |
| The brand/manufacturer's website | 93 | 23.1% |
| Petco retail store | 66 | 16.4% |
| Another veterinarian's office | 61 | 15.1% |
| PetSmart.com | 56 | 13.9% |
| Amazon.com | 53 | 13.2% |
| Petco.com | 41 | 10.2% |
| Somewhere else | 76 | 18.9% |
| Don't know / no opinion | 2 | 0.5% |
| Does not provide suggestion for purchase location | 108 | 26.8% |
| **Total Respondents** | **403** | |

*Q18. [For therapeutic pet food not purchased at your clinic/hospital, do / Do] you provide a suggestion or recommendation for where the therapeutic pet food can be purchased?*

*Q19. You indicated you provide a suggestion or recommendation for where the therapeutic pet food can be purchased. Which of the following retailers, if any, do you suggest or recommend?*

Note: [1] Percent does not add to 100 because respondents could select multiple responses.

Source: NERA Veterinarian Survey, June 2022

192.     When asked why they recommend specific retailers or purchase locations, respondents noted that they do so out of consideration for their pet parents, with most respondents noting convenience/ease for pet parents as an important consideration. For example, respondents gave answers such as "ease for owner" (Respondent 442), "Because they are convenient" (Respondent 444), "ease of purchase for client and home delivery" (Respondent 1462), and "They are often the most convenient for my clients" (Respondent 1092).

193.     In sum, veterinarians vary in their behavior for how they recommend and prescribe therapeutic pet food. While many sell therapeutic pet food in office, veterinarians also prioritize pet parent convenience when purchasing therapeutic pet food and will provide the option to purchase the food elsewhere. Many of those who do sell therapeutic foods in the office do not provide written authorization. However, respondent behavior varied more when providing

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

authorization for purchase outside the veterinarian's office. Veterinarians appeared equally likely to write a formal prescription/authorization for the pet parent to take with them as they were to simply note in the patient's chart that the food had been authorized. Others appeared to wait for an authorization request from the retailer. These data suggest that consumers encounter the prescription or authorization requirement in varied ways depending on the availability of the food in the office, the veterinarian's procedures, and consumer preference. The veterinarian survey contradicts Dr. Reed-Arthurs' untested assumption that the authorization requirement conveys to consumers that they are making a choice between "prescription-only" and "over-the-counter" products.

194.     Further, veterinarians generally appear to be very specific in their recommendations – many (but not all) detailing which brand and which form (wet or dry) to purchase. In addition, many consumers purchase the food directly in-clinic, shortly after receiving a recommendation. In whole, these data suggest that consumers are unlikely to spend time reviewing packaging labels or in-store product displays when purchasing therapeutic pet foods.

195.     As a whole, the results from the veterinarian survey demonstrate that professionals view therapeutic food as beneficial for their patients and believe that requiring authorization is important for keeping pets healthy and safe. These data also indicate that veterinarians recommend specific brands (suggesting that consumers are unlikely to review and rely on packaging labels or in store product displays) when authorizing therapeutic foods and that consumers purchasing in office often never receive a written prescription or authorization. Finally, these results demonstrate that veterinarians generally do not receive questions about whether they products contain drugs and are not conveying such information to pet parents.

## C. Hill's Prescription Diet Customer Survey Results[140]

196.    I surveyed a total of 411 U.S. adult dog/cat parents who have purchased Hill's Prescription Diet pet food in the past six years. Respondents in the survey reported owning both types of pets, with 330 respondents (80.3 percent) reporting owning a dog, and 252 respondents (61.3 percent) reporting that they owned a cat. A total of 171 respondents (41.6 percent) indicated that they own both a dog and a cat.

197.    The formulations of Hill's Prescription Diet most frequently purchased by dog owners were Digestive Care (i/d) (47.6 percent), Dental Care (t/d) (38.2 percent), and Joint Care (j/d) (32.7 percent). The formulations of Hill's Prescription Diet most frequently purchased by cat owners were Urinary Care (c/d, s/d, or u/d) (34.5 percent), Kidney Care (k/d) (24.6 percent), and Digestive Care (i/d) (31.0 percent).

198.    When asked why they first purchased the food, approximately half of all respondents who could recall why they first purchased the food indicated that they did so because their veterinarian recommended or prescribed it to them.[141] Examples of these responses are shown below:[142]

- vet recommendation for gastrointestinal/skin symptoms (Respondent 133)
- It was recommended from my veterinarian to help with specific health conditions (Respondent 285)
- Vet recommendation due to severe acid reflux (Respondent 549)

---

[140] The data for the Customer Survey are included as **Exhibit E.3**.

[141] A total of 145 respondents stated that at least one of the reasons for first purchase was because the veterinarian recommended the product. A total of 114 respondents (27.7 percent) could not recall why they first purchased the product.

[142] Six additional respondents gave responses that suggest they obtained the product after some interaction with their veterinarian: "Dog was sick, Doctor did surgery and put her on special for for urinary stones" (Respondent 1095), "Our special boy was diagnosed with pancreatitis" and "Glutton-free diet recommended." (Respondent 4063), "I am the veterinarian and want to feed my dogs the foods best suited to their individual needs. Those needs change as pets age and develop health concerns" and "Diets as part of the medical treatment regimen" (Respondent 4432), "Senior cat was diagnosed with kidney problems and vet put him on a special kidney diet" (Respondent 5389), "The doctor and my introduction of its quality is very guaranteed" (Respondent 5418), "About 7 yrs ago from vet" and "MY RESCUE HAD URINARY PROBLEMS AND HAS BEEN ON SINCE" (Respondent 5852).

