UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

HOLLY BLAINE VANZANT, and SHERRY
NEVIUS, individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

HILL'S PET NUTRITION, INC., and
PETSMART LLC,

        Defendants.

Case No. 1:17-cv-02535

Hon. Jorge L. Alonso

Hon. Jeffrey Cole

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO PARTIALLY
EXCLUDE DEFENDANTS' PROFFERED EXPERT SARAH BUTLER**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. iii

INTRODUCTION ..................................................................................................... 1

FACTS ....................................................................................................................... 2

STANDARD .............................................................................................................. 4

ARGUMENT ............................................................................................................. 5

    1. Ms. Butler failed to test the actual scenario –the prescription ........................ 5

    2. Ms. Butler used an undefined, different term—"therapeutic"—in the screening process which undermined the Survey results ............................................... 8

    3. Ms. Butler failed to select an appropriate sample because she did not account for income levels among respondents ................................................................ 9

CONCLUSION ........................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010),
  *aff'd*, 412 F. App'x 304 (Fed. Cir. 2011) ................................................................................ 9

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .................................................... 4, 5

*Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.,* No. 14-CV-5696,
  (N.D. Ill. Mar. 31, 2017) ........................................................................................................ 5

*Menasha Corp v. News Am. Mktg. In-Store, Inc.,* 238 F. Supp. 2d 1024, 1030
  (N.D. Ill. 2003), *aff'd*, 354 F. 3d 661 (7th Cir. 2004) ............................................................. 6

*Messner v. Northshore Univ. Health System,* 669 F.3d 802, 813 (7th Cir. 2012) ......................... 4

*Moore v. Mars Petcare US, Inc.,* 966 F.3d 1007, 1018-19 (9th Cir. 2020) ................................... 8

*Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014) ........................................... 4

*Uncommon, LLC v. Spigen Inc.,* 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018), *aff'd*,
  926 F.3d 4019 (7th Cir. 2019) .............................................................................................. 10

*Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 (N.D. Ill. Mar. 29, 2022 ....... 4,5

**Rules**

Fed. R. Evid. 702 ............................................................................................................................ 4

**INTRODUCTION**

The Purchase Intention Survey ("Survey") that defense expert, Sarah Butler, relies on to suggest that the prescription requirement is immaterial failed to disclose that a prescription is required for all applicable "Prescription Diet" ("PD") cat and dog food purchases.[1] Defendants rely on Sarah Butler's opinions derived from the Survey of 600 people to argue that changing PD labels – without ever telling respondents about the prescription-only sales process – would not affect a decision to purchase PD products.

Defendant Hill's Pet Nutrition, Inc. ("Hill's") manufactures and sells PD products and mandates that they can only be sold to consumers after consumers receive prescription authorization from a veterinarian. (E.g., PCC Ex. 6 at 42; PCC Ex. 7; PCC Ex. 8 at ¶ 3; PCC Ex. 11 at 60:6–22).[2] Hill's imposes this requirement even though PD products contain no drugs or medicine (PCC Ex. 18 at 112–15), have not been approved by the FDA (PCC Ex. 6 at 158–60), and no law requires they be sold by prescription. (*Id.* at 33–34). Hill's fails to disclose this on labels or otherwise. Defendants Hill's and PetSmart enforce the prescription requirement and do not permit the sale of PD products without a veterinary prescription.

The Court should exclude these "lack of materiality" opinions because the Survey is unsound in critical ways, which, in the aggregate, render all opinions derived from it unreliable and unhelpful to the trier of fact.

---

[1] Plaintiffs seek to exclude only the Purchase Intention Survey and opinions derived from it, not Ms. Butler's 2 other surveys.

[2] Exhibit 1 refers to the attached exhibit to the concurrently filed Declaration of Luke Tompkins. Citations to "PCC Ex." refer to the exhibits attached to Plaintiff's Motion for Class Certification filed January 20, 2023. Citations to "HOCC Ex." refer to the exhibits attached to Defendant Hill's Opposition to Plaintiffs' Motion for Class Certification filed March 20, 2023.

