**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HOLLY BLAINE VANZANT, and SHERRY NEVIUS, individually and on behalf of all others similarly situated, | Case No. 1:17-cv-02535 |
| Plaintiffs, | Hon. Jorge Alonso |
| v. | |
| HILL'S PET NUTRITION, INC., and PETSMART, INC., | |
| Defendants. | |

**PLAINTIFFS' REPLY SUPPORTING
THEIR MOTION FOR CLASS CERTIFICATION
AS TO DEFENDANT HILL'S PET NUTRITION, INC.**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

I.  Introduction ...................................................................................................... 1

II.  Common Questions as to Hill's Deception Predominate ............................... 2

    A.  Common evidence of deception and materiality demonstrates
        their predominance ..................................................................................... 2

          1.  Common, classwide evidence demonstrates that Hill's
              required prescription was both likely to deceive a reasonable
              consumer and literally false ........................................................... 2

          2.  Materiality, shown by classwide, common evidence,
              is a predominant question ............................................................... 5

    B.  Individual veterinary advice does not impact the predominant questions
        of deception and materiality ..................................................................... 7

III. Damages are susceptible to measurement across the entire class,
     and Plaintiffs' damages model matches each of their theories of liability ........ 9

IV. Common evidence demonstrates that Defendants engaged in unfair conduct
     that proximately caused consumers' damages ............................................. 16

V.  Plaintiffs are adequate class representatives with typical claims ................. 21

VI. PD products are all substantially similar .................................................... 24

VII. Conclusion .................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Case**

*Anthony v. Country Life Mfg., LLC.*,
No. 02 C 1601, 2002 WL 31269621 (N.D. Ill. Oct. 9, 2002).........................................20

*Anthony v. Country Life Mfg., LLC.*,
70 Fed. Appx. 379 (7th Cir. 2003)...................................................................................20

*Arwa Chiro. PC v. MedCare Diabetic & Med. Supplies, Inc.*,
322 F.R.D. 458 (N.D. Ill. 2017)......................................................................................21

*Bausch v. Stryker Corp.*,
630 F.3d 546 (7th Cir. 2010) ...........................................................................................21

*Beardsall v. CVS Pharm., Inc.*,
953 F.3d 969 (7th Cir. 2020) ..............................................................................................6

*Benson v. Newell Brands, Inc.*,
No. 19 C 6836, 2021 WL 5321510 (N.D. Ill. Nov. 16, 2021).......................................4-5

*CE Design Ltd. v. King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) ......................................................................................21,23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)......................................................................................................9, 16

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (Ill. 1996)............................................................................................5-6

*Dhamer v. Bristol Myers Squibb Co.*,
183 F.R.D. 520, (N.D. Ill. 1998)........................................................................................8

*Flaherty v. Clinique Labs. LLC*,
No. 1:21-CV-03447, 2021 WL 5299773 (N.D. Ill. Nov. 15, 2021)................................24

*Hartmarx Corp. v. JBA Int'l, Inc.*,
No. 99 C 4874, 2002 WL 406973.......................................................................................6

*Illinois Bell Tel. Co. v. MCI Telecomms. Corp.*,
No. 96 C 2378, 1996 WL 717466 (N.D. Ill. Dec. 9, 1996) ................................................3

*Johnson & Johnson-Merck Consumer Pharms. Co. v.*
    *Rhone-Poulenc Rorer Pharms., Inc.*,
    19 F.3d 125 (3d Cir. 1994) ............................................................. 3

*Kleen Prods. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) .......................................................... 2

*Lipton v. Chattem, Inc.*,
    289 F.R.D. 456 (N.D. Ill. 2013) ............................................... 22-23

*Mednick v. Precor, Inc.*,
    No. 14 C 3624, 2014 WL 6474915 (N.D. Ill. Nov. 13, 2014) .................. 24-25

*Minter v. Diamond*,
    No. 15 C 4323, 2017 WL 1862639 (N.D. Ill. May 9, 2017) .................... 17-18

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) ............................................... *passim*

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck*
    *Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002) ............................................................ 3

*Oliviera v. Amoco Oil Co.*,
    201 Ill. 2d 134 (2002) ......................................................... 13-14

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ...................................................... 4, 7-8

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ...................................................... 21

*Ryan v. Wersi Elec. GmbH and Co.*,
    59 F.3d 52 (7th Cir. 1995) ............................................................. 6

*Smith-Brown v. Ulta Beauty, Inc.*,
    335 F.R.D. 521 (N.D. Ill. 2020) .................................................... 25

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ................................................. *passim*

*Suchanek v. Sturm Foods, Inc.*,
    No. 11-CV-565-NJR-RJD, 2017 WL 3704206
    (S.D. Ill. Aug. 28, 2017) ("*Suchanek II*") ................................... *passim*

*Thorogood v. Sears, Roebuck & Co.*,
   547 F.3d 742 (7th Cir. 2008) ...........................................................................4

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016)......................................................................................2

*Ulrich v. Probalance, Inc.*,
   No. 16 C 10488, 2017 WL 3581183 (N.D. Ill. Aug. 18, 2017)................................ 24-25

*Vanzant v. Hill's Pet Nutrition, Inc.*,
   934 F.3d 730 (7th Cir. 2019) ...................................................................17, 21

*Wagner v. Gen. Nutrition Corp.*,
   No. 16 C 10961, 2017 WL 3070772 (N.D. Ill. July 19, 2017).........................................24

*Wahl v. Midland Credit Mgmt., Inc.*,
   243 F.R.D. 291 (N.D. Ill. 2007).........................................................................24

## Statutes and Regulations

815 ILCS 505/2 .............................................................................................7

410 ILCS 620/17.1 ........................................................................................17

21 U.S.C. § 360b............................................................................................17

## Other Authorities

Fed. R. Civ. P. 23 ...................................................................................1, 22, 25

## I. Introduction

Defendant Hill's nationwide business practice restricts sales of its "Prescription Diet" ("PD") branded pet food to consumers with a "prescription" (the "prescription requirement"). As such, Hill's violates the ICFA by deceptively misrepresenting that a prescription is legally required, that PD is a prescription product, and that PD contains drugs or medicine necessary for sick pets. Hill's provides no PD-label disclaimer to mitigate these misrepresentations. Hill's also markets and sells PD products as therapeutic products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease ("disease treatment"), but never submitted any PD product to the FDA for approval as a new animal drug. PD is thus unsafe, misbranded and adulterated under the Federal and Illinois Food, Drug, and Cosmetic Acts ("FD&C Acts"), and its marketing and sale is illegal and violates the public policy underlying those laws (*i.e.*, protecting animals from unsafe and ineffective drugs). Thus, Hill's also engages in unfair practices, violating the ICFA by engaging in this unethical and unscrupulous behavior and reaping substantial, unjustifiable profits from PD products.[1]

Rule 23 is satisfied. Classwide evidence supporting Plaintiffs' claims shows that reasonable consumers are likely to be deceived, that the prescription required to buy PD is material to reasonable consumers' purchase decisions because it concerns the type of information upon which a buyer would be expected to rely in deciding whether to purchase PD for a sick pet, and that PD sales are unfair under the ICFA because Hill's markets PD as intended for use in disease treatment despite that PD has not been evaluated for safety or efficacy by the FDA. Plaintiffs' claims for Hill's deceptive and unfair conduct under the ICFA both present classwide

---

[1] Contrary to Hill's protestations, this case is *not* about whether PD products "work," though they did not for Plaintiff Vanzant and former Plaintiff Land. And it is *not* about what any vet said to a Plaintiff or class member as to what disease a PD formulation was marketed to treat or any other treatment advice. These red herrings distract from the predominant issues: whether Hill's conduct is deceptive and/or unfair.

