IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HOLLY BLAINE VANZANT, and SHERRY NEVIUS, individually and on behalf of all others similarly situated,<br>　　　　　　Plaintiffs,<br>v.<br>HILL'S PET NUTRITION, INC., and PETSMART, INC.<br>　　　　　　Defendants. | Case No. 1:17-cv-02535<br><br>Hon. Jorge Alonso |

**PLAINTIFFS' REPLY SUPPORTING
THEIR MOTION FOR CLASS CERTIFICATION
AS TO DEFENDANT PETSMART, INC.**

**TABLE OF CONTENTS**

TITLE PAGE ..................................................................................................................................i

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION ........................................................................................................................1

I.     PLAINTIFFS HAVE SATISFIED RULE 23 (a) AS TO SUBCLASS ..........................2

    A. PetSmart makes common misrepresentation and omissions about PD products and thus, common questions exist to PetSmart's deceptive conduct ...............2

    B. Vanzant is an adequate subclass representative ................................................................4

II.     COMMON QUESTIONS PREDOMINATE AND THUS, PLAINTIFFS HAVE SATISFIED RULE 23(b)(3) AS TO THE SUBCLASS ...................................................8

    A. Common questions as to the likelihood of deception and materiality predominate ..................................................................................................8

        1. Common, classwide, evidence demonstrates the PetSmart's required prescription was likely to deceive a reasonable consumer and literally false ...................................................................................................8

        2. Materiality, shown by classwide, evidence, is another predominant question ......................................................................................................................12

    B. The question of whether PetSmart's sale of PD products to the subclass as prescription-only, therapeutic products is unfair also predominates ...........................13

    C. Damages are susceptible to measurement across the entire subclass ..............................13

    D. PetSmart has not shown that individual issues overwhelm predominant questions of the likelihood of deception, materiality, and classwide damages ..................................................................................14

CONCLUSION ...........................................................................................................................15

**TABLE OF AUTHORITIES**

**Cases**

*Al Haj v. Pfizer Inc.,* No. 17 C 6730, 2019 WL 3202807
    (N.D. Ill. Jul. 16, 2019)..........................................................................................................9

*Al Haj v. Pfizer Inc.,* No. 17 C 6730, 2020 WL 1330367
    (N.D. Ill. March 23, 2020)..................................................................................................6, 7

*Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969
    (7th Cir. 2020)......................................................................................................................12

*Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510
    (N.D. Ill. Nov. 16, 2021).......................................................................................................11

*Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927
    (2d Dist. 2003) .....................................................................................................................15

*Clark v. Experian Info. Sols., Inc.*, 256 Fed. App'x 818
    (7th Cir. 2007)......................................................................................................................11

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...........................................................................14

*Connick v. Suzuki Motor Co.,* 675 N.E.2d 584 (Ill. 1996)............................................................12

*Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919
    (7th Cir. 2016).......................................................................................................................8

*Lipton v. Chattem, Inc.*, 289 F.R.D. 456
    (N.D. Ill. 2013)..................................................................................................................6, 7

*Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007
    (9th Cir. 2020)................................................................................................................11, 12

*Oliviera v. Amoco Oil Co.*, 201 Ill. 2d 134 (2002) .........................................................................7

*Oshana v. Coca-Cola Co.*, 472 F.3d 506
    (7th Cir. 2006)......................................................................................................................10

*Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750
    (7th Cir. 2014)............................................................................................................. passim

*Suchanek v. Sturm Foods, Inc.,* No. 11-CV-565-NJR-RJD, 2017 WL 3704206
    (S.D. Ill. Aug. 28, 2017) (*Suchanek II*)..................................................................8, 11, 15

**Statutes and Regulations**

815 ILCS 505/2.............................................................................................................................13

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................................2, 4, 8

