**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HOLLY BLAINE VANZANT, and SHERRY NEVIUS, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br>v.<br>HILL'S PET NUTRITION, INC., and PETSMART, INC.<br>     Defendants. | Case No. 1:17-cv-02535<br><br>Hon. Jorge Alonso |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**HILL'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. JANET NETZ**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................................... ii

I. INTRODUCTION .............................................................................................................1

II. DR. NETZ'S OPINION .....................................................................................................2

III. HILL'S CHALLENGES TO DR. NETZ'S OPINIONS UNDER *DAUBERT* FAIL. ..........6

    A. *Daubert* Standard ................................................................................................6

    B. Science Diet is an Appropriate Benchmark for Prescription Diet Products. .................7

IV. NEITHER DR. NETZ'S OPINIONS NOR PLAINTIFFS' THEORIES OF LIABILITY ARE IMPROPERLY BASED ON A "MARKET THEORY" OF CAUSATION AS HILL'S CONTENDS ...........................................................................................................12

V. CONCLUSION ................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Andy Mohr Truck Ctr. V. Volvo Trucks N. Am.*, No. 1:12-cv-448,
    2015 U.S. Dist. LEXIS 11560 (S.D. Ind. Feb. 2, 2015) ...................................................... 11

*CDW LLC v. NETech Corp.*, No. 1:10-cv-00530-SEB-DML,
    2014 U.S. Dist. LEXIS 8898 (S.D. Ind. Jan. 23, 2014) ...................................................... 10

*Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169 (S.D.N.Y. 2006) ................................ 7

*Comcast Inc. v. Behrend*, 569 U.S. 27 (2013) .................................................................................. 9

*Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018) ............ 14, 15

*Dial Corp. v. News Corp.*, 314 F.R.D. 108 (S.D.N.Y. 2015) ............................................................ 8

*Eleven Line, Inc. v. North Texas State soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000) ............. 10

*Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859,
    2017 U.S. Dist. LEXIS 133449 (N.D. Ill. Aug. 21, 2017) ........................................... 7, 8, 11

*Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010) ......................................... 7

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017) .............................................. 6

*In re Blood Reagants Antitrust Litig.*, MDL No. 09-2081,
    2015 U.S. Dist. LEXIS 141909 (E.D. Pa. Oct. 19, 2015) .............................................. 7-8

*In re Suboxone*, 421 F. Supp. 3d 12 (E.D. Pa. 2019) ................................................................. 7, 8

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794
    (N.D. Ill. 2005) ........................................................................................................ 7, 10, 11

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013) .............................................. 6, 11

*Mihailovich v. Laatsch*, 359 F.3d 892 (7th Cir. 2002) ..................................................................... 6

*Morelock Enterprises v. Weyerhaeuser Co.*, No. CV 04-583-PA,
    2004 U.S. Dist. LEXIS 28270 (D. Or. Dec. 16, 2004) ...................................................... 14

*Oliviera v. Amoco Oil Co.*, 201 Ill. 2d 134 (2002) ........................................................................ 12

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) .................................................................. 13

*Suchanek v. Strum Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)..................................................13, 14

*Suchanek v. Strum Foods, Inc.*, No. 11-CV-565,
     2017 U.S. Dist. LEXIS 138016 (N.D. Ill. Aug. 28, 2017).......................................... 11-12

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015).................................. 8, 10-11

*Weiner v. Snapple Beverage Corp.*, No. 07-cv-8742,
     2010 U.S. Dist. LEXIS 79647 (S.D.N.Y. Aug. 5, 2010).....................................................10

**Other Authorities**

Fed. R. Evid. 702 ..............................................................................................................................6

**I.      INTRODUCTION**

Plaintiffs' damages expert, Dr. Janet Netz, used a well-established methodology to measure the classwide economic impact to purchasers of Hill's Prescription Diet ("PD") pet food products that resulted from Defendants' alleged deceptive conduct and unfair conduct under the Illinois Consumer Fraud Act ("ICFA"). Under her "benchmark" analysis, Dr. Netz used Hill's Science Diet ("SD") pet food as a benchmark product for PD to examine the economic impact on consumers in a "but-for" world, where the challenged conduct did not exist (*i.e.*, a world without Hill's prescription requirement or Hill's marketing and selling PD as therapeutic products).

