UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HOLLY BLAINE VANZANT, and SHERRY NEVIUS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:17-cv-02535 |
| | Hon. Jorge L. Alonso |
| v. | Hon. Jeffrey Cole |
| HILL'S PET NUTRITION, INC., and PETSMART LLC, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO PARTIALLY EXCLUDE DEFENDANTS' PROFFERED SURVEY EXPERT SARAH BUTLER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    The Survey failed to approximate real-world conditions or expose respondents to the wrongful conduct at issue ................................................................................... 2

        A.    Defendants concede that the Survey fails to address that a veterinarian's prescription is required to purchase PD ..................................................... 3

        B.    The Survey scenarios conceal the term "prescription" and the prescription-restricted sales process. .................................................................................. 4

        C.    The disclaimer makes no sense because respondents were not informed about the prescription-restricted sales process ................................................... 6

        D.    The prescription requirement predominates veterinary-consumer interactions ... 7

    II.    The Survey is also unreliable because it did not account for respondents' income levels ................................................................................................................... 9

CONCLUSION ............................................................................................................................. 13

**TABLE OF AUTHORITIES**

**Cases**

*Dyson, Inc. v. Bissell Homecare, Inc* ................................................................................................4

*Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007) .........................3

*Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014) ............................................2

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 783 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir.2007) ........................................................................................4

*Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018), *aff'd*, 926 F.3d 409 (7th Cir. 2019)..................................................................................................................12

*Zarinef v. Champion Petfoods USA Inc., No. 18 C 6952 (N.D. Ill. Mar. 29, 2022* .......................2

**INTRODUCTION**

Plaintiffs contend that the entire process through which Defendant Hill's Pet Nutrition, Inc.'s ("Hill's") Prescription Diet ("PD") is marketed, labeled, sold, and restricted for sale only to consumers with a veterinarian's prescription – through Hill's self-imposed and enforced prescription requirement – deceives consumers into believing that PD is a prescription product that contains drugs or medicine necessary for the health of their sick pets. Defendants rely on one of Ms. Butler's surveys – the Purchase Intention Survey (the "Survey") – to proffer an opinion that changing PD labels to add a disclaimer explaining that "no prescription is required for purchase" and that the product "does not contain drugs or medicine" allegedly does not impact consumers' willingness to purchase PD and that the labels are purportedly immaterial. But the Survey considered only a single aspect of the deceptive conduct: PD's labels.[1] The Survey stripped away the real-world context of prescription-restricted PD sales, where a consumer must obtain a veterinary prescription to purchase a product called *Prescription* Diet that a veterinarian prescribes for a sick pet. The Survey fails to identify the product by name (until the label is presented), simply calling it an undefined "therapeutic" diet, and using the term "recommend" in lieu of "prescription" or "prescribe." The Survey further fails to explain what the term "therapeutic" is intended to mean. In this artificial Survey scenario, where a consumer is not initially told the name of the product, that a veterinarian is *prescribing* it to treat a sick pet, that a *prescription* is required for purchase, or that PD cannot be purchased without such a veterinary prescription, the Survey's disclaimer makes no sense. The disclaimer would be pertinent only if the respondents were first exposed to the alleged wrongful conduct, but the scenario carefully omits explaining what occurs in the real

---

[1] As Defendants tacitly acknowledge, Ms. Butler's Customer Survey further undermines the challenged Survey, since more than half of actual PD purchasers made their PD purchase decision before reviewing the packaging. (Opp. 9).

1

world, where veterinarians must prescribe (or formally authorize) Prescription Diet.

The Survey suffers another fatal flaw. Ms. Butler purports to measure consumers' willingness to purchase PD—an expensive product—without collecting any data on respondents' income levels to ensure that respondents were from the correct universe, representing potential PD purchasers, let alone attempting to ensure that income levels were evenly distributed among test and control groups. Because Ms. Butler ignored respondents' income levels and because consumers taking surveys skew towards lower income levels, the Survey does not reliably measure the impact of labeling on a consumer's willingness to purchase PD, as opposed to some other variable such as income or socioeconomic status. This flaw further compounds the unreliability of the Survey's methodology, rendering it unhelpful, and warranting exclusion.

