**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HOLLY BLAINE VANZANT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 17 C 2535 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| HILL'S PET NUTRITION INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons that follow, Plaintiff's Motion for Class Certification [249] is granted in

part and denied in part.

**I.     BACKGROUND**

Plaintiffs filed a second-amended complaint, in which they assert two claims against

Defendant Hill's Pet Nutrition, Inc. ("Hill's") and two claims against Defendant PetSmart, Inc.

("PetSmart").[1] They assert these claims on their own behalf and on behalf of:

> (1) a statewide Class of all similarly situated Illinois residents who purchased
> Prescription Pet Food from any retailer (including any veterinarian or
> veterinary clinic) in Illinois (the "Class"); and (2) a statewide subclass of all
> similarly situated Illinois residents who purchased Prescription Pet Food from
> PetSmart in stores or online through PetSmart.com, Pet360.com, or any other
> website operated or controlled by PetSmart (the "PetSmart Subclass").

---

[1] The Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).
Plaintiff has alleged that there are "hundreds, if not thousands," of class members (2d Am.
Compl. ¶ 80) and that the amount in controversy exceeds $5,000,000.00 (2d Am. Compl. ¶ 6).
Plaintiffs are citizens of Illinois (Notice of Removal ¶ 13, ECF No. 1), Defendant Hill's is a
citizen of Delaware (its State of incorporation) and Kansas (the location of its principal place of
business) (2d Am. Compl. ¶ 4), and Defendant PetSmart is a citizen of Delaware (its State of
incorporation) and Arizona (the location of its principal place of business) (2d Am. Compl. ¶ 5).
Thus, at least one plaintiff is "a citizen of a State different from any defendant." 28 U.S.C. §
1332(d)(2)(A).

1

(2d Am. Compl. ¶ 78.) In Count I, Plaintiffs assert a claim for violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") against Hill's, and in Count III, Plaintiffs assert a claim in the alternative against Hill's for restitution/unjust enrichment. In Count II, Plaintiff Vanzant asserts a claim for violation of the ICFA against PetSmart, and in Count IV, Plaintiff Vanzant asserts a claim in the alternative against PetSmart for restitution/unjust enrichment.

At the heart of Plaintiffs claims is the undisputed fact that Defendant Hill's restricts the sale of Prescription Diet ("PD") pet food to those with a prescription from a veterinarian—a requirement that Defendant PetSmart enforces through the use of a "MedCard." Plaintiffs assert deceptive practices claims, which allege that PD is not legally required to be sold by prescription, and so Defendants' representations that PD is required to be sold by prescription are literally false. (2d Am. Compl. ¶ 32.) Plaintiffs further allege that Defendants engaged in deception in the manufacturing, distributing, marketing, advertising, labeling, and/or selling of PD at above-market prices to diagnose, cure, mitigate, treat, or prevent diseases or other conditions, even though PD: (a) does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food; (b) does not contain a substance medically necessary to the health of the pet for which it was prescribed; and/or (c) is not materially different than non-prescription pet food. (2d Am. Compl. ¶¶ 32-37.)

Plaintiffs also assert unfair practices claims, alleging that Defendants manufactured, marketed, labeled, and/or sold PD at above-market prices to diagnose, cure, mitigate, treat, or prevent diseases in animals without approval as a "new animal drug" pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FD&C Act"), and without being registered and listed as a "drug" with the Food and Drug Administration ("FDA"). (2d Am. Compl. ¶¶ 38-45.) As a result, PD is allegedly adulterated and misbranded under the FD&C Act

and its introduction into interstate commerce is a prohibited act. (2d Am. Compl. ¶¶ 43, 45.) Per Plaintiffs, reasonable consumers expected, but did not receive, a substance that: (a) is legally required to be sold by prescription; (b) contains a drug, medicine or other ingredient that is not common in non-prescription pet food; (c) is medically necessary to the health of the pet for which it was prescribed; (d) has been evaluated and approved by the FDA as a drug; and/or (e) as to which Hill's representations regarding intended uses and effects have been evaluated by the FDA. (2d Am. Compl. ¶ 59.) Consequently, Plaintiffs Defendants' conduct allegedly offends public policy, is immoral, unethical, oppressive, or unscrupulous, and has caused substantial harm to consumers. (2d Am. Compl. ¶¶ 57-60.)

Plaintiff Vanzant alleges she first purchased Hill's PD c/d Multicare Feline Bladder Health cat food in Illinois for her cat, Tarik, on February 13, 2013. (2d Am. Compl. ¶ 66.) On January 24, 2013, Tarik underwent emergency surgery for bladder stones at Blue Pearl Vet Hospital in Skokie, Illinois. At a follow up appointment on or about February 13, 2013, the veterinarian at Blue Pearl Vet Hospital, Dr. Jean Frazho, wrote a prescription for Hill's PD c/d Multicare Feline Bladder Health cat food for Tarik. (2d Am. Compl. ¶ 63.) That same day, Vanzant went to PetSmart to purchase the prescribed Hill's pet food, and in the process, was required to transfer the prescription from Blue Pearl Vet Hospital to Banfield Pet Hospital, which provided Vanzant with a pet prescription card containing her cat's name, RX # and RX date. (2d Am. Compl. ¶¶ 64-65.) Vanzant continued to purchase the same pet food at PetSmart for approximately the next three years, and each time she was required to show the prescription card she had obtained from Banfield Pet Hospital to the cashier at PetSmart. (2d Am. Compl. ¶ 66.)

