**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HOLLY BLAINE VANZANT, *et al.*,    )
                                                    )
           Plaintiffs,                         )
                                                    )         No. 17 C 2535
                                                    )
    v.                                             )
                                                    )         Judge Jorge L. Alonso
HILL'S PET NUTRITION INC., *et al.*,  )
                                                    )
           Defendants.                        )

## MEMORANDUM OPINION AND ORDER

For the reasons that follow, Defendants' Motion to Exclude the Opinions and Testimony

of Plaintiffs' Proffered Consumer Survey Expert Rebecca Reed-Arthurs (ECF No. 273),

Plaintiffs' Motion to Partially Exclude Defendants' Proffered Expert Sarah Butler (ECF No.

292), and Hill's Motion to Exclude the Opinions and Testimony of Plaintiffs' Proffered Damages

Expert Janet Netz (ECF No. 274) are denied. The Court assumes familiarity with the facts of this

case and incorporates the "Background" section set forth in the Memorandum Opinion and Order

entered on September 29, 2023, regarding Plaintiffs' Motion for Class Certification. (ECF No.

314.)

## LEGAL STANDARD

 "The admission of expert testimony is governed by Federal Rule of Evidence 702 and

the principles outlined in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993)]." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 requires

that the district judge act as a "gate-keeper who determines whether proffered expert testimony is

reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d

734, 741 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d

745, 749 (7th Cir. 2006) (cleaned up)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589. Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule imposes "three basic prerequisites." 4 *Weinstein's Federal Evidence* § 702.02[3]. "Under Federal Rule of Evidence 702 and *Daubert,* the district court must . . . determine [1] whether the witness is qualified; [2] whether the expert's methodology is . . . reliable; and [3] whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007)).

The proponent of the expert bears the burden of demonstrating, by a preponderance of the evidence, that "the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendments). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of Rule 702 opinion testimony).

In this case there are three pending *Daubert* motions, each of which challenges the reliability of a proffered expert's opinion. "The non-exclusive list of *Daubert* reliability factors

2

for scientific evidence includes whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94). But this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted).

"Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). Consequently, "Rule 702's requirement that expert opinions be supported by 'sufficient facts or data' means 'that the expert considered sufficient data to employ the methodology.'" *Id.* at 808 (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013)). Whether an expert "selected the best data set to use, however, is a question for the jury, not the judge." *Id.* at 809. Assuming there is "a rational connection between the data and the opinion," the "expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Id.* (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000)).

## ANALYSIS

### I.  Rebecca Reed-Arthurs and Sarah Butler

Plaintiffs submit the expert opinion of Rebecca Reed-Arthurs in support of their motion for class certification. Reed-Arthurs designed, conducted, and analyzed a consumer survey (the "Survey") to assess: (1) any differences that actual or potential prescription pet food consumers understand there to be between a prescription-only pet food product and one that is available over the counter ("OTC"); (2) whether pet food being offered as prescription-only leads these

3

consumers to believe those pet foods contain a medicine or drug; (3) whether the messaging and labeling of PD as "Prescription Diet" combined with the fact that they are only sold pursuant to a prescription leads consumers to believe those products contain a medicine or drug; and (4) the effect certain protocols around the sale of prescription-only pet food products at PetSmart have on consumers' beliefs about those pet foods. (Reed-Arthurs Report ¶ 6.)[1]

Reed-Arthurs concluded that based on the Survey results, a statistically significant number of respondents believe (a) the difference between pet food sold per a veterinarian's prescription and pet food sold OTC is that prescription pet food contains drugs or medicine, (b) that pet foods labeled "Prescription Diet" and purchased per a veterinarian's prescription contain drugs or medicine, and (c) that prescription pet food sold per PetSmart's MedCard/prescription process contains drugs or medicine. (Reed-Arthurs Report ¶¶ 20-24.) Plaintiffs rely upon Reed-Arthurs' opinion as evidence that between 22% and 46% of actual or likely potential PD purchasers believe that PD products contain a drug or medicine due to the prescription requirement and labeling. (Pls.' Mem. of Law in Support of Their Mot. For Class Cert. 5, ECF No. 252.)