- Because our vet recommended it for our pet's health issues. (Respondent 1511)
- Was recommended by the vet for an elderly cat with kidney problems (Respondent 2287)

199.    Interestingly, very few respondents, only 18 in total, actually used the term "prescribed" or "prescription" when asked why they purchased the product. These data suggest that purchasers placed greater emphasis on the veterinarian's advice and assessment of their pet's condition and less importance on a formal authorization or prescription, and the data may indicate that some purchasers did not receive a written prescription when they purchased the product in their veterinarian's office or clinic.[143]

200.    Respondents (including those who indicated that their veterinarian recommended the product) also noted that they purchased the food to help their pet with a specific health condition:

- Cat had repeated urinary blockages. (Respondent 671)
- Our cat has FIV and serious dental issues so we wanted to purchase the best dental food for him. (Respondent 860)
- My cat had crystals in his urethra. The doctor prescribed Hills urinary care. (Respondent 1755)
- Because of my pets digestive and other health problems (Respondent 2083)
- Had a dog with an unexpected joint injury (Respondent 2169)

201.    Only two respondents gave answers that could indicate that, when first purchasing Hill's Prescription Diet pet food, they did so because they believed it contained drugs or medication: "Because some of my dogs have series skin care issues and need special medical food" (Respondent 1104) and "My dog was overweight so the vet suggested diet medicine for my dog" (Respondent 1799).

---

[143] This interpretation is supported by the findings of the veterinarian survey, which demonstrated that veterinarians who have the food available in their office/clinic often do not write a formal authorization or prescription.

202.     Respondents were then asked a closed-ended question as to why they first purchased Hill's Prescription Diet pet food. Consistent with the open-ended responses, the majority of respondents (61.6 percent) selected "My veterinarian recommended this pet food." The next most common response was "My veterinarian prescribed this pet food" (49.9 percent). In total, 335 respondents (81.5 percent) indicated their veterinarian "recommended" or "prescribed" this pet food as a reason for why they first purchased the product. A total of 129 respondents, or 31.4 percent, indicated that they *only* relied on the veterinarian's recommendation or prescription and consulted no other source of information when first purchasing the food. When I include the respondents who received a recommendation from the veterinarian's staff, the share increases to 38.2 percent. In other words, 38.2 percent of respondents relied solely on an interaction with their veterinarian or their veterinarian's staff when first purchasing Hill's Prescription Diet pet food.

203.     As shown in Table 12 below, only approximately one quarter of respondents indicated that they looked at the bags or cans of food in-store, at the veterinarian's office, or online, and only 22.9 percent indicated that they got a recommendation from a sales person in store.[144] In total, more than half of all surveyed respondents (52.1 percent) indicated that they did not review the product online, in a store, or at their veterinarian's office before first purchasing Hill's Prescription Diet pet food.

---

[144] In total, 47.9 percent indicated that one of the ways they looked at the bags or cans of food was in store, at the veterinarians' office, or online.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 12: Customer Survey**
**Why Respondents First Purchased Hill's Prescription Diet**

| Response | Count | Percent[1] |
|---|---|---|
| My veterinarian recommended this pet food | 253 | 61.6% |
| My veterinarian prescribed this pet food | 205 | 49.9% |
| I got a recommendation from staff at my veterinarian's office or pet clinic | 138 | 33.6% |
| I looked at the bags/cans of food in a store | 106 | 25.8% |
| I got a recommendation from a family member or friend | 105 | 25.5% |
| I looked at the bags/cans of food at my veterinarian's office | 104 | 25.3% |
| I received advertising for this food | 99 | 24.1% |
| I got a recommendation from a salesperson at pet food store | 94 | 22.9% |
| I looked at the bags/cans of food online | 93 | 22.6% |
| Something else | 2 | 0.5% |
| Don't recall / unsure | 1 | 0.2% |
| **Total Respondents** | **411** | |

*Q4. Which of the following, if any, describes why you <u>first</u> decided to purchase <u>Hill's Prescription Diet</u> pet food?*

Note: [1] Total does not sum to 100 because respondents could select multiple responses.

Source: NERA Hill's Prescription Diet Customer Survey, August 2022

204. For respondents who indicated that they did look at the bags/cans of food in-store, online, or at their veterinarian's office, I wanted to understand when this evaluation occurred and what information on the bag or can was relevant to the respondent. The majority of respondents (57.8 percent) who decided to purchase based on a prescription/authorization and who looked at the food indicated that *first* they received the recommendation/authorization and only *subsequently* looked at the product.

205. As shown below in Table 13, those who looked at the bag/can sought information on the type of food, the "veterinarian recommended" statement, a description of how the food works, and the flavor. Few respondents look at or look to the name of the product as relevant information.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Table 13: Customer Survey**
**What Information Helped Respondents to Decide to Purchase Food**

| Response | Count | Percent[1] |
|---|---|---|
| Type of pet food – wet or dry | 99 | 24.1% |
| Hill's U.S. #1 Veterinarian Recommended statement on label | 98 | 23.8% |
| Description of how the food works | 91 | 22.1% |
| Flavor of pet food (e.g., chicken, venison, fish) | 84 | 20.4% |
| Made in the U.S.A. with global ingredients you can trust | 84 | 20.4% |
| Clinical nutrition statement on label | 84 | 20.4% |
| The list of ingredients | 81 | 19.7% |
| Look and design of the package | 77 | 18.7% |
| Reviews from other pet owners | 65 | 15.8% |
| The name of the food | 58 | 14.1% |
| Feeding instructions | 48 | 11.7% |
| Price | 34 | 8.3% |
| Something else | 0 | 0.0% |
| Don't know / don't recall | 0 | 0.0% |
| Did not look at product in store/online/at veterinarian's office | 214 | 52.1% |
| **Total Respondents[2]** | **411** | |

*Q6. When evaluating the Hill's Prescription Diet pet food [ **online / in store / at your veterinarian's office** ,] what information helped you to decide to purchase the food the first time?*

Notes: [1] Total does not sum to 100 because respondents could select multiple responses.

[2] Respondents were only asked Q6 if, at Q4, they selected "I looked at the bags/cans of food online," "I looked at the bags/cans of food in a store," or "I looked at the bags/cans of food at my veterinarian's office."

Source: NERA Hill's Prescription Diet Customer Survey, August 2022

206.     Respondents who indicated that they relied upon "The name of the food" when deciding to purchase the food the first time were asked what the name conveyed to them. Results from this question show that only 34 of the total 411 respondents (8.3 percent) (i) reviewed the product either online, in a store, or at their veterinarian's office; (ii) relied upon the name when making the decision to purchase it; and (iii) gathered some information about product ingredients based on the name of the food.