1

*First*, the Survey failed to include the actual scenario involved in the PD purchases at issue. Ms. Butler screened potential respondents by asking if they purchased pet food in the past 6 years because "a veterinarian advised." This excluded the situation pet parents face in their real-world. Defense expert Sarah Butler's Purchase Intention Survey ("Survey") is unreliable, unhelpful, and inadmissible. Indeed, it failed to tell respondents that a prescription is required for all "Prescription Diet" ("PD") purchases. Defendants nonetheless rely on Ms. Butler's opinions derived from the Survey to argue that changing PD labels – without ever telling respondents about the prescription-restricted sales process – would not affect a consumer's decision to purchase PD products, and thus to imply that the Defendants' mandated prescription is not material to PD purchase decisions.

*Second*, Ms. Butler failed to use the word used in the real world: "prescription." Instead, she used the word "therapeutic," but never defined it. Therapeutic has a different meaning than prescription. Using an undefined term that differs from what consumers see and hear in the real world renders her results unreliable.

*Third*, the Survey failed to verify respondents' income level, such that they were potential purchasers of expensive PD products. Ms. Butler failed to ensure that respondents reflected the U.S. population related to income. Participants in this type of survey tend to over-represent lower income levels. By not controlling for this inherent skew, the Survey likely oversampled respondents from lower income levels, who tended to fit Defendants' desired result more than the U.S. population, undermining Ms. Butler's opinions based upon the results.

## FACTS

Ms. Butler conducted the Survey to examine the effect of altering the labels, alone, on consumers' willingness to purchase Hill's PD products. (HOCC Ex. I at ¶ 80). A vendor screened 2,625 potential respondents from the internet. (*Id.* at ¶¶ 82-84). 600 respondents qualified and

completed the Survey. (*Id.* at ¶ 83). The respondents purportedly represented the U.S. Census in terms of age, gender, and region. (*Id.* at ¶ 85e). No steps were taken to ensure the potential or actual respondents reflected income levels of the U.S. population. (Ex. 1 at 112:12-121:18; PCC Ex. 20 at ¶¶ 71-72; HOCC Ex. P at 101:25-102:5).

Any potential respondent who answered the following initial screening questions "yes" qualified to proceed: 1) live in U.S., 2) 18 years old or older, 3) own at least 1 dog or cat, and 4) person who purchases pet food or shares responsibility for purchasing pet food in household. (HOCC Ex. I at ¶ 87). The next screening questions asked about past experience with or future interest in therapeutic foods.

> First, respondents were asked to select, from a list, the reasons they had purchased pet food for their dog(s) and/or cat(s) in the past six years. Respondents who indicated that they had purchased pet food (i) "to support a pet with an acute or short-term health problem," (ii) "to support a pet with a chronic or long-term health problem," or (iii) because their "veterinarian advised I purchase a therapeutic food" were qualified for the survey and asked to indicate the health reasons for which they had purchased this type of food. Second, respondents were asked to select, from a similar list, the reasons they would consider purchasing pet food. Respondents who indicated that they would consider purchasing a pet food for any of the three reasons mentioned above qualified for the survey.

(*Id.* at ¶ 88).

At no point in the screening process did Ms. Butler ask a respondent if they had purchased or would consider purchasing "prescription" pet food under these 3 scenarios: 1) "a veterinarian prescribed a pet food," 2) "a veterinarian recommended the food," or 3) "a veterinarian authorized this food." (PCC Ex. 20 at ¶ 73; Ex. 1 at 141:18-142:15; HOCC Ex. P at 151:23-152:9). At no point in the screening process did Ms. Butler explain what "therapeutic" food was. (PCC Ex. 20 at ¶ 74; Ex. 1 at 156:23-162:21; HOCC Ex. P at 149:25-150:15). At no point in the screening process did Ms. Butler ask potential respondents if they had purchased a Hill's PD product. (PCC Ex. 20 at ¶ 81; HOCC Ex. I at Ex. C.2).

At the end of the Survey, all respondents answered the question: "Do you currently have pet insurance?" with a "Yes," or "No," or "Don't know/unsure" response. (HOCC Ex. I at ¶ 101). Ms. Butler found that "as a whole, those with pet insurance indicated they were more likely to purchase the product than those without pet insurance. The preferences of those with and without insurance did not differ across the Test and Control Groups." (*Id.* at n.91).