1

issues that predominate over any individual questions. Plaintiffs presented a reliable method for measuring classwide damages using an accepted benchmarking analysis in a formulaic manner that matches Plaintiffs' liability theories. Plaintiffs' claims are typical, and they are more than adequate representatives for the class. Hill's concedes numerosity and commonality. Rules 23(a) and (b)(3) are satisfied. And, because all PD products are substantially similar, Plaintiffs can represent all PD purchasers. The proposed class should be certified.

## II. Common questions as to Hill's deception predominate.

When, as here, common questions represent a significant aspect of a case and can be resolved for all class members in a single adjudication, predominance is satisfied. *Kleen Prods. LLC v. Int'l Paper Co*., 831 F.3d 919, 925 (7th Cir. 2016); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Whether Hill's representations and omissions about PD products are literally false, and whether they are likely to deceive a reasonable consumer in a material way are objective questions upon which the claims of every class member will rise or fall. *Suchanek v. Sturm Foods, Inc*., 764 F.3d 750, 757, 762 (7th Cir. 2014). These questions are the heart of Plaintiff's deceptive-conduct claim and predominate.

### A. Common evidence of deception and materiality demonstrates their predominance.

#### 1. Common, classwide evidence demonstrates that Hill's required prescription was both likely to deceive a reasonable consumer and literally false.

Deception turns on whether the representations were likely to deceive a reasonable consumer. *See Suchanek*, 764 F.3d at 757. Thus, it represents the key question common to the entire class, is the threshold question for determining Hill's liability, and, therefore, is the most significant element of each class member's claim. *Suchanek v. Sturm Foods, Inc.,* No. 11-CV-565-NJR-RJD, 2017 WL 3704206, at *14 (S.D. Ill. Aug. 28, 2017) ("*Suchanek II*"). Hill's prescription requirement deceived Plaintiffs and reasonable consumers into believing that a

prescription was legally required to purchase PD, that PD was a prescription product, and that the PD products they purchased, at a premium price, contained drugs or medication necessary for their sick pets' health. (Pls.' Br. § I.A). Classwide evidence of deception is provided by expert survey evidence and Hill's own documents. (Pl.'s Br. § I.C).

Survey expert Dr. Rebbecca Reed-Arthurs tested the crux of what Plaintiffs allege is deceptive about PD: the mandatory veterinary prescription necessitated by Hill's prescription requirement, the "limited access" sales process, the fact that the food was prescribed for a sick pet, and the name/label of the food. (Ex. 14 ¶¶ 6, 35-73). Her survey shows that a significant number of actual or likely PD purchasers -- between 22 and 46% -- believe that PD products contain a drug or medicine based on the way in which PD products are sold (prescription-restricted) and labeled.[2] (See Ex. 14,[3] ¶¶ 20-24, 88-110; *see also*, Ex. 20, ¶ 12). This is reliable, classwide evidence of deception.[4]

Hill's mistakenly contends that defense expert Sarah Butler's purchase-intention survey counters this class-wide evidence of deception. Ms. Butler's survey purports to answer whether consumers would have been as likely to buy PD if the label included disclaimers that PD included no medicine or that no prescription was required. But Ms. Butler failed to tell respondents that a prescription was required in the first place. (Ex. 20 ¶ 8). Thus, it is not

---

[2] The percentage needed to show that deceptive conduct is "likely to mislead" a reasonable consumer under the ICFA is unclear. But 15.5-20% is sufficient to meet the Lanham Act's more stringent "substantial likelihood of actual confusion or deception." *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 583, 594 (3d Cir. 2002) (15.5% sufficient); *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc*., 19 F.3d 125, 134 n.14 (3d Cir. 1994) (cases suggest 20% is sufficient); *Illinois Bell Tel. Co. v. MCI Telecomms. Corp.*, No. 96 C 2378, 1996 WL 717466, at *9 (N.D. Ill. Dec. 9, 1996) (finding ~20% likely to be misled, which "is generally viewed as a not insubstantial number of consumers" in Lanham Act cases).

[3] "Ex." cites to numbers 1-34 are the exhibits filed with Plaintiffs' motion for class certification. Numbers 35-40 are provided with this Reply. "Ex." cites to letters are to exhibits filed with Hill's Opposition.

[4] Defendants' ill-founded *Daubert* motion attacking Dr. Reed-Arthurs, as detailed in Plaintiffs' Opposition, should be denied.

surprising that the disclaimers had little to no impact on potential purchasers who were not exposed to the key wrongful conduct. Ms. Butler's weak challenge to Plaintiffs' classwide proof is unreliable under *Daubert* and should be excluded. Regardless, it does not impact certification.

Citing *Thorogood v. Sears, Roebuck & Co*., 547 F.3d 742, 747 (7th Cir. 2008), and *Oshana v. Coca-Cola Co*., 472 F.3d 506, 514 (7th Cir. 2006), Hill's wrongly contends that because class members' individual claims ultimately rest on their subjective understanding of Hill's PD prescription requirement, restricted sales process, and labeling, the class should not be certified. (Opp. at 15.) But every consumer fraud case involves individual elements of reliance or causation, and that does not preclude certification, particularly where, as here, the causation issue is simpler than the classwide issues and does not require costly expert evidence. *Suchanek*, 764 F.3d at 759; *Suchanek II*, 2017 WL 3704206, at *14.

*Thorogood and Oshana* are inapposite because Plaintiffs' claims rest upon Hill's universally mandated and enforced "prescription" that indicates to a reasonable consumer that PD requires a legal prescription and contains drugs or medicine. The *Thorogood* plaintiff contended that "stainless steel," on a clothes-dryer drum meant that the drum was 100% stainless steel because it otherwise might rust and stain clothes. 547 F.3d at 747. This understanding was found "idiosyncratic," and it was "implausible" that putative class members shared it. *Id.* at 747-48. Similarly, the *Oshana* plaintiff complained of being deceived by the non-disclosure that fountain and bottled Diet Coke used different sweeteners, but the claim was not based on a specific representation, and it was unclear that any other potential class member shared the plaintiff's complaint. 472 F.3d at 513-14.