## INTRODUCTION

In a desperate attempt to downplay its critical role in the deceptive and unfair conduct alleged in this case, PetSmart puts the blame on Hill's. To be sure, Hill's imposed the prescription requirement on resellers like PetSmart for its Prescription Diet ("PD") products. But PetSmart actively participates in the deceptive conduct by enforcing Hill's prescription requirement, restricting the sale of PD products in-store and online to consumers with a prescription from their veterinarian. PetSmart – not Hill's – sells the PD products directly to consumers. PetSmart enforces Hill's prescription requirement for in-store purchases and communicates to consumers that a prescription is required to buy PD through its MedCard program. Consumers cannot buy PD from a PetSmart store without a MedCard and they cannot get a MedCard without a prescription from their vet. Likewise, consumers cannot buy PD from PetSmart online without a prescription. By restricting the sale of "Prescription Diet" labeled products to consumers with a "prescription" from a veterinarian, PetSmart falsely represents that PD products are prescription products and that a prescription is required to purchase these products, impliedly represents to consumers that PD products contain a drug or medicine (when they do not), and fails to disclose to consumers that PD products are not legally required to be sold by prescription and that they do not contain a drug or medicine.

Similarly, PetSmart actively participates in the unfair conduct. It sells PD products – which are intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease ("disease treatment") – as prescription-only, therapeutic products, even though PD products have not been approved by the FDA as new animal drugs, thereby rendering the products unsafe, misbranded and adulterated under the Federal and Illinois Food, Drug, and Cosmetic Acts ("FD&C Acts"). In doing so, PetSmart violates the public policy underlying the acts (*i.e.*,

1

protecting consumers and pets from unsafe and ineffective drugs) and the standards set forth in them. PetSmart's marketing and sale of unsafe, unapproved PD products to vulnerable pet parents as prescription-only, therapeutic products which purportedly provide clinical benefits for sick pets is both prohibited under the FD&C Acts and is unethical and unscrupulous. As such, PetSmart's "it was Hill's" defense should be rejected.

PetSmart argues that Plaintiffs have not satisfied Rule 23(a) or Rule 23(b)(3) as to the subclass. PetSmart claims that it does not make any common misrepresentations and that because Plaintiffs have not presented classwide evidence of materiality or causation, they cannot prove typicality, commonality, or predominance as to the PetSmart subclass. It is wrong. As detailed above, PetSmart makes numerous, common misrepresentations and omissions about PD products to the subclass. Whether these misrepresentations and omissions are literally false, likely to deceive a reasonable consumer, and material are objective, common questions upon which the deception claims of every subclass member depend. These questions predominate. And Plaintiffs presented classwide evidence on both deception and materiality. Every ICFA deception claim involves individual issues of causation, but that does not preclude certification.

PetSmart essentially ignores Plaintiffs' unfair practices claim. But whether PetSmart's sale of unapproved PD products constitutes an unfair practice is yet another predominant question for which Plaintiffs have presented classwide evidence. Plaintiffs also demonstrated that damages are susceptible to measurement on a classwide basis for the subclass. For all of these reasons, and those set forth more fully below, certification of the subclass is appropriate here.

I. **PLAINTIFFS HAVE SATISFIED RULE 23(a) AS TO THE SUBCLASS.**

A. **PetSmart makes common misrepresentations and omissions about PD products and thus, common questions exist as to PetSmart's deceptive conduct.**

Contrary to PetSmart's contention, it makes common misrepresentations and omissions

about PD products to in-store and online purchasers. PetSmart's nationwide policy requires all in-store purchasers to obtain a MedCard and present it to the cashier in order to purchase any PD product. (Ex. 17 at 17-19, 26-27, 96-97; Ex. 1 at 123-24).[1] Consumers need a prescription from their veterinarian for a PD product to obtain a MedCard. (Ex. 17 at 18-19, 57-59, 142-43; Ex. 38 Resps. 6-7). By requiring consumers to present a MedCard (which requires a veterinary prescription) for in-store purchases of PD products, PetSmart represents to every in-store purchaser that PD products are prescription products and that a prescription is required to purchase PD products in PetSmart's stores. Indeed, if a consumer walks into PetSmart without a MedCard and without a written prescription for a PD product, they would not be allowed to purchase the product. (Ex. 17 at 28).[2]

PetSmart also represents to every online purchaser that PD products are prescription products and that a prescription is required to purchase PD on PetSmart's website. PetSmart's policy requires all online purchasers to enter their vet's information, the name of the product prescribed, the duration, and the authorization date so that PetSmart can call the vet to verify the prescription for the PD product. (Ex. 17 at 62-63, 65-66, 97). Moreover, PetSmart tells every online purchaser that a prescription or veterinary authorization – terms Hill's and PetSmart use interchangeably[3] – is required to purchase PD products. (*Id*. at 143-47; Ex. 16 at -0046-0048).