Hill's does not dispute Dr. Netz's use of the methodology, but criticizes her selection of SD as a reliable benchmark for PD. Hill's points to "therapeutic" differences between SD and PD, but ignores that, in the relevant "but-for" world, an appropriate benchmark product would *not* have those qualities. Dr. Netz's choice of SD as a benchmark is sound. Hill's critiques go to the weight, not the admissibility, of her opinion, and are no reason to bar her testimony under *Daubert* or Rule 702.

Hill's also argues that Dr. Netz relies on an improper "market theory" of causation for ICFA claims, and that her opinion should be barred because there is a "disconnect" between her model and plaintiffs' theory of liability. While this is really a *Comcast* argument, not a *Daubert* one, it is also wrong. Netz is not offering a "market theory" of causation to support either Plaintiffs' deceptive practices claim or their unfair practices claim. Rather, she uses classwide evidence to show an economic impact (*i.e.*, higher prices for PD products) to the class. Neither *Daubert* nor *Comcast* support excluding Netz's opinions. Hill's motion should be denied.

1

## II. DR. NETZ'S OPINION

Plaintiffs have asserted two theories of liability in this case: (1) that Defendants engaged in *deceptive conduct* in violation of the ICFA by marketing and selling "Prescription Diet" labeled products pursuant to the prescription requirement and by making material omissions about these products; and (2) that Defendants engaged in *unfair conduct* in violation of the ICFA by marketing and selling PD products as therapeutic products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease ("treatment of disease") (and thus, can be purchased only by prescription), despite the fact that these products have not been approved as new animal drugs by the FDA. Ex. 28[1] ¶ 5, 2d Am. Compl. at ¶ 1. Plaintiffs contend that Defendants' deceptive conduct and their unfair conduct each caused Plaintiffs and other reasonable consumers to overpay and make purchases they otherwise would not have made.

Plaintiffs' damages expert, Dr. Janet Netz, evaluated whether the alleged deceptive conduct, the alleged unfair conduct, or both, resulted in an economic impact to purchasers of PD products. Based on her evaluation of evidence in this case, pertinent aspects of the pet food market, and fundamental economic principles, including supply and demand factors, Dr. Netz found that: prices for Hill's pet food are determined by common market forces (not individually negotiated prices); all class members were exposed to both the alleged deceptive conduct and unfair conduct; Defendants' deceptive conduct, as well as its unfair conduct, induced a higher willingness to pay for PD products by changing consumers' perception of the value of PD products and the need for these products; consumers revealed through their purchases of PD products that they were willing to pay more for these products; and that Hill's, as a profit-

---

[1] References to "Ex. __" are to exhibits to plaintiffs' motion for class certification; to "Pls.' Br. __" are to plaintiffs' memorandum in support of class certification; and to "Opp. __" are to Hill's opposition brief.

2

maximizing firm, would use this information to maintain a high-price strategy for PD products. Ex. 28 ¶¶ 47-65; Ex. 29 ¶ 61.

Dr. Netz concluded that classwide evidence demonstrated that Defendants' deceptive conduct resulted in an economic impact to the class, *i.e.,* higher prices for PD products. Ex. 29 ¶¶ 76-77, 85. She further concluded that classwide evidence demonstrated that Defendants' unfair conduct similarly resulted in an economic impact to the class, *i.e.*, higher prices for PD products. *Id.*