## ARGUMENT

### I. The Survey failed to approximate real-world conditions or expose respondents to the wrongful conduct at issue.

Under *Daubert*, trial courts, acting as the gatekeeper, admit expert evidence only if (1) the expert is qualified, (2) her methodology or reasoning is reliable, and (3) her testimony will assist the trier of fact to understand the evidence or determine a fact in dispute. *See Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014). Defendants have failed to satisfy their burden of demonstrating that Ms. Butler's Survey methodology and reasoning are reliable and that her opinions will be helpful. *See Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *2 (N.D. Ill. Mar. 29, 2022). Here, Ms. Butler's Survey wholly failed to account for the real-world scenario in which PD purchases occur, intentionally omitted key challenged conduct, leaving respondents unaware that PD is sold only pursuant to veterinary prescription or authorization like prescription drugs, which rendered its purported disclaimer largely irrelevant. Additionally, Ms. Butler failed to ensure that the Survey polled a proper universe of respondents

2

– those who could afford the premium priced PD products. The Survey's methodology was unreliable, and its results thus have no bearing on the materiality of Defendants' challenged conduct and are unhelpful. Survey evidence that fails to comply with the principles of professional survey research is not admissible. *See Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007). By failing to test the real-world sales process for PD and failing to select (and control for) the proper universe of respondents, Ms. Butler's Survey failed to accord with these principles, utilized unreliable methodology, and is inadmissible.

## A. Defendants concede that the Survey fails to address that a veterinarian's prescription is required to purchase PD.

Defendants do not dispute that the Survey fails to test the impact of the prescription requirement on consumers' willingness to purchase PD. In fact, "[t]he primary purpose of the [Survey] was to test [at most] Plaintiffs' allegations that 'the at-issue *labeling* [] affects[s]' purchase behavior." (Opp. (Doc. 307) 9 (emphasis added)). But Plaintiffs' claims are based on deception through the entire real-world PD marketing and sales process, not just the PD label (which a majority of consumers do not review prior to purchase). The prescription required to purchase PD products, mandated by Hill's, deceives consumers into believing that the PD product prescribed to treat their sick pet contains a drug or medicine and is a prescription product, legally required to be sold only by prescription. (*See* SAC (Doc. 136) ¶¶ 36, 61, 73, 74). As Plaintiffs explained, "[I] assumed that the vet would not need to prescribe something if it didn't have a medication involved[,]" (PCC Ex. 1 112:15-16),[2] and "[m]y understanding was that there was some sort of regulated ingredient in the food, be it a medication, a drug, something that is regulated, that PetSmart was not allowed to sell without a veterinary prescription." (*Id.* 127:14-18). In

---

[2] Citations to "HOCC Ex." refer to the exhibits attached to Defendant Hill's Opposition to Plaintiffs' Motion for Class Certification filed March 20, 2023. Citations to "PCC Ex." refer to the exhibits attached to Plaintiffs' Motion for Class Certification filed January 20, 2023.

3

addition, "it says right on the label, Prescription required. So based on that, I assumed as a consumer that it had medication in it because it requires a veterinarian prescription. You can't just buy it over the counter. So I assumed it had medication in it." (PCC Ex. 4 154: 13-20).

"A survey that fails to adequately replicate market conditions is entitled to little weight, if any." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 452 F. Supp. 2d 772, 783 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007). As Plaintiffs' survey expert Dr. Reed-Arthurs explained, the scenarios in Ms. Butler's challenged Purchase Intention Survey wholly failed to communicate the prescription-restricted manner in which Hill's PD must be purchased. In the real world, PD products are only available from a veterinarian or with a veterinarian's explicit prescription/authorization. (PCC Ex. 20 ¶¶ 10, 86). But this key information appears nowhere in the scenarios presented to the Survey respondents. This omission is a fundamental failing since the test scenario fails to address key contentions about the Defendants' deceptive and unfair conduct. (*Id.*). The Survey scenarios further lack external validity because they do not adequately replicate the real-world experiences of consumers purchasing PD. (*See id.*).

### B. The Survey scenarios conceal the term "prescription" and the prescription-restricted sales process.

Not only does the Survey fail to test the effect of the prescription requirement on a consumer's willingness to purchase PD, its scenarios actively conceal the prescription requirement and its implications from respondents. The Survey's scenarios fail to call the prescribed product by its actual trademarked brand name, "*Prescription* Diet." (*See* PCC Ex. 20 ¶¶ 85-86). They further fail to explain that a veterinarian's prescription or express authorization is required to purchase the "therapeutic" diet,[3] suggesting to respondents that they can simply pick out an

---

[3] Ms. Butler's use of the undefined term "therapeutic" was not harmless error. Defendants cite *Dyson, Inc. v. Bissell Homecare, Inc.*, to argue that the "precise definition" of a survey term is not required where there is no "evidence suggesting that Participants did not understand the term."