Plaintiff Nevius alleges she first purchased Hill's PD i/d Digestive Care dry dog food in Illinois for her dog, Moose, on June 1, 2019. (2d Am. Compl. ¶ 69.) Moose's veterinarian at

Kruger Animal Hospital prescribed Hill's PD i/d Digestive Care dry food for Moose's gastrointestinal issues. Nevius was told by her veterinarian that the PD i/d Digestive Care required a prescription to purchase. (2d Am. Compl. ¶ 68.) Nevius understood the prescription requirement to indicate that the food contained medicine and was subject to the controls associated with prescription drugs. (2d Am. Compl. ¶ 68.) On or about January 3, 2020, Moose's veterinarian at Kruger Animal Hospital prescribed Hill's PD i/d Digestive Care wet food for Moose's gastrointestinal issues, which Nevius purchased and fed to Moose. (2d Am. Compl. ¶ 71.) Plaintiffs allege that they would not have purchased PD absent Defendants' deceptive conduct and unfair practices, including the prescription requirement. (2d Am. Compl. ¶ 76.)

## II.    DISCUSSION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). "A class action may be maintained if Rule 23(a) is satisfied and" if the case falls within at least one of the categories outlined in Rule 23(b). Fed. R. Civ. P. 23(b); *see also Wal-Mart Stores*, 564 U.S. at 345. Rule 23(a) allows "[o]ne or more members of a class" to "sue or be sued as representative parties on behalf of all class members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) allows class certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(c)(1)(A) requires that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A).

To support a motion for class certification, a "party seeking class certification must affirmatively demonstrate [her] compliance with the Rule—that is, [s]he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350. Thus, the "party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir 2015). A court considering a motion for class certification must engage in "a rigorous analysis" that "will frequently" overlap with the merits, because the considerations "are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (citations omitted).

Plaintiffs seek to certify:

> (1) a statewide Class of all similarly situated Illinois residents who purchased Prescription Pet Food from any retailer (including any veterinarian or veterinary clinic) in Illinois . . . ; and (2) a statewide subclass of all similarly situated Illinois residents who purchased Prescription Pet Food from PetSmart in stores or online through PetSmart.com, Pet360.com, or any other website operated or controlled by PetSmart[.]

(2d Am. Compl. ¶ 78.) Excluded from the definition are: (a) Defendants, their legal representatives, officers, directors, assigns, and successors; (b) Judges to whom this case is

assigned and their staffs; (c) the attorneys involved in this matter; and (d) all persons or entities that purchased PD pet food for resale. (2d Am. Compl. ¶ 79.)

### 1. Numerosity

"The crux of the numerosity requirement is not the number of interested persons per se, but the practicality of their joinder into a single suit." *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 663 (N.D. Ill. 1996). Here, Plaintiffs allege that there are "hundreds, if not thousands," of class members (2d Am. Compl. ¶ 80) and has submitted sales data showing that there were thousands of PD purchasers throughout Illinois during the class period. Defendants do not contest numerosity. Accordingly, the Court concludes that joinder would be impracticable and the numerosity requirement is met.

### 2. Typicality, Adequacy, and Standing

Rule 23(a)'s requirement that "the representative parties will fairly and adequately protect the interests of the class," has two components: the adequacy of the named plaintiffs and the adequacy of proposed class counsel. *See Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011) (citations omitted). The adequacy of proposed class counsel has not been challenged.

Hill's argues that the named Plaintiffs are inadequate and atypical because they lack standing to sue regarding the dozens of PD products that they never purchased. Article III limits federal court jurisdiction to cases or controversies in which the plaintiff has suffered an injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.").

The complaint alleges that Vanzant and Nevius purchased only two PD foods: c/d Multicare Feline and i/d Canine. Hill's points to cases finding that class action plaintiffs lack standing to sue where they have no injury-in-fact caused by products that they did not buy, particularly where "the purchased products [had] different formulations than the unpurchased products." *Flaherty v. Clinique Labs. LLC*, 2021 WL 5299773, at *3-5 (N.D. Ill. Nov. 15, 2021) (plaintiff lacked standing for unpurchased products); *see also Bakopoulos v. Mars Petcare US, Inc.*, 2021 WL 2915215, at *3 (N.D. Ill. July 12, 2021); *Willard v. Tropicana Mfg. Co.*, 577 F. Supp. 3d 814, 823 (N.D. Ill. 2021). Hill's contends that Plaintiffs are also atypical and inadequate because the "products they purchased varied widely" and those "differences in the products affected" the conduct at issue. *Smith-Brown v. Ulta Beauty, Inc.*, 335 F.R.D. 521, 528-30 (N.D. Ill. 2020).

Plaintiffs contend that Hill's approach to standing is only adopted by a minority of courts and that the majority allows a plaintiff to bring claims and represent other purchasers when the purchased products are "substantially similar" to the other products. *See, e.g., Ulrich v. Probalance, Inc.*, No. 16 C 10488, 2017 WL 3581183, at *6 (N.D. Ill. Aug. 18, 2017) ("[T]he majority of courts that have considered the issue hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar.'" (citations omitted) (cleaned up)).

There appear to be a split between courts in this district considering this issue. This Court is persuaded in this case to consider whether the purchased products are "substantially similar" to the other PD products. Substantial similarity is determined via "context-specific analysis," evaluating whether the products are "of the same kind," made from "largely the same

ingredients," and bear "the same alleged mislabeling," looking at both physical similarities and the misrepresentations' similarities. *Id*. at *6. In this case, all of the products are Hill's PD pet food; all are marketed and sold as therapeutic despite not being evaluated or approved by the FDA (and so all are allegedly adulterated and mislabeled pursuant to the FD&C Act); all are named and labelled "Prescription Diet" (an alleged misrepresentation); and all are subject to a uniform prescription requirement that allegedly misleads purchasers because it indicates that the prescription is legally required, and that PD contains a drug or medicine. The differences in formula, intended benefits, and individual bases for veterinarian authorizations "are irrelevant because the Products are all alike with respect to the 'specific component' that is the subject of plaintiff's claims[.]" *Id*; *see also Mednick v. Precor, Inc.*, No. 14 C 3624, 2014 WL 6474915, at *3 (N.D. Ill. Nov. 13, 2014) ("Where product composition is less important, the cases turn on whether the alleged misrepresentations are sufficiently similar across product lines."). The Court finds that Plaintiffs have standing to bring claims with respect to all PD products. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021 (9th Cir. 2020) ("Last, Defendants argue that Plaintiffs do not have standing to enjoin all of Defendant Manufacturers' prescription pet food products because Plaintiffs have not purchased every single type of prescription pet food available from Hill's or Mars. This does not constitute a basis for dismissal because Plaintiffs' challenge to prescription pet foods is to the common scheme of the prescription requirement and prescription-based advertising.").