Defendants retained Sarah Butler as an expert witness to investigate Plaintiffs' claim that the prescription purchase process misleads consumers and to rebut Reed-Arthurs' opinion and testimony. Butler designed three separate surveys to evaluate the PD purchase process: (1) a "Purchase Intention Survey" of likely PD purchasers, designed to test whether the marketing that Plaintiffs claim is deceptive makes a difference to consumers' willingness to purchase the food; (2) a "Veterinarian Survey," designed to understand why veterinarians recommend therapeutic

---

[1] The Court cites herein to the Opening Expert Report of Rebecca Reed-Arthurs, Ph.D. (ECF No. 252-2) as the "Reed-Arthurs Report" and the Reply Expert Report of Rebecca Reed-Arthurs, Ph.D. as the "Reed-Arthurs Reply Report" (ECF No. 252-2).

foods, what information they share with consumers, and what questions consumers ask; and (3) a Hill's PD "Customer Survey" designed to evaluate what information actual PD consumers rely on, and to understand veterinarian interaction from the consumer's perspective. (Defs.' Opp'n to Pls.' Mot. to Partially Exclude Defs.' Proffered Expert Sarah Butler 4, ECF No. 307 ("Defs.' Opp'n to Exclude Butler"); Butler Report ¶ 8.)[2] Defendants contend that based on the Purchase Intention Survey results, the challenged marketing had no impact on respondents' willingness to purchase PD. (Defs.' Opp'n to Exclude Butler 5.)

Each party challenges the reliability of the other's expert witness based on the surveys they designed and analyzed.

### a. Reliability of Surveys

"[C]ourts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *28 (N.D. Ill. Mar. 31, 2017) (quoting *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003)). "A court assessing whether a survey employs a reliable methodology examines whether '(1) the 'universe' [of respondents] was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted

---

[2] The Court cites herein to the Expert Report of Sarah Butler (ECF No. 275-9) as the "Butler Report."

statistical principles[;] and (7) objectivity of the entire process was assured.'" *Id.* (quoting *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009)). "Although these criteria generally address the weight a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible." *Id.* (citations omitted) (cleaned up).

### b. Rebecca Reed-Arthurs

Defendants challenge the reliability of Reed-Arthurs' Survey for two reasons: first, because it purportedly ignores how the market for therapeutic food works; and second, because the Survey purportedly introduces bias at the outset by framing questions as a comparison between "prescription-only" and OTC pet food.

First, Defendants argue that the Survey is unreliable because it distorts the marketplace for PD—namely, the actual purchase process that consumers encounter when purchasing PD. As a threshold matter, Plaintiffs respond that Defendants' market distortion theory is specific to trademark infringement, in which surveys replicate the thought processes of consumers encountering a disputed mark as they would in the marketplace to test the likelihood of confusion. Indeed, Defendants fail to identify any controlling cases applying the market distortion theory to a consumer fraud or unfair practices claim. Regardless, the Court agrees with Defendants to the extent that a survey testing deceptive labeling may be unreliable if it omits material portions of the labeling or context. *Cf. Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020) (finding that "deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used," similar to other consumer-protection laws such as trademark and trade-dress claims). The Court accordingly considers whether such is the case here.

6

Defendants identify a number of problems with the Survey that they contend distort the marketplace. They note that all Survey respondents are presented with a text-only description of two types of products, "prescription-only," and "OTC," but there is no evidence that any consumer would see such a comparison in the real world. Rather, in the real world, a consumer would have visited or at least talked to their veterinarian, who would recommend PD and influence what consumers think about it, including whether it contains medicine. (Butler Report ¶ 65.) In response, Reed-Arthurs explains how the binary nature of prescription-only and OTC pet foods is evidenced by Hill's and PetSmart's sales policies, PetSmart's store layout, and online retailer websites. (Reed-Arthurs Reply Report ¶¶ 44-55.) Reed-Arthurs' explanation provides a satisfactory basis for the use of the comparison between "prescription-only" and "OTC."