207.     These results directly contradict the artificial Scenarios 1 and 2 presented to respondents in Dr. Reed-Arthurs' survey. My data from actual Hill's Prescription Diet pet food

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

customers demonstrate that many purchase the product solely because it is the product their veterinarian has recommended. In fact, my results demonstrate (both in the open-ended question and in the close-ended question) that very few purchasers use the term "prescription" or "prescribed" or think of these products in these terms and instead think of these products as those which have been recommended or suggested by their veterinarian. These data are further evidence that the juxtaposition between "prescription-only" and "over-the-counter" in Dr. Reed-Arthurs' survey misrepresents the consumer experience and biases the survey results. Furthermore, these results demonstrate that, even consumers who review the bag/can are not relying on the product name – and particularly not anything the name conveys about the product ingredients – in making their purchase decision.

208.    Respondents in this survey were also asked where they first purchased Hill's Prescription Diet pet food. Respondents most frequently indicated that they purchased the food at their veterinarian's office (35.8 percent), followed by PetSmart (17.8 percent) and Amazon.com (16.5 percent).

209.    Finally, all respondents were asked whether or not they asked questions or raised concerns with their veterinarian before purchasing Hill's Prescription Diet pet food. The majority of respondents indicated that they did not ask questions or raise concerns (63.3 percent) with only 115 respondents (28.0 percent) indicating that they did ask questions or raise concerns with the veterinarian.

210.    The questions pet parents reported asking their veterinarians largely correspond to and confirm the data from the veterinarian survey. For example, respondents indicated that they asked their veterinarians about feeding routines, including questions about whether other

household pets could eat the food, how often the pet should be fed, and what happens if the

dog/cat didn't like the food. Examples are below:

- how many times a day should my dog eat (Respondent 1817)
- I asked if it was ok if the other animals in the house ate it. (Respondent 2843)
- How long should the cat be on this formula and how much per day (Respondent 3254)
- What if they don't like or eat it, will there be other choices? (Respondent 4980)
- would the cat eat it? how much to feed? (Respondent 5830)

211.    Respondents also asked about anticipated or expected benefits and or how long it

would take to see results. For example:

- What are the benefits (Respondent 313)
- I wanted to know how it would help my cat and how long it would take to see improvement. (Respondent 1720)
- I wanted to know the health benefits and factors (Respondent 3849)

212.    Respondents did have questions about the product's ingredients, but these

questions did not reference drugs or medicine. For example:

- I asked what the ingredients were (Respondent 556)
- whats in the product Im purchasing (Respondent 760)
- If it was grain-free (Respondent 1440)
- Can the ingredients of the product be unsafe (Respondent 3669)
- I asked about the ingredients. (Respondent 3720)

213.    Only seven respondents (1.7 percent) indicated that they asked a question that

contained any reference to medicine or prescription (and no respondent asked anything about

drugs). As shown below, some appear to be generic references to the food being prescribed or

authorized:

- I was worried that the first bag we were prescribed had in fact chicken inside. (Q11, Respondent 35)
- how long until we see results, how long will he need to be on that medication (Q11, Respondent 591)
- I asked for the side effects and other remedies of the medicine (Q11, Respondent 2083)

- Why it can be used as a prescription diet (Q12, Respondent 3669)
- What kind of prescription diet would be helpful for my pet? (Q11, Respondent 3706)
- I asked about the dosage (Q11, Respondent 4236)
- How does this prescription help with my pet's health long term. (Q12, Respondent 4830)

# IX.  CONCLUSIONS

214.    The research conducted by Plaintiffs' expert is methodologically flawed, unreliable, and fails to address key questions. Dr. Reed-Arthurs' survey does not adhere to proper experimental design. Since all of her survey respondents are exposed to the "treatment" scenario juxtaposing "prescription-only" and "over-the-counter" products, Dr. Reed-Arthurs cannot isolate the causal affect, if any, the word "prescription" has on consumer perception. Therefore, Dr. Reed-Arthurs cannot assert, based on her survey, that identifying a food as "prescription-only" causes consumers to believe the product contains drugs. Her survey is further rendered unreliable by framing and priming biases, neither of which is ameliorated by dividing respondents too late into "prescription-only" or "over-the-counter" groups. Dr. Reed-Arthurs' survey also lacks external validity for two reasons. She has no evidence that any consumer would see products characterized as "prescription-only" and "over-the-counter only," and has done nothing to place her results within the real-world context of pet owner/veterinarian interactions. And, she sampled respondents based on a broad, self-created definition of "specialty" pet food, resulting in a survey over 80% composed of respondents who have never purchased Hill's Prescription Diet. Finally, Dr. Reed-Arthurs provides no evidence that consumers' purchasing behavior has been or would be affected by the at-issue package labeling. She does not provide any evidence that individuals who have purchased therapeutic pet food would purchase anything different or pay any less for a food without the challenged labeling features, nor does she demonstrate that consumer behavior

would change if consumers were explicitly informed – as Plaintiffs allege they should be – that the product does not contain drugs and is not legally required to be sold by prescription.

215.     My survey results provide direct, empirical evidence contradicting the methodologically flawed and invalid survey put forward by Dr. Reed-Arthurs. I surveyed 600 purchasers of therapeutic pet food, 403 veterinarians, and 411 purchasers of Hill's Prescription Diet pet food.

216.     My survey of 600 therapeutic pet food purchasers examined Plaintiffs' claim as to the materiality of the product packaging. My survey results confirm that Dr. Reed-Arthurs' test of the product packaging (Scenario 2) is biased and flawed and provide further evidence that her results do not address Plaintiffs' claims. The results from my purchase intention survey demonstrate that the "Prescription" labeling and related packaging features challenged by Plaintiffs do not affect consumers' purchasing behavior. Consumers are no less likely to purchase a therapeutic product when it is labeled "Preferred" or when it contains a statement indicating it contains no drugs. Contrary to Plaintiffs' claims, the results of this study demonstrate that changes in the product labeling had no impact on consumer purchasing preferences.