## STANDARD

Expert testimony is admissible if it is relevant, reliable, and will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The trial court acts as gate keeper with respect to expert testimony and will admit expert evidence only if it concludes that (1) the expert is qualified by specialized knowledge, (2) the methodology or reasoning is reliable, and (3) the testimony will assist the trier of fact to understand the evidence or determine a fact in dispute. *See Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014).

"The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence." *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *2 (N.D. Ill. Mar. 29, 2022). At the class certification stage, "whenever an expert's report or testimony is critical to a class certification decision, a district court must rule conclusively on a challenge to the expert's qualifications or opinions before ruling on class certification, without regard to whether the district court ultimately grants or denies that motion." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 813 (7th Cir. 2012).

When deciding if survey methodology is reliable, courts consider, *inter alia*, "(3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; … (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with

4

accepted statistical principles[;] and (7) objectivity of the entire process was assured." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *28 (N.D. Ill. Mar. 31, 2017) (citation omitted). "[A] survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible." *Id.*

## ARGUMENT

Ms. Butler's conclusions drawn from her fundamentally flawed Survey do not satisfy *Daubert* because her methodology is unreliable and her testimony will not assist the trier of fact. Plaintiffs challenge her failure to base her opinions on sufficient facts or data, her failure to use reliable principles and methods, and her failure to reliably apply the principles and methods to the facts of the case. *See* Fed R. Evid. 702. The Court should exclude Ms. Butler's opinions drawn from the Survey.

### 1. Ms. Butler failed to test the actual scenario –the prescription.

Plaintiffs contend that they purchased Hill's PD products after a veterinarian wrote a *prescription* and/or informed them that they were prescribing PD, which misled them into believing that it contained medicine. (PCC Ex. 1 at 81-83; 103-04; 112; PCC Ex. 4 at 28-30, 99-100). Hill's admits that it follows a prescription business model and that it requires a *veterinarian's prescription* as a prerequisite to the purchase of its PD products. (PCC Ex. 6 at 42, 49). PetSmart enforces the prescription for all sales of PD products, including verifying all prescriptions and issuing "MedCards" for in-store sales. (PCC Ex. 17 at 17-19, 26-27, 96-97).

Ms. Butler acknowledges that Plaintiffs claim "the product packaging for Hill's Prescription Diet pet food *and* the *required veterinarian authorization* mislead consumers into believing that the products contain drugs (or some similar substance), and this belief causes consumers to pay more than they otherwise would." (HOCC Ex. I at ¶ 17) (emphasis added). She

5

testified: "Again, I understand that the language of *prescription* is part of what's at issue in this case." (Ex. 1 at 132:13-14) (emphasis added).

Yet, the screening process for the Survey, and the very Survey itself, completely ignored the prescription requirement. The Survey's screening questions asked whether potential respondents had purchased pet food in the past 6 years, or would purchase it in the future, for a list of reasons, and only those who provided a "yes" response to the following reasons were allowed to proceed: (i) "to support a pet with an acute or short-term health problem," (ii) "to support a pet with a chronic or long-term health problem," or (iii) because their "veterinarian advised I purchase a therapeutic food." (Ex. 1 at 129:22-130:3, 147:16-25; HOCC Ex. I at Ex.C.2, ¶ 88). Notably absent from these choices are the options that: "a veterinarian *prescribed* the food" or even that a veterinarian authorized or recommended the food. (Ex. 1 at 130:19-25, 131:10-12, 132:6-14, 147:16-148:10, 154:7-14) (emphasis added).

Yet, that is the only way consumers can purchase PD products in the real-world. By failing to include respondents who purchased pet food pursuant to a veterinarian's prescription or authorization, the Survey excluded respondents who faced the precise real-world scenario at issue. (HOCC Ex. P at 153:7-21). Accordingly, the Survey is unreliable. *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003), *aff'd*, 354 F.3d 661 (7th Cir. 2004) ("For survey results to be considered reliable . . . an appropriate target population must be identified, [and] a sample that accurately represents the target population must be selected . . .").