But Plaintiffs' claims, like those in *Suchanek* and *Benson v. Newell Brands, Inc*., No. 19 C 6836, 2021 WL 5321510, at *6 (N.D. Ill. Nov. 16, 2021), are straightforward and, as survey

evidence demonstrates, shared by a significant number of consumers. In *Benson*, plaintiffs purchased pacifiers after the term "orthodontic" on the label misled them into believing that the products promote healthy oral development. *See id.* Similarly, here, Plaintiffs purchased PD after the Hill's-mandated veterinary "prescription" and restricted sales process misled them into believing that "*Prescription* Diet" products were actual prescription products that contained medicine necessary for their sick pets' health. "[I]t is reasonable for a consumer to rely on the prescription requirement and labeling in her purchasing decision for an ailing pet." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021 (9th Cir. 2020). Hill's intends this message:

> that these foods are not only recommended by vets but actually require an authorization . . . signals this is an 'extra-strength' approach to addressing pets['] health needs. Consumers love extra strength when seeking medical solutions for themselves, I would anticipate it's not different for their pets.

(Ex. 35).

Hill's mandatory "prescription" is also literally false. Hill's admits that there is no legal requirement for its imposition of a "prescription" for all PD sales. (Ex. 19, Resps. 13 & 14.) But it argues that the "prescription requirement" is not literally false because, under its business plan, a "prescription" is required to purchase PD, and that is how the product is sold. Hill's verbal gymnastics cannot change that there is no legal requirement for a "prescription" to purchase any PD product and PD is not an actual prescription product. (*Id.*, Resps. 13, 57). Hill's self-imposed prescription requirement and its representation that PD is a prescription product are still lies.

### 2. Materiality, shown by classwide, common evidence is a predominant question.

Materiality is another central question upon which all class members' claims will rise or fall, *Suchanek*, 764 F.3d at 757. As articulated by the Illinois Supreme Court in *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (1996): "[a] material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon

which a buyer would be expected to rely in making a decision whether to purchase." Hill's

suggests *Ryan v. Wersi Elec. GmbH and Co.,* 59 F.3d 52 (7th Cir. 1995), governs, but *Connick*,

decided post-*Ryan* controls. *See Hartmarx Corp. v. JBA Int'l, Inc.,* No. 99 C 4874, 2002 WL

406973, at *7 (N.D. Ill. Mar. 15, 2002) (rejecting *Ryan*'s "essential to the transaction"

materiality formulation in favor of *Connick*'s).

Extrinsic evidence in the form of consumer surveys or market research is *not* mandatory

for an ICFA deceptive marketing claim. *See Beardsall v. CVS Pharm., Inc*., 953 F.3d 969, 976

(7th Cir. 2020). Rather, such evidence is needed only where the marketing "is not clearly

misleading on its face and materiality is in doubt." *See id.* Because no legal requirement for a

prescription for any pet food exists, the prescription requirement and naming/labeling Hill's

therapeutic pet food "Prescription Diet" are literally false and clearly misleading on their face.

The materiality of Hill's "prescription requirement," is not in doubt. Representing a product as

"prescription only," and thus indicating that it contains a drug or medicine is "the type of

information upon which a buyer would be expected to rely in making a decision whether to

purchase" that product for their sick pet. *See Moore*, 966 F.3d at 1021. "Commonsense dictates

that a product that requires a prescription may be considered a medicine that involves a drug or

controlled substance." *Id.* at 1018 (explaining that this conforms with "general understandings of

prescription drugs for humans and pets").

Hill's own market research provides further classwide evidence that the mandatory

prescription is material to consumers' decisions to purchase PD products. (*See* Ex. 22 at -927

("prescription" in "Prescription Diet" name implies that PD products contain a drug)). Hill's

knows that pet parents trust their vets and will typically "purchase whatever the Veterinarian

recommends/prescribes." (Ex. 23, slide 7; see also, Ex. 24 at -172; Ex. 25.) Hill's thus leverages

6

consumers' trust in their vets to market PD for sick pets. The prescription is mandated not by veterinarians, but by Hill's nationwide prescription requirement. Hill's prescription requirement cannot be separated from the "prescriptions" Hill's requires veterinarians to issue. Hill's cannot blame veterinarians, its own trade group, or the FDA for its misleading "prescriptions." Neither the CPG nor the AAFCO statement mentions prescriptions.

Hill's does not refute the presumption of materiality under the FTC's Policy Statement on Deception. (*See* 815 ILCS 505/2; Pls.' Br. at 11-12). The "target group" for Hill's marketing practices is vulnerable consumers with sick pets, Hill's expressly represents that a prescription is required to purchase PD, and "prescription" products "significantly involve[s] health, safety, or other areas with which the reasonable consumer would be concerned." (Ex. 34 at 5.)

**B. Individual veterinary advice does not impact the predominant questions of deception and materiality.**

The overwhelming constant in this case is Hill's prescription requirement. Because Hill's business model mandates a "prescription" for all PD purchases, every consumer must obtain a "prescription" that is not legally required. Even if vets do not use "prescription" in prescribing PD, which strains credulity given the name of the product, or provide a written script,[5] every bag and can of PD bears the "Prescription Diet" name and is prescription restricted.[6]

Unlike *Oshana*, where whether potential class members even knew that the formulas for

---

[5] Hill's contends that because some vets simply note "authorizations" in the chart for PD sold at their clinics, some consumers may not have been exposed to Hill's mandatory "prescription." (Opp. at 14). But the survey Hill's relies on permitted veterinarians to choose only one response; vets could not respond that they both chart the prescription authorization and provide a written copy. (Ex. 20 ¶¶ 109-17). Per Defendants' surveys, few PD purchases occur at vet clinics: 64% of initial PD purchases were not at a vet clinic, and 80% of actual purchasers do not typically purchase food from their vets. (*Id.* ¶ 114).

[6] The value of veterinary oversight for pets eating PD is not at issue; this case is not about whether the FDA was right to suggest veterinary involvement. But neither the CPG nor the AAFCO statement mentions a "prescription" or formal authorization. Both say only that therapeutic food should be used under veterinary "direction." Hill's suggestion that it merely follows FDA guidance is specious; it named its food "Prescription Diet" and required a prescription well before the CPG. (Ex. 19, RFA Resps. 4-8).

Diet Coke varied between fountain and bottled versions was unknown, *cf.* 225 F.R.D. 575, 586 (2005), here every proposed class member was necessarily exposed to Hill's PD sales process, which communicates that PD requires a legal prescription and contains medicine necessary for a sick pet. After all, "[a] reasonable consumer being told about 'prescription pet food' may be surprised to learn that there are no drugs or controlled ingredient in the pet food by nature of brand names like 'Prescription Diet' . . . ." *Moore,* 966 F.3d at 1018.

Common questions as to the prescription's misleading nature and its materiality to reasonable consumers predominate over any individualized veterinary advice. Hill's knows that veterinary prescriptions and recommendations are a top driver for PD sales. (Ex. 18 at 94-95; Ex. 39 at 0027483, -485, -494). Hill's attempt to shift focus to other veterinary advice is thus misplaced. Hill's cannot require consumers to ask whether PD requires a legal prescription or contains medication, or place the onus on veterinarians to volunteer such information, to contradict the core misrepresentations that flow from Hill's mandated prescription.