By requiring a prescription online and in-store (via the MedCard) for purchases of PD, PetSmart also impliedly represents to consumers that PD products contain a drug or medicine

---

[1] "Ex." cites to numbers 1-34 are the exhibits filed with Plaintiffs' motion for class certification. Numbers 35-40 are provided with this Reply.
[2] It is irrelevant that PetSmart's in-store veterinary clinic, Banfield, issues the MedCard to consumers, or that Hill's contractually imposed the prescription requirement (or MedCard requirement) on PetSmart. PetSmart is the gatekeeper of PD products as it sells these products to consumers. It is PetSmart, not Hill's or Banfield, that restricts the sale of PD products in PetSmart stores to consumers with a MedCard.
[3] Pl. Br. at n.1.

(when they do not). (*See* Ex. 14, ¶¶ 88-110.) PetSmart does not disclose to consumers that PD products do not contain a drug or medicine and are not legally required to be sold by prescription. (Ex. 38 at Resps. 15, 17, 29-30, 46). Thus, common questions exist as to whether PetSmart's uniform misrepresentations and omissions regarding PD products were material or likely to deceive a reasonable consumer. For Rule 23(a)(2) purposes, even a single common question will suffice. *Suchanek v. Sturm Foods, Inc*., 764 F.3d 750, 755 (7th Cir. 2014). Thus, Plaintiffs have satisfied commonality. (*See* Pl. Br. at 8, identifying several common questions).

### B. Vanzant is an adequate subclass representative.

Vanzant is an adequate representative for both in-store and online purchasers in the subclass because the misrepresentations and omissions Plaintiffs challenge as deceptive are the same regardless of whether the purchaser bought PD online or in-store. The express, false representation that a prescription is required to buy PD, and PetSmart's omissions described above are identical online and in-store. The same is true for PetSmart's implied representation that PD contains medicine. Expert survey evidence demonstrates that between 22-46% of actual or likely PD purchasers believe it contains medicine based on the way that it is labeled and sold (prescription-restricted). (*See* Ex. 14, ¶¶ 20-24, 88-110.) The number is 46% for consumers who experience the prescription mandate via PetSmart's MedCard process. (*Id*. at ¶¶ 24, 109.) Accordingly, the verification process need not be identical for in-store and online purchasers, as PetSmart suggests, for Vanzant to adequately represent the subclass.[4]

---

[4] PetSmart argues that the class should not be certified because online purchasers supposedly agreed to arbitrate, citing Terms and Conditions currently available on its website. (Opp. at 9, n.13). But PetSmart made no effort to demonstrate that those Terms and Conditions have been in place since the class period began on March 2, 2013 (three years before this lawsuit was filed). Moreover, PetSmart produced online terms and conditions that do not include an arbitration provision. (Ex. 40, PetSmart_0000089-94). If PetSmart wanted to enforce any arbitration agreement for online purchasers, it should have moved to compel arbitration as to those purchases. It did not do so and thus, has waived this argument. *See, e.g., St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prod. Co.*, 969 F.2d 585, 588 (7th Cir. 1992).

PetSmart argues that Vanzant is subject to unique defenses because she bought PD again after knowing of the alleged deceptive conduct. But PetSmart patently misrepresents the evidence. Vanzant bought Prescription Diet c/d for her cat Tarik for three years because her vet prescribed it and because she believed it contained medicine that would prevent Tarik's bladder stones from returning. (Ex. 1 at 81-83; 103-04; 112; Ex. 3 at Resp. No. 6). She did not learn that *all* PD products do not contain medicine and are not FDA-approved[5] in early 2016 as PetSmart claims. Rather, she learned then that the c/d product she had been buying Tarik did not contain medicine. (Ex. 1 at 167-68). Similarly, Vanzant did not purchase PD products four times in 2017 after the lawsuit was filed or in October 2020 knowing the products did not contain medicine. In February 2017, when her cat Diablo was diagnosed with kidney disease, she bought k/d products for him *pre-lawsuit*, but she did not know at the time whether these products contained medicine. (Ex. 1 at 194-96). Vanzant did not purchase any k/d in October 2017; rather, she returned it. (*Id*. at 225). In 2020, Vanzant's vet sent her home what she thought were free samples of two PD products for her cat, but she did not know until shortly before her deposition that she had been charged for those samples and she did not feed them to her cat. (*Id*. at 235). Given this, she certainly did not buy them knowing that the products do not contain medicine.