In order to determine the extent to which consumers paid a price premium or overpaid for Hill's PD products as a result of Defendants' deceptive conduct, their unfair conduct, or both, Dr. Netz first considered what the "but-for world" (*i.e.,* the world in which Defendants did not engage in the alleged wrongful conduct) would look like under each theory of liability. Ex. 28 ¶¶ 66-69. After considering Plaintiffs' allegations and the evidence,[2] Dr. Netz found that "with respect to the deceptive practices claim, absent the prescription requirement, [PD] products would be marketed and sold in the but-for world as nontherapeutic wellness products rather than as therapeutic products requiring a prescription." Ex. 29 ¶ 20; see also Ex. 28 ¶ 68. With respect to the unfair practices claim, Dr. Netz found that "absent Defendants' marketing and sale of [PD] products as products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, [PD] products would be marketed and sold in the but-for world as non-therapeutic wellness products." *Id.* Consequently, Dr. Netz concluded that the but-for world is the same regardless of whether Plaintiffs prevail on either theory of liability or both. *Id.*

Dr. Netz's damages approach measures the difference between the actual prices consumers paid for PD products under the alleged wrongful conduct and the prices they would

---

[2] Her consideration of materials included plaintiffs' complaint (Ex. 28 ¶ 68), case evidence on the pet food market (*id.* ¶¶ 22-38), and economic literature on benchmark methods (*id.* ¶¶ 66-67 & n.88-89).

have paid in the but-for world, absent that conduct. Because she concluded that the but-for world is the same under each theory of liability, Dr. Netz used a single damages model to measure the difference between the actual prices consumers paid and the prices they would have paid in the but-for world.[3] Under her model, class-wide expenditures for PD products in the actual world minus class-wide expenditures for PD products in the but-for world equals the price premium or overcharge paid by the class (and separately, by the subclass). Ex. 28 ¶¶ 66-67

Class-wide expenditures in the but-for world depend on two components: (1) the lower wholesale prices that resellers would have paid Hill's for PD products; and (2) the lower markup[4] over those lower wholesale prices that resellers would have charged consumers in the but-for world. Class-wide expenditures in this but-for world, however, cannot be directly measured. A common way to overcome this lack of observable data is to find a reasonable proxy (or benchmark) for the but-for product. Ex. 29 ¶ 86 & n.11. Dr. Netz considered several potential benchmarks and ultimately concluded that Hill's SD product line is the best proxy or benchmark for PD products. Ex. 28 ¶¶ 70-74; Ex. 29 ¶¶ 90-100. She explained in detail why SD is an appropriate benchmark. *Id*.

Dr. Netz used SD as a profit benchmark to determine the extent to which Hill's wholesale prices for PD to its resellers would have been lower absent the alleged wrongful conduct. Dr. Netz assumed that PD products in the but-for world (which would be sold as non-therapeutic, non-prescription wellness products) would be as profitable for Hill's as its SD products in the actual world (which are sold as non-therapeutic, non-prescription wellness products). She used

---

[3] Hill's mischaracterizes Netz's report and testimony as being unable to determine differences between the challenged conduct under either theory. Not true; she explained the challenged conduct for each theory. *E.g.*, Ex. 29 ¶¶ 5, 17-18.

[4] Markup measures the extent to which a firm sells a product to its customers at a price above which it acquired the product, expressed as a percentage of the acquisition cost. For example, if a firm paid $50 to acquire a product and sold it for $72.50, the markup would be: $(72.50 - 50) / 50 = 45\%$.

the relationship between Hill's gross margins reflected on Hill's profit and loss statements for its PD and SD product lines to determine the overcharge reflected in Hill's PD wholesale prices. Dr. Netz calculated the amount resellers would have paid Hill's at wholesale prices in the but-for world by assuming that Hill's would have been able to price its PD products in the but-for world above its direct costs at the same rate it is able to price its SD products above its direct costs in the actual world. Ex. 28 ¶¶ 75-92; Ex. 29 ¶¶ 106-111. Dr. Netz also used SD as a markup benchmark to determine the extent to which reseller markups on PD products would have been lower in the but-for world. She calculated the amount consumers would have paid for PD in the but-for world assuming that resellers would have marked up PD products over the lower wholesale prices by the same amount they marked up SD products over their wholesale prices in the actual world. *Id.*