4

unnamed "therapeutic" pet food over the counter, directly off the shelf, from any store. The scenarios fail even to note the veterinarian's *prescription* of pain medication/antibiotics, also calling these products a "recommendation," and further obfuscating what consumers experience in PD purchases in the real world.[4] (*Id.* ¶ 86). And Ms. Butler's Survey did not explain that this so-called "therapeutic diet" can be purchased only at veterinary clinics or retail stores only by consumers with a veterinary prescription.

Defendants contend that using the term "prescription" – apparently even in accurately naming the recommended product – would be improper "priming" in the context of a survey, despite the actual name of PD and Hill's mandate that veterinarians provide formal authorization or prescriptions for all real-world sales. First, using the term "prescription" would not have

---

951 F. Supp. 2d 1009, 1019 (N.D. Ill. 2013). But in *Dyson*, the purpose of the survey was not to test consumers' understanding of the undefined term or the process it required. *Id.* By contrast, here the so-called "therapeutic" food's brand name "*Prescription* Diet" and the prescription-restricted sales process is at the heart of the case. Using the undefined term "therapeutic" to avoid the term "prescription" substantially undermines the Survey's relevance and reliability. Even Ms. Butler's Veterinary Survey explains that "therapeutic pet food" refers to pet food requiring a veterinary authorization. (PCC Ex. 20 ¶ 22). That explanation would have revealed challenged conduct that Defendants concealed from Survey respondents.

[4] Defendants contend that Plaintiffs fail to acknowledge the scenarios' use of the term "recommend." (Opp. 10, n.4). The point here is not that Defendants use the terms "recommend" and "prescribe" synonymously to describe their prescription requirement, (*see, e.g.,* PCC Mem. (DE 250) 4, n.1), but that the term "prescription," even as part of the PD name, or any description of Hill's restricted PD sales process, is not provided in Ms. Butler's Survey scenarios. (*See* PCC Ex. 20 ¶¶ 85-86). Hill's "Science Diet" ("SD") products, which do not require a prescription to purchase, are also routinely recommended by veterinarians and actually say "Veterinarian Recommended" on their labels. (*See, e.g.,* Hill's Science Diet website at https://www.hillspet.com/science-diet?cq_src=google_ads&cq_cmp=9995673795&cq_con=101673606940&cq_term=science%20diet&cq_med=&cq_plac=&cq_net=g&cq_plt=gp&gad=1&gclid=CjwKCAjw-b-kBhB-EiwA4fvKrI2gu1dRrQNO_dMA4IQj7nIsGiHLEr_tgBLGc14Munq5Vju-krtv7hoCPc4QAvD_BwE&gclsrc=aw.ds.) While a veterinarian may recommend an over-the-counter product like SD or prescription-restricted product like PD (or any other pet food product), the vast majority of purchasers of PD are either told they need a veterinarian's prescription or authorization or are provided with a prescription for PD. *See infra* at 7-9. As such, real world PD purchasers experience the prescription-restricted process at the heart of this case. Yet Ms. Butler deliberately concealed that process from Survey respondents.

5

improperly primed respondents. As Defendants note, "[p]riming can become a source of bias . . . when a survey makes certain mental content more or less salient in people's thinking *than plausibly occurs in the relevant real-world context*." (Opp. 11 (emphasis added)). Here, however, the term "prescription" is ubiquitous in the relevant real-world context. Consumers cannot purchase *Prescription* Diet without obtaining a *prescription* from a veterinarian, so their exposure to the term "prescription" in the context of PD food is not limited to the PD name on a product label. Defendants' priming argument only underscores a central flaw in the Survey—that it isolated the labeling of PD from the broader context in which the product exists and is marketed and sold in the real world. By doing so, it produced artificial results that are not relevant to this dispute. The Survey thus fails to replicate real-world purchase transactions and should be excluded.

### C. The disclaimer makes no sense because respondents were not informed about the prescription-restricted sales process.