Next, each Defendant challenges the adequacy of the named Plaintiffs in this case (PetSmart challenges only Vanzant) because they continued to purchase PD or prescription pet food after becoming aware that it did not contain medicine. Hill's also contends that typicality is not met for the same reason.

"The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (citations and internal quotation marks omitted). Although "[i]n many cases . . . the requirement of typicality merges with the further requirement that the class representative will fairly and adequately protect the interests of the class[,] . . . typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members[.]" *Id*. at 724-25 (citation and internal quotation marks omitted).

Typicality is satisfied when a plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Here, Plaintiffs' deceptive practices claims all arise from Hill's's allegedly misleading prescription requirement and PetSmart's use of the MedCard. Plaintiffs' unfair practices claims arise from Defendants' marketing, labeling, and selling of adulterated and misbranded products under the FD&C Act. Accordingly, typicality is satisfied.

Adequacy is the proper rubric for considering particularized defenses. *CE Design Ltd.*, 637 F.3d 721 at 725. To determine the adequacy of a class representative, the Court considers whether each of the named Plaintiffs are "subject to a substantial defense unique to [her.]" *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018).

### a. Vanzant

Vanzant brings claims against Hill's and PetSmart, respectively. Hill's and PetSmart both argue that Vanzant is atypical of the proposed class and subclass because she continued to buy PD after learning that it does not contain drugs or medicine.

Vanzant purchased c/d in January 2013 for her cat, Tarik, and fed it to him for nearly three years until she learned in early 2016 that it did not contain medicine. (Vanzant Tr. 104:10-12, 122:9-16, 152:14-154:23, 161:1-10, 167-68, ECF No. 252-2.) She later bought PD k/d for her cat, Diablo, in February 2017 (*id.* at 204:21-206:12), PD k/d for Diablo in September and October 2017 (*id.* at 224:4-225:18), and PD a/d for Tarik in December 2019 (*id.* at 185:5-187:16). At the time Vanzant purchased PD k/d at the end of 2017, she knew that it did not contain medicine and that the FDA did not regulate it. (*Id.* at 224:19-24.) Vanzant testified she made the late 2017 and 2019 purchases in a desperate attempt to save each cat's life when they were near death. (*Id.* at 225, 274.) Both cats died shortly after the purchases. (*Id.*)

Vanzant's deceptive practices claim centers on her testimony that Hill's prescription requirement, enforced by PetSmart, misled her into believing that PD pet food contains medicine. This claim "requires proof of materiality and proximate cause." *Al Haj v. Pfizer Inc.*, No. 17 C 6730, 2020 WL 1330367, at *2 (N.D. Ill. Mar. 23, 2020); *see also infra.* "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick v. Suzuki Motor Co.* 675 N.E.2d 584, 595 (1996).

Vanzant is subject to particular defenses as to her deceptive practices claim that prevent her from being an adequate class representative. In response to Defendants' argument, Plaintiffs point to testimony that in early 2016, Vanzant did not learn that *all* PD products do not contain

medicine. Rather, she learned only that the specific PD c/d product she had been buying for

Tarik did not contain medicine, (*id*. at 167-168), and when she bought PD k/d products for

Diablo in February 2017, she did not know at the time whether k/d contained medicine. (*Id*. at

194-96.) But this argument only undermines the theory of materiality and causation at the heart

of Plaintiffs' deceptive practices claims: namely, that it is the prescription requirement,

universally applied to all PD products, that misleads a reasonable consumer into believing that

PD products contain medicine and that a purchaser would have acted differently (*i.e.*, not

purchased the product) knowing the truth.

Plaintiffs next point out that when Vanzant bought two PD products after filing this

lawsuit, she did so in desperation and that both cats died shortly after the purchases. Plaintiffs

argue that this does not mean she was not deceived by Defendants' misrepresentations and

omissions when she purchased c/d for Tarik from 2013 to 2016. That may be so, but Plaintiffs do

not address how Vanzant's 2019 purchases have the potential to substantially undermine the

materiality and causation elements of her claims.

Plaintiffs argument that proximate cause is an individual question in all ICFA cases does

not move the needle. In determining the adequacy of a named plaintiff, the concern with a

defense peculiar to the named plaintiff is that she "would have to devote substantial attention to

overcoming her deposition testimony, and if she failed to do so, she would sink each absent

member's claims even though they might have prevailed had a class representative without [the

named plaintiff's] baggage been carrying the torch." *Lipton v. Chattem, Inc.*, 289 F.R.D. 456,

460 (N.D. Ill. 2013) (citations omitted). Here, a jury easily could find that Vanzant has not

proved materiality or causation on her deceptive practices claim. That obstacle to Vanzant's

success would not apply to class members who would not have bought PD had they known that

it did not contain medicine. For these reasons, Vanzant is subject to particular defenses that prevent her from being an adequate class representative with respect to the deceptive practices claims. Vanzant's deceptive practices claims will proceed as an individual action.