Defendants also point out that consumers purchasing PD at the veterinarian's office may not actually receive a written authorization or review the packaging beforehand. Butler's Consumer Survey shows that approximately 36% of PD consumers report first purchasing PD at a veterinarian's office. (Butler Report ¶ 208.) Defendants further contend that, based on Butler's Veterinarian Survey, most veterinarians do not provide written authorization for in-clinic purchases because when veterinarian respondents were asked whether or not they provide pet parents with written authorization when recommending therapeutic pet food that is available at their clinic or hospital, 55.8% selected the response, "I note in patient chart that therapeutic food has been authorized and inform the pet owner/clinic staff that the food can be purchased." (*Id*. ¶ 187.) Respondents also had the option to select "I provide a written copy of the authorization for the pet parent to take to the front desk" or "Whether I provide a written copy or only note in chart only [*sic*] depends on the circumstance." (*Id*.)

7

Plaintiffs point out that respondents could choose only one response, and so they could not respond that they both chart the prescription authorization *and* provide a written copy. (Pls.' Reply Supporting Their Mot. for Class Cert. as to Def. Hill's Pet Nutrition, Inc. 7 n.5, ECF No. 295.) It is also conceivable that veterinarians—even if they did not give a written copy of the prescription or authorization—may have told the pet owner that they were prescribing or authorizing PD or referred to the food as prescription pet food. (Reed-Arthurs Reply Report ¶ 115.) Accordingly, it is not evident that a great many number of class members did not see or hear the veterinarian's prescription or PD labeling prior to purchasing PD.

Next, Defendants' second challenge to the Survey's reliability implicates the third and seventh factors courts may consider—namely, whether the questions to be asked of interviewees were framed in a clear, precise and non-leading manner and the objectivity of the entire process was assured. *See supra*. Defendants argue that the Survey is unreliable because it introduced bias and had no true control group to control for that bias.

Specifically, Butler opined that because all respondents were first presented with the juxtaposition between a product described as "prescription-only" and a product described as OTC, the Survey lacks a true control group. (Butler Report ¶ 51.) Only after that were respondents were split into a treatment group and control group. The treatment group respondents were shown actual PD packaging and were asked, among other things, "Based on the prescription-only product information you just viewed, do you agree, disagree, or not know whether the following statements describe the pet food you just viewed?" The control group respondents were shown mocked-up "Preferred Diet" packaging and were asked about the "over-the-counter product information" they viewed. (Reed-Arthurs Report ¶¶ 93-110.)

According to Butler, the use of the juxtaposition likely induced respondents to frame their answers in a particular way, thereby introducing bias that likely increased the rate at which respondents indicated that "prescription-only" products contain drugs or medicine. (Butler Report ¶ 56.) Butler further stated that the use of the juxtaposition also primed respondents at the start of the survey to attend to product differences related to those terms. (*Id*. ¶ 57.) Defendants argue that because Reed-Arthurs showed the "OTC" comparison to all respondents, she has no way to know whether that comparison or the word "prescription" alone drove her results.

Plaintiffs respond that the use of "prescription only" versus "OTC" was proper because it reflects how Hill's sells the products in the real world, *supra*, and how various entities in the pet food industry—including a number of the veterinarians who responded to Butler's Veterinarian Survey—differentiate between products that require a veterinarian prescription and those that do not. (Reed-Arthurs Reply Report ¶¶ 29-43.) For example, Plaintiffs point to evidence that Hill's used the "prescription" versus "OTC" language in its marketing to veterinarians, veterinarian and consumer surveys, and internal Hill's communications. (*Id*. ¶¶ 31-38.) Plaintiffs also point to evidence that PetSmart, Banfield, Vetsource, and outside marketing consultants use the terms "prescription" and "OTC" in juxtaposition to each other, including in consumer facing documents. (*Id*. ¶¶ 39-42.)