217.     My survey of 403 veterinarians examined Plaintiffs' claim that the authorization requirement is misleading. Most veterinarians endorsed the need for authorization to ensure that pet parents purchase the food that would benefit their pet's health. In terms of how they authorize therapeutic pet foods, their behavior is variable. While many veterinarians sell therapeutic pet food in office, veterinarians also provide the option to purchase the food elsewhere. When veterinarians sell therapeutic foods in the office, they often do not provide written authorization. For pet parents intending to purchase the food at a retailer, veterinarians appeared equally likely to write a formal prescription/authorization for the pet parent to take with them as they were to

simply note in the patient's chart that the food had been authorized. In other words, consumers are likely to encounter the prescription or authorization requirement in varied ways depending on the availability of the food in the office, the veterinarian's procedures, and consumer preference. The veterinarian survey contradicts Dr. Reed-Arthurs' untested assumption that consumers purchasing therapeutic foods encounter information conveying that they are making a choice between "prescription-only" and "over-the-counter" products. To the contrary, many authorizations/prescriptions are simply noted in the patient's chart, without the pet parents ever seeing a formal "prescription." These data also indicate that veterinarians recommend specific brands (suggesting that consumers are unlikely to review and rely on packaging labels or instore product displays) when authorizing therapeutic foods. Finally, these results demonstrate that veterinarians generally do not receive questions about whether the products contain drugs and are not conveying such information to pet parents.

218.    My final survey of Hill's Prescription Diet pet food purchasers demonstrates most consumers purchase Hill's Prescription Diet because a veterinarian recommended the product. In fact, my results demonstrate (both in the open-ended question and in the close-ended question) that few purchasers use the language of "prescription" at all and instead think of these products as those which have been recommended or suggested by their veterinarian. These data are further evidence that the juxtaposition provided in Dr. Reed-Arthurs' survey between "prescription-only" and "over-the-counter" misrepresents the consumer experience and biases the survey results. Furthermore, the majority of respondents who indicated that they did look at the bags/cans of food in-store, online, or at their veterinarian's office indicated that they first received the recommendation from their veterinarian and only subsequently looked at the bag/cans of food. Last, the results of the Hill's Prescription Diet customer survey demonstrate that, even of the

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

consumers who review the bag/can, they are not relying on the product name, and in particular they are not relying on the product name to communicate information about the product's ingredients.

219.     My conclusions have been reached through the proper application of survey methods and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and or supplement my opinions if I am provided with additional information. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Sarah Butler, Managing Director
August 26, 2022

Exhibit A

NERA
Economic Consulting

**Sarah Butler**
Managing Director

National Economic Research Associates, Inc
4 Embarcadero, Suite 400
San Francisco, CA 94111
+ 1 415 291 1000 Fax + 1 415 291 1010
Direct dial: + 1 415 291 1022
sarah.butler@nera.com
www.nera.com

# SARAH BUTLER, M.A.
## MANAGING DIRECTOR

Ms. Butler is an expert in survey research, market research, sampling, and statistical analysis. She has applied her expertise in a wide range of litigation and strategic business cases. Her litigation and project experience includes survey research, market research, the design of samples, and the statistical and demographic analysis of large data files in a number of areas including:

Intellectual Property

- Trademark and Trade Dress Infringement:  Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark and trade design infringement cases.

- False and Misleading Advertising: Design, analysis and critique of surveys used to measure consumer perceptions and the materiality of advertising claims.

- Patent Infringement:  Sample designs and surveys to the value of patented feature of a larger product and to establish rates at which infringing material exist in populations of products.

- Copyright infringement:  Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

Mass Torts/Class Actions

- Conduct surveys and design samples providing evidence on issues of commonality and consumers' awareness of key documents or facts and reliance on representations.

- Analyze large databases of claims files to generate invoices, estimate future liabilities and calculate policy shares for insurer liabilities in asbestos, tobacco and pharmaceuticals.

- Design, analyze and critique surveys and sampling plans used to evaluate employment and promotion records. Review and design surveys for purposes of estimating key facts

Sarah Butler

in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Antitrust

- Design, analysis and critique of surveys and other market research used as evidence of consumer purchasing and switching behavior in the areas of CPG, entertainment, automobiles, public transportation, sports and consumer electronics.

- Design, analysis and critique of surveys used to demonstrate consumer price sensitivities and willingness to pay.

Prior to joining NERA, Ms. Butler worked in market research, conducting survey research, focus groups and in-depth interviews.

## Education

**Temple University**
Applied Sociology, coursework, exams and dissertation proposal complete (2005).

**Temple University**
M.A. Sociology, (2000).

**Trinity College, Dublin Ireland**
M.Phil. (1997).

**Wellesley College**
B.A. Sociology and History (with honors). (1995).

## Professional Experience

| July 2006 - Present | **Senior Consultant – Managing Director** |
| | NERA Economic Consulting |
| | San Francisco, California, USA |

| Oct 2005 – May 2006 | **Special Consultant** |
| | NERA Economic Consulting |
| | London, England |

| Jan 2003 – Oct 2005 | **Senior Analyst - Consultant** |
| | NERA Economic Consulting |
| | Philadelphia, Pennsylvania, USA |

Sarah Butler

| | |
|---|---|
| 2002 - 2003 | **Consultant**<br>Integrated Marketing Associates<br>Bryn Mawr, PA, USA |
| Oct 1998 - Jan 2002 | **Research Associate – Analyst**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |
| Sept 1998 – May 2003 | **Adjunct Professor**<br>Temple University<br>Philadelphia, Pennsylvania, USA |
| Jan 1997 – Feb 1998 | **Manager of Member Research**<br>Society for Neuroscience<br>Washington DC, USA |

# Expert Analysis and Testimony

2022

*Intellectual Property Matters*

In re Application of Wine.com LLC.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report*.

Bilt Technologies, Inc. v. BILT, Inc.* United States District Court for The Southern District of New York. *Expert Report*.

Sazerac Brands, LLC* v. Eagle Trace Brewing Company LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report*.

UV RML NL ASSETS LLC* v. Coulter Ventures LLC. United States District Court Central District of California. *Expert Report. Rebuttal Report.*

Tortilla Factory, LLC v. GT's Living Foods, LLC.* United States District Court for The Central District of California. *Expert Report. Trial Testimony.*

Thrive Natural Care, Inc. v. Le-Vel Brands, LLC. United States District Court Central District of California, Southern Division. *Expert Report. Deposition.*

Crystal Lagoons U.S. Corp and Crystal Lagoons Technologies, Inc. v. Desert Color Manager LLC, Desert Color St. George LLC, AJ Construction, Inc., Cole West Home LLC, Holmes Homes, Inc., Sullivan Homes LLC, and Pacific Aquascape International, Inc.* United States District Court District of Utah, Central Division. *Expert Report.*

Sarah Butler

Sazerac Brands, LLC,* v. Buffalo Chip Campground, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report*.