A potential respondent could type in a reason for purchasing pet food in the past years that was not on the list. (Ex. 1 at 131:1-9, 131:24-132:4, 132:22-133:4). However, the screening questions did not instruct potential respondents to list every reason why they had purchased pet food. (PCC Ex. 20 at n.102.) That, coupled with the fact that it is relatively uncommon for survey

6

respondents to type in a response when offered several multiple-choice options like those presented here, renders it likely that most respondents thought the list presented all of the options available. (*Id.*) Indeed, the most obvious response for every respondent should have been that they purchased pet food to feed their pet. Yet no potential respondent typed in that response, exposing the intrinsic flaw. (*Id.*)

Even if potential respondents had typed in "veterinarian's prescription" as the reason for purchasing pet food in the past 6 years, they could not continue in the survey on that basis. (*Id.*) Indeed, at least 1 potential respondent typed in "prescription food" as a response to the open-ended question about purchasing pet food, and 6 other potential respondents entered responses related to receiving a veterinarian's recommendation. (*Id.*) Thus, a potential respondent could: recognize the deficiency in the list options, write in a response that actually described the real-world scenario being tested, and be excluded after identifying an accurate version of the real-world scenario. (HOCC Ex. P at 154:10-155:6). The "savings provision" for this screening question excluded the precise respondents who should have been included, and a "savings provision" did not even exist for the second screening question, as potential respondents could not type in reasons that they would purchase pet food in the future. (Ex. 1 at 153:10-20; PCC Ex. 20 at n.102).

Even more problematic, the actual Survey failed to inform respondents that a veterinarian's prescription is required to purchase PD products. The prescription requirement is the main aspect of Defendants' conduct that Plaintiffs contend misleads consumers into thinking PD products contain a drug or medicine. Yet, the Survey did not mention the prescription requirement at all. It focused solely on the labels. The Survey's failure to address the prescription requirement—which lies at the heart of this case—renders it an inaccurate measure of consumers' willingness to purchase PD products.

7

Accordingly, because the Survey failed to expose respondents to the challenged deceptive conduct – that a prescription was required to purchase the food – its results are not relevant, and it would not aid the trier of fact.

**2. Ms. Butler used an undefined, different term—"therapeutic"—in the screening process which undermined the Survey results.**

Ms. Butler's opinions based on the Survey should be excluded because she used the word "therapeutic" in the screening phase to describe prescription pet food without ensuring that respondents knew what it meant. Therapeutic has a different meaning than prescription. Merriam Webster Dictionary defines "therapeutic" as: "1) of or relating to the treatment of disease or disorders by remedial agents or methods…." Conversely, it defines "prescription" as: "…4) a) a written direction for a therapeutic or corrective agent, *specifically*: one for the preparation and use of a medicine; b) a prescribed medicine; …6) something prescribed as a rule."

Plaintiffs' misrepresentation claims involve Defendants' requirement of prescriptions for PD product purchases. (HOCC Ex. I at ¶ 17). Using the word "therapeutic" instead of "prescription" is inaccurate. The difference matters. By common use, therapeutic is less regulated than prescription. That means therapeutic food could be different and both less expensive than, and of lower importance in a purchase decision than, a prescription. If a PD product is prescribed for a sick pet, that indicates that it is needed for the health of the pet. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1018–19 (9th Cir. 2020). Ms. Butler did not even inform respondents of the reality that Hill's requires a veterinarian prescription to purchase PD products.

Ms. Butler conceded that it is important to consider the language used in a survey, and that it is possible that respondents may not be familiar with a word in the survey. (Ex. 1 at 70:15-71:5). The word "therapeutic" does not appear on the packaging for the Hill's Prescription Diet pet food that Ms. Butler tested in her Survey. (*Id.* at 159:13-160:2). Ms. Butler admitted that therapeutic

8

was "a different word, and in this case, the word you're using in terms of prescribed, is a word that I understand to be at issue here." (*Id.* at 155:4-15).

Yet, in designing a study to purportedly evaluate whether consumers found Defendants' imposition and enforcement of the prescription requirement for all PD product sales material to their purchase decisions, Ms. Butler used the term "therapeutic," instead of prescription. She compounded this problem by taking no action to ascertain the respondents' understanding of the word "therapeutic" or to ensure that respondents understood what it meant. (PCC Ex. 20 at ¶¶ 74-75; Ex. 1 at 160:24-162:21; HOCC Ex. P at 150:1-151:21). "A reliable survey should avoid the use of confusing or ambiguous questions." *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010), *aff'd*, 412 F. App'x 304 (Fed. Cir. 2011). Ms. Butler offered no support for using "therapeutic" instead of using "prescription," which was the actual situation that should have been tested.