Unlike *Dhamer v. Bristol Myers Squibb Co.*, PD is not an FDA-approved medication, and Plaintiffs' claims are not for defective warnings. *See* 183 F.R.D. 520, 532 (N.D. Ill. 1998). In *Dhamer*, a narcotic medication was alleged to be unsafe, in contradiction of its warnings, due to addiction dangers. *See id.* There, complex individualized questions focused on what deceptive warning had led to the prescription and the balancing of addiction risks with the benefit of pain abatement, per a physician's individualized evaluation of each patient. *Id.* Here, the prescription itself – necessitated by Hill's prescription requirement – is the deceptive act. Simply put, to purchase PD, a consumer necessarily experiences Hill's core misrepresentation that a veterinary prescription is required for a product to help a sick pet, when there is no such legal requirement. Hill's inserted veterinarians into its PD marketing scheme to persuade consumers to purchase PD

products to treat disease in their sick pets, (Ex. 20 ¶ 128), and nothing a veterinarian says could eliminate Hill's prescription requirement. Every class member's claim will rise or fall based on whether a reasonable consumer would be deceived by the prescription requirement.

Hill's attempted deflection as to Plaintiffs – that their pets were prescribed medications along with PD and they received advice from their vets – ignores that they purchased Prescription Diet *because* their vets' prescribed it for their sick pets. (Ex. 1 at 81-83; 103-04; 112; Ex. 3 at Resp. No. 6; Ex. 4 at 28-30, 99-100, 102, 105-06; Ex. 5, Resp. Nos. 6 & 9). Hill's then misconstrues Plaintiffs' experts' testimony, futilely attempting to manufacture individual issues. But, that Plaintiffs' *damages* expert, a California resident and non-class member, might hypothetically not always follow veterinary recommendations does not impact deception or materiality. And it is unsurprising that Dr. Jack Fincham, Plaintiffs' FDA expert, who knows there is no medicine in "prescription" pet food, declined to purchase it when prescribed for his pet. (Ex. N at 18-20). Non-purchasers are simply not members of the proposed class.

Although vet office discussions and decisions may vary, they do not impact the truth that Hill's knows: its mandated veterinary "prescriptions" are the dominant reason that consumers purchase PD. Defendants' own survey expert determined that 82% of consumers surveyed purchased a Hill's PD product because it was prescribed or recommended by a veterinarian, terms Hill's uses interchangeably. (*See* Pls.' Br., n.1).

## III. Damages are susceptible to measurement across the entire class, and Plaintiffs' damages model matches each of their theories of liability.

Hill's argues that Plaintiffs' damages model and theories of liability do not match and that *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), precludes certification. It is wrong. Plaintiffs assert two theories of how Hill's violates the ICFA, that Hill's engages in: (1) deceptive conduct and (2) unfair conduct. Defendants' deceptive conduct and their unfair conduct each caused

Plaintiffs and other reasonable consumers to overpay and make purchases they otherwise would not have made. Damages expert, Dr. Janet Netz, provided a reasonable and reliable method of calculating overcharge damages matching each liability theory.

"The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Id*. at 38 (citation omitted). Dr. Netz evaluated whether the alleged deceptive conduct, the alleged unfair conduct, or both, resulted in an economic impact to PD purchasers. She evaluated evidence in this case, pertinent aspects of the pet food market, and economic principles, including supply and demand factors. Dr. Netz's evaluation of such common evidence revealed that: prices for Hill's pet food are determined by common market forces (not by individually negotiated prices); all class members were exposed to both the alleged unfair conduct and the deceptive conduct; Defendants' deceptive conduct, as well as its unfair conduct, induced a higher willingness to pay for PD products by changing consumers' perception of the value of and need for PD products; consumers purchases revealed that they were willing to pay more for PD products; and that Hill's, a profit-maximizing firm, uses this information to maintain a high-price strategy for PD. (Ex. 28 ¶¶ 47-65; Ex. 29 ¶ 61).[7] Dr. Netz concluded that classwide evidence demonstrates that Defendants' deceptive conduct resulted in an economic impact to the class, *i.e.,* higher prices for PD products. (Ex. 29 ¶¶ 76-77). She further concluded that classwide evidence demonstrates that Defendants' unfair conduct similarly resulted in an economic impact to the class, *i.e.*, higher prices for PD products. (*Id.*)

Next, Dr. Netz evaluated classwide evidence to determine the extent of the economic impact to the class under each theory of liability. In order to determine the extent to which

---

[7] Dr. Netz did not start with a presumption of market-wide prices or effects; instead, she concluded from an economic analysis of the documents and data that the economic impact of either set of alleged wrongful conduct – higher prices for PD products – was common across the market.

consumers paid a price premium or overpaid for Hill's PD products as a result of Defendants' deceptive conduct, their unfair conduct, or both, Dr. Netz first considered what the "but-for world" (*i.e.,* the world in which Defendants did not engage in the alleged wrongful conduct) would look like under each theory of liability. (Ex. 28 ¶¶ 66-69). After considering Plaintiffs' allegations and the evidence, Dr. Netz found that "with respect to the deceptive practices claim, absent the prescription requirement, [PD] products would be marketed and sold in the but-for world as nontherapeutic wellness products rather than as therapeutic products requiring a prescription." (Ex. 29 ¶ 20). Indeed, Hill's explained in great detail why it requires and has always required a veterinary prescription for its purportedly therapeutic PD products. (Opp. pp. 6-9). Absent that prescription, mandated by Hill's prescription requirement, Defendants could not market PD products as therapeutic products intended for use in disease treatment. (*Id.*). Dr. Netz found that "with respect to the unfair practices claim, absent Defendants' marketing and sale of [PD] products as products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, [PD] products would be marketed and sold in the but-for world as non-therapeutic wellness products." (Ex. 29 ¶ 20). Thus, the but-for world would be the same whether Plaintiffs prevail on one liability theory, the other, or both. (*Id.*; Ex. 28 ¶¶ 68-79).

Dr. Netz's damages approach measures the difference between the actual prices consumers paid for PD products under the alleged wrongful conduct and the prices they would have paid in the but-for world absent that conduct. Defendant's experts generally agree that damages can be measured in this manner. (Ex. 36 at 53-54; Ex. 29 ¶ 33). Because she concluded that the but-for world is the same under each theory of liability, Dr. Netz used a single damages model to measure the difference between the actual prices consumers paid and the prices they would have paid in the but-for world. Under her model, classwide expenditures for PD products

in the actual world minus classwide expenditures for PD products in the but-for world equals the price premium or overcharge paid by the class. (Ex. 28 ¶¶ 66-67).

Because the Defendants engaged in the alleged deceptive and unfair conduct, classwide expenditures in the but-for world cannot be measured directly. A common way to overcome this lack of observable data is to find a reasonable proxy (or benchmark) for the but-for product. (*Id.* ¶ 66). Dr. Netz considered several potential benchmarks and concluded that Hill's Science Diet ("SD") product line is the best proxy or benchmark for PD products. (Ex. 28 ¶¶ 70-73). She explained in detail why SD is an appropriate benchmark. (*Id.* ¶ 74). Hill's expert agrees that a "benchmark" analysis is a reliable damages methodology. (Ex. 36 at 53-54; Ex. 29 ¶ 86).