Vanzant did buy two PD products after filing the lawsuit in a desperate attempt to save each cat's life when they were near death. (*Id*. at 225, 274). Indeed, both cats died shortly after these purchases. (*Id*.). The fact that Vanzant bought PD for her dying cats on these two occasions, desperately attempting to save their lives does not mean that she was not deceived by PetSmart's material misrepresentations and omissions when she purchased c/d for Tarik for three years. Rather, it illustrates just how vulnerable consumers are when cherished family members

---

[5] Whether Vanzant knew the products were FDA-approved is irrelevant. Plaintiffs are not pursuing a claim that the prescription deceived consumers into believing the products were FDA-approved.

are sick or dying. This goes to the heart of Plaintiffs' unfair practices claim. Notably, Vanzant alleges that she would not have purchased PD, would not have purchased PD for a lengthy duration, or would not have purchased PD when priced so excessively relative to non-prescription pet foods absent each Defendant's deceptive conduct and unfair practices. (SAC ¶ 76). Even if Vanzant was not deceived as to these two purchases, she certainly made them as a result of Hill's and PetSmart's marketing and sale of PD products as therapeutic products intended for use in the treatment of disease. (*Id*. at 225, 274). Neither product worked. (*Id*.).

*Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 460 (N.D. Ill. 2013), is inapt. There, the plaintiff claimed she would not have purchased the at-issue product had she known it contained a particular ingredient. *Id*. However, she admitted that she did not even know what that ingredient was when she made her initial purchase. *Id*. That is a far cry from this case, where Vanzant testified that she was misled into believing PD products were *prescription* products that contained medicine at the time of her initial purchase and for the next three years. (Ex. 1 at 137-39). Vanzant's post-lawsuit efforts to save her dying cats could not possibly impact causation in the way the *Lipton* plaintiffs' admission destroyed *any* possibility that the defendant's conduct caused her injury because it demonstrated that she was never deceived in the first place.

*Al Haj v. Pfizer Inc.*, No. 17 C 6730, 2020 WL 1330367, at *2 (N.D. Ill. Mar. 23, 2020), is similarly inapt. There, the plaintiff alleged that Pfizer deceived her by charging more for "Maximum Strength" Robitussin cough syrup than for "Regular Strength" Robitussin even though the former had a lower concentration of active ingredients than the latter and double the recommended adult dose. But she admitted that she did not purchase Maximum Strength Robitussin believing it had a greater concentration of active ingredients and continued to purchase the product after learning that its recommended adult dose was double that of Regular

6

Strength Robitussin. Like in *Lipton*, the *Al Haj* plaintiff's admission that she did not buy Maximum Strength Robitussin believing it had a greater concentration of active ingredients destroyed *any* possibility that Pfizer's conduct caused her injury because it demonstrated that she was never deceived in the first place. Again, that is not the case here.

PetSmart's reliance on *Oliviera v. Amoco Oil Co.*, 201 Ill 2d 134, 155 (2002), is equally misplaced. Unlike Vanzant, who testified that she was misled by PetSmart's MedCard and bought the products believing they contain medicine and because they were prescribed, the *Oliviera* plaintiff did not allege that he saw or was deceived by the any of the at-issue ads, nor did he contend that they induced his purchase.

To find a proposed class representative inadequate, a defendant must show an arguable, unique defense that is not applicable to the class as a whole. *See CE Design*, 637 F.3d at 726. But proximate cause – which requires consumers to demonstrate they were deceived in some manner – is an individual question in all ICFA cases. *Suchanek*, 764 F.3d at 759-60. Thus, there is no "unique" proximate cause defense here. Likewise, there is no unique defense applicable to Vanzant's unfair practices claim. Plaintiffs' unfair practices claim does not hinge on deception so it does not matter whether (or when) Vanzant knew that PD products do not contain medicine and are not FDA-approved. Even assuming Vanzant discovered these facts at some point, that does not mean she knew that PD products are unsafe in the absence of such approval, that the sale of unapproved PD products is prohibited, or that the price was inflated due to Defendants' marketing and sale of PD as therapeutic products intended for use in disease treatment.