      Dr. Netz opined that consumer expenditures in the but-for world would have been $80.7 million less for PD products than they were in the actual world. Ex. 29 ¶¶ 111, 147-148. In other words, calculated class-wide, the economic impact of the alleged wrongful conduct is an overcharge of $80.7 million to the class (and $6.6 million to the subclass). *Id.* ¶¶ 146-148. Dr. Netz recognized that class members need to show that the deceptive conduct proximately caused their injuries, *i.e.,* that they were deceived in some manner by the alleged misrepresentations and omissions. *Id.* ¶ 22. She presented both an overcharge rate (PD prices were 25% higher than they would have been in the but-for world) and a classwide overcharge amount across all putative class members of $80.7 million. But stated that her "classwide damages number can be adjusted for the share of purchases made by class members who were deceived. For example, if half of the purchases were made by class members who were deceived, damages would be $40.35 million." *Id.* ¶ 23. That final adjustment, which can also be made for the subclass overcharge

amount, can be made once it is determined which class members have a valid deception claim.

## III. HILL'S CHALLENGES TO DR. NETZ'S OPINIONS UNDER *DAUBERT* FAIL

### A. *Daubert* Standard

"In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotations omitted). To screen proposed expert testimony, a district court must answer three questions: "whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 779 (citations omitted).

Hill's does not challenge either Dr. Netz's experience or the relevance of her opinions – rather they challenge the reliability of those opinions. Under Rule 702, the three requirements for reliability are: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2002), quoting Fed. R. Evid. 702. "Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). In performing its gatekeeper role, "the district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert deployed." *Gopalratnam*, 877 F.3d at 781.[5]

---

[5] Hill's cites to a pending amendment to Rule 702 that is not in effect in an attempt to cast its criticisms as one of reliability versus questions of weight. Mot. at 7 & n.3.

Here, Dr. Netz's opinions are based on sufficient facts and data, are the product of reliable principles and methods, and she applied the principles and methods reliably to the facts.

**B. Science Diet is an Appropriate Benchmark for Prescription Diet Products.**

Hill's first argues that Netz's opinions are not reliable because SD is an inappropriate benchmark[6] for SD in her damages analysis. Mot. at 8-12.

A benchmark analysis requires the selection of a benchmark (or comparator) product, which should be reasonably similar to the at-issue product in the but-for world. As Netz explained, the benchmark products should be: (1) subject to similar supply and demand conditions as the at-issue product, and (2) not exposed to the at-issue conduct. Ex. 28 ¶ 67 n.89, citing AMERICAN BAR ASSOCIATION, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES at 204 (3d ed. 2017). Under *Daubert*, "exact correlation is not necessary" and the products need only be "fair congeners." *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005). A benchmark need not be perfectly comparable, so long as it allows the jury to calculate a "reasonable estimate of damages." *See*, *e.g.*, *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 148 (N.D.N.Y. 2010) (citation omitted). "The selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone." *Celebrity Cruises Inc. v. Essef Corp.* 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006).

Generally, arguments regarding the comparability or appropriateness of a particular benchmark go to the weight, not the admissibility, of a benchmarking analysis. *See, e.g., In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 U.S. Dist. LEXIS 141909, at *68 n.18

---

[6] Hill's does not challenge a benchmark analysis generally as a reliable methodology upon which to calculate damages. Nor could it. The yardstick or benchmark analysis is an acceptable damages method. See *In re Suboxone*, 421 F. Supp. 3d 12, 42-43 (E.D. Pa. 2019) (collecting cases); *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859, 2017 U.S. Dist. LEXIS 133449, at *32-35 (N.D. Ill. Aug. 21, 2017) ("benchmarking is a valid methodology"). Hill's expert acknowledges this. See Ex. 29 ¶86.