The failure to provide relevant information about the real-world purchase experience further renders the disclaimer: "Contains no drugs. No law requires a prescription for this product" non-sensical. (*Id.* ¶ 21). Nothing in the Survey told respondents that a prescription or veterinary authorization is a mandatory prerequisite for purchasing PD or that PD is sold pursuant to a restricted process that parallels prescription drug sales. Thus, when the Survey's "no prescription, no medicine" disclaimer was shown to the control group, respondents did not know that PD is restricted for sale to only those with a veterinary prescription; they had not been exposed to the wrongful conduct such that the disclaimer had any salience. At best, the Survey supports an opinion that the purchase intentions of respondents who did not know that PD is sold via a prescription-restricted process are, unsurprisingly, unaltered by disclaimers that no prescription is required, and the product contains no medicine. Such an opinion has no impact on materiality in the real world and should not be admitted to attempt to challenge Plaintiffs' materiality opinions

or Dr. Reed-Arthur's opinions that a substantial percentage of consumers are likely deceived by the manner in which PD products are sold.

### D. The prescription requirement predominates veterinary-consumer interactions.

Defendants contend that the prescription requirement could not be addressed by the Survey because vets may say different things to different consumers, and that, purportedly, "there is no evidence that vets regularly tell pet parents that an authorization is necessary." (Opp. 10). They are wrong. Indeed, Ms. Butler's Veterinary and Customer Survey data supports that veterinarians use the term "prescription" and provide written prescriptions to their pet parents. (*See* PCC Ex. 20 ¶¶ 112-13 (noting that nearly four times as many vets answered an open-ended question about how they authorize PD purchases by using the term "prescription" than using the question's "veterinary authorization" language). Further, in her Customer Survey, 50% of actual purchasers reported that they made their first PD purchase specifically because a veterinarian had *prescribed* PD. (PCC Ex. 20 ¶¶ 142-45 (noting that 30% of respondents selected that their first purchase had been due to both veterinary prescription and recommendation, and 20% had been due to veterinary prescription)).[5]

Defendants further surmise that some pet parents buy PD from their veterinarians, who may not tell them about the required prescription or provide a written copy and could theoretically simply note an "authorization" in the chart. But Ms. Butler's Veterinarian Survey carefully avoided asking respondents what percentage of consumers purchase prescription-restricted pet food from their veterinary clinics. (*Id.* ¶ 114). Further, contrary to standard survey construction, the "do you

---

[5] Defendants fail to acknowledge this substantial percentage of consumers who answered a multiple-choice question utilizing the term "prescription," despite that four of the eleven potential responses used the word "recommended" or "recommendation," while only one response used the word "prescribed." (PCC Ex. 20 ¶ 144). Instead, Defendants misleadingly cite only open-ended responses to purportedly support a much lower number of "prescription" responses. (Opp. 11).

7

provide a written authorization" questions of her Veterinary Survey required veterinarians to choose only one response; vets could not respond that they both chart the prescription authorization and provide a written copy. (PCC Ex. 20 ¶¶ 109-17). Further, few PD purchases occur at vet clinics: 64% of initial PD purchases were *not* at a vet clinic, and 80% of actual purchasers do not typically purchase food from their vets. (*Id.* ¶ 114). Thus, the overwhelming majority of PD purchases required the presentation and validation of a veterinarian's written prescription or formal authorization.

Further, for a consumer to obtain a "refill" or make additional PD purchases, a vet must explain that the sale of PD is controlled by Hill's prescription requirement, such that additional purchases must occur either at the prescribing veterinarian's clinic or from an authorized retailer with a verified prescription or authorization. This process approximates the controlled sale of drugs for human use, reinforcing to consumers that PD is a prescription product containing medicine or drugs. A vet could disaffirm this consumer perception only by expressly stating there is no drug or medicine in the food or that PD is not an actual prescription product. Ms. Butler's Veterinary Survey evidence shows, however, that some veterinarians, indeed 23.4% of those asked by pet parents whether PD contains medicine, answer affirmatively that PD does contain medicine or drugs. (PCC Ex. 20 ¶¶ 105-08). And some surveyed veterinarians admitted that they recommend PD because of a profit motive. (*Id.* ¶ 101 (noting that, despite social desirability bias, which causes under-reporting of perceived negative responses, 16.4% of veterinarians admitted to a financial incentive in prescribing PD)). Thus, some vets give incorrect information even when asked directly about medicine in PD, and they are financially disincentivized from disclosing that PD does not contain a drug or medicine or is sold pursuant to a fake "prescription." Finally, Ms. Butler's

8

Veterinary Survey confirms that most vets in fact use the "prescription" vs. "OTC" terminology in discussing PD, to distinguish it from unrestricted, store-bought pet food. (*Id.* ¶¶ 22-28).