Vanzant is, however, an adequate class representative for the unfair practices claim. Plaintiffs' theory of liability as to unfair practices appears to continue to shift. As pled in the complaint, Plaintiffs allege at least in part that PD products are not as promised because they do not contain a drug or medicine. (2d Am. Compl. ¶¶ 59-62.) As argued in the class certification briefing, however, Plaintiffs' unfair practices claims now appear to focus only on the allegation that Defendants' marketing, labeling, and selling of PD products for the diagnosis, cure, mitigation, treatment, or prevention of disease brings it within the definition of a "drug" and "new animal drug" that requires FDA or FD&C Act approval, and without that approval it is statutorily "unsafe," "adulterated," and "misbranded," and so selling PD products offends public policy, is immoral, unethical, oppressive, or unscrupulous, and has caused substantial harm to consumers. (*See, e.g.*, Pls. Mem. 1-2, 13-14.)[2] The Court understands that Plaintiffs do not base their unfair practices claims on a theory of deception.

Plaintiffs argue that Vanzant testified that she purchased PD after this lawsuit was filed as therapeutic products in a desperate attempt to save her cats lives, which goes to the heart of Plaintiffs' unfair practices claims. The fact that Vanzant knew PD did not contain medicine yet purchased it anyway does not substantially undermine her theory of liability in the same manner as her deceptive practices claim. As for the fact that Vanzant knew PD products were not FDA approved, Plaintiffs point out that this does not indicate that Vanzant knew that PD products are

---

[2] The Court cites herein to Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification (ECF Nos. 250, 252) as "Pls. Mem."

unsafe, adulterated, and misbranded in the absence of FDA approval. Accordingly, the Court finds that Vanzant is not subject to a substantial defense that prevents her from being an adequate class representative with respect to the unfair practices claims.

### b. Nevius

Nevius purchased i/d for her dog, Moose, in June 2019 (Nevius Tr. 117:23-118:2, ECF No. 252-2), and fed it to him for a month before switching to a Royal Canin therapeutic pet food in July 2019 (*id*. at 126:3-127:23). Nevius testified that knew after looking at the label and ingredient list that there was no medication in the PD pet food she purchased, but she did not recall exactly when she discovered that. (*Id*. at 157:3-159:20.) After switching to a Royal Canin prescription product, she testified that she continued purchasing Royal Canin after learning that there was no medication in it "because it was working." (*Id*. at 157:13-18.) However, she then immediately testified, "I don't remember exactly when I discovered that. . . but I did purchase Royal Canin for prescription dog food at the recommendation of Dr. Bleem for approximately a year because I was under the assumption that it did have medication in it because it requires a prescription from your veterinarian." (*Id*. at 157:19-158:4.) She then testified that she could not "say for sure" if she continued purchasing Royal Canin after being told it was not FDA approved and contained no medicine by her pet insurance company. (*Id*. at 158:10-20.)

The Court finds that Nevius' testimony does not indicates a "substantial" defense unique to her. There is no evidence that Nevius continued purchasing the PD products at issue in this case after learning of Defendants' alleged unlawful conduct. While her subsequent purchase of Royal Canin prescription pet food may be relevant to materiality and causation, the Court cannot say that a jury could "easily find" that she has not proved materiality or causation as to PD based

on these facts. *Cf. Lipton*, 289 F.R.D. at 460. Accordingly, Nevius is an adequate class representative.

### 3. Commonality and Predominance

Next, the Court considers whether Plaintiffs have shown the existence of one or more common issues and whether such common questions will predominate over individual questions. The Supreme Court has described what makes an issue common:

> Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention[.] . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart*, 564 U.S. at 349-50 (citations omitted). In describing the difference between common and individual questions, the Supreme Court has explained:

> An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005))).

To be suitable for class action treatment, a case must not only involve common questions (Fed. R. Civ. P. 23(a)(2)), but those common questions must predominate (Fed. R. Civ. P. 23(b)). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521

U.S. 591, 623 (1997). Rule 23(b)(3)'s "predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement[.]" *Amchem*, 521 U.S. at 623-34. "Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner*, 669 F.3d at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

"To prevail on a claim under the ICFA, 'a plaintiff must plead and prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages.'" *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)). Where, as here, the plaintiff alleges conduct that is both deceptive and unfair, the court considers both possibilities.

The elements of Plaintiffs' claims for deceptive practices are (1) a deceptive act or practice by Defendants, (2) that the deceptive act or practice occurred in the course of conduct involving trade or commerce, (3) that Defendants intended that Plaintiffs rely on the deception, and (4) that the deception caused Plaintiffs actual damages. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). "[A] practice is deceptive 'if it creates a likelihood of deception or has the capacity to deceive.'" *Benson*, 944 F.3d at 646 (citation omitted). "To determine the likelihood of deception, courts apply a 'reasonable consumer' standard." *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 704-05 (N.D. Ill. 2020) (citing *Benson*, 944 F.3d at 646). Courts considering "deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 476 (7th Cir. 2020).

Next, "[t]o determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.'" *Vanzant*, 934 F.3d at 738-39 (quoting *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014)). "A plaintiff need not satisfy all three factors; a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id*. (citation omitted) (cleaned up). Under either theory of the case, Plaintiffs must show causation, or that "but for the defendant's deceptive or unfair conduct, [they] would not have been damaged." *Vanzant*, 934 F.3d at 739.

Plaintiffs argue that they have suffered the same injury: overpayment for PD pet food based on Defendants' deceptive and unfair practices. They contend that common questions central to their, and the putative classes', claims include:

1) Whether Defendants have engaged in deceptive practices by marketing and selling "Prescription Diet" labeled products pursuant to the prescription requirement and without disclosing that the products are not legally required to be sold by prescription and do not contain medicine.

2) Whether Defendants' representations and omissions regarding PD products were literally false or likely to deceive a reasonable consumer in a material way.

3) Whether Defendants' marketing and sale of PD products as therapeutic products intended for use in the diagnosis, treatment, mitigation, cure, and prevention of diseases in pets violates public policy (by violating the FD&C Act), is unethical or unscrupulous, and/or causes substantial harm to consumers and thus, is unfair.