Plaintiffs further argue that there was a control group (which saw "Preferred Diet" labeled pet food) and a treatment group (which saw "Prescription Diet" labeled pet food). They contend that to the extent that asking both the treatment and control respondents whether there was a difference between prescription and OTC pet foods caused a priming bias towards drugs and medicine, it would have occurred across both the treatment and control groups. Reed-Arthurs subtracted the fraction of control group respondents who thought the product contained a

drug or medicine from the fraction of treatment group respondents who reported the same, which Plaintiffs contend netted out any priming bias effect. (Pls. Opp'n to Defs.' Mot. to Exclude the Opinions and Testimony of Pls.' Consumer Survey Expert Rebecca Reed-Arthurs 12, ECF No. 291; Reed-Arthurs Report ¶¶ 49-51; Reed-Arthurs Dep. Tr. 73:3-14, ECF No. 275-25.) Further, Reed-Arthurs conducted six focus group sessions with 15 total participants in an attempt to ensure that the Survey questions were clear, unbiased, and not leading. (Reed-Arthurs Report ¶¶ 71-73.) Focus group participants were not able to determine the purpose of the Survey or the fact that prescription pet food was of particular interest. (*Id*. ¶ 73.) Reed-Arthurs also noted that Butler's own Veterinarian Survey used a similar question format and juxtaposition, asking all respondents early in the survey: "In your opinion, what, if anything, makes therapeutic pet food (which requires a veterinarian authorization) different from non-therapeutic pet food (pet food available without a veterinarian authorization)? (Please type in your response.)." (Reed-Arthurs Reply Report ¶ 18.)

The Court is satisfied that this is not one of those "rare" situations "when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible[.]" *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (citing *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992)); *see also Chartwell Studio, Inc. v. Team Impressions, Inc.*, No. 19-CV-06944, 2023 WL 1992180, at *6 (N.D. Ill. Feb. 14, 2023) ("In terms of the survey design and question phrasing, the Court does not find the survey so fundamentally flawed to require exclusion.").

The flaws Defendants point out in Reed-Arthurs' Survey do not rise to the level of those at issue in the cases Defendants rely upon. *See DeKoven v. Plaza Assocs.*, 599 F.3d 578, 581 (7th Cir. 2010) (finding the language of the control letter was more confusing than actual letter); *Free*

*v. Peters*, 12 F.3d 700, 705 (7th Cir. 1993) (finding study conducted to test jury instructions given in a sentencing hearing lacked comparability between the test setting and the setting of the sentencing hearing and lacked a control group given adequately clear instructions); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010) (finding survey unreliable because, among other things, expert did not define target universe, failed to focus survey on consumers in the market at issue, surveyed an underinclusive population, included many ambiguous questions, and failed to include open-ended questions or allow for "don't know" responses), *aff'd,* 412 F. App'x 304 (Fed. Cir. 2011); *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642, at *2 (N.D. Ill. Jan. 24, 2003) (excluding survey that lifted portions of commercials out of context that provided important cues regarding affiliation, contained a highly leading question, and failed to ask respondents a crucial state-of-mind question).

Defendants' argument regarding the pending amendments to Rule 702, to take effect in December 2023, do not merit a different result. As the advisory committee explains, "[n]othing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702 advisory committee's notes to 2023 amendments. Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000-- requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." *Id*. The advisory committee further notes,

> Some challenges to expert testimony will raise matters of weight rather than admissibility even under the Rule 104(a) standard. For example, if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility. But this does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis always go to weight and not admissibility. Rather it means that once the court has found it more

11

likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.

*Id*.

Here, even if the language of the pending amendments to Rule 702 is considered, Plaintiffs have shown that Reed-Arthurs has a sufficient basis to support her Survey and opinions. Accordingly, the issues Defendants raise go to the weight, rather than the admissibility, of Reed-Arthurs' Survey and related testimony. *See Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *4 (N.D. Ill. Mar. 29, 2022) ("These types of technical defects and study design choices may lessen the evidentiary weight to be afforded but do not leave the surveys so flawed as to be unreliable or unhelpful to a trier of fact."); *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018) ("Courts rarely exclude consumer surveys from evidence, since most 'shortcomings' go to 'the proper weight of the survey' rather than admissibility." (citing *AHP Subsidiary*, *supra*)), *aff'd,* 926 F.3d 409 (7th Cir. 2019). To the extent that Defendants believe Reed-Arthurs "makes unfounded or incorrect assumptions," they "remain[] free to address those deficiencies through vigorous cross-examination." *Africano v. Atrium Med. Corp.*, 561 F. Supp. 3d 772, 777 (N.D. Ill. 2021).