Nichino America, Inc., v. Valent U.S.A., LLC.* United States District Court District of Delaware. *Expert Report. Reply Report. Deposition.*

Promotion in Motion Inc.,* v. The J.M. Smucker Company. United States District Court District of New Jersey. *Rebuttal Report.*

Chartwell Studio Inc., v. Team Impressions, Inc., and The Peel People, LLC.* United States District Court Northern District of Illinois Eastern Division. *Rebuttal Report. Deposition.*

Brooks Sports, Inc.* v. SPARC Group, LLC, Authentic Brands Group LLC, BB IPCO, LLC, BB OPCO, LLC., Simon Property Group, INC., Simon Property Group, L.P. United States District Court Western District of Washington at Seattle. *Expert Report.*

Shanghai Zhenglang Technology Co., Ltd,* v. Mengku Technology Co., Ltd, and Qianan Li. United States District Court Eastern District Of New York. *Rebuttal Report.*

Harman International Industries, Inc.,* v. Jem Accessories, Inc. United States District Court for the Central District of California. *Expert Report.*

PepsiCo* v. Rockstar Industries, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report*.

EBIN New York v. SIC Enterprise, Inc.* United States District Court Eastern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Aqua Connect, Inc. and Strategic Technology Partners, LLC. v. TeamViewer US, LLC.* United States District Court District of Delaware. *Expert report. Deposition. Trial Testimony.*

R80 LLC* v. Société des Produits Nestlé S.A., et al. United States District Court District of Maryland Southern Division. *Expert Report. Rebuttal Report.*

H&R Block, Inc.,* and HRB Innovations, Inc. v. Block, Inc. United States District Court Western District of Missouri. *Rebuttal Declaration. Reply Declaration. Expert Report.*

Vans, Inc. and VF Outdoor, LLC v. Walmart, Inc., The Doll Maker, Inc., and Trendy Trading, LLC.* United States District Court Central District of California Southern Division. *Declaration*.

Warner Bros. Entertainment Inc. v. Brian Biggs, Dawn Biggs, and Random Tuesday, Inc. *et al.* * United States District Court Central District of California. *Expert Report. Deposition.*

Sarah Butler

*Class Action Matters*

<u>In re: National Football League Sunday Ticket Antitrust Litigation.</u> United States District Court Central District of California. *Expert Report*.

<u>Kimberly Banks and Carol Cantwell v. R.C. Bigelow, Inc., and Does 1 through 10.*</u> United States District Court Central District of California. *Rebuttal Report*.

<u>Mocha Gunaratna and Renee Camenforte v. Dr. Dennis Gross Skincare, LLC.*</u> United States District Court Central District of California. *Expert Report. Deposition*.

<u>Paul Orshan, Christopher Endara, David Henderson, and Steven Neocleous, v. Apple Inc.*</u> United States District Court Northern District of California. *Expert Report. Deposition*.

<u>Elizabeth Maisel v. S. C. Johnson, Inc.*</u> United States District Court Northern District of California. *Expert Report*.

*Other Matters*

<u>Bluebonnet Internet Media Services, LLC* vs. Pandora Media, LLC.</u> United States District Court Western District of Texas Waco Division. *Expert Report*.

<u>United States ex rel. Terrence Barrett, and on behalf of various States* v. Allergan, Inc.</u> United States District Court Central District of California. *Expert Report*.

<u>2021</u>

*Intellectual Property Matters*

<u>Power Home Remodeling Group, LLC* v. Power Home Solar LLC d/b/a Powerhome Solar, also d/b/a Powerhome Solar & Roofing, also d/b/a Power Home Solar and Roofing.</u> United States District Court Eastern District of Pennsylvania. *Expert Report*.

<u>Honda Motor Co., LTD., v. Microsoft Corporation.*</u> United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

<u>Kaifi LLC v. T-Mobile US, Inc.; LAYER3 TV, Inc.; L3TV Dallas Cable System, LLC; METROPCS Texas, LLC; T-Mobile License LLC; T-Mobile USA, INC.; T-Mobile West LLC; T-Mobile West Tower LLC; IBSV LLC; Theory Mobile, Inc.; T-Mobile PCS Holdings LLC; T-Mobile Resources Corporation; and T-Mobile Subsidiary IV Corporation.*</u> United States District Court Eastern District of Texas Marshall Division. *Expert Report. Deposition*.

<u>Premier Specialty Brands LLC, d/b/a Kamado Joe v. Dansons US, LLC and Dansons, Inc. d/b/a Louisiana Grills.*</u> United States District Court for the Norther District of Atlanta, Georgia Division. *Expert Report. Deposition.*

Sarah Butler

Crocs, Inc.* v. Effervescent, Inc. et. al. United States District Court for the District of Colorado. *Expert Report. Deposition.*

Theia Technologies LLC v. Theia Group, Inc. and Theia Holdings A, Inc.* United States District Court for the Eastern District of Pennsylvania. *Expert Report.*

Lambda Labs, Inc.* v. Lambda Inc.* United States District Court for the Northern District of California Oakland Division. *Expert Report.*

Storage Cap Management LP* v. Robarco, Inc. and SpareSpace Storage, LLC. United States District Court for the Southern District of Ohio Eastern Division. *Expert Report. Deposition.*

Clear Imaging Research, LLC v. Samsung Electronics Co. LTD and Samsung Electronics America.* *Expert Report. Deposition.*

Patagonia, Inc. and Patagonia Provisions, Inc. v. Anheuser-Busch, LLC dba Patagonia Brewing Co.* United States District Court for the Central District of California Western Division, Los Angeles. *Expert Report.*

In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same. United States International Trade Commission, Washington DC. *Expert Report. Deposition. Trial Testimony.*

Vivint Inc.* v. Alarm.com. United States District Court for the District of Utah. *Expert Report. Deposition.*

*Class Action Matters*

Kristen Schertzer, Meagan Hicks, Brittany Covell* v. Bank of America, N.A., Cardtronics, Inc., FCTI, Inc., Cash Depot, Ltd. And DOES 1-50. United States District Court Southern District of California. *Expert Report. Deposition.*