Defendant PetSmart's consumer-facing advertising material specifically defined the term "therapeutic," to mean prescription pet food. (HOCC Ex. P at 146:3-147:13). PetSmart knew that the word "therapeutic" did not mean that one needed a prescription to buy food, unless that was separately clarified.

Despite this acknowledgment, Ms. Butler did not alleviate the confusion in the screening process of her Survey. She could have defined therapeutic as requiring a prescription from a veterinarian, as PetSmart did, or just used the actual word "prescription" to accurately describe the situation. Failing to do so injected confusion from the outset and undermined any opinions derived from the Survey.

   3. **Ms. Butler failed to select an appropriate sample because she did not account for income levels among respondents**.

9

The results of the Survey are unreliable because Ms. Butler failed to select the right sample from the universe of respondents. "Selecting the right universe of respondents significantly affects the probative value of a consumer survey. An 'erroneous or undefined' universe diminishes the survey's reliability. Once the universe is defined, a sample population must be selected 'that accurately represents the universe.'" *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018), *aff'd*, 926 F.3d 409 (7th Cir. 2019) (citations omitted).

It is axiomatic that a potential respondent's income level is relevant to a survey measuring *purchase* intention. Ms. Butler agreed, conceding that income can "certainly have an impact on purchase decisions." (Ex. 1 at 113:9-13).

No information about the prospective respondents' income is reported. (PCC Ex. 20 at n.97). Ms. Butler took no action to ensure that her sample represented the U.S. population with respect to income levels. (*Id.*; Ex. 1 at 112:12-14). She could have measured the extent to which income impacted purchase decisions but did not. Nor did she confirm that respondents in her test and control groups had similar mixes of income levels. (Ex. 1 at 113:15-24). Because she failed to ask respondents any questions about their income, Ms. Butler cannot verify that the Survey tested a representative sample of actual or potential purchasers of PD products.

This failure further diminishes the reliability of the Survey, particularly due to the impact income has on a person's willingness or ability to purchase expensive pet food like PD products. One purpose of the Survey was to determine whether pet parents would pay more for prescription pet food. (HOCC Ex. I at ¶ 17). People from a lower income distribution than the general population would be less willing to purchase more expensive prescription pet food when cheaper options are available. Skewing the sample below general income levels renders the results unreliable.

This is not just theoretical. The Survey results suggest that the sample skewed to lower income respondents because cost concerns dominated responses. (PCC Ex. 20 at ¶¶ 76-80, n.112; HOCC Ex. I at ¶ 155). The failure to ensure this sample adequately represented the actual universe of prescription pet food purchasers undermines the results by including too many lower income respondents.

A screening question, which allowed potential respondents to participate in the Survey if they would *consider* purchasing the expensive pet food in the future "to support a pet with an acute or short-term health problem", "to support a pet with a chronic or long term health problem", or because "a veterinarian advised [that they] purchase a therapeutic food," compounded the problem. (PCC Ex. 20 at ¶ 77; HOCC Ex. I at Ex. C.2, p.6). This question undermined the reliability of the Survey by injecting social desirability bias, explained as:

> the tendency of some respondents to report an answer in a way they deem to be more socially acceptable than would be their 'true' answer. They do this to project a favorable image of themselves and to avoid receiving negative evaluations. The outcome of the strategy is overreporting of socially desirable behaviors or attitudes and underreporting of socially undesirable behaviors or attitudes.

(PCC Ex. 20 at ¶ 78, Ex. 1 at 73:16-74:7). This bias caused respondents to claim they would purchase expensive pet food for a sick pet, even if they could not realistically afford to do so. (PCC Ex. 20 at ¶ 79).

Of the 600 respondents, over half claimed they would purchase more expensive pet food, but demonstrated no financial capacity to or any history of actually doing so. (PCC Ex. 20 at ¶ 77). Only 297 respondents indicated that they ever purchased specialized, more expensive pet food in the past. (PCC Ex. 20 at ¶ 76, HOCC Ex. I at Ex. C.2, p.6). A majority of respondents had no experience purchasing PD products or other expensive prescription pet food.