Classwide expenditures in the but-for world depend on two components: (1) the lower wholesale prices that resellers would have paid Hill's for PD products; and (2) the lower markup[8] over those lower wholesale prices that resellers would have charged consumers in the but-for world. Dr. Netz used SD as a profit benchmark to determine the extent to which Hill's wholesale prices for PD to its resellers would have been lower absent the alleged wrongful conduct. She also used SD as a markup benchmark to determine the extent to which reseller markups on PD products would have been lower in the but-for world. Dr. Netz calculated the amount resellers would have paid to Hill's at wholesale in the but-for world assuming Hill's would have been able to price its PD products in the but-for world above its direct costs at the same rate it is able to price its SD products above its direct costs in the actual world. (Ex. 28 ¶¶ 75-92). She then calculated the amount consumers would have paid for PD in the but-for world assuming that resellers would have marked up PD products over the lower wholesale

---

[8] Markup measures the extent to which a firm sells a product to its customers at a price above which it acquired the product, expressed as a percentage of the acquisition cost. For example, if a firm paid $50 to acquire a product and sold it for $72.50, the markup would be: ($72.50 – $50) / ($50) = 45%.

prices by the same amount they marked up SD products over their wholesale prices in the actual world. (*Id.* ¶¶ 93-106). Ultimately, Dr. Netz opined that consumer expenditures in the but-for world would have been $80.7 million less for PD products than they were in the actual world. (Ex. 29 ¶ 147). In other words, calculated classwide, the economic impact of the alleged wrongful conduct is an overcharge of $80.7 million.[9]

Contrary to Hill's suggestion, however, Plaintiffs are not advancing a "market theory of causation" for their deceptive conduct claim as the plaintiff did in *Oliviera v. Amoco Oil Co.*, 201 Ill 2d 134, 155 (2002). The *Oliviera* plaintiff did not allege that he saw, heard, or read any of the allegedly deceptive ads, nor did he contend that those ads deceived him or induced his purchase. In contrast, here, evidence demonstrates that all purchasers of PD products, including Plaintiffs, were exposed to Hill's mandatory prescription requirement. (Pls.' Br. § I.B; *supra* at 7.). And, the named Plaintiffs were misled by the prescription required to buy PD, they bought the products because they were prescribed, and classwide evidence shows that Hill's conduct is likely to deceive reasonable consumers and is material to their purchase decisions. (*Id.* §§ I.A. & C.).

More importantly, the fact that Dr. Netz drew causal connections between the alleged deceptive conduct and resulting economic impact (*i.e.,* higher prices for PD products) does not mean that Plaintiffs contend that every consumer who purchased a PD product during the class period is entitled to recover damages because they paid those higher prices – regardless of whether they were actually deceived. To the contrary, Dr. Netz recognized that class members need to show that the deceptive conduct proximately caused their injuries, *i.e.,* that they were deceived in some manner by the alleged misrepresentations and omissions. (Ex. 29 ¶ 22). Dr.

---

[9] PetSmart produced additional data on February 26, 2023 because it inadvertently failed to include Illinois purchases for one product. The estimated overcharge will increase slightly as a result.

Netz presented both an overcharge rate (PD prices were 25% higher than they would have been in the but-for world) and a classwide overcharge amount across all putative class members of $80.7 million. But her "classwide damages number can be adjusted for the share of purchases made by class members who were deceived. For example, if half of the purchases were made by class members who were deceived, damages would be $40.35 million." (*Id.* ¶ 23). That final adjustment can be made once it is determined which class members have a valid deception claim. That determination is to be made after the class is certified. *Suchanek*, 764 F.3d at 757.[10] Thus, Dr. Netz presented a reliable method of calculating classwide overcharge damages for class members (and subclass members) with a valid deceptive conduct claim.

Illinois courts have not rejected a "market theory of causation" for ICFA unfair practices claims. Even so, Plaintiffs are not advancing a market theory of causation for their unfair practices claim either. While Dr. Netz opines that common evidence shows that the alleged unfair conduct resulted in an economic impact to the class (*i.e.*, higher prices for PD products), again, unlike in *Oliviera*, Plaintiffs do not contend that every purchaser of PD during the class period is entitled recover damages because they paid those higher prices – regardless of whether they were exposed to the alleged unfair conduct. To the contrary, Plaintiffs presented evidence that Hill's markets and sells *all* PD products as products intended for use in disease treatment despite that no PD product is approved by the FDA for any disease-treatment purpose and thus, all PD purchasers were exposed to the alleged unfair conduct. *Infra* at 16. Even if proximate cause for the unfair practices claim were found to be an individual issue for which each consumer must present individual causation evidence, again, once it is determined (after class certification) which class members have a valid unfair conduct claim, the classwide overcharge

---

[10] Hill's is wrong in suggesting that no class can be certified until proof exists that every class member has been harmed or has a valid claim. *Suchanek*, 764 F.3d at 757.

number can be adjusted to reflect purchases made by just those class members.

Hill's remaining arguments concerning Dr. Netz's damages model are equally unavailing. Hill's argues that SD is not comparable to PD because PD foods supposedly deliver therapeutic benefits that SD products do not, and Dr. Netz's model would result in a windfall to consumers who obtain PD's therapeutic benefits for the same cost as foods that do not offer those benefits. (Opp. at 19). It also argues that Dr. Netz ignores other critical differences between PD and SD, including development and testing costs, costs of educating vets about PD's alleged therapeutic benefits, and the vet's role in purchase decisions. (*Id.*). But Hill's disregards that in the but-for world, absent the alleged wrongful conduct, PD products would not be therapeutic products sold by prescription; rather, they would be marketed and sold as non-therapeutic, non-prescription wellness products. Hill's comparisons between PD and SD are differences in the *actual* world. But the question is whether SD is a reasonable benchmark for what PD would look like in the *but-for* world. Dr. Netz demonstrated that it is. (Ex. 28 ¶¶ 70-74, Ex. 29 ¶ 28).

Finally, Hill's argues that the but-for world Dr. Netz utilized for her model is inconsistent with the relief Plaintiffs seek because it is one in which there is no therapeutic pet food. (Opp. at 16). Hill's claims that Plaintiffs do not dispute that therapeutic pet foods benefit pets and that pet health would suffer if therapeutic foods were unavailable or sold without vet involvement. (*Id.*). Not true. Vanzant and former plaintiff Land both testified that Hill's PD products did not work for their pets and in fact, caused them further harm. (Ex. 1 at 160, 166-67; Ex. M. at 210, 319).[11] More importantly, the crux of Plaintiffs' unfair practices claim is that Hill's charges consumers higher prices for so-called therapeutic products which are unsafe in the absence of FDA-approval

---

[11] Hill's also mischaracterizes what Dr, Netz said. She was responding to counsel's question about how her model would be impacted if Hill's determined it was not economically feasible to sell PD in the but-for world. (Hill's Ex. J at 131-32). And Dr. Netz did not concede that PD products actually have therapeutic benefits. Rather, she was referring to the higher-quality ingredients in PD. (*Id.* at 90, 132).

and which *may or may not* provide the benefits that Hill's claims. It is unfair for Hill's to market and sell PD products as therapeutic products intended for use in disease treatment and charge consumers more as a result of such marketing when the FDA has not evaluated whether the products are safe and effective, or whether Hill's therapeutic claims are substantiated.