Even if Vanzant were somehow found to be an inadequate representative of the subclass, that would not defeat certification of even the deceptive conduct claim. Indeed, if an affirmative defense against a plaintiff / class representative becomes a distraction from the larger issues

7

affecting the class as a whole, a new class representative can be substituted to resolve any problem. *See Wahl v. Midland Credit Mgmt., Inc.*, 243 F.R.D. 291, 298, n.4 (N.D. Ill. 2007).

**II.     COMMON QUESTIONS PREDOMINATE AND THUS, PLAINTIFFS HAVE SATISFIED RULE 23(b)(3) AS TO THE SUBCLASS.**

    **A. Common questions as to the likelihood of deception and materiality predominate.**

When, as here, common questions represent a significant aspect of a case and can be resolved for all class members in a single adjudication, predominance is satisfied. *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016). Whether PetSmart's representations and omissions about PD products are literally false, and whether they are likely to deceive a reasonable consumer in a material way are objective questions upon which the claims of every class member will rise or fall. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757, 762 (7th Cir. 2014). These questions are the heart of Plaintiff's deceptive-conduct claim and predominate.

    **1. Common, classwide evidence demonstrates that PetSmart's required prescription was likely to deceive a reasonable consumer and literally false.**

Deception turns on whether PetSmart's representations and omissions were likely to deceive a reasonable consumer. *See Suchanek*, 764 F.3d at 757. Thus, it is the threshold question for determining PetSmart's liability, and the most significant element of each subclass member's deception claim. *Suchanek v. Sturm Foods, Inc.,* No. 11-CV-565-NJR-RJD, 2017 WL 3704206, at *14 (S.D. Ill. Aug. 28, 2017) ("*Suchanek II*") (denying motion to de-certify). Classwide evidence of deception is provided by expert survey evidence. (Pl.'s Br. § I.C.).

PetSmart argues that Plaintiffs cannot demonstrate deception because it cannot be held responsible for "reinforcing" a consumer's prior held belief that PD products contain medicine and are prescription products. But PetSmart, not Hill's, sells PD products directly to consumers and thus, it is the gatekeeper. The online and in-store purchase experience at PetSmart is the

8

consumer's last opportunity to discover that Hill's mandatory prescription requirement is self-imposed and false, and that the products do not contain medicine. Yet, PetSmart fails to disclose to consumers that PD products do not contain medicine and are not legally required to be sold by prescription. *Supra* at 2-4. Instead, it enforces Hill's prescription requirement by making a prescription a mandatory prerequisite to every in-store and online purchase of PD. *Id*. In doing so, PetSmart, like Hill's, represents to the subclass that a prescription is required to purchase PD products and that the products are prescription products. These representations are literally false and misleading on their face because, as Defendants admit, PD products are not legally required to be sold by prescription and they are not actual prescription products. (Ex. 38 at Resps. 29-30; Ex. 19 at Resps. 13, 57). *See, e.g., Al Haj v. Pfizer Inc.*, 2019 WL 3202807, at *4 (N.D. Ill. Jul. 16, 2019) (deception demonstrated if a statement is literally false).

Furthermore, Plaintiffs' survey expert, Dr. Rebbecca Reed-Arthurs, tested the crux of the deception: the mandatory prescription necessitated by PetSmart's prescription requirement for online and in-store purchasers of PD, the "limited access" sales process, and the name/label of the food. (Ex. 14, ¶¶ 6, 35-73). Her survey shows that between 22 and 46% of actual or likely PD purchasers believe that PD products contain a drug or medicine based on the way in which PD products are sold (prescription-restricted) and labeled.[6] (*See* Ex. 14, ¶¶ 20-24, 88-110; *see also*, Ex. 20, ¶ 12.) This is reliable, classwide evidence that consumers who were exposed to PetSmart's prescription-restricted sales process to purchase PD products online or in-store are likely to be deceived by PetSmart's conduct.[7]

---

[6] The Seventh Circuit has not determined the percentage of misled survey respondents needed to show that deceptive conduct is "likely to mislead" a reasonable consumer under the ICFA. But other courts have found 15.5-20% sufficient to demonstrate the more stringent "substantial likelihood of actual confusion or deception" under the Lanham Act. *See* Pls.' Reply in Supp. of its Mot. for Class Certification as to Hill's at n.2 ("Pls.' Hill's Reply").