7

(E.D. Pa. Oct. 19, 2015) (citations omitted); *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859, 2017 U.S. Dist. LEXIS 133449, at **21-41 (N.D. Ill. Aug. 21, 2017) (denying motion to exclude experts' benchmark analyses); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 317 (S.D.N.Y. 2015) (same). This is particularly true where a defendant's conduct has rendered selection of a perfectly comparable benchmark difficult or impossible. *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118-19 (S.D.N.Y. 2015). Similarly, "arguments about what factors an expert should have controlled for in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's testimony." *In re Suboxone*, 421 F. Supp. 3d 12, 43 (E.D. Pa. 2019) (citation omitted).

Here, Dr. Netz's method and choice for selecting SD as a benchmark meet the requirements for a reasonable benchmark. She considered products for which data were available and could be used as a proxy for PD in the but-for world, including Hill's various wellness products, which are non-prescription, non-therapeutic products. Ex. 28 ¶ 71. In her analysis, Netz considered a multitude of material[7] and concluded that SD in the actual world was the most reasonable proxy for PD in the but-for world. Ex. 28, ¶¶ 70-74; Ex. 29 ¶¶ 90-100.

Hill's criticizes Netz's selection of SD as a benchmark because of supposed "foundational" differences between SD and PD products, such as different nutritional profiles, research and development costs, costs of educating vets about the therapeutic benefits, and the vet's role in purchase decisions." Mot. at 9-12. At heart, Hill's criticisms focus on differences stemming from the "therapeutic benefits" that PD foods purportedly deliver, but that SD

---

[7] This included deposition testimony on product similarities (Ex. 29 ¶ 92 n.117-118); economics of the pet food market generally (Ex. 28 ¶¶ 22-38, 53-64); testimony by Hill's expert regarding the reasons consumers buy Prescription Diet (Ex. 29 ¶¶ 93-94); Hill's public marketing of PD and SD (Ex. 29 ¶ 93); and Hill's contemporaneous documents financial data for each pet food product line (Ex. 28 ¶ 74; Ex. 29 ¶¶ 95-100).

8

products do not. But these are differences in the *actual* world -- PD would not have those characteristics/functions in her single *but-for* world. As Dr. Netz explained, "An appropriate benchmark product is one that is similar to how the [PD] products would be sold without a prescription requirement or asserted therapeutic benefits." Ex. 28 ¶ 70; Ex. 29 ¶¶ 28, 101.

Hill's simply rejects the but-for world Dr. Netz has articulated. But Dr. Netz's but-for world – the world in which the alleged wrongful conduct does not occur – and her damages model based on that but-for world must match *Plaintiffs'* theory of liability. *See Comcast Inc. v. Behrend*, 569 U.S. 27 (2013). And in *that* but-for world, PD products would be sold as a non-therapeutic, non-prescription wellness products, like SD.[8] *Supra* at 3. As such, SD is a reasonable benchmark product.

Hill's also argues that Dr. Netz needed to use a benchmark for each PD *product*, not for PD product lines, because gross margins differ across products. But Dr. Netz used Hill's contemporaneous business documents to measure benchmark margins in the same manner as Hill's reports them (*e.g.*, Hill's tracks gross margins across all PD products sold nationwide to its resellers and does the same separately for all SD products). Ex. 29 ¶¶ 87, 120. This is a sound basis for using that benchmark and the resulting measures. And as Dr. Netz explained, "[w]hile gross margins do differ across products within a product line, using a quantity-weighted gross margin [as Dr. Netz did] does not ignore these differences. Indeed, it is directly taking them into account, by weighting more heavily the gross margin on products that sell the most." See Ex. 29 ¶ 124; see generally *id.* ¶¶ 124-127, citing Hill's supporting documents. She further addressed

---

[8] Indeed, Hill's explained in great detail why it requires and has always required a veterinary prescription for its purportedly therapeutic PD products. Opp. pp. 6-9. Absent that prescription, mandated by Hill's prescription requirement, Defendants could not market PD products as therapeutic products intended to treat sick pets. *Id.*

Hill's criticism that she did not take pricing variations into account.  Ex. 29 ¶¶ 38, 78-81, 133-134.  That there is not a one-on-one product match or may be some price variation does not make SD a benchmark product so unreliable as to bar Dr. Netz's opinion.