Regardless of the precise words a veterinarian uses or where PD is purchased, one fact common to all PD purchases remains: consumers cannot obtain a PD product without a veterinary prescription or authorization. (PCC Ex. 6 at 42, 49 (admitting that Hill's follows a prescription business model and that it requires a veterinarian's prescription as a prerequisite to the purchase of its PD products)). The Survey could have easily disclosed this fact to respondents, and its failure to do so demonstrated an utter failure to replicate real-world purchase experiences and eliminated any salience of the Survey's disclaimer.[6]

In sum, the Survey does not reveal substantial portions of the Defendants' challenged conduct, fails to replicate – or even acknowledge – real-world restricted sales conditions, and thus is not relevant to the materiality of Defendants' conduct.

**II. The Survey is also unreliable because it did not account for respondents' income levels.**

Finally, Defendants do not dispute that Ms. Butler failed to ensure that respondents had sufficient income to afford to purchase a premium-priced pet food or that income levels were appropriately distributed among control and test groups. Defendants protest that "there is no good reason why Butler should have screened for this factor[.]" (Opp. 3). Yet, the Survey was expressly designed to evaluate "*purchase* intention" and "consumers' willingness to *purchase*" PD, an expensive, high-end product. (*See* HOCC Ex. I ¶¶ 77, 80 (emphasis added); PCC Ex. 28 ¶ 59

---

[6] Plaintiffs did not, as Defendants contend, argue that the Survey was invalid because it included prospective purchasers of prescription pet food. Rather, Plaintiffs pointed out the Survey's exclusion of actual purchasers of prescription pet food whose answers to screening questions indicated that they had purchased prescription pet food based on a veterinarian's prescription, authorization, or recommendation. (Mot. 6-7). Thus, the Survey excluded respondents who demonstrated experience with the Defendants' challenged conduct through the real-world process of controlled PD purchases, demonstrating intrinsic flaws from the outset.

9

("Prescription Diet prices are higher than prices of all other Hill's product lines regardless of year, distribution channel, species (cat or dog), product form (dry or wet) or size group.")).

To reliably measure the impact of labeling on consumers' willingness to purchase this expensive product, at a minimum, Ms. Butler needed to select a universe of respondents who could afford the product. Otherwise, respondents might feel constrained by their income levels and base their willingness to purchase the product on affordability, rather than labeling. That is exactly what happened here. Survey respondents were shown the following prices: "Dog k/d '$78.99 for 17.6 lb. bag,' Dog c/d Multicare '$75.99 for 17.6 lb. bag,' Cat k/d '$60.99 for 8.5 lb. bag,' and Cat c/d Multicare '$88.99 for 17.6 lb. bag.'" (HOCC Ex. I at 63, n.83). When asked what factor determined their willingness or unwillingness to purchase the product, many respondents indicated they were unwilling to purchase PD because the price exceeded their budget or income. For example, respondents stated:

- "I'm on a fixed income. couldnt [sic] afford it." (Respondent 2050)

- "The cost of the food would not be possible for me, especially with current economic issues." (Respondent 344)

- "They got me messed up if they think I'm spending $60 on a little 8 lb bag of cat food." (Respondent 550)

- "I'm not sure I could afford this for my dog." (Respondent 552)

- "The proce [sic] for the bag is way out of my budget." (Respondent 647)

- "It is extremely expensive and I could never afford to buy this." (Respondent 700)

- "I would do what I can to improve and lengthen the lives of my cats. but at our current economy I can barley [sic] afford to put food on the table for my family and prescription meds, nor can I afford health insurance. So at roughly $7.00 lb is like feeding them ribeye instead of a more affordable healthy option." (Respondent 181)

10

- "That is a lot of money and money is very tight right now. If I could afford it I would." (Respondent 1076)

- "That is 10 times what I now pay (and can afford to pay) for a bag of cat food. OUTRAGEOUS!" (Respondent 1126)

- "I don't have that kind of money." (Respondent 1984)

- "Unfortunately I'm on a very strict budget and cannot afford to buy this food." (Respondent 1773)

- "Way, way, way too expensive." (Respondent 292)

- "89 is a big chunk of my fixed income. I would purchase a smaller bag if it was available." (Respondent 1948)