4) Whether Defendants intended consumers to rely on the veterinary prescription's implications and their marketing of PD products as therapeutic products and purchase costly food to treat their sick pets.

"Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). Here, Hill's imposes a blanket prescription requirement before all putative class members could purchase PD products—all of which are labeled with the name "Prescription Diet." PetSmart complied with that prescription requirement through its use of the MedCard. The same objective legal standards govern every class member's claim. *Supra*. Accordingly, the Court agrees with Plaintiffs that there are questions "common to the claims of all putative class members." *Id.* at 755 ("[T]he court failed to recognize the question common to the claims of all putative class members: whether the GSC packaging was likely to mislead a reasonable consumer.").

The thornier issue is whether the common questions predominate. Defendants contend that they do not for a variety of reasons. The Court addresses each in turn.

### a. Deceptive Practices

Because Vanzant's deceptive practices claims will proceed as an individual action, the Court considers only Nevius' deceptive practices claim against Hill's (Nevius does not assert such a claim against PetSmart).

Hill's first argues that the same prescription requirement[3] that underpins Nevius' theory of deception also precludes class certification because consumers receive different information

---

[3] Hill's uses the term "authorization" rather than "prescription," although Plaintiffs submit evidence that Hill's uses those two terms interchangeably. In this Opinion, the Court typically uses the Plaintiffs' term "prescription."

before purchasing PD—from their veterinarian in individualized discussions about their pets' health, from the label, which they may or may not read, and from their own knowledge. According to Hill's, it is therefore "impossible" to fix liability "[w]ithout determining what each member heard, saw, or knew," which unavoidably "requires an individual analysis of the extent to which [Hill's] marketing played a role in each class member's decision to purchase" PD. *See Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2005), *aff'd sub nom. Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). Hill's also relies upon *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008), in which the Seventh Circuit decertified a class where evaluation of the class members' claims would have required individual hearings as "to what he understands to be the meaning of a label or advertisement that identifies a clothes dryer as containing a stainless steel drum." *Thorogood*, 547 F.3d at 747.

Nevius responds that every consumer fraud case involves individual elements of reliance or causation, which do not preclude certification where (as here) the putative class members' subjective understanding is simpler than the class-wide issues. Nevius relies heavily upon *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014), in which the Seventh Circuit found in part that to the extent the district court "thought that no class can be certified until proof exists that every member has been harmed, it was wrong." *Id*. at 757 (listing cases). The Seventh Circuit draws a "distinction between class members who *were not* harmed and those who *could not* have been harmed." *Id*. at 758 (emphasis original) (citation and internal punctuation omitted). Courts have denied certification in the latter circumstance. *Id*. In the former circumstance, however, if purchasers were exposed to allegedly deceptive practices and could have been injured by it, it is "not a legitimate basis for denying certification" if it "turns out later that a few were not." *Id*.

Here, the prescription requirement applied to all PD purchasers, and all PD products were labeled "Prescription Diet," and so all putative class members were exposed to the allegedly deceptive practices and could have been injured by it. Even if it turns out that "very few members of the class were harmed, that is an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate" the defendant. *Id.* (citations and internal punctuation omitted).

*Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D. Ill. 1998) is distinguishable. There, the district court denied certification to a proposed class of individuals who purchased prescription nasal spray and asserted ICFA claims that the spray was deceptively marketed as safe. The court found that the "role of the prescribing physician" was "central" to the plaintiffs' claims about "product warnings, claimed misrepresentations, and proximate causation," and that because a doctor's advice necessarily alters the information presented to each individual consumer, there were "highly individualistic factual determinations" that "preclude certification." *Dhamer*, 183 F.R.D. at 532. Here, in contrast, the prescription requirement itself is the deceptive act.

All of this is not to say that a plaintiff can prevail under the ICFA on a theory of deception that is "idiosyncratic or possibly unique." *Suchanek*, 764 F.3d at 758; *see also Thorogood*, 547 F.3d at 747 (no evidence that anyone in 500,000 person class other than Thorogood believed the allegations); *Oshana*, 472 F.3d at 514 (Oshana appeared to be the only person in million-plus class that believed defendant deceived consumers by using different formulae in fountain and bottled soda products). That is not the situation here, where Nevius proffers evidence—in the form of expert Dr. Rebbecca Reed-Arthurs' survey—that between 22 and 46% of actual or likely PD purchasers believe that PD products contain a drug or medicine

19

based on the prescription requirement and labeling. (Pls. Mem. 5.) Nevius testified that she too believed that the PD products she purchased contained medicine based on the prescription requirement and/or labelling. (*Id*. at 3.)

Hill's contends, however, that Nevius' testimony otherwise does not support her theory of deception. Specifically, Hill's points out that Nevius did not review the packaging or label before purchasing PD and contends that if she had, she would have seen from the ingredient list that PD does not contain medicine. (Hill's Opp'n 9.)[4] The Court fails to see how this undermines Nevius' theory of deception, which requires applying a 'reasonable consumer' standard" *Geske, supra*, and "tak[ing] into account all the information available to consumers and the context in which that information is provided and used." *Bell*, *supra*. "Many reasonable consumers do not instinctively parse every front label or read every back label before placing groceries in their carts." *Id*.

Hill's also takes issue with Reed-Arthurs' survey, which Hill's contends did not test the theory of deception that Nevius is pursuing because it eliminated the one thing every PD purchaser must do: talk to their veterinarian. But that argument fails for the reasons explained above—the inquiry into whether a purchaser talked to their veterinarian might only reveal that the purchaser was not in fact harmed (*i.e.*, because he or she learned that PD pet food did not contain medicine), not that that the purchaser *could not* have been harmed. *Suchanek*, 764 F.3d at 758. Such an argument is not a basis for denying class certification. *Id*. Hill's also filed a motion to exclude Reed-Arthurs' opinions and testimony (ECF No. 273), which the Court denies for the reasons set forth in a forthcoming separate opinion.