For all of these reasons, Defendants' motion to exclude Reed-Arthurs' opinion and testimony is denied.

### c. Sarah Butler

Plaintiffs, in turn, seek to exclude Butler's Purchase Intention Survey of likely PD purchasers as unreliable for two reasons. They do not challenge the Veterinarian Survey or the Customer Survey.

First, Plaintiffs argue that the Purchase Intention Survey failed to tell respondents that a prescription is required for all PD purchases and so failed to include the actual scenario involved

12

in the PD purchases at issue. Instead, Butler used the undefined word "therapeutic" in the screening questionnaire, which Plaintiffs contend differs from what consumers see and hear in the real world.

Defendants respond that Plaintiffs' argument misconstrues the purpose of the Purchase Intention Survey, which evaluated prospective consumers' willingness to purchase PD based on how it is labeled. They contend that this tests whether the alleged "deception" on the label was material to reasonable consumers. An expert's testimony need be admissible only for some purpose; she need not testify as to Plaintiffs' entire theory of the case. *Anderson v. City of Chicago*, 454 F. Supp. 3d 808, 815 (N.D. Ill. 2020) (An expert's opinion "must assist the jury in understanding the evidence or determining a fact in issue." (citation and quotation marks omitted)). Here, Butler's Purchase Intention Survey focuses on one aspect of Plaintiffs' theory—the PD label—and attempts to test the materiality of the word "prescription" on the label. Defendants also argue that using the word "prescription" in lieu of "therapeutic" would have introduced bias by priming respondents to with the central stimulus that the survey was intended to test. This is the same basis on which Defendants challenge Reed-Arthurs' Survey. *See supra*.

Second, Plaintiffs argue that Butler failed to select the right sample from the universe of respondents by failing to verify income level. Plaintiffs argue, without citation to any authority, that a potential respondent's income level is relevant to a survey measuring purchase intention. Plaintiffs argue that participants in this type of survey tend to over-represent lower income levels, which tended to fit Defendants' desired result because people from a lower income distribution than the general population would be less willing to purchase more expensive prescription pet food when cheaper options are available. Plaintiffs do not cite any authority or evidence for this conclusion.

Defendants respond that the Purchase Intention Survey followed standard principles of experimental design. To ensure that respondents were representative of likely PD purchasers, Butler drew respondents from a pool maintained by an independent third-party data collection services company and directed that company to use a process known as "click-balancing" to ensure that respondents were representative of the United States Census in terms of age, gender, and region. (Butler Report ¶¶ 82, 85.e.) Defendants further contend that Plaintiffs identify no evidence indicating that Butler's sample was skewed toward either end of the income spectrum. Finally, Defendants point out that respondents were randomly sorted into test and control groups and shown the same price for PD, thus neutralizing any potential for bias.

Defendants have shown that Butler has a sufficient basis to support her Purchase Intention Survey, and that it is not "so flawed" that it would be unreliable and completely unhelpful to the trier of fact. *AHP Subsidiary*, 1 F.3d at 618. Accordingly, the problems that Plaintiffs identify go to the weight, rather than admissibility, of the Purchase Intention Survey results and Butler's related opinions, *Zarinebaf*, 2022 WL 910638, at *4; *Uncommon*, 305 F. Supp. 3d at 850, and are the proper subject of cross-examination. *Manpower*, 732 F.3d at 809.

For all of these reasons, Plaintiffs' motion to partially exclude Butler's opinion and testimony is denied.

## II.    Janet Netz

Defendants move to exclude the expert opinion of Janet Netz, which Plaintiffs submitted in support of their motion for class certification. Netz used a "benchmark" analysis to evaluate whether the alleged deceptive conduct and the alleged unfair conduct resulted in an economic impact to PD purchasers. She evaluated certain evidence regarding the pet food market and economic principles, including supply and demand factors, and concluded that: prices for PD are

14

determined by common market forces (not by individually negotiated prices); all class members were exposed to both the alleged unfair conduct and the deceptive conduct; Hill's deceptive conduct (the prescription requirement), as well as its unfair conduct (marketing and selling PD as therapeutic), induced a higher willingness to pay for PD products by changing consumers' perception of the value of and need for PD products; consumers' purchases revealed that they were willing to pay more for PD products; and Hill's, a profit-maximizing firm, uses this information to maintain a high-price strategy for PD. (Netz Report ¶¶ 47-65; Netz Rebuttal Report ¶ 61.) [3] Netz concluded that class-wide evidence demonstrates that Hill's deceptive conduct and unfair conduct resulted in higher prices for PD products.