Warren Gross, Deborah Levin, Shelby Cooper, and Edward Buchannan v. Vilore Foods Company, Inc., Arizona Canning Company, LLC.* United States District Court Southern District of California. *Expert Report. Rebuttal Report. Deposition.*

Scott and Rhonda Burnett, Ryan Hendrickson, Jerod Breit, Scott Trupiano, and Jeremy Keel v. The National Association of Realtors, Realogy Holdings Corp., Homeservices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max LLC, and Keller Williams Realty, Inc.* United States District Court for the Western District of Missouri, Western Division. *Expert Report.*

In re: Marriott International, Inc., Customer Data Security Breach Litigation. United States District Court of Maryland, Southern Division. *Expert Report. Deposition.*

Sarah Butler

Christopher Julian et. al. v. TTE Technology, Inc., dba TCL North America.* United States District Court for the Northern District of California. *Expert Report*.

Kaylan Morris, et. al. v. Walmart Inc., f/k/a/ Wal-mart Stores Inc.* United States District Court, Northern District of Alabama, Southern Division. *Expert Report. Deposition. Class Certification Testimony.*

Ricardo R. Garcia, Duane K. Glover, Paul E. Jacobson, Gaetano Calise, Mykhalo I. Holovatyuk, Brian Garcia, Paul Thompson, and David Hartman* v. Volkswagen Group of America, Inc. a/k/a Audi of America, Inc. and Volkswagen Aktiengesellschaff. United States District Court for the Eastern District of Virginia, Alexandria Division. *Expert Report. Deposition.*

Charles Tillage and Joseph Loomis* v. Comcast Corporation and Comcast Cable Communications, LLC and Does 1-20. United States District Court for the Northern District of California, San Francisco Division. *Expert Report.*

Kathleen Ryan-Blaufuss, Cathleen Mills, and Khek Kuan v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., INC., and DOE Defendants 1-10.* United States District Court for the Central District of California, Western Division. *Expert Report. Deposition.*

H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis* v. Goldman Sachs & Co. and The Goldman Sachs Group, Inc. United States District Court for the Southern District of New York. *Expert Report. Deposition.*

Michael Testone, Collin Shanks, and Lamartine Pierre, et. al., v. Barlean's Organic Oils, LLC.* United States District Court Southern District of California. *Expert Report. Deposition.*

Susan Wang Rene Lee v. StubHub, Inc.* Superior Court of the State of California for the County of San Francisco. *Expert Report.*

Michael Madea and Rick Smith, et. al, v. Kennedy Endeavors, Inc.* United States District Court for the District of Hawai'i. *Expert Report. Deposition.*

Shelly Benson and Lisa Caparelli, et. al, v. Newell Brands, Inc.* United States District Court for the Northern District of Illinois. *Expert Report. Deposition.*

Thomas Bailey, et. al, v. Rite Aid Corporation.* United States District Court for the Northern District of California. *Expert Report. Deposition.*

2020

*Intellectual Property Matters*

Nirvana LLC v. Marc Jacobs International LLC.* United States District Court Central District of California. *Expert Report. Deposition.*

Sarah Butler

<u>Girl Scouts of the United States of America\* v. Boy Scouts of America.</u> United States District Court Southern District of New York. *Expert Report. Deposition.*

<u>American Dairy Queen Corporation v. W. B. Mason Co. Inc.\*</u> United States District Court for the District of Minnesota. *Expert Report. Deposition. Trial Testimony.*

<u>Seven Networks, LLC v. Apple Inc.\*</u> United States District Court for the Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

<u>New NGC, Inc. d/b/a National Gypsum Company, NGC Industries, LLC, and National Gypsum Properties,\* LLC v. Alpinebay, Inc.</u> *Expert Report. Deposition.*

<u>Glaxo Group Limited\* v. Respirent Pharmaceuticals Co., LTD. United States District Court Southern District of New York.</u> *Expert Report.*

<u>Kaifi LLC v. AT&T Inc.; AT&T Corp.; AT&T Communications, LLC; AT&T Mobility, LLC; and AT&T Services, Inc.\*</u> United States District Court Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

<u>CFA Institute v. American Society of Pension Professionals & Actuaries, et. al.\*</u> United States District Court for the Western District of Virginia, Charlottesville Division. *Expert Report. Deposition.*

<u>Match Group LLC\* v. Bumble Trading Inc., Bumble Holding, LTD., Badoo Trading Limited, Magic Lab Co., Worldwide Vision Limited, Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited.</u> United States District Court for the Western District of Texas, Waco Division. *Expert Report. Deposition.*

<u>ClearPlay, Inc. v. Dish Network, L.L.C. and Echostar Technologies, L.L.C.\*</u> United States District Court, District of Utah, Central Division. *Expert Report.*

*Class Action Matters*

<u>Vicky Maldonado, et. al., v. Apple, Inc.\*</u> United States District Court, Northern District of California, San Francisco Division. *Expert Report. Deposition.*

<u>Jason DeCarlo v. Costco Wholesale Corporation and MBNR.\*</u> United States District Court Southern District of California. *Expert Report.*

<u>Javier Cardenas et al., Plaintiffs v. Toyota Motor Corporation et al., Defendants.\*</u> United States District Court Southern District of Florida. *Expert Report. Deposition.*

<u>Brian Gozdenovich et al., v. AARP Inc., AARP Services, Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and UnitedHealthCare Insurance Company.\*</u> United States District Court District of New Jersey. *Expert Report.*

Sarah Butler

Barbara Lewis, et al., v. Rodan & Fields, LLC.* United States District Court Northern District of California Oakland Division. *Expert Report*. *Deposition*.

Austin Rugg v. Johnson & Johnson Consumer Inc.* United States District Court Norther District of California San Jose Division. *Expert Report*.

Caryn Gorzo, et al., v. Rodan & Fields, LLC.* The Superior Court of California County of San Francisco. *Expert Report*.

Toya Edwards and Jamal Erakat, et al., v. Walmart, Inc.* United States District Court, Central District of California. *Expert Report*. *Deposition*.

Ohio State Troopers Association, Inc., et al., & Miguel Porras v. Point Blank Enterprises, Inc.* United States District Court, Southern District of Florida. *Expert Report*. *Deposition*.