11

Ms. Butler attempted to infuse reliability into the Survey by asking respondents whether they had purchased pet insurance. (Ex. 1 at 113:23-117:3, 118:21-121:18). She implied that this question provided some form of proxy for economic status. (*Id.* at 119:23-121:18). Presumably, Ms. Butler theorized that people who purchase pet insurance have higher incomes than the average American. But she offered no support for such a conclusion, and it is not obvious. (PCC Ex. 20 at n.100; HOCC Ex. P at 156:9-157:2).

Ms. Butler did not test whether the group of pet insurance respondents was representative of pet insurance purchasers in the general population. (PCC Ex. 20 at ¶ 72). She did not test the original group of 2,625 potential respondents to see how many purchased pet insurance. Nor did she refer to how many pet owners, in general, purchase pet insurance. Rather, she claimed that the number of respondents who purchased pet insurance was randomly distributed in similar numbers across the various test groups within the Survey, after removing over 2,000 potential respondents who were never asked about pet insurance. (Ex. 1 at 116:4-8, 116:22-117:3, 119:1-120:7).

Even worse, she offered no evidence to suggest that the income of pet insurance respondents correlated with the distribution of higher income individuals in the general population. (PCC Ex. 20 at n.100; HOCC Ex. P at 156:9-157:2). So, even if each small group in her Survey happened to purchase similar amount of pet insurance as respondents when compared to each other small group, that has no bearing on whether that distribution correlated to people with higher income in the general population.

Perhaps most important, Ms. Butler provided no evidence that any pet insurance covers the purchase of PD products. (PCC Ex. 20 at ¶ 72, Ex. 1 at 113:23-117:3, 118:21-121:18.). She theorized that pet insurance could have an impact on purchasing prescription pet food:

12

> because willingness to purchase a therapeutic product *may* be correlated with whether the pet parent has insurance, and I wanted the ability to evaluate this possible effect. Moreover, I understand some pet insurance policies cover therapeutic foods … and some policies *may* differentiate therapeutic foods and drugs for coverage purposes, thus indicating to pet parents that therapeutic foods are not "drugs."

(HOCC Ex. I at n.91; Ex. 1 at 114:16-18) (emphasis added).[3] This conclusory statement provides no foundation for an opinion that pet insurance impacts a respondent's likelihood of purchasing prescription pet food, much less PD products. This opinion is baseless. Pet insurance is irrelevant, and it does not cure the Survey's sampling bias.

Neglecting to ask respondents any questions about their income or take any action to establish that her sample reflected the general population universe means Ms. Butler failed to ensure that respondents comprised a representative sample of actual or potential prescription pet food purchasers, making the results unreliable.

## CONCLUSION

For all these reasons set forth above, the Court should exclude Ms. Butler's opinions derived from the Survey.

Dated: April 26, 2023

Respectfully submitted,

BY: */s/ Luke C. Tompkins*
Luke C. Tompkins (*pro hac vice*)
One of Plaintiffs' Attorneys

Luke C. Tompkins
For the Firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC 27636-3009
Telephone 919.277.9100
Facsimile: 919.277.9177 -lctompkins@wardandsmith.com

---

[3] The website does not say that a person who purchases an unknown type of pet insurance policy can or does use such coverage to pay for prescription pet food. It says nothing about any of these respondents purchasing PD products. https://www.forbes.com/advisor/pet-insurance/what-does-pet-insurance-cover/ (last visited April 26, 2023).

13

Ellen M. Carey
Brian P. O'Meara
FORDE & O'MEARA LLP
191 North Wacker Drive, 31st Floor
Chicago, IL 60606
Tel: (312) 399-2377
ecarey@fordellp.com
bomerara@fordellp.com

Michael L. McGlamry
POPE MCGLAMRY, P.A.
3391 Peachtree Road, NE, Suite 300
Atlanta, Georgia 30326
Tel: (404) 523-7706
mmcglamry@pmkm.com

Michael P. Morrill
POPE MCGLAMRY, P.A.
1200 6th Avenue
Columbus, Georgia 31901
Tel: (760) 324-0050
mikemorrill@pmkm.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **Plaintiffs' Memorandum in Support of Motion to Partially Exclude Defendants' Proffered Expert Sarah Butler** was filed electronically with the Clerk of the Court using the CM/ECF systems this 26th day of April 2023, and served electronically on all counsel of record.

*/s/ Luke C. Tompkins*
Luke C. Tompkins (*pro hac vice*)

14