Dr. Netz's classwide damages model, based on a standard benchmarking analysis, matches the theories of liability. Even if *Comcast* were not satisfied (it is), courts have discretion to certify on the issues that are common to the class. *Suchanek II*, 2017 WL 3704206, at *14.

## IV. Common evidence demonstrates that Defendants engaged in unfair conduct that proximately caused consumers' damages.

Common evidence demonstrates that Hill's marking and sale of PD products violates the standards set forth in the FD&C Acts and the public policy underlying these Acts. There is no need for a product-by-product review. Rather, expert testimony and Hill's own documents demonstrate that Hill's markets *every* PD product as a therapeutic product intended for use in disease treatment to veterinarians and to consumers. (*See* Ex. 26 at 9-10, 15-17; Ex. 25 (*passim*), Ex. 37, Ex. H at 170). Per the FDA, therapeutic products like PD meet the statutory definition of drugs. (*See* Ex. 34). Hill's admitted to Illinois regulators that each of its PD products is marketed under the FDA CPG 690.150. (Hill's Ex R). As such, all PD products are "new animal drugs" under the FD&C Acts.

The public policy underlying the regulation of new animal drugs in the FD&C Acts is to protect animal and public health. (Ex. 26 at 7). Indeed, the FDA has stated:

> The pre-market review is integral to FDA's ability to protect animal and public health. During the review, the agency evaluates information submitted by the drug company to make sure the drug is safe and effective for its intended use and that the drug is properly manufactured and properly labeled.[12]

---

[12] United States Food and Drug Administration, Unapproved Animal Drugs. https://www.fda.gov/animal-veterinary/compliance-enforcement/unapproved-animal-drugs, accessed 24 April 2023.

New animal drugs are unsafe under the FD&C Acts unless they have been approved, conditionally approved, or index listed by the FDA as new animal drugs. See 21 U.S.C. § 360b; 410 ILCS 620/17.1. Hill's admits that none of its PD products have been approved, conditionally approved, or index listed by the FDA. (Ex. 19, Resps. 15-26). Because the FDA has not had the opportunity to evaluate whether PD products are safe and effective for their intended uses or whether they are properly manufactured and labeled, the legislature has determined that these products are unsafe.[13] PD products are also adulterated and misbranded under the FD&C Acts, and the marketing and sale of these products is prohibited. (Ex. 26 at 11-14). By marketing and selling unsafe, adulterated, and misbranded products, Defendants are violating both the standards set forth in the FD&C Acts and the public policy underlying these statutes.[14]

Common evidence also demonstrates that Defendants' marketing and sale of PD products

---

[13] Hill's contends that Plaintiffs do not dispute that these products work or provide the benefits Hill's claims they provide. (Opp. at 1). That is not true. *Infra* at 22. Plaintiffs did not submit expert testimony concerning the safety or efficacy of PD products or Hill's claims about them because it is not the purview of Hill's, its experts, or Plaintiffs to determine whether PD products are safe and effective for their intended uses (*i.e.*, whether they work). That is the FDA's responsibility and the purpose of the regulatory scheme implementing the FD&C Acts. PD products may or may not work for some pets. But absent FDA approval or an index listing as a new animal drug, PD products remain unsafe, and Hill's cannot legally market them as therapeutic products intended for use in disease treatment.

[14] Plaintiffs' motion is not based on an unpled claim (Opp. at n.7). Plaintiffs alleged that Defendants' marketing and sale of PD products as therapeutic products intended for use in disease treatment violates public policy. (SAC, ¶¶ 38-61). The fact that the *same* public policy is expressed in and underlies the regulation of new animal drugs in more than one statute should not preclude Plaintiffs from arguing about both – particularly because the definition of "new animal drug" and the regulatory approval requirements applicable to such drugs in the IL FD&C Act mirror those in the federal act. Moreover, Hill's safe harbor argument is specious. The Seventh Circuit rejected Hill's attempt to equate regulatory forbearance with regulatory authorization. *Vanzant v. Hill's Pet Nutrition, Inc.,* 934 F.3d 730, 738 (7th Cir. 2019). The Illinois Department of Agriculture ("IDA") "followed the guidance recommended by the FDA" set forth in the FDA's CPG. (Hill's Ex. R). Thus, like the FDA, the IDA simply exercised regulatory forbearance. Hill's has not demonstrated what "approved for registration" means, much less that the IDA specifically authorized Hill's to market and sell PD products as a therapeutic product intended for use in the treatment of disease even though these products have not been approved by the FDA. At best, Ex. R shows that the IDA approved *some* PD products for registration in Illinois (whatever that means) in September 2021, *years* after this case was filed and the class period began.

as therapeutic products intended for use in disease treatment is unethical and unscrupulous.[15] The term "ethical" is defined as "conforming to accepted professional standards of conduct." *Minter v. Diamond*, No. 15 C 4323, 2017 WL 1862639, at *7 (N.D. Ill. May 9, 2017). "Scrupulous" means "having moral integrity; acting in strict regard for what is considered right or proper." *Id*.

Hill's knows that the FDA has determined that therapeutic pet food products, including PD, are new animal drugs. (Ex. 34). It also knows that absent FDA-approval, PD products are unsafe under the law and that the marketing and sale of these products is prohibited. (*Id.*). Yet Hill's continues to market PD products to veterinarians as therapeutic products intended for specific uses so that vets will prescribe them to consumers for their sick pets for those purposes. It does so because Hill's knows that veterinary prescriptions are a top driver of sales for PD products and because it can and does command a higher price for PD products as a result of marketing these products as therapeutic products for sick pets. (Ex. 18 at 94-95, 253-57; Ex. 28 at 16-17; Ex. 39 at -485, -494). In addition, Hill's conveys the message that PD products are prescription-only, therapeutic products intended for use in disease treatment directly to consumers. Hill's own market research confirms that its use of "Prescription Diet," "veterinary exclusive," "clinical nutrition," "therapeutic" and "medical/clinical food" conveys medical and clinical treatment messages. (See Ex. 22 at -254). Hill's also distributes its product guides – which unquestionably show that PD products are intended for use in disease treatment – to vets with the intent that vets share their information with pet parents. (Ex. 18 at 65-67).

Pets are valued family members and, in caring for a sick pet, vulnerable pet "parents" reasonably gravitate toward a "prescription" product. *See Moore*, 966 F.3d at 1021. The same

---

[15] The second factor courts consider in determining whether a practice is unfair is whether it is "immoral, unethical, oppressive, *or* unscrupulous." *Suchanek*, 764 F.3d at 739-40 (emphasis added). Thus, contrary to Hill's suggestion, Plaintiffs need not prove that the practice is unethical, unscrupulous *and* "so oppressive as to leave the consumer with little alternative except to submit to it."

can be said for a so-called therapeutic product recommended to treat a consumer's sick pet. Common evidence demonstrates that Hill's peddles PD products to pet parents as prescription-only, therapeutic products which purportedly provide clinical benefits for their sick pets despite that these products are not FDA-approved and thus, are unsafe, rendering Hill's marketing and sale of PD in this manner illegal. *Supra* at 16. This conduct is unethical and unscrupulous.