[7] Plaintiffs oppose Defendants' *Daubert* motion attacking Dr. Reed-Arthurs, which should be denied.

Dr. Reed-Arthurs also specifically tested the MedCard process for in-store purchases of PD, which Vanzant testified implied to her that there was medication in the food. (Ex. 1 at 240). The MedCard survey mirrors Vanzant's in-store experience and the MedCard process described in PetSmart's documents and by its corporate representative. (*See* Ex. 15). The MedCard survey shows that shows that 46% of actual or likely PD purchases exposed to the prescription-restricted MedCard process believe that "Prescription Diet" labeled products contain a drug or medicine. (Ex. 14 at ¶¶ 24, 109). As such, PetSmart's claim that there is no evidence that other consumers interpreted the MedCard in the same manner as Vanzant is specious.

PetSmart complains that Plaintiffs' survey expert did not examine the impact of the MedCard standing alone. But a prescription is required to obtain a MedCard and the MedCard process is the mechanism by which PetSmart communicates to consumers that a prescription is required to buy PD products in PetSmart's stores. *Supra* at 3. Accordingly, the MedCard cannot be divorced from the prescription required to obtain it.

Citing *Oshana v. Coca-Cola Co*., 472 F.3d 506, 514 (7th Cir. 2006), PetSmart argues that the class should not be certified as it would include members who were not deceived (and thus, have no ICFA deception claim), because more than 50% of Dr. Reed-Arthurs' survey respondents knew the product did not contain a drug or medicine.[8] *Oshana* is inapposite because Plaintiffs' claims against PetSmart rest on PetSmart's universal representations (through its nationwide policies) that a prescription is required for all online and in-store purchases of PD products and its omissions about PD products, which indicate to reasonable consumers that PD contains medicine and is a prescription product. In *Oshana*, the plaintiff complained that

---

[8] PetSmart argues Vanzant's claims are atypical for the same reason. (Opp. at n.16). PetSmart is wrong in suggesting that no class can be certified until proof exists that every class member has been harmed or has a valid claim. *Suchanek*, 764 F.3d at 757. The question is whether class members could be harmed – not whether they have a valid ICFA deception claim, which is to be determined after the class is certified. *Id*.

10

consumers were deceived by Coke's failure to disclose its use of different sweeteners in fountain and bottled Diet Coke, but the claim was not based on any specific representation, and it did not appear that any other potential class member shared the plaintiff's complaint. 472 F.3d at 514.

PetSmart's argument that satisfaction of the deception element requires individualized proof is equally unavailing. The Seventh Circuit was referring to the proximate cause element of an ICFA deception claim, not the likelihood of deception element as PetSmart suggests. *Clark v. Experian Info. Sols., Inc.*, 256 Fed. App'x 818, 821 (7th Cir. 2007). In any event, every ICFA deception case involves individual elements of causation, but that does not preclude certification. *Suchanek*, 764 F.3d at 759; *Suchanek II*, 2017 WL 3704206, at *14.

Plaintiffs' claims, like those in *Suchanek* and *Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *6 (N.D. Ill. Nov. 16, 2021), are straightforward and, as survey evidence demonstrates, shared by a significant number of consumers. In *Benson,* plaintiffs purchased pacifiers after being misled into believing that the term "orthodontic" on the label meant that the products promote healthy oral development. *See id.* Similarly, here, Vanzant purchased PD based Hill's and PetSmart's representations that a "prescription" was required and the restricted sales process, which led her to believe that PD products were actual prescription products that contained medicine necessary for her sick pet. "[I]t is reasonable for a consumer to rely on the prescription requirement and labeling in her purchasing decision for an ailing pet." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021 (9th Cir. 2020).