Hill's cases are distinguishable and do not call for barring Dr. Netz's opinions.  See *Loeffel Steel Prods., Inc.*, 387 F. Supp. 2d at 813 (excluding opinion where expert "admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability"); *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 208-09 (5th Cir. 2000) (expert's damages projections not based on a satisfactory yardstick of performance by different soccer arenas as closely comparable businesses where no evidence offered regarding geographical location, size or attractiveness of facilities, size and type of market served, relative costs of operation, amounts charged, or number years facilities were run); *Weiner v. Snapple Beverage Corp.*, No. 07-cv-8742, 2010 U.S. Dist. LEXIS 79647, at *20 (S.D.N.Y. Aug. 5, 2010) (finding expert's yardstick approach unreliable where plaintiffs relied solely on a "skeletal, four-page expert report" that did "not explain how his approach would isolate the impact of [the anti-competitive conduct] from the other factors that purportedly affect the price of [defendant's product] and its competitors."); *CDW LLC v. NETech Corp.*, No. 1:10-cv-00530-SEB-DML, 2014 U.S. Dist. LEXIS 8898, at **8-9 (S.D. Ind. Jan. 23, 2014) (methodology employed by the expert undermined by variations in office performance, lack of relevant similarities between offices, and the use of office average).

Here, in contrast, Dr. Netz has provided fulsome explanations of what she did, what she considered, how she came to her opinions, and explained why defendants' experts' criticisms were wrong.  *See Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 316 (S.D.N.Y. Apr. 21,

10

2015) (rejecting *Daubert* challenge to expert's yardstick analysis where plaintiffs' expert "proffer[ed] a number of bases upon which he builds his comparison," and "examined a number of underlying documents, including. . . relevant depositions and case documents"); *Andy Mohr Truck Ctr. v. Volvo Trucks N. Am.*, No. 1:12-cv-448, 2015 U.S. Dist. LEXIS 11560, at \*\*10-16 (S.D. Ind. Feb. 2, 2015) (expert sufficiently explained selection of eight heavy-duty truck Midwestern markets as yardsticks for Indianapolis heavy-duty truck market). Unlike in *Loeffel Steel*, Netz's benchmark choice is not so deficient that the "comparison is manifestly unreliable and cannot logically advance a material aspect of the proposing party's case." *Loeffel Steel Products, Inc.* 387 F. Supp. 2d at 812.

Hill's criticisms go to the weight, but not the admissibility, of Dr. Netz's opinions. In *Elorac, Inc.*, the court found that the defendant's objection concerning factors distinguishing a benchmark product from the at-issue product "goes to the weight of the expert's testimony, rather than its admissibility," and that scrutiny of data inputs is normally reserved for the jury. *Elorac, Inc.*, 2017 U.S. Dist. LEXIS 133449, at \*\*32-33, quoting *Manpower, Inc.*, 732 F.3d at 806. Because there was a "rational connection" between the comparable product data and the expert's damages opinion, the court did not bar the opinion. *Id.* at \*\*34-35.

The same is true here. Hill's has not established that SD products lack any "rational connection" to PD products in the but-for world, and thus Dr. Netz's use of SD as a benchmark provides no reason to exclude her testimony. Hill's is free to cross-examine Dr. Netz as to her opinion and point out differences between PD and SD, but that is a matter for the jury to consider. *See Elorac, Inc.*, 2017 U.S. Dist. LEXIS 133449, at \*35; *Suchanek v. Strum Foods, Inc.*, No. 11-CV-565, 2017 U.S. Dist. LEXIS 138016, at \*26 (N.D. Ill. Aug. 28, 2017) ("Defendants will have the opportunity to criticize [expert's] choice of comparables and the

11

variables she included in her methodology through '[v]igorous cross-examination…[and] presentation of contrary evidence.'" (quoting *Daubert*, 509 U.S. at 596)).