- "Very expensive for only 17.5 lbs." (Respondent 321)

- "its freaking expensive." (Respondent 326)

- "price is insane." (Respondent 369)

- "Way too expensive and I am sure I could get a similar product for a much lesser price." (Respondent 442)

- "The price is very high. I get food for $20 dollars cheaper." (Respondent 473)

- "The price seems too high just for pet food." (Respondent 243)

(HOCC Ex. I, ex. C.3). This sample of respondents' many cost-related answers disproves Defendants' contention that there is no evidence that income levels are tied to how a pet parent responds to different labels or to a pet parent's willingness to purchase PD to help her sick pet. (Opp. 3). This confirms Dr. Reed-Arthurs' opinion that "[t]o the extent that income affects a respondent's willingness or ability to purchase a prescription pet food as opposed to a lower cost over-the-counter pet food, Ms. Butler's Purchase Intention Survey may not be representative of

11

the population she intends to survey (i.e., actual or potential purchasers of therapeutic pet foods)" because internet survey participants skew towards lower income levels. (PCC Ex. 20 ¶ 71).[7]

Even Ms. Butler admitted that "[r]espondents who indicated that they would not be likely to purchase the product also provided a range of reasons, *with most stating that the price was a deterrent*." (HOCC Ex. I ¶ 155) (emphasis added). Income level clearly influenced respondents' Survey answers, and Ms. Butler's failure to select a universe of respondents with appropriate income levels renders the Survey unreliable. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018), *aff'd*, 926 F.3d 409 (7th Cir. 2019) (citations omitted) (selecting the right universe of respondents significantly affects a consumer survey's probative value, and an erroneous universe diminishes reliability).

Defendants speculate that assuming respondents "had income levels atypical of the average PD consumer, they would have been randomly sorted into test and control groups, thus neutralizing any potential for bias." (Opp. 3). Ms. Butler did not direct Veridata Insights to perform testing with respect to income levels, as she did with other variables such as gender, age, and region, and she did not collect any data on the respondents' income. (PCC Ex. 20 at 31, n.97). She did not even confirm whether the 303 out of 600 respondents who had never purchased prescription pet food before were evenly distributed amongst her three test groups. (*See* Opp 15). Thus, it is impossible to know whether income levels were in fact representative of the population at large, or of consumers who would consider purchasing PD, much less appropriately distributed among the Survey's test and control groups. Defendants' protestation as to purported "randomization across groups" cannot render her sample representative of a group that was not included or was under-sampled in her survey. (*See* PCC Ex. 20 at 32, n. 100).

---

[7] That is also why Dr. Reed-Arthurs, in contrast, gathered income data and ensured that her respondent pool was representative of the U.S. population in terms of income. (*See id.*).

12

Given that the Survey was designed to evaluate consumers' willingness to purchase an expensive product, and given the ubiquitous cost concerns among Survey responses, Ms. Butler's decision to blatantly ignore income levels in selecting respondents renders her Survey unreliable. The Survey and her opinions derived therefrom should be excluded.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Motion, Ms. Butler's Survey and opinions derived therefrom should be excluded as irrelevant, non-probative, and unhelpful under *Daubert*.

Dated: June 19, 2023          Respectfully submitted,

         BY:
         Luke C. Tompkins (*pro hac vice*)
         One of Plaintiffs' Attorneys

Luke C. Tompkins
For the Firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC 27636-3009
Telephone 919.277.9100
Facsimile: 919.277.9177
lctompkins@wardandsmith.com

Ellen M. Carey
Brian P. O'Meara
FORDE & O'MEARA LLP
191 North Wacker Drive, 31st Floor
Chicago, IL 60606
Tel: (312) 399-2377
ecarey@fordellp.com
bomerara@fordellp.com

Michael L. McGlamry
POPE MCGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, Georgia 30326
Tel: (404) 523-7706
mmcglamry@pmkm.com

13

Michael P. Morrill
POPE MCGLAMRY, P.C.
1200 6th Avenue
Columbus, Georgia 31901
Tel: (760) 324-0050
mikemorrill@pmkm.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **Plaintiffs' Reply in Support of their Motion to Partially Exclude Defendants' Proffered Survey Expert Sarah Butler** was filed electronically with the Clerk of the Court using the CM/ECF systems this 19th day of June, 2023, and served electronically on all counsel of record.

Luke C. Tompkins (*pro hac vice*)

ND:4856-7586-5707, v. 1