---

[4] The Court cites herein to Defendant Hill's Pet Nutrition, Inc.'s Opposition to Plaintiffs' Motion for Class Certification (ECF No. 272) as "Hill's Opp'n."

Hill's submits a competing survey by its expert, Sarah Butler, showing that only 1% of survey respondents assumed PD pet food contains medication after viewing the label, and only .5% of actual PD purchasers believed PD contained drugs or medicine when they first purchased it. (Hill's Opp'n 15-16.) Nevius responds that Butler's survey failed to tell respondents that a prescription was required in the first place and so it was not surprising that the disclaimers had little to no impact on potential purchasers who were not exposed to the key wrongful conduct. Plaintiffs filed a *Daubert* motion to partially exclude Butler's testimony (ECF No. 292), which the Court denies for the reasons set forth in a forthcoming separate opinion. Regardless, the Court does not find that Butler's survey results defeat certification; the PD label is one factor for consideration in applying the objective "reasonable consumer" standard.

For these reasons, individual issues as to deception do not predominate.

### i. Causation and Materiality

Hill's next argues that Nevius proffers no common evidence, such as a study, that the alleged deception was material to the proposed class. Hill's relies on *Ryan v. Wersei Elec. GmbH & Co.*, 59 F.3d 52, 54 (7th Cir. 1995) for the proposition that Nevius must demonstrate that "the misrepresented fact must be essential to the transaction between the parties" to be material under Illinois law. Hill's points to Nevius' testimony that she bought PD because her veterinarian recommended it (Hill's Opp'n 17) and attempts to draw a distinction between the effects of the veterinarian's nutritional recommendation for a specific pet on consumers' purchasing decisions and the effects of the veterinarian's gatekeeping role (the allegedly deceptive practice). (*Id.* at 18.) Consumers could not buy PD simply because they want food that is prescription only—a veterinarian must make a determination, based on his or her clinical judgment and ethical obligations, that a specific therapeutic food will help the pet patient. (*Id.* at 17-18.) According to

Hills, consumers buy PD because of the veterinarian's recommendation, not the gatekeeping prescription requirement.

Nevius responds that the materiality standard later articulated by the Illinois Supreme Court in *Connick v. Suzuki Motor Co.* applies: "[a] material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." 675 N.E.2d 584, 595 (1996). The Court agrees. *See Hartmarx Corp. v. JBA Int'l, Inc.*, No. 99 C 4874, 2002 WL 406973, at *7 (N.D. Ill. Mar. 15, 2002) (rejecting *Ryan's* "essential to the transaction" materiality formulation in favor of *Connick's*). Thus there is an "objective component to the inquiry, i.e., ascertain what information would be relevant to a typical buyer." *Id.*

Nevius contends that evidence of materiality in the form of consumer surveys or market research is needed only where the marketing "is not clearly misleading on its face and materiality is in doubt." *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 976 (7th Cir. 2020). She argues that the prescription requirement and name "Prescription Diet" are literally false and misleading on their face and that the materiality of Hill's prescription requirement is not in doubt. *See Moore*, 966 F.3d at 1021 ("The misrepresentation of prescription pet food as medicine or FDA-controlled can be a material fact for a reasonable consumer—particularly for a pet owner who is dealing with possibly a sick or unhealthy pet. In other words, it is reasonable for a consumer to rely on the prescription requirement and labeling in her purchasing decision for an ailing pet."); FTC's Statement on Deception dated October 14, 1983, Pls. Ex. 33 at 5 (presuming materiality of claims or omissions that "significantly involve health, safety, or other areas with which the reasonable consumer would be concerned"). Nevius also points to Hill's market research, which she contends provides classwide evidence that the prescription requirement is material to

22

consumers' decisions to purchase PD products. (Pls.' Reply to Hill's Opp'n 6.)[5] And, according to Plaintiffs, Hill's prescription requirement (the so-called gatekeeping role) cannot be separated from the veterinarian's recommendation.

The Court finds that Nevius carries her burden of showing that the materiality of Hill's alleged misrepresentations and omissions involves questions common to all members of the class and is capable of classwide proof. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("While Connecticut Retirement certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification. Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class. Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class Connecticut Retirement would represent." (emphasis original)).

### ii. Damages

Hill's next argues that Nevius cannot certify a class because her damages model does not match her theory of liability, and so individual damage calculations will predominate. *See Comcast*, 569 U.S. at 34-38 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) ("A district judge may not refuse to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply

---

[5] The Court cites herein to Plaintiffs' Reply Supporting Their Motion for Class Certification As To Defendant Hill's Pet Nutrition, Inc. (ECF No. 295) as "Pls.' Reply to Hill's Opp'n."

because those arguments would also be pertinent to the merits determination." (citation omitted) (cleaned up)).

"The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at 38 (emphasis original) (citation and internal quotation marks omitted). Nevius claims in relevant part that consumers overpaid for PD because of the prescription requirement and the alleged misrepresentation that PD contains medicine. Plaintiffs' damages expert, Janet Netz, purports to evaluate whether the alleged deceptive conduct and the alleged unfair conduct resulted in an economic impact to PD purchasers. She concluded that classwide evidence demonstrates that Hill's deceptive conduct and unfair conduct resulted in higher prices for PD products. She utilized a benchmark analysis to calculate the amount the class overpaid for Hill's PD products as a result of Hill's deceptive and unfair conduct. (Pls.' Ex. 28 at 20-33; Pls.' Ex. 29 at 12-28.) Netz calculates classwide damages to be approximately $80.7 million.