To determine the extent to which consumers overpaid for PD products as a result of Hill's deceptive and unfair conduct, Netz considered what the "but-for world" (*i.e.*, the world in which Defendants did not engage in the alleged wrongful conduct) would look like. She concluded that "with respect to the deceptive practices claim, absent the prescription requirement, [PD] products would be marketed and sold in the but-for world as nontherapeutic wellness products rather than as therapeutic products requiring a prescription." (Netz Rebuttal Report ¶ 20.) Netz also concluded that "with respect to the unfair practices claim, absent Defendants' marketing and sale of [PD] products as products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, [PD] products would be marketed and sold in the but-for world as non-therapeutic wellness products." (*Id.*) Thus, Plaintiffs contend that the

---

[3] The Court cites herein to the Expert Report of Janet S. Netz, Ph.D. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) (ECF No. 252-5) as the "Netz Report" and the Rebuttal Expert Report of Janet S. Netz, Ph.D. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) as the "Netz Rebuttal Report" (ECF No. 252-5).

but-for world would be the same whether Plaintiffs prevail on one liability theory, the other, or both. (*Id*.; Netz Report ¶¶ 68-79.)

Netz then purports to measure the difference between the actual prices consumers paid for PD products under the alleged wrongful conduct and the prices they would have paid in the but-for world absent that conduct. Under Netz's model, class-wide expenditures for PD products in the actual world minus class-wide expenditures for PD products in the but-for world equals the overcharge paid by the class. (Netz Report ¶¶ 66-67.) Netz used Science Diet ("SD") as a benchmark for PD products in the but-for world. (*Id*. ¶ 70.) Netz concluded that SD is an appropriate benchmark because both SD and PD are Hill's products (*id*. ¶ 72), both are considered a "premium" pet food (*id*. ¶ 73), both are sold through the same channels (including veterinarian offices), SD is marketed as "Veterinarian Recommended" to address targeted special needs including age, weight, digestive health, urinary health, and skin and coat health (*id*. ¶ 33), and a Hill's research study found that language about being "Medical/clinical" food "helps to distinguish Hill's [PD] from [SD] and other wellness diets" (*id*. ¶ 73).

Hill's challenges Netz's opinion as unreliable for two reasons. Hill's first argues that Netz cannot measure how much consumers overpaid for PD products because under her model consumers would get the benefits of PD for free. Specifically, Hill's takes issue with Netz's choice of SD as a benchmark, which is not a therapeutic food. There is no dispute that a "benchmark," or "yardstick," analysis is generally considered a reliable methodology upon which to calculate damages. *See Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *10 (N.D. Ill. Aug. 21, 2017).

For a benchmark product to be sufficiently reliable it should be "truly comparable" to the at-issue product. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D.

Ill. 2005), *amended,* No. 01 C 9389, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005). "[E]xact correlation is not necessary," but "care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Id*. (citation omitted). If the at-issue product and benchmark product are not "fair congeners," the resulting damages estimate will include factors and price inputs beyond the challenged conduct and the comparison is "manifestly unreliable." *Id*. However, "[t]he selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone." *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006) (citation omitted).

Hill's relies on *Loeffel Steel*, in which the district court found a benchmark analysis to be unreliable where the at-issue company and the benchmark companies were in the same industry but the expert "knew nothing about the respective geographic or product markets or customer bases of the [benchmark companies] or of the quality of service or any other relevant factor that would bear upon the question of comparability." 387 F. Supp. 2d at 813; *see also Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000) (rejecting soccer arenas as comparable businesses where "no evidence was offered regarding geographical location, size or attractiveness of those facilities, the size and type of the market that they served, the relative costs of operation," the amounts charged, or the number years the facility was run).