*Other Matters*

TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Strum Foods, Inc.,* v. Keurig Green Mountain, Inc. United States District Court for the Southern District of New York. *Expert Reports*. *Deposition*.

2019

*Intellectual Property Matters*

Sazerac Brands, LLC* v. Bullshine Distillery, LLC. In the United States Patent and Trademark Office Before the Trademark and Trial Appeal Board. Opposition No. 91227653. *Expert Report. Deposition.*

X One* v. Uber Technologies, Inc. United States District Court Northern District of California. *Expert Report. Deposition.*

NIKE, Inc. v. Skechers U.S.A., Inc.* United States District Court, Central District of California. *Expert Report. Deposition.*

Vital Pharmaceuticals, Inc. v. Monster Energy Company and Reign Beverage Company, LLC.* United States District Court Southern District of Florida. *Expert Report. Deposition.*

Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc.* v. FCA US LLC. United States District Court, Eastern District of Michigan. *Expert Report. Deposition. ITC Trial Testimony.*

Rex Real Estate I., L.P., v. Rex Real Estate Exchange, Inc.* United States District Court for the Eastern District of Texas, Sherman Division. *Expert Report.*

Sarah Butler

adidas America, Inc., et al. v. Forever 21 Inc., et al.* United States District Court District of Oregon Portland Division. *Expert Report.*

Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc., and Bacardi Limited.* United States District Court Central District of California, Western Division. *Expert Report. Deposition.*

*Class Action Matters*

Paul Stockinger et al. v. Toyota Motor Sales, U.S.A., Inc.* United States District Court Central District of California. *Expert Report. Deposition.*

Thomas Allegra, et. al.* v. Luxottica Retail North America, d/b/a LensCrafters, United States District Court, Eastern District of New York, Brooklyn Division. Survey to evaluate consumers' willingness to pay for Accufit measurement system. *Expert Report. Deposition.*

Collin Shanks v. Jarrow Formulas, Inc.* United States District Court Central District of California. *Expert Report.*

Crystal Hilsley vs. Ocean Spray Cranberries, Inc.*, Arnold Worldwide LLC. United States District Court Western District Southern District of California. *Expert Report. Deposition.*

Erin Allen et al. v. Conagra Foods Inc.* United States District Court Northern District of California San Francisco Division. *Expert Report. Deposition.*

Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, James Pinion* v. Polaris Industries, Inc. United States District Court District of Minnesota. *Expert Report. Deposition.*

*Other Matters*

In re: Windstream Holdings, Inc., et al., Debtors. Windstream Holdings Inc., et. al.* v. Charter Communications, Inc. and Charter Communications Operating, LLC. United States Bankruptcy Court, Southern District of New York. Chapter 11, Case No. 19-22312 (RDD). *Expert Report.*

Belcher Pharmaceuticals, LLC v. Hospira, Inc.* United States District Court for the Middle District of Florida, Tampa Division. *Expert Report. Deposition.*

State of Washington* v. TVI, INC., d/b/a Value Village. State of Washington King County Superior Court. *Expert Report. Deposition. Trial Testimony.*

Obagi Cosmeceuticals LLC* v. ZO Skin Health, Inc. and Zein E. Obagi, M.D. JAMS Arbitration Proceeding. *Expert Report. Deposition. Arbitration Testimony.*

James Pudlowski, Louis C. Cross, III, Gail Henry, Steve Henry v. St. Louis Rams, LLC, St. Louis Rams Partnership, ITB Football Company, LLC.* *Expert Report.*

Sarah Butler

People of the State of California vs. The Hertz Corporation, American Traffic Solutions, Inc., ATS Processing Services, L.L.C., American Traffic Solutions Consolidated, L.L.C., PlatePass, L.L.C.* *Deposition.*

2018

*Intellectual Property Matters*

Spangler Candy Company vs. Tootsie Roll Industries, LLC.* United States District Court Northern District of Ohio Western Division Toledo. *Expert Report. Deposition.*

American Automobile Association of Northern California, Nevada & Utah and A3 Mobility LLC v. General Motors LLC and Maven Drive LLC.* United States District Court Northern District of California San Jose Division. *Expert Report. Deposition.*

Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Merck KGaA*. United States District Court District of New Jersey. *Expert Report. Deposition.*

MZ Wallace Inc. v. Sue Fuller, d/b/a/ The Oliver Thomas, and Black Diamond Group, Inc.* United States District Court Southern District of New York. *Expert Report. Deposition.*

Newmark Realty Capital, Inc.* v. BCG Partners, Inc. United States District Court Northern District of California San Jose Division. *Expert Report. Deposition.*

Advice Interactive Group, LLC* v. Web.Com Group, Inc. United States District Court for the Middle District of Florida Jacksonville Division. *Expert Report. Deposition.*

Global Brand Holdings, LLC* v. Church & Dwight Co., Inc. United States District Court Southern District of New York. *Expert Report. Deposition.*

Forever 21, Inc.* v. Gucci America, Inc., and Guccio Gucci S.p.A. United States District Court Central District of California Western Division. *Expert Report. Deposition.*

Masterbuilt Manufacturing, LLC v. Wal-Mart Stores, Inc.* United States District Court for the Middle District of Georgia Columbus Division. *Expert Report. Deposition.*

Strategic Partners, Inc.* v. Koi Design, LLC. United States District Court Central District of California. *Expert Report.*

Hard Rock Café International (USA), Inc., and Tarsadia Hotels v. RockStar Hotels, Inc.* United States District Court for the Southern District of Florida Fort Lauderdale Division. *Expert Report.*

Sarah Butler

Ghostbed, Inc. and Werner Media Partners, LLC d/b/a Nature's Sleep, LLC v. Casper Sleep, Inc., Red Antler, LLC and ICS, Inc.* United States District Court for the Southern District of Florida. *Expert Report. Deposition.*

*Class Action Matters*

Kaylee Browning and Sarah Basile v. Unilever United States, Inc.* United States District Court Central District of California. *Expert Report. Deposition.*

Scott R. Bernard v. Public Power, LLC.* In the Circuit Court of Cook County, Illinois County Department, Chancery Division. *Expert Report.*

Kristian Zamber v. American Airlines, Inc.* United States District Court Southern District of Florida Miami Division. *Expert Report. Deposition.*