Dr. Netz opined that Defendants' unfair conduct, specifically, its marketing of PD products as therapeutic products intended for use in disease treatment, resulted in an economic impact or harm to the class in the form of higher prices for PD products. *Supra* at 10. Beyond the economic harm to the class, evidence shows that Hill's marketing of PD products as therapeutic products proximately caused Plaintiffs' and the Class' damages. Common evidence shows that Hill's markets *all* of its PD products as therapeutic products intended for use in disease treatment to veterinarians through its product guides, clinical evidence reports, veterinary hotline, and other marketing materials. (*See, e.g.*, Ex. 25; Ex. 26 at 9-10 & Table 1; Ex. 20, ¶¶ 119-23). Expert survey evidence shows that vets rely on manufacturer marketing materials in prescribing therapeutic products like PD, and that vets prescribe such products to treat disease in pets. (Ex. 20, ¶¶ 124-27; see also, Pl.'s Br. § I.B). Expert survey evidence further shows that 81.5% of PD purchasers surveyed indicated that they purchased a PD product *because* it was recommended or prescribed by their vet. (Ex. 20 at ¶¶ 142-45, Fig. 7). Absent Hill's marketing of PD products as therapeutic, veterinarians would not know what PD products are designed to do, the therapeutic benefits PD products purportedly provide, or the purposes for which they are intended (*i.e.*, for use in disease treatment) and thus, veterinarians could not prescribe or recommend PD for those purposes. Without a vet's prescription, consumers would not have and could not have purchased PD products for their sick pets; nor would consumers have overpaid

for PD products absent Hill's illegal marketing. Thus, common evidence demonstrates that Hill's marketing of PD as therapeutic products not only resulted in higher prices for these products (thereby, causing economic harm to the class), but that conduct also causes vets to prescribe PD products for consumers' sick pets, which, in turn, causes consumers to buy them at higher prices. Thus, Hill's violation of public policy and its unethical and unscrupulous conduct proximately caused Plaintiffs' and the Class's damages.

Hill's reliance on *Anthony v. Country Life Mfg., LLC.*, No. 02 C 1601, 2002 WL 31269621 (N.D. Ill. Oct. 9, 2002), is misplaced. There, the plaintiff alleged that the marketing of adulterated nutritional bars (which contained ingredients not approved by the FDA) was an unfair practice. *Id*. at *1-2. The district court dismissed the claim, finding a total absence of oppressiveness (which it mistakenly believed was necessary to establish an unfair practice) and because the plaintiff had failed to plead damages proximately caused by the marketing of the adulterated bars. *Id*. at *2-3. The Seventh Circuit affirmed, explaining that while the ingredients at issue were not FDA-approved for use as "food additives," they were approved for sale as nutritional supplements, and the plaintiff had not alleged their use in the bars harmed consumers. *Anthony v. Country Life Mfg., LLC.*, 70 Fed. Appx. 379, 382 (7th Cir. 2003). This technical distinction did not support a claim that the manufacturer engaged in an "unfair practice," because the challenged ingredients were listed on the label and the plaintiff had consumed the products. *Id.* Thus, the court found she received exactly what she paid for and did not suffer an economic injury. *Id*. at 383. In contrast, the evidence here shows that Hill's violation of public policy and its unethical and unscrupulous conduct proximately caused Plaintiffs' and the Class's damages. *Supra* at 16-17. Moreover, Plaintiffs' unfair practices claim does not concern disclosed ingredients that were FDA-approved. Rather, it concerns Hill's marketing of prescription-only,

so-called therapeutic products to vulnerable consumers with sick pets and Hill's complete

disregard of the FD&C Acts' new animal drug approval requirements, which renders all PD

products unsafe.[16]

Finally, because common evidence demonstrates that Hill's violated public policy and

engaged in unethical and unscrupulous conduct that proximately caused Plaintiffs' and the

Class's damages, Plaintiffs need not demonstrate substantial injury. *Vanzant*, 934 F.3d at 739

("A plaintiff need not satisfy all three factors" for a practice to be unfair). In any event, this

Court need not conduct an individual inquiry, as Hill's suggests, to determine whether an $80

million injury to the class "is outweighed by any countervailing benefits to consumers" from

Hill's illegal marketing and sale of unsafe pet food products. Under this factor, the injury is to be

weighed against any countervailing benefits to "consumers," not to each individual consumer.

And it is the FDA's job – not this Court's – to evaluate whether PD products are safe and

effective and whether Hill's therapeutic claims are substantiated. Hill's cannot rely on the health

benefits PD products supposedly provide to pets to manufacture an individual inquiry when it

has deprived the FDA of the opportunity to evaluate whether those benefits even exist.

## V. Plaintiffs are adequate class representatives with typical claims.

Hill's attacks Plaintiffs Vanzant and Nevius as atypical and inadequate, contending that

they purchased PD products after they purportedly learned of Hill's misrepresentations and

illegal marketing.[17] Here, Hill's attempts to manufacture an "arguable defense peculiar to the

---

[16] Plaintiffs are not asserting claims for Hill's "mere marketing" of adulterated food. Nor are they alleging fraud on the FDA or trying to privately enforce the FD&C Acts. State law claims, like Plaintiffs' ICFA unfairness claim, are permitted to incorporate federal FD&C Act violations. *Cf. Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010) (no pre-emption of state-law manufacturing-defect claim in FDA-approved medical device if plaintiff shows she was harmed by a violation of applicable federal law).
[17] Arguments against plaintiffs serving as class representatives are analyzed as to adequacy – not typicality – under Rule 23(a). *See Arwa Chiro. PC v. MedCare Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458, 464-65 (N.D. Ill. 2017) (citing *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d

named plaintiff," to facilitate an inadequacy argument. *See CE Design*, 637 F.3d at 726. But Hill's contentions do not demonstrate a unique defense to the ICFA deceptive practices claim, or any defense whatsoever to the unfair practices claims.

As an initial matter, the testimony Hill's relies on does not demonstrate that Nevius or Vanzant purchased another PD product after this lawsuit was filed. (Opp. at 24). Nevius' testimony was not even about a PD product, and Vanzant testified that she believed her vet gave her a can of PD a/d as a sample in a desperate attempt to get Tarik to eat as he was dying. (Ex. 1 at 185-187; Ex. 4 at 156-158). Vanzant did buy two PD products after filing the lawsuit in a desperate attempt to save each of her cat's lives when they were near death. (Ex. 1 at 225, 274). Both cats died shortly after these purchases. (*Id*.). The fact that Vanzant bought PD for her dying cats on these two occasions, desperately attempting to save their lives does not mean that she was not deceived by Hill's material misrepresentations and omissions when she purchased c/d for Tarik for three years. Rather, it illustrates just how vulnerable consumers are when cherished family members are sick or dying. This goes to the heart of Plaintiffs' unfair practices claim. Notably, Vanzant alleges that she would not have purchased PD, would not have purchased PD for a lengthy duration, or would not have purchased PD when priced so excessively relative to non-prescription pet foods absent each Defendant's deceptive conduct and unfair practices. (SAC ¶ 76). Even if Vanzant was not deceived as to these two purchases, she certainly made them as a result of Hill's marketing of PD products as therapeutic products intended for use in disease treatment. (*Id*. at 225, 274). Unfortunately, neither product worked. (*Id*.).

*Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 460 (N.D. Ill. 2013), is inapt. There, the plaintiff claimed she would not have purchased the at-issue product had she known it contained a

---

721 (7th Cir. 2011)). Typicality is satisfied because Plaintiffs' and the class's claims rest on the same deceptive and unfair Hill's conduct. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

particular ingredient. *Id*. However, she admitted that she did not even know what that ingredient was when she made her initial purchase. *Id*. That is a far cry from this case, where Vanzant testified that she was misled into believing PD products were *prescription* products that contained medicine at the time of her initial purchase and for the next three years. (Ex. 1 at 137-39). Vanzant's post-lawsuit efforts to save her dying cats could not possibly impact causation in the way the *Lipton* plaintiffs' admission destroyed *any* possibility that the defendant's conduct caused her injury because it demonstrated that she was never deceived in the first place.

To find a proposed class representative inadequate, a defendant must show an arguable, unique defense that is not applicable to the class as a whole. *See CE Design*, 637 F.3d at 726. But proximate cause, which requires consumers to show they were deceived in some manner, is an individual question in all ICFA cases. *Suchanek*, 764 F.3d at 759-60. Thus, there is no "unique" proximate cause defense here.

Likewise, there is no unique defense to Plaintiffs' unfair practices claim. Proximate cause for the unfair practices claim does not hinge on whether Plaintiffs knew that PD products were not FDA-approved. Even if Plaintiffs knew that PD was not FDA-approved, that does not mean they knew that PD products are unsafe in the absence of such approval, or that Hill's was illegally marketing PD products as therapeutic products so that vets would prescribe them for their sick pets knowing that consumers buy what their vets recommend. Indeed, Nevius and Vanzant both testified that they relied on their vet's recommendations to treat their sick pets with the PD products and purchased the products their vets had prescribed. (*See*, *e.g.*, Ex. 1 at 245; Ex. 4 at 102). Absent Hill's illegal marketing of PD products as therapeutic products intended for use in disease treatment, veterinarians would not have prescribed these products, and neither Nevius nor Vanzant would or could have purchased these products. *Supra* at 17-18.

If Plaintiffs were somehow found inadequate, that would not defeat certification of even the deceptive-conduct claim. If an affirmative defense against a plaintiff/ class representative becomes a distraction from the larger issues affecting the class, a new class representative can be substituted. *See Wahl v. Midland Credit Mgmt., Inc*., 243 F.R.D. 291, 298, n.4 (N.D. Ill. 2007).

## VI.  PD products are all substantially similar.

Hill's contends Plaintiffs can assert only claims and represent a class of purchasers for PD c/d multicare feline and PD i/d canine. Hill's position is adopted by a minority of courts. *See Flaherty v. Clinique Labs. LLC*, No. 1:21-CV-03447, 2021 WL 5299773, at *4 (N.D. Ill. Nov. 15, 2021). But this Court follows the majority approach, allowing a plaintiff to bring claims and represent other purchasers when – as here – the purchased products are "substantially similar" to the other products. *See Ulrich v. Probalance, Inc.*, No. 16 C 10488, 2017 WL 3581183 (N.D. Ill. Aug. 18, 2017) (denying motion to strike). Substantial similarity is determined via "context-specific analysis," evaluating whether the products are "of the same kind," made from "largely the same ingredients," and bear "the same alleged mislabeling," looking at both physical similarities and the misrepresentations' similarities. *Id.*, at *6 (citing *Mednick v. Precor, Inc.*, No. 14 C 3624, 2014 WL 6474915, at *3 (N.D. Ill. Nov. 13, 2014), and *Wagner v. Gen. Nutrition Corp.*, No. 16 C 10961, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017)). While PD products are purportedly formulated for different diseases and health conditions, these differences have no impact on the relevant inquiries. Thus, *Ulrich* is analogous. *Id.*, at *6 ("[w]hatever differences there may be among the Products . . . are irrelevant because the Products are all alike with respect to the 'specific component' that is the subject of plaintiff's claims[,]" where products were sold by same defendant, misrepresentations all related to same relevant issues, and alleged false claims were "inaccurate in the same manner on every Product."); *see also Mednick*, 2014

24

WL 6474915, at *4 (finding substantial similarity where, despite physical dissimilarities among products, the similarity of the misrepresentations was not impacted by those differences).

Plaintiffs allege that the prescription requirement is misleading because it indicates that PD products are prescription products, are required by law to be sold only by prescription, and contain a drug or medicine. Evidence supporting these allegations is universal across the PD product line, regardless of the product's formulation, purported benefits, or intended uses. Hill's has put forth no law requiring any PD product to be sold by prescription. (See Ex. 6 at 41-44 (citing only the non-binding CPG, which does not require or allow the products to be sold by prescription to support its prescription requirement); Ex. 19, Resp. 14). Hill's admits that no PD product contains a drug or medicine. (Ex. 19, Resp. 33). Hill's uniformly imposes the prescription requirement on every PD product, regardless of formulation, as a standard, nationwide business practice and in doing so, makes uniform misrepresentations. (*Id.*, Resp. 12).[18] *Smith-Brown v. Ulta Beauty, Inc.*, is inapplicable because the differences between the products at issue "affected" the conduct. 335 F.R.D. 521, 528-30 (N.D. Ill. 2020). Not so here. Like the plaintiffs' theories in *Ulrich* and *Mednick*, Plaintiffs' theory is not impacted by the product differences suggested by Hill's. Thus, all PD products are substantially similar.

## VII. Conclusion

Rule 23 is satisfied, and the proposed class should be certified. Plaintiffs should be appointed class representatives for all PD purchasers, and undersigned counsel should be appointed class counsel, with class notice to issue forthwith.

---

[18] Hill's argues that vets might make different representations to pet owners for different PD products, but there is no evidence that any vet could eliminate Hill's prescription requirement.

Dated:  April 26, 2023                                Respectfully submitted,

                                        By:  */s/ Ellen M. Carey*
                                              One of Plaintiffs' Attorneys

Ellen M. Carey                              Michael P. Morrill
Brian P. O'Meara                            Pope McGlamry, P.C.
Forde & O'Meara LLP                         1200 6th Avenue
191 North Wacker Drive, 31ˢᵗ Floor          Columbus, GA 31901
Chicago IL 60606                            (706) 324-0050
(312) 641-1441                              mikemorrill@pmkm.com
bomeara@fordellp.com
ecarey@fordellp.com


### CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **PLAINTIFFS' REPLY**

**SUPPORTING THEIR MOTION FOR CLASS CERTIFICATION AS TO DEFENDANT**

**HILL'S PET NUTRITION, INC.**  was filed electronically with the Clerk of the Court using the

CM/ECF system this 26th day of April, 2023, and served electronically on all counsel of record.


                                        *s/ Ellen M. Carey*