**2. Materiality, shown by classwide evidence, is another predominant question.**

Materiality presents another central, objective question upon which all subclass members' deception claims will rise or fall. *Suchanek*, 764 F.3d at 757. "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type

11

of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 595 (1996). Extrinsic evidence in the form of consumer surveys or market research is *not* mandatory for an ICFA deception claim, as PetSmart suggests. *See Beardsall v. CVS Pharm., Inc*., 953 F.3d 969, 976 (7th Cir. 2020). Rather, such evidence is needed only where the marketing "is not clearly misleading on its face and materiality is in doubt." *See id.* Because there is no legal requirement for a prescription for any pet food, PetSmart's prescription requirement is literally false and misleading on its face. The materiality of the "prescription," necessitated by PetSmart's MedCard and online prescription requirement, is not in doubt. Representing a product as "prescription only," and thus indicating that it contains a drug or medicine is "the type of information upon which a buyer would be expected to rely in making a decision whether to purchase" that product for their sick pet. *See Moore*, 966 F.3d at 1021. "Commonsense dictates that a product that requires a prescription may be considered a medicine that involves a drug or controlled substance." *Id.* at 1018 (explaining that this conforms with "general understandings of prescription drugs for humans and pets").

      PetSmart argues that Plaintiffs have not put forth any evidence that the MedCard process was material to the purchase decisions of subclass members. To the contrary, Plaintiffs presented Hill's market research, which demonstrates that "Pet Parents trust their Vet and will typically just pick up or purchase whatever the Veterinarian recommends/prescribes." (Ex. 23, slide 7; see also, Ex. 24 at -172; Ex. 25.) Hill's market research also shows that the term "prescription" in "Prescription Diet" name implies that PD products contain a drug. (*See* Ex. 22 at -927). This classwide evidence demonstrates that the prescription is material to consumers' decisions to purchase PD products. The prescription is mandated not by veterinarians, but by Hill's and PetSmart's prescription requirement, which PetSmart enforces for all purchases of PD.

PetSmart also does not refute the presumption of materiality for "prescriptions" under the FTC's Policy Statement on Deception. (*See* 815 ILCS 505/2; Pls.' Br. at 11-12).

**B. The question of whether PetSmart's sale of PD products to the subclass as prescription-only, therapeutic products is unfair also predominates.**

For the most part, PetSmart ignores Plaintiffs' unfair practices claim, arguing that Hill's, not PetSmart, is responsible for satisfying all PD regulatory requirements. But the question of whether PetSmart's sale of PD products to the subclass violates public policy or is unethical or unscrupulous and thus, constitutes an unfair practice, is another common, predominant question. PetSmart does not contend otherwise. Classwide evidence demonstrates that Hill's markets *all* of its PD products as therapeutic products intended for use in disease treatment and PetSmart sells these products to consumers even though PD products have not been approved by the FDA as new animal drugs, thereby rendering the products unsafe, misbranded and adulterated under the FD&C Acts. (Pls.' Hill's Reply at 16-17; Ex. 38 at Resp. 1). PetSmart's sale of PD products is prohibited and violates both the public policy underlying the acts (*i.e.*, protecting consumers and pets from unsafe and ineffective drugs) and the standards set forth in them. (Pl. Br. at 13-14). Like Hill's, PetSmart's sale of unsafe, unapproved PD products to vulnerable pet parents as prescription-only, therapeutic products which purportedly provide clinical benefits for their sick pets is also unethical and unscrupulous. (Pls.' Hill's Reply at 17-19).

**C. Damages are susceptible to measurement across the entire subclass.**

Plaintiffs assert two theories of liability, that Defendants engaged in: (1) deceptive conduct and (2) unfair conduct, both in violation of the ICFA. Defendants' deceptive conduct and their unfair conduct each caused Plaintiffs and other reasonable consumers to overpay and make purchases they otherwise would not have made. As discussed in Plaintiffs' Reply in Support of its Motion for Class Certification as to Hill's, which Plaintiffs incorporate herein,

damages expert, Dr. Janet Netz, provided a reasonable and reliable method of calculating classwide and subclasswide overcharge damages matching each liability theory. (Pls.' Hills' Reply at 9-16). As such, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), is satisfied.