## IV. NEITHER DR. NETZ'S OPINIONS NOR PLAINTIFFS' THEORIES OF LIABILITY ARE IMPROPERLY BASED ON A "MARKET THEORY" OF CAUSATION AS HILL'S CONTENDS.

Hill's also argues that Dr. Netz's proffered model should be excluded because there is a "disconnect" between her model and plaintiffs' theory of liability. Mot. at 13-15. It argues that Dr. Netz's damages opinion is based on a "market theory" of causation, which is precluded for both ICFA deceptive practices and unfair practices claims. Mot. at 13-14. This is a *Comcast* argument and thus, is not an appropriate *Daubert* challenge. In any event, Hill's is wrong.

*Deceptive Practices*

Plaintiffs are not advancing a "market theory" of causation for their deceptive conduct claim. Hill's reliance on *Oliviera v. Amoco Oil Co.*, 201 Ill. 2d 134 (2002), is misplaced. In *Oliviera*, the plaintiff did not allege that he saw, heard, or read any of the allegedly deceptive ads, nor did he contend that he was actually deceived by the ads or that the ads induced him to purchase the at-issue product (gasoline). In contrast, here, evidence demonstrates that all purchasers of PD products were exposed to common deceptive conduct because Defendants' imposition and enforcement of the prescription requirement mandated that consumers obtain a prescription for every PD product. Pls.' Br. § I.B. In addition, named Plaintiffs were actually deceived by the alleged deceptive conduct and classwide evidence shows that the alleged deceptive conduct is likely to deceive reasonable consumers and material. *Id.* §§ I.A. & C.

Dr. Netz did not start with a presumption of market-wide prices or effects; instead, she concluded from an economic analysis of the facts reflected in the documents and data that the economic impact of either set of alleged wrongful conduct – higher prices for PD products – was

12

common across the market. Dr. Netz considered firm-level conduct and policies, including deposition testimony and Hill's data (Ex. 28 ¶ 52); Hill's firm-level marketing and selling pricing practices (*id.* ¶¶ 48-51); analysis of patterns and trends in Hill's pricing lists, sales, and P&L data (*id.* ¶¶ 83, 90-98); and the economics of the pet food market generally (*id.* ¶¶ 22-38 and 53-64). Based on her analysis of the evidence, she concluded that Defendants' alleged deceptive conduct resulted in an economic impact to the class, *i.e.,* higher prices for PD products.

The fact that Dr. Netz drew causal connections between the alleged deceptive conduct and resulting economic impact (*i.e.,* higher prices for PD products) does not mean that Plaintiffs are contending that every consumer who purchased a PD product during the class period is entitled to recover damages because they paid those higher prices – regardless of whether they were actually deceived by the alleged unfair conduct. To the contrary, Dr. Netz recognized that class members need to show that the deceptive conduct proximately caused their injuries, *i.e.,* that they were deceived in some manner by the alleged misrepresentations and omissions, but also that, using an overcharge rate and a classwide and subclasswide overcharge amount, her "classwide damages number can be adjusted for the share of purchases made by class members who were deceived." Ex. 29 ¶¶ 22-23; see *supra* at 5. That final adjustment (which can also be made for the subclass overcharge amount) can be made once it is determined which class members have a valid deception claim.

Hill's argues that the class cannot be "redefined to match Netz's model, because there is no way to identify through common proof which consumers were deceived and which were not." Mot. at 15. But individual determinations as to actual deception are to be made after the class is certified. *Suchanek v. Strum Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid

13

claim is the issue to be determined *after* the class is certified." (emphasis in original).[9] Hill's is wrong to suggest that no class can be certified until proof exists that every class member has been harmed or has a valid claim. *Suchanek*, 764 F.3d at 757.

Hill's further argues that the fact that the classwide overcharge amounts can be adjusted does not save Dr. Netz's analysis because that would require a class definition of "class members who were deceived," which would be an impermissible "fail safe" class. Mot. at 13-14. But again, Hill's has it wrong. Neither Plaintiffs' class nor the subclass is defined this way. And neither Plaintiffs nor Dr. Netz seek to identify a "smaller class" as Hill's argues – it is simply a matter of adjusting the classwide and subclasswide overcharge amounts post-certification once it is determined which class members have valid deception claims.