The parties agree, at a high level, that Netz's benchmark methodology is generally accepted. Hill's argues, however, that there are several flaws with the way that Netz implemented her methodology that result in a disconnect between her model and Plaintiffs' theory of liability and that render Netz's opinion unreliable. All of the arguments that Hill's raises are also raised in its Motion to Exclude the Opinions and Testimony of Plaintiffs' Proffered Damages Expert Janet Netz (ECF No. 274), which the Court denies for the reasons set forth in a forthcoming separate opinion. Accordingly, the Court finds that Nevius has sufficiently shown that damages are capable of classwide proof.

### b. Unfair Practices

Defendants each make various arguments that common questions do not predominate on Plaintiffs' unfair practices claims. To reiterate, "[t]o determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.'" *Vanzant*, 934 F.3d at 738-39 (quoting *Batson*, 746 F.3d at 830). "A plaintiff need not satisfy all three factors; a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (citation omitted) (cleaned up). Plaintiffs must show that "but for the defendant's . . . unfair conduct, [they] would not have been damaged." *Id.* at 739. Because the Court finds that individual damages calculations will overwhelm questions common to the subclass against PetSmart, the Court starts there.

Hill's argues that Plaintiffs' unfair practices claim cannot be certified as a class because in Netz's damages model, her but-for world is premised on removing Defendants' alleged deceptive practices, but Plaintiffs' unfair practices claim does not turn on proof of deceptive practices. Hill's also argues that Plaintiffs cannot articulate where the allegedly deceptive practices ends and the unfair conduct begins. Hill's argues that this means Netz's damages model cannot support class certification. *See Comcast*, 569 U.S. at 36-38.

Netz's but-for world is premised on removing Hill's prescription requirement (the allegedly deceptive practices) and marketing of PD products as therapeutic, including to veterinarians (the allegedly unfair conduct). (Pls.' Reply to Hill's Opp'n 11.) Under either or both theories of liability, PD products would be marketed and sold as non-therapeutic wellness products. (*Id.*) Her damages model is thus tied to Plaintiffs' two theories of harm. In *Comcast*, the Supreme Court specifically noted that a model calculating damages resulting from four

(related) theories of harm "might have been sound, and might have produced commonality of damages, if all four of those alleged [theories] remained in the case." *Comcast*, 569 U.S. at 37. But because only one theory of harm survived, such a model provided no assurance that damages resulting from that particular theory of harm were capable of measurement on a classwide basis. *Id*. In the absence of such an assurance, questions of individual damage calculations would inevitably overwhelm common questions. *Id*. at 34. Here, however, both theories of harm remain as against Hill's and so the concerns present in *Comcast* are not at issue.

The circumstances as to PetSmart, however, materially differ. For the reasons explained above, Vanzant is inadequate as a named plaintiff on her deceptive practices claim and so that claim will proceed individually. Nevius does not assert a deceptive practices claim against PetSmart. Consequently, only Vanzant's unfair practices claim against PetSmart remains to be considered for class certification. Because Netz's damages model does not differentiate between damages due to deceptive versus unfair practices, her model falls short of establishing that damages based on PetSmart's unfair practices are capable of measurement on a classwide basis. *See id*. Questions of individual damage calculations will inevitably overwhelm questions common to the class. *Id*. Class certification as to Vanzant's unfair practices claim against PetSmart is therefore denied. The Court declines to address PetSmart's various other arguments against class certification.

The Court proceeds to consider Hill's additional arguments that Plaintiffs have failed to generate common evidence of unfair practices. Hill's argues that Plaintiffs have no common proof that the alleged overpayment was unavoidable, which it contends is required to show oppressive conduct and requires individualized proof. *Batson*, 746 F.3d at 833 ("The relevant inquiry here is whether a defendant's conduct is so oppressive as to leave the consumer with

little alternative except to submit to it[.]" (citation and internal punctuation omitted)); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (finding plaintiff's testimony that he purchased gasoline from non-defendants undermined his claim that he had no meaningful opportunity to avoid paying the higher retail price and whether a class member could have avoided the defendants' conduct was an individualized question of fact).

Plaintiffs contend that they need not prove that Hill's practice is oppressive because there is common evidence that it is unethical and unscrupulous. In *Batson*, there was no consideration whether the defendant's conduct was "immoral, unethical . . . or unscrupulous." *Id*. Rather, the court considered the relevant inquiry to be whether the defendant's conduct was "oppressive." *Id*. "Whether a defendant's conduct is unfair under the ICFA is determined on a case-by-case basis." *Minter v. Diamond*, No. 15 C 4323, 2017 WL 1862639, at *7 (N.D. Ill. May 9, 2017). Here, Plaintiffs argue that the term "[e]thical is defined as conforming to accepted professional standards of conduct[,] . . . and scrupulous is defined as having moral integrity; acting in strict regard for what is considered right or proper." *Id*. (citations omitted) (cleaned up).

Plaintiffs point to evidence that Hill's knows the FDA has determined that therapeutic pet food products, which would include PD, meet the statutory definition of a drug and that absent FDA-approval, PD products are unsafe under the law and that the marketing and sale of these products is prohibited. (Pls.' Reply to Hill's Opp'n 18.) Plaintiffs point to evidence that Hill's markets PD products to veterinarians as therapeutic products intended for specific uses so that veterinarians will prescribe them to consumers for their sick pets for those purposes, and that Hill's own market research shows that its use of "Prescription Diet," "veterinary exclusive," "clinical nutrition," "therapeutic," and "medical/clinical food" conveys medical and clinical treatment messages. (*Id*.) Plaintiffs point to evidence that they contend shows that Hill's does so

27

because veterinary prescriptions are a top driver of sales for PD products and because it can and does command a higher price for PD products. (*Id*.) Plaintiffs argue that pets are valued family members and, in caring for a sick pet, vulnerable pet "parents" reasonably gravitate toward a therapeutic product recommended to treat a consumer's sick pet. (*Id*.) The Court finds that Plaintiffs have shown that the inquiry into whether Hill's conduct was unethical or unscrupulous is capable of resolution on classwide proof.