Hill's argues that Netz does not account for the differences between PD and SD, including the therapeutic benefits that PD provides, Hill's development and testing costs for each specific PD food, the cost of educating veterinarians about each PD food, and the role veterinarians play in a particular consumer's decision to purchase PD. Hill's marketing director for PD, Brian McCall, testified that the cost of Science and Technology and Research and Development (R&D) for clinical nutrition is a "more significant part" of PD formula

development than in Hill's nontherapeutic brands. (McCall Dep. Tr. 247:12-16, ECF No. 252-2.) Hill's expert Keith Ugone reports that financial data from Hill's Pet Nutrition Center indicates that from 2014 through 2021, Hill's allocated 16% to PD-specific projects, 7% to SD-specific projects, and 77% to projects that benefitted both product lines. (Ugone Report ¶ 84.)[4] Per Hill's, Netz's model would result in a windfall to consumers who would obtain PD's therapeutic benefit for the same cost as foods that do not offer those benefits.

Plaintiffs argue in response that Netz's but-for world—the world in which the alleged wrongful conduct does not occur—and her damages model based on that but-for world must match Plaintiffs' theory of liability. *See Comcast Inc. v. Behrend*, 569 U.S. 27 (2013). And in that but-for world, PD products would be sold as a non-therapeutic, non-prescription wellness product, like SD. There would therefore be no expenses incurred in educating veterinarians about each PD food and veterinarian authorization would not be required. As for the cost of development and testing for PD foods, Netz reports that McCall testified that Hill's accounting attributes the actual annual cost of R&D and Science and Technology at the global level and no longer allocates them between product lines—for example, between PD and SD. (Netz Report ¶ 78.) Netz points to internal Hill's documents that she contends show, contrary to McCall's belief, that when Hill's did allocate these costs by product line in 2013, it allocated essentially the same amount per pound to its wellness products (which include SD, Healthy Advantage, Bioactive Recipe, and, until 2019, Ideal Balance) as it did to PD. (*Id.*) Further, Netz calculates that a higher amount of R&D per dollar of net sales revenues was allocated to wellness products than to PD.

---

[4] The Court cites herein to the Rebuttal Expert Report of Keith R. Ugone, Ph.D. (ECF No. 275-22) as the "Ugone Report."

(*Id.*) Ultimately, Plaintiffs argue that Netz's selection of SD as a benchmark goes to the weight, not admissibility, of her opinion.

The Court is satisfied that the reasons Netz provides show a "rational connection" between the data and Netz's choice of SD as a benchmark. *Manpower*, 732 F.3d at 809 ("Assuming a rational connection between the data and the opinion . . . an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."); *Elorac*, 2017 WL 3592775, at \*11. Netz's explanations show that SD was not chosen arbitrarily. *See Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015), *amended,* No. 13CV6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016). Contrary to Hill's suggestion, PD and SD are hardly as conceptually dissimilar as saffron, caviar, and dry-aged steaks. And the Court agrees with Plaintiffs that Netz's personal pet situation is irrelevant as she is a California resident and not a class member. The comparison between SD and PD is not so "manifestly unreliable" that it "cannot logically advance a material aspect" of Plaintiffs' case. *Loeffel Steel*, 387 F. Supp. 2d at 812. Hill's will instead be free to explore the differences between SD and PD on cross-examination. *Manpower*, 732 F.3d at 809.

Second, Hill's argues that Netz's model relies on a "market theory" of causation that is foreclosed by Illinois law. *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 822 (7th Cir. 2018) ("ICFA plaintiffs cannot rely on a generalized 'market theory' of causation claiming that the defendant 'inflate[d] the cost of its product far above what it could have charged had the' defendant not 'misled consumers.'" (quoting *De Bouse v. Bayer AG*, 922 N.E.2d 309, 314-15 (Ill. 2009)). "To show proximate cause, the 'plaintiff must actually be deceived by a statement or omission that is made by the defendant;' the plaintiff cannot rest on vague accusations about inadequate disclosures and resulting price effects in the marketplace." *Id.* (citation omitted). In