Thomas Blitz v. Monsanto Company.* United States District Court Western District of Wisconsin. *Expert Report. Deposition.*

*Other Matters*

State of Washington* v. Johnson & Johnson, Ethicon, Inc. Ethicon US, LLC. King County Superior Court State of Washington. *Expert Report.*

Steven A. Conner DPM, P.C. v. Optum 360, LLC.* United States District Court Eastern District of Pennsylvania. *Expert Report. Deposition.*

State of Washington* v. Comcast Cable Communications Management, LLC, et. al. State of Washington King County Superior Court. *Expert Report. Deposition. Trial Testimony.*

Josephine James Edwards v. Hearst Communications, Inc.* United States District Court for the Southern District of New York. *Expert Report. Deposition.*

2017

*Intellectual Property Matters*

Shelia Dashnaw, et. al. v. New Balance Athletics, Inc.* United States District Court Southern District of California. *Expert Report. Deposition.*

Tri-Union Seafoods, LLC v. Otis McAllister, Inc.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Michael Kors, L.L.C.* v. Chunma USA, Inc. United States District Court Central District of California. *Expert Report. Deposition.*

Sarah Butler

Weems Industries, Inc. v. Plews, Inc.* United States District Court for Northern District of Iowa, Cedar Rapids Division. *Expert Report. Deposition.*

Mars Incorporated and Mars, Petcare US, Inc. v. The J. M. Smucker Company and Big Heart Pet, Inc.* United States District Court for the Eastern District of Virginia. *Expert Report. Deposition.*

Professional Liability Insurance Services, Inc. v. U.S. Risk, Inc. and Crystal Jacobs.* United States District Court for Western District of Texas, Austin Division. *Expert Report. Deposition.*

Luxe Hospitality Company, Inc.* v. SBE Entertainment Group. United States District Court Central District of California. *Expert Report. Deposition.*

*Class Action Matters*

Martin Schneider, et. al. v. Chipotle Mexican Grill, Inc.* United States District Court Northern District of California. *Expert Report. Deposition.*

Trevor Singleton et. al. v. Fifth Generation, Inc. d/b/a Tito's Handmade Vodka.* United States District Court for the Northern District of New York. *Expert Report. Deposition.*

*Other Matters*

State of Arizona v. Volkswagen AG, et. al.* Superior Court of the State of Arizona – Maricopa County. *Expert Report.*

ADT LLC, and ADT US Holdings, Inc., v. Vivint, Inc.* United States District Court Southern District of Florida Palm Beach Division. *Expert Report. Deposition.*

\* Retaining party

## Publications and Presentations

"A tale of two cups: Acquired distinctiveness and survey evidence before the TTAB." (May-June 2020), with Healey Whitsett. *The Trademark Reporter.*

"Survey response bias and the 'privacy paradox': Evidence from a discrete choice experiment." (May, 2020), with Garrett Glasgow and Samantha Iyengar in *Applied Economics Letters.* DOI: 10.1080/13504851.2020.1770183.

NAD Panel – "Consumer Perception Survey Design Safeguards & Pitfalls." National Advertising Division Annual Meeting, New York, NY (September, 2019).

Sarah Butler

INTA Panel – "Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags." Annual Meeting, Boston MA (May, 2019).

"The value of non-personally identifiable information to consumers of online services: evidence from a discrete choice experiment," (2016) with Garrett Glasgow in *Applied Economics Letters*, DOI: 10.1080/13504851.2016.1197357.

"Using Survey Methods to Demonstrate the Value of Personal Information and Privacy" (May 2015) *Panel on Privacy, Security and IRBs – American Association for Public Opinion Research,* Annual Meeting, Hollywood Florida.

"Battle of the Experts—Deploying the Proper Scientific Methodology for Supporting or Challenging Claims" (March 13, 2015) invited panelist at the *Advanced Forum on Resolving & Litigating Advertising Disputes.*

"Effective Use of Surveys in Trademark Litigation," (August, 2014) *Knowledge Group Webinar*.

"The Use of Statistical Sampling Post-Duran," (August, 2014) *Law360*.

"The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," (June 19, 2014). *National Economic Research, Inc.*

"An assessment of the nonmarket benefits of the Water Framework Directive for households in England and Wales," with Metcalfe, Baker, Andrews, Atkinson, Bateman, Carson, East, Gueron, Sheldon and Train in *Water Resources Research,* 48:W10516. (Paper awarded Editor's Choice Award for 2013).

ABA Webinar "The Use of Surveys in Advertising Substantiation" (June 23, 2011).

"Meeting the New Standards for Reasonable Royalties," (February, 2011) with Mario Lopez. *Law360.*

"Survey Evidence in False Advertising Cases," (Winter, 2010). *The Antitrust Trial Practice Newsletter.*

"The Use of Surveys in Litigation: Recent Trends," (April, 2010) with Kent Van Liere. National Economic Research Associates, Inc.

"Emerging Issues in the Use of Surveys in Trademark Infringement on the Web," with Kent Van Liere. Paper published in the *Advanced Trademark & Advertising Law Conference* proceedings, September 2007, Seattle, WA.

"An Analysis of the Hypothetical Situations in Willingness to Pay Studies." Paper presented at the July 2006 Thematic Seminar "Quality Criteria in Survey Research," hosted by World Association for Public Opinion Research, Lake Como, Italy.

Sarah Butler

"Use of Surveys in Intellectual Property Disputes," (2005) with Eugene P. Ericksen, in *Economic Approaches to Intellectual Property Policy, Litigation and Management Issues,* Gregory K. Leonard and Lauren J. Stiroh (eds.) National Economic Research Associates, Inc.

"Response Rate Standards: Lessons from the 2004 Presidential Polls."  Paper presented at the 2005 Annual Meeting of American Association of Public Opinion Research, Miami Beach, FL.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, March 2004 Charlotte, NC.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, January 2004 San Diego, CA.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, June 2003, McLean, VA.


## Professional Associations

Member, American Association of Public Opinion Research and World Association for Public Opinion Research, Member, American Statistical Association, Member, American Bar Association, Intellectual Property Section, Member, International Trademark Association (INTA), Reviewer for *Trademark Reporter*, Member, American Marketing Association.