Dr. Netz's damages approach measures the difference between the actual prices consumers paid for PD products under the alleged wrongful conduct and the prices they would have paid in the but-for world absent that conduct. Under her model, classwide expenditures for PD products in the actual world minus classwide expenditures for PD products in the but-for world equals the price premium or overcharge paid by the subclass. (Ex. 28 ¶¶ 66-67). Dr. Netz opined that consumer expenditures for the subclass in the but-for world would have been $6.6 million less for PD products than they were in the actual world. (Ex. 29 ¶ 146). In other words, the economic impact of the alleged wrongful conduct to the subclass is an overcharge of $6.6 million.[9] That number can be adjusted for the share of purchases made by subclass members who demonstrate they were deceived by PetSmart's conduct. (*Id.* ¶ 23).

### D. PetSmart has not shown that individual issues overwhelm predominant questions of the likelihood of deception, materiality, and classwide damages.

PetSmart argues that Plaintiffs failed to demonstrate that common issues of reliance predominate for the deception claim and contends that Plaintiffs conflate damages and causation. It is wrong. Plaintiffs recognize that deceptive practices cases involve individual issues of causation. (Pl. Br. at 12).[10] Moreover, the Seventh Circuit has held that "100% commonality" is not required, as that "would eviscerate consumer-fraud class actions." *Suchanek*, 764 F.3d at 759. Here, the individual causation issue and information needed to prove it are less complex and

---

[9] PetSmart produced additional data on February 26, 2023 because it inadvertently failed to include Illinois purchases for one product. The estimated overcharge will increase slightly as a result.
[10] Dr. Netz's analysis addresses whether the alleged wrongful conduct resulted in an economic impact to the class and subclass, *i.e.*, higher prices for PD.

14

more accessible to individual litigants than the likelihood of deception and classwide damages issues, which require costly expert evidence. Thus, individual causation issues should not defeat class certification here. *Suchanek*, 764 F.3d at 759; *Suchanek II*, 2017 WL 3704206, at *14.

PetSmart also suggests that consumers who go through the effort to obtain a MedCard have already decided to purchase a PD product and thus, they could not have relied on PetSmart's MedCard in deciding to make those purchases. Not true. The MedCard is the means by which PetSmart communicates to in-store purchasers its express representation that a prescription is required to buy PD products and its implied representation that these prescription-restricted products contain medicine. PetSmart communicates these same misrepresentations to online purchasers. That Hill's makes the same misrepresentations and omissions about PD products does not mean that consumers could not have also relied on *PetSmart's* misrepresentations and omissions in deciding to go through with the purchases they intended to make when they obtained the MedCard or visited PetSmart.com.

Proximate cause means any cause which, in natural or probable sequence, produced the injury complained of; it need not be the sole cause or the last or nearest cause. *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 937 (2d Dist. 2003). Under Illinois law, "there can be more than one proximate cause contributing to any one injury." *Id*. Consumers who demonstrate they relied on or were deceived in some manner by PetSmart's representations and omissions – along with or in addition to Hill's representations and omissions – can show PetSmart's deceptive conduct proximately caused their damages.

## CONCLUSION

For all of the reasons set forth above, Plaintiffs respectfully request that this Court certify the PetSmart subclass.

Dated: April 26, 2023                          Respectfully submitted,

                                             By: */s/ Ellen M. Carey*
                                                     One of Plaintiffs' Attorneys

| | |
|---|---|
| Ellen M. Carey | Michael P. Morrill |
| Brian P. O'Meara | Pope McGlamry, P.C. |
| Forde & O'Meara LLP | 1200 6th Avenue |
| 191 North Wacker Drive, 31st Floor | Columbus, GA 31901 |
| Chicago IL 60606 | (706) 324-0050 |
| (312) 641-1441 | mikemorrill@pmkm.com |
| bomeara@fordellp.com | |
| ecarey@fordellp.com | |

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **PLAINTIFFS' REPLY SUPPORTING THEIR MOTION FOR CLASS CERTIFICATION AS TO DEFENDANT PETSMART, INC.** was filed electronically with the Clerk of the Court using the CM/ECF system this 26th day of April, 2023, and served electronically on all counsel of record.

                                                             *s/ Ellen M. Carey*