Thus, Dr. Netz has presented a reliable method of calculating classwide overcharge damages for class and subclass members with a valid deceptive conduct claim. She quantified the economic impact to consumers (the overcharge amounts) resulting from Defendants' deceptive conduct, a necessary part of calculating damages. That is helpful to the fact finder, even if she needs to adjust the overcharge amounts post-certification to complete her damages calculation. See *Morelock Enterprises v. Weyerhaeuser Co.*, No. CV 04-583-PA, 2004 U.S. Dist. LEXIS 28270, at *7 (D. Or. Dec. 16, 2004) (jury can determine liability notwithstanding that precise quantum of damages must still be determined in a subsequent phase).

*Unfair Practices Claim*

Illinois courts have not rejected a "market theory of causation" for an unfair practices claim under the ICFA. Hill's only cites *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018) ("*Schnuck Markets*") for that proposition. In that case, the court

---

[9] Hill's reference to Dr. Netz's personal pet situation and her purchase of PD products (Mot. at 1-2) is irrelevant. She is a California resident and not a class member.

14

affirmed dismissal at the pleadings stage because the plaintiffs "fail[ed] to allege an unfair practice under the ICFA because their theory is essentially a 'market theory of causation' argument that Illinois courts have rejected." *Schnuck Markets,* 887 F.3d at 823. But the court clarified that, while characterized as an "unfair practice" claim by the plaintiffs, they actually alleged a misrepresentation "that claims the consumer market as a whole was deceived" and the court addressed it as a deception claim. *Id.* at 824 n.11. Thus, the pleaded deception claim was controlled by *Oliviera*, and a market theory of causation was precluded.

In any event, Plaintiffs are not advancing a market theory of causation for their unfair practices claim. While Dr. Netz opines that common evidence shows that the alleged unfair conduct resulted in an economic impact to the class (*i.e*., higher prices for PD products), again, unlike in *Oliviera*, Plaintiffs do not contend that every purchaser of PD during the class period is entitled recover damages because they paid those higher prices – regardless of whether they were exposed to the alleged unfair conduct. To the contrary, Plaintiffs presented evidence that Hill's markets and sells *all* of its PD products as products intended for use in the treatment of disease despite the fact that no PD product is approved by the FDA and thus, all PD purchasers were exposed to the alleged unfair conduct. Pls.' Br. § I.D; Pls.' Reply in Supp. of its Mot. for Class Certification as to Hill's at 16-17. But, even if proximate cause for the unfair practices claim were found to be an individual issue for which each consumer must present individual causation evidence, Dr. Netz can similarly adjust the class and subclass overcharge amounts once it is determined, post-certification, which class members have valid unfair practices claims.

V.   **CONCLUSION**

Accordingly, for the foregoing reasons, Plaintiffs respectfully request that this Court deny Hill's Motion to Exclude the Opinions and Testimony of Dr. Netz.

15

Dated: April 26, 2023                                             Respectfully submitted,

                                                        By:  */s/ Ellen M. Carey*
                                                              One of Plaintiffs' Attorneys

| | |
|---|---|
| Ellen M. Carey | Michael P. Morrill |
| Brian P. O'Meara | Pope McGlamry, P.C. |
| Forde & O'Meara LLP | 1200 6th Avenue |
| 191 North Wacker Drive, 31st Floor | Columbus, GA 31901 |
| Chicago IL 60606 | (706) 324-0050 |
| (312) 641-1441 | mikemorrill@pmkm.com |
| bomeara@fordellp.com | |
| ecarey@fordellp.com | |

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **PLAINTIFFS' RESPONSE IN OPPOSITION TO HILL'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. JANET NETZ** was filed electronically with the Clerk of the Court using the CM/ECF system this 26th day of April, 2023, and served electronically on all counsel of record.

                                                              *s/ Ellen M. Carey*

16