Plaintiffs also argue that Hill's marketing and sale of PD products violates the public policy underlying the FD&C Act[6] to protect animal and public health by making sure that a drug is safe and effective for its intended use and is properly manufactured and labeled. *See* United States Food and Drug Administration, Unapproved Animal Drugs, available at https://www.fda.gov/animal-veterinary/compliance-enforcement/unapproved-animal-drugs, accessed September 27, 2023. Plaintiffs point to FDA guidance, which states that therapeutic pet food can be regulated as a drug. (Pls.' Reply to Hill's Opp'n 16.) Plaintiffs argue that PD products are also "new animal drugs" under the FD&C Act. Under the FD&C Act, "new animal drugs" are "unsafe" unless they have been approved, conditionally approved, or index listed by the FDA as new animal drugs, 21 U.S.C. § 360b, none of which applies to PD products. As the argument goes, because the FDA has not had the opportunity to evaluate whether PD products are safe and effective for their intended uses or whether they are properly manufactured and labeled, the legislature has determined that these products are unsafe. Plaintiffs further argue that because PD products are also adulterated and misbranded under the FD&C Act, the marketing

---

[6] The Court need not decide in deciding class certification whether Plaintiffs adequately pled a similar claim under Illinois' FD&C Act.

and sale of these products is prohibited. By marketing and selling unsafe, adulterated, and misbranded products, Hill's purportedly violates the public policy underlying the FD&C Act.

Hill's argues that individual issues predominate because each PD product differs in, among other things, its marketing claims, labeling, targeted health condition, formulation, and substantiation. It contends that a factfinder would need to conduct an individual review of the more than 40 different PD foods to determine on a product-by-product basis whether each food is a drug under the FD&C Act. Plaintiffs, however, contend that there is no need for a product-by-product review because expert testimony and Hill's own documents demonstrate that Hill's markets every PD product as a therapeutic product intended for use in disease treatment to veterinarians and to consumers. (Pls.' Reply to Hill's Opp'n 16.) The Court finds that Plaintiffs have shown that the inquiry into whether Hill's conduct offends public policy is capable of resolution on classwide proof. Because Plaintiffs need not prove all three factors to establish unfair conduct, the Court need not consider Hill's arguments regarding substantial injury.

Hill's also argues that Plaintiffs cannot prove causation with common evidence. Hill's relies on *Anthony v. Country Life Mfg., LLC.*, 70 F. App'x 379, 383 (7th Cir. 2003), in which the Seventh Circuit found that the plaintiff failed to allege that the "unfair practice" (the presence of two ingredients in nutritional bars that were not approved by the FDA for use as "food additives," but were approved for sale as nutritional supplements) proximately caused an injury. Specifically, the plaintiff did not claim she was physically harmed by eating the nutritional bars. *Id*. Although the plaintiff alleged economic injury, the court found that because the two substances were listed on the ingredients label and because the plaintiff consumed the products, she received exactly what she paid for and therefore did not suffer an economic injury. *Id*. This case is distinguishable from *Anthony* for multiple reasons, including because that case applied

the different standard applicable to a 12(b)(6) motion to dismiss and because the ingredients at issue were approved by the FDA for sale as nutritional supplements. *Anthony*, 70 F. App'x at 383.

Here, Plaintiffs allege economic harm (higher prices) that resulted from Hill's unfair practices (marketing and selling PD products to vulnerable pet parents, including through veterinarians, as therapeutic when the products were allegedly "unsafe," "adulterated," and "misbranded" pursuant to the FDA and FD&C Act). Plaintiffs point to evidence in the form of Hill's corporate representative's testimony and Netz's expert testimony comparing PD pricing to other Hill's veterinarian recommended but non-therapeutic products to show that consumers' perception of therapeutic value drives PD's premium pricing. (*See* Pls.' Reply to Hill's Opp'n 18.)

Plaintiffs also argue that common evidence demonstrates that Hill's marketing of PD as therapeutic products not only resulted in higher prices but also caused veterinarians to prescribe PD products to for consumers' sick pets, which in turn causes consumers to buy them at higher prices. Plaintiffs point to evidence that Hill's markets all of its PD products as therapeutic products intended for use in disease treatment to veterinarians through its product guides, clinical evidence reports, veterinary hotline, and other marketing materials; expert survey evidence that veterinarians rely on manufacturer marketing materials in prescribing therapeutic products like PD, and that veterinarians prescribe such products to treat disease in pets; and expert survey evidence that 81.5% of PD purchasers surveyed indicated that they purchased a PD product because it was recommended or prescribed by their vet. (Pls.' Reply to Hill's Opp'n 19.) Plaintiffs contend that absent Hill's marketing efforts, veterinarians would not know about the PD product's therapeutic benefits and so would not prescribe or recommend them.

The Court finds that Plaintiffs adequately show that causation is capable of resolution on classwide proof.

### 4. Superiority

Class actions are superior where potential individual damages are too insignificant to incentivize class members to pursue claims individually. *See Suchanek*, 764 F.3d at 759. Plaintiffs proffer evidence that the prosecution of this case has entailed hundreds of thousands of dollars in expert costs. *Id*. at 760 ("In this case, resolution of the merits may require costly survey evidence and expert testimony, along the lines plaintiffs have proffered for certification purposes, to prove the allegation that the GSC packaging was likely to mislead a reasonable consumer."). Hill's does not challenge superiority. Thus, "the class device is superior, because no rational individual plaintiff would be willing to bear the costs of this lawsuit." *Id*.

## III. CONCLUSION

For all of these reasons, Plaintiff's Motion for Class Certification [249] is granted in part and denied in part.

This case is set for status hearing on October 26, 2023 at 9:30 a.m.

**SO ORDERED.**                                    **ENTERED: September 29, 2023**

_____
**HON. JORGE ALONSO**
**United States District Judge**