*Oliveira v. Amoco Oil Co.*, the Illinois Supreme Court found the plaintiff's "market theory" of causation to be a "legally insufficient theory of causation" under ICFA. 776 N.E.2d 151, 160 (Ill. 2002). There, the plaintiff did not allege that the defendant's deceptive advertisements induced him to buy defendant's gasoline or that he was deceived by the ads. *Id*. at 155. Rather, he alleged that the defendant's deceptive advertising scheme increased demand for defendant's premium gasoline, which in turn allowed the defendant to charge inflated prices, and so all purchasers were injured irrespective of whether they saw or heard the advertisements in question. *Id*. at 155-56.

Here, Hill's argues that Plaintiffs' theories of causation for their deceptive and unfair practices claims are as follows: Some consumers were influenced by Defendants' allegedly deceptive or illegal marketing to buy or pay more for PD, thereby driving up market-wide prices for all consumers, even those who were not deceived or affected by the marketing in any way. Hill's *Daubert* argument overlaps with its argument against class certification based on its contention that causation is not capable of resolution on class-wide proof.

The Court finds that Plaintiffs do not rely on a market theory of causation. Named Plaintiff Nevius verified that she purchased PD because she believed there was medicine in it because her veterinarian had prescribed it (Resp. of Pl. Sherry Nevius to Def. Hill's Pet Nutrition Inc. First Set of Interrogs. at Resp. No. 6, ECF No. 252-2), and Named Plaintiff Vanzant's testimony supports that she purchased PD as a therapeutic product in a desperate attempt to save her cats' lives. (Vanzant Dep. Tr. 225, 274, ECF No. 252-2.) The evidence Plaintiffs rely upon to show class-wide proof of causation is set forth in the Court's Memorandum Opinion and Order on class certification, which is incorporated herein. (Mem. Opinion and Order 21-22, 29-31, ECF No. 314.)

Plaintiffs do not contend that every consumer who purchased PD during the class period is entitled to recover damages, regardless of whether they were actually deceived or induced by Hill's unfair conduct. Plaintiffs' position is that individual determinations as to actual deception or inducement may be made after the class is certified, which finds support in the law. *See Suchanek v. Strum Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined after the class is certified." (emphasis in original)); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("Proximate cause, however, is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification."). Although "a class will often include persons who have not been injured by the defendant's conduct . . . [s]uch a possibility or indeed inevitability does not preclude class certification." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) (finding defendant's argument that a number of putative class members were not harmed "is at best an argument that some class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification.").

To the extent individual issues as to damages arise, they can be addressed as this litigation unfolds. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) ("A determination of liability could be followed by individual hearings to determine the damages sustained by each class member."); *Dial*, 314 F.R.D. at 120 ("With looming issues regarding damages, a liability-only class, or the creation of subclasses, may be the most efficient vehicle to move this action forward." (citing *Butler, supra*), *amended,* No. 13CV6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016)). Such a process would not, as Hill's contends, necessarily render the

class an impermissible fail-safe class—*i.e.*, "a class that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 799 (7th Cir. 2017). If Defendants were correct in their position, it would be next to impossible to certify a class based on fraud. *Suchanek*, 764 F.3d 750, 759 ("Every consumer fraud case involves individual elements of reliance or causation. . . . [A] rule requiring 100% commonality would eviscerate consumer-fraud class actions.").

The Court's conclusion is consistent with the pending amendments to Federal Rule of Evidence 702; Plaintiffs have shown that it is more likely than not that Netz's opinion reflects a reliable application of the principles and methods to the facts of the case.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Exclude the Opinions and Testimony of Plaintiffs' Proffered Consumer Survey Expert Rebecca Reed-Arthurs [273], Plaintiffs' Motion to Partially Exclude Defendants' Proffered Expert Sarah Butler [292], and Hill's Motion to Exclude the Opinions and Testimony of Plaintiffs' Proffered Damages Expert Janet Netz [274] are denied.

**SO ORDERED.**                                      **ENTERED: October 23, 2023**

 

_____
**HON. JORGE ALONSO**
**United States District Judge**