**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HOLLY BLAINE VANZANT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 17 C 2535 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| HILL'S PET NUTRITION INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant PetSmart LLC's Motion for Summary Judgment and

Defendant Hill's Pet Nutrition, Inc.'s Motion for Summary Judgment. For the following reasons,

the Court grants Hill's' Motion in part and denies the Motion in part, and the Court grants

PetSmart's Motion.

## <u>Background</u>

In resolving a motion for summary judgment, the Court views the evidence in the light

most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). The following facts are taken from the record and are undisputed unless

otherwise noted.[1]

---

[1] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment and states that motions to strike are disfavored. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; he or it must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th

In the operative second amended complaint, Plaintiffs, Holly Blaine Vanzant and Sherry Nevius, assert two claims against Defendant Hill's Pet Nutrition, Inc. ("Hill's") and two claims against Defendant PetSmart, Inc. ("PetSmart"). In Count I, Plaintiffs assert a claim for violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") against Hill's, and in Count III, Plaintiffs assert a claim in the alternative against Hill's for restitution/unjust enrichment. In Count II, Plaintiff Vanzant asserts a claim for violation of the ICFA against PetSmart, and in Count IV, Plaintiff Vanzant asserts a claim in the alternative against PetSmart for restitution/unjust enrichment. This Court certified a class as to Plaintiffs' unfair practices claim against Hill's and Nevius's deceptive practices claim against Hill's under Count I. (Sep. 29, 2023 Mem. Opinion and Order, ECF No. 314.) The Court denied class certification with respect to Vanzant's deceptive practices claim against Hill's under Count I and her ICFA claims against PetSmart under Count II. (*Id.*) Accordingly, Vanzant's deceptive practices claim against Hill's and all her ICFA claims against PetSmart are proceeding individually.

Hill's sells "prescription diet" ("PD") products through veterinarians and third-party pet-food retailers like PetSmart, although consumers may only purchase it with a veterinarian's prescription. PetSmart enforces the prescription requirement through the use of a "MedCard."

---

Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

Vanzant's cat, Tarik, was diagnosed with feline lower urinary tract disease and required surgery in early 2013 to remove bladder stones. Tarik's veterinary surgeon prescribed Hill's PD crystal diet ("c/d") cat food to prevent future stones and gave Ms. Vanzant a written prescription. Vanzant testified that her vet told her she could fill the prescription at PetSmart, which PetSmart denies based on the veterinarian's testimony that she did not recall telling Vanzant she could "only" purchase PD at PetSmart. (PetSmart's Resp. to PSAF ¶ 8.) In any event, Vanzant went to PetSmart to purchase the prescribed Hill's pet food and was required to present the written prescription to PetSmart's in-store vet clinic, Banfield Pet Hospital ("Banfield"), which issued a MedCard for Tarik. Vanzant further testified that she "took the prescription to PetSmart, and they said that they could fill the prescription there, that I could buy the food there and the prescription would be filled." (Vanzant Dep. 123:2–5, ECF No. 368-3.) Plaintiffs contend that a PetSmart employee said this to Vanzant, while PetSmart argues that it could have been a Banfield employee. Vanzant found the PD c/d pet food near Banfield, segregated from the rest of the pet food in PetSmart.

Vanzant continued to purchase PD c/d pet food at PetSmart for approximately the next three years, and each time she was required to show the MedCard she had obtained from Banfield to the cashier at PetSmart. Vanzant testified that she bought the PD c/d cat food for Tarik for three years because her vet prescribed it and because she thought there was medication in the food to prevent Tarik's bladder stones from recurring. She testified that had PetSmart done anything to make her aware that the PD c/d product did not contain drugs or medicine or did not contain an FDA-approved drug or medicine, she would have "reevaluated [her] position and probably would not have purchased it on that day so that [she] could do some more research." (Vanzant Dep. 272:9–17, ECF No. 368-3.) In late 2015, Tarik was again diagnosed with bladder

stones and needed a second surgery. In early 2016, through researching Tarik's condition and feeding options, Vanzant learned that the PD c/d product she had been buying and feeding Tarik did not contain medicine.

In February 2017, when her cat Diablo was diagnosed with kidney disease, Vanzant bought a single can and a single bag of vet-prescribed PD kidney diet ("k/d") products for him as a stop-gap measure. She testified that she was unsure whether the PD k/d product contained medicine at that time and wanted to research the question further, rather than make any assumptions based on her prior bad experience with PD c/d food. Vanzant bought PD k/d cat food for Diablo in September 2017 and PD a/d pet food—a product designed for pets recovering from injury or surgery—for Tarik in December 2019. At the time Vanzant purchased PD k/d pet food at the end of 2017, she knew that it did not contain medicine and that the FDA did not regulate it. She bought these PD products—despite knowing that they did not contain medicine—in a desperate attempt to save her cats' lives when each cat had stopped eating and was near death. Both cats died shortly after the purchases. In 2020, during the Covid-19 pandemic, when Ms. Vanzant had to wait in her car while her cats saw the vet, she was sent home with what she thought were free samples of two cans of PD products; she did not know until shortly before her deposition that she had been charged for those samples and she did not feed them to her cat.

Nevius' labrador retriever, Moose, had diarrhea and possibly irritable bowel syndrome. In June 2019, Moose's vet prescribed PD intestinal diet ("i/d") dry dog food to treat Moose's gastrointestinal condition and told Nevius that the food required a prescription to purchase. Nevius bought the PD i/d food from Moose's vet because she believed there was medicine in the

4

food that would help with Moose's gastrointestinal issues and because Moose's vet had recommended and prescribed it for him.

Plaintiffs bring a deceptive practices claim against Defendants alleging that PD is not legally required to be sold by prescription, and so Defendants' representations that PD is required to be sold by prescription are literally false. (2d Am. Compl. ¶ 32.) Plaintiffs further allege that Defendants engaged in deception in the manufacturing, distributing, marketing, advertising, labeling, and/or selling of PD at above-market prices to diagnose, cure, mitigate, treat, or prevent diseases or other conditions, even though PD does not contain a drug, medicine or other ingredient that is not also common in non-prescription pet food. (2d Am. Compl. ¶¶ 32-37.)

It is disputed whether PD products are so-called "actual prescription products," and Hill's contends that Plaintiffs cannot prove that PD products are not legally required to be sold by prescription. (Hill's' Resp. to PSAF ¶¶ 11–12.) It is undisputed that Hill's markets PD as prescription-only therapeutic products, although the parties dispute whether Hill's markets PD products as intended to diagnose, cure, mitigate, treat, or prevent diseases. (Hill's' Resp. to PSAF ¶ 23.)[2] And while it is undisputed that PD products do not contain "pharmaceutical" drugs, Hill's contends that Plaintiffs cannot assert both that PD does not contain drugs and that it is a drug under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq. ("FDCA" or "FD&C

---

[2] The Court refers herein to Defendant Hill's Pet Nutrition, Inc.'s Rule 56.1(c)(2) Response to Plaintiffs' Rule 56.1(b)(2) Statement of Additional Material Facts (ECF No. 391) as "Hill's' Resp. to PSAF." The Court similarly refers herein to Defendant PetSmart LLC's Response to Plaintiff Vanzant's Statement of Additional Facts (ECF No. 390) as "PetSmart's Resp. to PSAF." Plaintiff's Statement of Additional Facts that Require the Denial of Defendant PetSmart LLC's Motion for Summary Judgment (ECF Nos. 373, 374) is referred to herein as "PSAF in Opp'n to PetSmart's Mot." Plaintiff's Rule 56.1 Statement of Additional Material Facts in Opposition to Hill's Pet Nutrition, Inc.'s Motion for Summary Judgment is referred to herein as "PSAF in Opp'n to Hill's Mot." (ECF Nos. 382, 383.)

Act"). (*Id.* ¶ 9.) The Court addresses these disputes—which are primarily legal in nature—in the Analysis section below.

Plaintiffs also assert unfair practices claims, alleging that Defendants manufactured, marketed, labeled, and/or sold PD at above-market prices to diagnose, cure, mitigate, treat, or prevent diseases in animals without approval as a "new animal drug" pursuant to the FDCA, and without being registered and listed as a "drug" with the Food and Drug Administration ("FDA"). (2d Am. Compl. ¶¶ 38–45.) As a result, PD is allegedly adulterated and misbranded under the FDCA and its introduction into interstate commerce is a prohibited act. (2d Am. Compl. ¶¶ 43, 45.) Plaintiffs claim that Defendants' conduct offends public policy and is unethical and/or unscrupulous under the ICFA. (2d Am. Compl. ¶¶ 57–60.)

While it is undisputed that Hill's has not obtained FDA approval for any PD products, Hill's disputes that FDA approval is necessary or warranted based on the FDA's April 2016 Compliance Policy Guide ("CPG"), which Hill's contends makes clear that the FDA has exercised its enforcement discretion under the FDCA to decide whether such PD products are drugs. (Hill's' Resp. to PSAF ¶ 25.) The FDA's Center for Veterinary Medicine ("CVM") determines whether a new animal drug may be sold as an over-the-counter ("OTC") drug, a prescription ("Rx") drug, or a Veterinary Feed Directive ("VFD") drug, limited to drugs used in or on animal feed. (*Id.* ¶ 26.)

It is undisputed that Hill's markets and sells PD products pursuant to the CPG. (*Id.* ¶¶ 23–24.) The CPG, which does "not establish legally enforceable responsibilities" but rather "describes the agency's current thinking on various topics and should be viewed only as recommendations," states in part:

> For more than fifty years, dog and cat food manufacturers have marketed diets identified on their labels or in labeling or other communications disseminated by or

on behalf of the manufacturers ("manufacturer communications") as being intended to diagnose, cure, mitigate, treat, or prevent diseases ("treat or prevent disease"). These products are intended to provide all or most of the nutrients in support of meeting the animal's daily nutrient needs, serving as the animal's sole source of nutrients or diet other than water. By virtue of their intended use to treat or prevent disease, such products meet the statutory definition of a drug in section 201(g)(1)(B) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) [21 U.S.C. 321(g)(1)(B)]. In addition, these products meet the definition of food in section 201(f) of the FD&C Act [21 U.S.C. 321(f)] because they are articles used for food for animals. Consequently, under the FD&C Act, dog and cat food products that are intended to treat or prevent disease and to provide nutrients in support of the animal's daily nutrient needs can be regulated as drugs (section 201(g) of the FD&C Act [21 U.S.C. 321(g)]), foods (section 201(f) of the FD&C Act [21 U.S.C. 321(f)]), or both.

(CPG 3, ECF No. 368-8.)

The CPG further states,

Under section 201(g)(1)(B) of the FD&C Act, dog and cat food products that are intended to treat or prevent disease are drugs, even if they also provide nutrients in support of the animal's total required daily nutrient needs. Unless these products are approved as new animal drugs, these products are adulterated under section 501(a)(5) and misbranded under 502(f)(1) of the FD&C Act. In addition, in the absence of compliance with current good manufacturing practice requirements, these products are adulterated under section 501(a)(2)(B) of the FD&C Act. Unless these products are manufactured in and listed by a facility that is registered under section 510 of the FD&C Act, they are misbranded under section 502(o) of the FD&C Act. However, FDA is less likely to initiate enforcement action against dog and cat food products intended to be fed as the pet's sole diet that claim to treat or prevent disease when all of the following factors are present[] . . . .

(*Id.* at 6–7.) The CPG lists 11 factors, including, "[t]he product is made available to the public only through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian." (*Id.*)

## **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary

7

judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Id.* at 248.

## Discussion

### I.  **Hill's' and PetSmart's[3] Motion for Summary Judgment on Plaintiffs' Unfair Practices Claim**

Hill's argues that Plaintiffs' unfair practices claim fails as a matter of law because it is impliedly preempted by the FDCA under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348 (2001). In the alternative, Hill's joins PetSmart's argument that Plaintiffs cannot prove that Hill's acted unfairly. Because the Court finds that Plaintiffs' unfair practices claim is preempted by the FDCA, the Court declines to reach Hill's' or PetSmart's alternative arguments.

---

[3] PetSmart joins Hill's' argument that Plaintiff's unfairness claim is preempted and interferes with FDA's enforcement discretion. (Def. PetSmart LLC's Mem. in Support of Mot. for Summ. J. 6 n.5, ECF No. 359-1.)

As a threshold matter, the Court must determine the scope of Plaintiffs' unfair practices claim. Hill's argues that Plaintiffs' unfair practices claim as certified by this Court is limited to the theory that Hill's' practice of marketing and selling unsafe, adulterated, and misbranded PD products offends public policy as established by the FDCA. Plaintiffs, on the other hand, argue that in addition to that theory, they also allege that Hill's' prescription requirement and marketing and sale of PD as therapeutic products intended to treat or prevent disease are unethical and unscrupulous because Hill's charges above-market prices for PD even though: (1) PD contains no drug, medicine, or other ingredient that is not also common in non-prescription pet food; (2) it is not legally required to be sold by prescription; and (3) Hill's markets other non-prescription pet foods as products intended to treat, mitigate, or prevent the same or similar conditions as PD, which are sold at significantly lower prices than PD. Plaintiffs argue that these additional allegations do not depend on a violation of the FDCA, so the claim is capable of existing independently of the FDCA and is not impliedly preempted under *Buckman*.

While Plaintiffs are correct that their additional three-prong theory appears in their complaint, when certifying the class, this Court stated that it understood that Plaintiffs were no longer pursuing this theory based on their class-certification briefing:

> Plaintiffs' theory of liability as to unfair practices appears to continue to shift. As pled in the complaint, Plaintiffs allege at least in part that PD products are not as promised because they do not contain a drug or medicine. (2d Am. Compl. ¶¶ 59-62.) As argued in the class certification briefing, however, Plaintiffs' unfair practices claims now appear to focus only on the allegation that Defendants' marketing, labeling, and selling of PD products for the diagnosis, cure, mitigation, treatment, or prevention of disease brings it within the definition of a "drug" and "new animal drug" that requires FDA or FD&C Act approval, and without that approval it is statutorily "unsafe," "adulterated," and "misbranded," and so selling PD products offends public policy, is immoral, unethical, oppressive, or unscrupulous, and has caused substantial harm to consumers. . . . The Court understands that Plaintiffs do not base their unfair practices claims on a theory of deception.

(Mem. Opinion and Order 12, ECF No. 314 (footnote and citations omitted).)

Plaintiff briefly argues that at the summary judgment stage, the court looks to the complaint to determine a plaintiff's claims. *See ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 270 (N.D. Ill. 2020) ("Although we are at the summary judgment stage, the Court still looks at the complaint to determine Plaintiff's claims."). But when certifying a class, the district court must specifically "define the class and the class claims, issues, or defenses[.]" Fed. R. Civ. P. 23(c)(1)(B). The district court must undertake a "rigorous analysis" to satisfy itself "that the prerequisites for class certification have been met." *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021) (cleaned up). The rigorous analysis required for "considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action." *Id.* (cleaned up). From there, the court should "frame[] within those elements what it deemed to be the common and individual issues" so that the inquiry is "train[ed] on the legal or factual questions that qualify each class member's case as a genuine controversy." *Id.* at 1018 (cleaned up).

Here, the first prong of Plaintiff's additional unfair practices theory—that PD products do not contain a drug or medicine—was expressly excluded from the claims and issues analyzed in the Court's Opinion on class certification. Nor did the second and third prongs undergo the rigorous analysis required before a district court may certify a class on those claims. Therefore, those issues were not certified for class treatment.

In short, the unfair practices claim certified for class treatment is that Defendants' marketing, labeling, and/or selling of PD products for the treatment or prevention of disease brings it within the definition of a "drug" and "new animal drug" under the FDCA that requires FDA approval, and without that approval it is statutorily "unsafe," "adulterated," and

10

"misbranded," offends public policy, and is unethical and unscrupulous. The Court turns to considering whether this state-law claim is preempted. Defendants do not argue express preemption, so the Court limits its analysis to implied preemption.

In *Buckman*, the Supreme Court held that, because enforcing the FDCA is exclusively the province of the federal government, there is no private right of action under the FDCA. 531 U.S. at 349 n. 4 ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance . . . : '[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.' 21 U.S.C. § 337(a)."). Thus, a private litigant cannot sue a defendant for violating the FDCA. Similarly, a private litigant cannot bring a state-law claim against a defendant when the state-law claim is in substance, if not in form, a claim for violating the FDCA—that is, when the state claim would not exist if the FDCA did not exist. *Id.* at 352–53; *see also Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009). In *Buckman*, the Court held that a state-law claim that the defendant made misrepresentations to the FDA is preempted because such a claim would not exist absent the federal regulatory scheme established by the FDCA. 531 U.S. at 353.

This does not mean that a plaintiff can never bring a state-law claim based on conduct that violates the FDCA. To avoid being impliedly preempted under *Buckman*, a claim must "rely[] on traditional state tort law which had predated the federal enactments in question[]." *Id.* In other words, the conduct on which the claim is premised must be the type of conduct that would traditionally give rise to liability under state law—and that would give rise to liability under state law even if the FDCA had never been enacted. If the defendant's conduct is not of this type, then the plaintiff is effectively suing for a violation of the FDCA (no matter how the plaintiff labels the claim), and the plaintiff's claim is thus impliedly preempted under *Buckman*.

11

*Id.* at 349 n. 4.

Plaintiffs' unfair practices claim would not give rise to a recovery under ICFA in the absence of the FDCA. If the FDCA had never been enacted, PD products would not be defined as a "drug" or "new animal drug;" there would be no requirement of FDA approval; and so the absence of that approval would not render PD products statutorily "unsafe," "adulterated," or "misbranded" under the FDCA. Plaintiffs put forth no argument or evidence that the PD products are unsafe, adulterated, or misbranded outside the confines of the FDCA—in other words, there is no allegation or evidence that a pet was physically injured, fell ill, or was otherwise harmed because of the PD products, or that the PD products did not provide the advertised therapeutic benefits.

Plaintiffs argue that the ICFA provides a remedy for false or misleading advertising and unfair or deceptive business practices, which is an area of regulation aimed at protecting consumer health, safety, and morals, and so falls under state regulated police powers. 815 ILCS § 505/1, et seq*.*; *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals."); *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002) (The ICFA "is a regulatory and remedial statute intended to protect consumers, . . . against fraud . . . and other unfair and deceptive business practices"). For claims related to a field of law that states had traditionally occupied, such as state regulation of matters of health and safety, there is a presumption against preemption. *Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010). That may be so, but it does not change the fact that Plaintiffs would have no claim under ICFA if the FDCA were never enacted.

For this reason, this case is distinguishable from *Bausch*. There, the plaintiff sued

defendants for manufacturing, distributing, and selling a hip replacement system that was implanted in her body six days after the FDA informed defendants that a component was "'adulterated' and the companies' manufacturing process failed to comply with federal standards." *Id.* at 549. After the hip replacement system failed, requiring surgical removal and replacement and leading to a host of medical problems, the plaintiff sued under Illinois common law for negligence and strict liability for a defective product. *Id.* The defendants argued in part that the plaintiff's claim that a medical device was "adulterated" was impliedly preempted because there is no state tort duty to manufacture a product that is not adulterated. *Id.* at 557. The court disagreed, finding that although there "may not be a 'traditional state tort law claim' for an 'adulterated' product in so many words, the federal definition of adulterated medical devices is tied directly to the duty of manufacturers to avoid foreseeable dangers with their products by complying with federal law." *Id.* Consequently, "[t]he evidence showing a violation of federal law shows that the device is adulterated and goes a long way toward showing that the manufacturer breached a duty under state law toward the patient." *Id.*

Here, by contrast, Plaintiffs bring no claim for negligence or strict liability for a defective product. To be sure, Plaintiffs allege that Defendants' conduct (the marketing, labeling, and/or selling of unsafe, adulterated, and misbranded products for the diagnosis, cure, mitigation, treatment, or prevention of disease) is unfair under ICFA. But *why* is it alleged to be unfair? Not because any pet was harmed or because the product does not work as promised, but solely because it falls within the FDCA's statutory definition of unsafe, adulterated, and misbranded products.

The Court finds *Anthony v. Country Life Mfg., L.L.C.*, No. 02 C 1601, 2002 WL 31269621, at *1 (N.D. Ill. Oct. 9, 2002), *aff'd sub nom. Anthony v. Country Life Mfg., LLC.*, 70

F. App'x 379 (7th Cir. 2003), persuasive on this issue. There, the plaintiff brought a claim under the ICFA, alleging that the making and manufacturing of adulterated food offends public policy and is immoral, unethical, and unscrupulous, and therefore amounts to an unfair practice. *Id.* at *2. Specifically, the plaintiff alleged that she purchased nutrition bars manufactured by the defendant that contained two ingredients that the FDA had not approved as food additives and therefore the bars were "adulterated" food products under the FDCA. *Id.* at *1. The plaintiff, like here, did not base her unfair practices claim on a theory of deception. *Id.* And also like here, the plaintiff pointed to direct economic loss (the cost of purchase) as her only injury. *Id.*[4]

The court found as a matter of law that the defendant's act of producing and marketing adulterated food did not rise to the level required by Illinois courts to establish an unfair practice, and that even if it did, her claim was preempted by the FDCA. *Id.* at *2–3. The court found that the plaintiff's claim was premised solely upon a violation of the FDCA (that defendant sold nutrition bars containing ingredients that the FDA had not approved) and did not allege the plaintiff was injured after consuming the bars. *Id.* The court explained that the case might have come out differently if, for example, the plaintiff had become ill after consuming the bars and wished to use the FDCA to demonstrate that the defendant's products had not met federal standards. *Id.* But that was not the claim in *Anthony*; there, as here, the plaintiff's claim was "unmistakably one for direct enforcement of the FDCA, for which no private right of action exists." *Id.*

---

[4] Plaintiffs briefly argue that *Anthony* is distinguishable because there the plaintiff sought injunctive relief in addition to damages. The Court finds this point unpersuasive because Plaintiffs' argument is underdeveloped and the court in *Anthony* did not consider the type of relief the plaintiff was requesting in its analysis. Further, as Hill's points out, *Buckman* involved a claim for damages. 531 U.S. at 343.

Accordingly, Plaintiffs' unfair practices claim is dismissed.[5] The Court declines to address the parties' remaining arguments regarding Plaintiffs' unfair practices claim.

II.    **Plaintiffs' Deceptive Practices Claim**

A.    **Hill's' and PetSmart's[6] Motion for Summary Judgment on Plaintiffs' Deceptive Practices Claim[7]**

Hill's argues that Plaintiffs' deceptive practices claim is based on two theories: the prescription requirement is deceptive because it falsely or misleadingly represents to consumers that (1) a prescription is "legally required" to purchase PD and (2) PD contains a drug or medicine. Hill's argues that each theory fails because (1) Plaintiffs have presented no evidence that reasonable consumers believe the prescription requirement impliedly represents that a prescription is "legally required," and (2) Plaintiffs cannot credibly claim that Hill's misled consumers into believing PD contains drugs, and at the same time allege that PD is a drug under the FDCA. Additionally, Hill's joins PetSmart's argument that Vanzant cannot prove materiality or causation because she continued to purchase PD after learning it does not contain drugs.

"To prevail on a claim under the ICFA, 'a plaintiff must plead and prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages.'"

---

[5] Plaintiffs concede that the analysis is the same for Hill's and PetSmart. Accordingly, Plaintiffs' unfair practices claim is dismissed as to both Hill's and PetSmart.

[6] PetSmart joins Hill's' argument that Plaintiff's deception theory fails to the extent her theory is that a prescription is "legally required" or that she was deceived into believing PD contained "drugs." (Def. PetSmart LLC's Mem. in Support of Mot. for Summ. J. 3 n.2, ECF No. 359-1.) However, the Court grants summary judgment in PetSmart's favor for other reasons with respect to Vanzant's claims against it. *Infra*.

[7] PetSmart joins Hill's' argument that Plaintiff's deception theory fails to the extent her theory is that a prescription is "legally required" or that she was deceived into believing PD contained "drugs." (Def. PetSmart LLC's Mem. in Support of Mot. for Summ. J. 3 n.2, ECF No. 359-1.) However, the Court grants summary judgment in PetSmart's favor for other reasons with respect to Vanzant's claims against it. *Infra*.

*Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)). The elements of Plaintiffs' claims for deceptive practices therefore are (1) a deceptive act or practice by Hill's, (2) that the deceptive act or practice occurred in the course of conduct involving trade or commerce, (3) that Hill's intended that Plaintiffs rely on the deception, and (4) that the deception caused Plaintiffs actual damages. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Where an ICFA claim is based on misrepresentations or omissions in statements made to consumers, the misrepresentation or omissions "must also be material to reasonable consumers." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598 n.6 (7th Cir. 2024) (citing *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1336 (Ill. App. Ct. 1995)); *see Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 53 (7th Cir. 1995).

Deception requires "proof that a statement is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (citations omitted). "[A] practice is deceptive 'if it creates a likelihood of deception or has the capacity to deceive.'" *Benson*, 944 F.3d at 646 (citation omitted). "To determine the likelihood of deception, courts apply a 'reasonable consumer' standard." *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 704-05 (N.D. Ill. 2020) (citing *Benson*, 944 F.3d at 646). Courts considering "deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 476 (7th Cir. 2020).

Although "Plaintiff's reliance is not an element of statutory consumer fraud . . . , a valid claim must show that the consumer fraud proximately caused plaintiff's injury." *Connick v.*

16

*Suzuki Motor Co.* 675 N.E.2d 584, 593 (Ill. 1996). Plaintiffs "must set forth sufficient evidence creating a genuine issue of material fact that 'but for' the defendants' [deceptive] conduct, [they] would not have been damaged, i.e., . . . would not have purchased the defendants' [product] at artificially inflated prices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). If the plaintiff in a consumer fraud action was not actually deceived by a statement or omission made by the defendant, then she cannot prove proximate causation. *De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009).

Ordinarily, proximate causation is a question of fact for the jury. *Connick*, 675 N.E.2d at 595. "Where, however, 'there is no material issue regarding the matter or only one conclusion is clearly evident' from the undisputed facts, a court may find lack of proximate causation as a matter of law." *Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 770 (S.D. Ill. 2010) (quoting *Williams v. Univ. of Chi. Hosps.*, 688 N.E.2d 130, 134 (Ill. 1997)).

### Plaintiffs' "Drug or Medicine" Claim

One of Plaintiffs' theories is that, by imposing and enforcing the prescription requirement for PD products and by labeling them "*Prescription* Diet," Hill's falsely represents to consumers that PD products contain a drug or medicine. Hill's argues that Plaintiffs cannot credibly claim that Hill's misled consumers into believing PD pet food contains drugs or medicine and, at the same time, claim that PD pet food qualifies as a drug under the FDCA. That is, according to Hill's, Plaintiffs cannot accuse Hill's of deception based on the theory that the labeling of "prescription diet" pet food falsely suggests that the product is a drug, when Plaintiffs' own position is that the product really *is* a drug.

Plaintiffs respond that Hill's misses an important semantic distinction: whether a product falls within the statutory definition of a "drug" under the FDCA is a different question than

17

whether the product actually contains a drug in a more colloquial sense, *i.e.*, medicine. What Plaintiffs mean when they argue that Hill's misleads consumers to believe that PD products contain drugs, they explain, is that Hill's suggests that they contain some sort of medicine or "pharmaceutical" drug. It is undisputed that PD products do not contain any "pharmaceutical" drugs, which the parties appear to mutually understand, in accord with the definition of "drug" in 21 U.S.C. § 321(g)(1)(C), to be chemical substances other than nutrients intended to affect the structure or function of the body of a human or other animal.[8]

Making inferences in Plaintiffs' favor, the Court construes Plaintiffs' claim to be that PD products do not contain pharmaceutical drugs, and so it is therefore not inconsistent with Plaintiffs' position that PD products qualify as "drugs" under the FDCA, in accord with the guidance provided in the CPG, because they are marketed as being intended to treat or prevent disease. To put it simply, the claims are based on two different meanings of the word "drug." And, in any event, the Court has explained above that any unfair-practices claim depending on the theory that PD products are drugs is preempted, so this suit will not be encumbered by any seemingly inconsistent theories going forward. Plaintiffs' "drug or medicine" claim does not fail as a matter of law for the reasons argued by Hill's, and summary judgment is denied in this respect.

### *Plaintiffs' "Legally Required" Claim*

Plaintiffs claim that Hill's represents to consumers that PD is required to be sold by prescription through its prescription requirement and "Prescription Diet" labeling, but that representation is both (1) literally false and (2) likely to mislead a reasonable consumer because

---

[8] The Court hereafter adopts this understanding of the term "pharmaceutical drugs" when referred to elsewhere in this Opinion.

PD products are not "actual prescription products" because they are not "veterinary prescription drugs" under 21 U.S.C. § 353(f)[9] and because no PD product is FDA approved. (Pls.' Resp. to Def. Hill's Pet Nutrition, Inc.'s Mot. for Summ. J. 13, ECF No. 380.) Although here, again, semantic difficulties plague the briefing, the Court understands Plaintiffs to be arguing essentially that PD labeling is misleading because it misrepresents to consumers that a prescription for PD products is required by law. (*Id.* at 13–15 ("Through its prescription requirement and 'Prescription Diet' labeling, Hill's also falsely represents to consumers that PD is a prescription product and is required to be sold by prescription." (citing PSAF in Opp'n to Hill's Mot ¶¶ 10, 14)); PSAF in Opp'n to Hill's Mot ¶ 10 ("By requiring a prescription to purchase PD and by labeling the products 'Prescription Diet,' Hill's also represents to PD purchasers that PD products are prescription products and that a prescription is required to purchase PD."); *id.* ¶ 14 ("Hill's does not disclose to consumers on the labels or elsewhere in its

---

[9] Both parties rely upon 21 U.S.C. § 353(f), which states in relevant part,

**Veterinary prescription drugs**

(1)(A) A drug intended for use by animals other than man, other than a veterinary feed directive drug intended for use in animal feed or an animal feed bearing or containing a veterinary feed directive drug, which—

(i) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary for its use, is not safe for animal use except under the professional supervision of a licensed veterinarian, or

(ii) is limited by an approved application under subsection (b) of section 360b of this title, a conditionally-approved application under section 360ccc of this title, or an index listing under section 360ccc-1 of this title to use under the professional supervision of a licensed veterinarian,

shall be dispensed only by or upon the lawful written or oral order of a licensed veterinarian in the course of the veterinarian's professional practice.

marketing or advertising that PD contains no drugs or medicine and is not required *by law* to be sold by prescription.") (emphasis added).)

Hill's argues that (1) Plaintiffs have presented no evidence that the prescription requirement communicated the message that a prescription is legally required, and (2) Plaintiffs cannot prove that a prescription is not legally required, both because they lack any evidence so demonstrating and because the issue is preempted. The Court addresses the second argument first.

According to Hill's, Plaintiffs cannot prove that a prescription is not legally required for PD because to do so they must prove pursuant to 21 U.S.C. § 353(f) that PD would be safe without veterinary supervision or that it is not a "drug" (a determination that is within the province of the FDA). As to the former point, Plaintiffs proffer no argument or evidence that PD is safe without veterinary supervision. As to the latter point, Hill's contends that Plaintiffs cannot prove that PD products are not a "drug" because they take the position that PD pet food *is* a "drug" under the FDCA, and in any event, whether PD pet food is a "drug" under the FDCA is a legal determination within the sole province of the FDA, not the Court or jury. And the FDA issued the CPG, which sets forth its position (according to Hill's' interpretation) that therapeutic pet foods like PD products are not safe without veterinary oversight. Hill's argues that Plaintiffs' "legally required" claim is consequently preempted, they cannot prove that a prescription is not legally required for PD, and so they cannot prove that Hill's' alleged representations are literally false or likely to mislead.

In response, Plaintiffs indulge in much hand-waving about Hill's historical position on the question of whether PD products are drugs,[10] but this is beside the point; the fact that Hill's took a particular position on a legal question does not, by itself, establish what the law provides. More to the point is Plaintiffs' argument that it is undisputed that no PD product is FDA approved. Both parties agree that the FDA decides whether a product is a drug under the FDCA and is subject to the prescription requirement of 21 U.S.C. § 353(f) for veterinary prescription drugs, and the FDA's CVM determines whether a drug may be sold by prescription or over-the-counter. In other words, it is for the FDA to determine whether a product is a drug and whether that drug must be sold by prescription, and it has made no such determination here because Hill's has not undergone the application process required to obtain FDA approval for new animal drugs. Based on the statutory framework for when prescriptions are required for drugs intended for animals under federal law, Plaintiffs need not prove that PD is not a "drug" subject to the prescription requirements of 21 U.S.C. § 353(f) to show that no prescription is legally required in the sale of PD products—the undisputed absence of any binding determination by the FDA that PD is a drug that must be sold by prescription only is sufficient. Because neither the Court nor jury need make these determinations, Hill's' preemption argument fails.

---

[10] In particular, they point to (1) Hill's' RFA responses that Hill's does not consider any PD product to be a "veterinary prescription drug" under 21 U.S.C. § 353(f); (2) Hill's answer to the Second Amended Complaint stating that PD products do not bear the mandatory legend borne by those items required by the FDA to be sold by prescription and denial that the legend is mandatory or legally required for PD products; and (3) the undisputed fact that PD products are not FDA approved. (PSAF in Opp'n to Hill's Mot. ¶ 11.) Additionally, Plaintiffs rely upon the testimony of Hills's' corporate representative, Dr. Faurot, stating that Hill's is not aware of any federal or state law that has ever required a prescription for PD products, and a 2019 e-mail from Hill's' Chief Professional Veterinary Officer stating "there is no legal requirement in the form of a law or regulation" that PD products be sold by prescription. (*Id.* ¶ 12.)

Hill's disputes that FDA approval is necessary or warranted here because the FDA exercised its enforcement discretion under the FDCA to decide whether PD products are drugs when it issued the CPG. To reiterate, the CPG states that pet food marketed as being intended to treat or prevent disease and also to provide all or most of the nutrients in support of meeting the animal's daily nutrient needs meets the statutory definition of both a drug and food under the FDCA, 21 U.S.C. 321(g)(1)(B), (f). The CPG further states that such products can be regulated as drugs, foods, or both. However, unless the "products are approved as new animal drugs . . . [they] are adulterated under section 501(a)(5) and misbranded under 502(f)(1) of the FD&C Act." The CPG states that the "FDA is less likely to initiate enforcement action against dog and cat food products intended to be fed as the pet's sole diet that claim to treat or prevent disease when all of the following factors are present[] . . . ." One of the factors is that "[t]he product is made available to the public only through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian."

To the extent Hill's position is that the upshot of this is that the CPG effectively requires PD products to be sold only by prescription, the CPG itself states that it does "not establish legally enforceable responsibilities"; it "describes the agency's current thinking and should be viewed only as recommendations." The Seventh Circuit stated that the CPG "helps FDA staff allocate enforcement resources" but "does not establish any legally enforceable responsibilities, . . . is not binding on either the FDA or the public[,]" and does not "specifically authorize the Hill's prescription requirement, prescription label, and related marketing representations[.]" *Vanzant*, 934 F.3d at 737–38. A reasonable factfinder could conclude that Hill's put PD labeling on products although no prescription was legally required to purchase them, and a claim based on that theory is not preempted.

22

That leaves the argument that Plaintiffs have proffered no evidence that the prescription requirement and labeling communicated the message that a prescription is legally required. Hill's argues that Plaintiffs' survey expert, Rebbecca Reed-Arthurs, did not test this theory because none of her closed-ended questions asked respondents whether they understood the prescription requirement to mean a prescription was legally required, and only two of the 288 respondents indicated they understood the prescription requirement to convey that a prescription was legally required. According to Hill's, Plaintiffs thus have no evidence that the PD labeling conveyed to consumers that a prescription was "legally required."

Plaintiffs appear to take the position that they need not provide extrinsic evidence of actual consumer confusion because the PD labeling, to the extent it suggests that a prescription is legally required, is literally false. They cite *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 976 (7th Cir. 2020), although the decision does not directly support their position. In *Beardsall*, the Seventh Circuit stated that the consumer-fraud plaintiffs in that case "needed to offer evidence that reasonable consumers were likely to be misled in a material way," *id.* at 973, and it distinguished precedents in which "the plaintiffs identified precisely how the manufacturers' advertising was misleading and provided evidence that the misrepresentation mattered to consumers," unlike in *Beardsall*, where the plaintiffs "offered no evidence that the products fell short of consumers' expectations in any material way," *id.* at 976. The court added—and this is the part Plaintiffs latch on to—that "[t]his is not to say that extrinsic evidence in the form of consumer surveys or market research is *always* needed for a plaintiff to survive summary judgment . . . on a deceptive advertising claim." *Id.* However, the court continued, "such evidence is necessary where the advertising is not clearly misleading on its face and materiality is in doubt." *Id.*

*Beardsall* does not aid Plaintiffs in pushing their "legally required" theory over the summary judgment hump. First, it is doubtful whether the PD labeling is "clearly misleading on its face," as to whether a prescription is legally required. *Beardsall* cited *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009), a Lanham-Act false-advertising case, for the proposition that "a representation may be so obviously misleading that there is no need to gather evidence that anyone was confused." But that case explained that courts may dispense with such evidence only where the challenged statement is a "literal falsehood" that is "bald-faced, egregious, undeniable, over the top." *Id.* at 513. "The proper domain of 'literal falsity' as a doctrine that dispenses with proof that anyone was misled or likely to be misled is the patently false statement that means what it says to any linguistically competent person." *Id.* "[T]he meaning of the alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed." *Id.* But "only an *unambiguous* message can be literally false." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 587 (3d Cir. 2002); *see* 4 McCarthy on Trademarks and Unfair Competition § 27:54 (5th ed.) ("All courts agree that only an unambiguous message can be classified as being 'literally false.'") (citing cases). "[I]f the language . . . is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Even if the PD labeling suggests to some consumers that a prescription is legally required, the Court fails to see how a reasonable juror could conclude that it does so unambiguously, *i.e.*, that it would convey that message to "any linguistically competent person." *Schering-Plough*, 586 F.3d at 513; *see Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936 (7th Cir. 2021) ("To

survive summary judgment, Weaver needed to offer evidence that reasonable consumers were likely to be misled in a material way . . . and he has failed to do so.").

Even putting that issue aside, another issue stands in Plaintiffs' way: materiality. Plaintiffs state that *Beardsall* provides that extrinsic evidence is unnecessary only where the challenged statement is "misleading on its face *and materiality is not in doubt*." (Pls.' Resp. Br. 15 (emphasis added) (citing *Beardsall*, 953 F.3d at 976).) To establish that "materiality is not in doubt," Plaintiffs cite certain evidence (*see* Pls.' Resp. Br. 14 (citing PSAF in Opp'n to Hill's Mot. ¶¶ 15-18, 29-30)), but this evidence does not establish that it makes any material difference to consumers whether the requirement that they must have a prescription to purchase PD products is imposed by the sellers or the law. Rather, the cited evidence tends to suggest that consumers purchase PD products because their veterinarians have directed them to do so for the well-being of their pets, and they therefore think of the PD products as medicine. Whether the PD labeling misleads consumers to believe that PD products contain drugs or medicine is a question for the finder of fact, as the Court has explained above, but the Court fails to see how any reasonable factfinder might conclude that it follows from evidence going to that drug/medicine issue that it matters to consumers whether the source of the prescription requirement is legal.  The Court fails to see any connection, nor does the Court see any other basis on which a reasonable factfinder might conclude that any "inaccuracy" about whether the prescription requirement arises out of law is "material" to consumers. *See Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (concluding that defendant's statement that its pagers displayed "updated game information direct from each arena," when the information came from broadcasts rather than first-hand observation, was "not material" because any "inaccuracy in the statements" was "simply irrelevant" to consumers).

25

Plaintiffs have not come forward with evidence that would permit a reasonable juror to conclude either that Hill's PD marketing deceived consumers as to whether a prescription was legally required or that such marketing caused any injury to consumers, regardless of whether they were deceived. Because Plaintiffs have not come forward with evidence sufficient to support a reasonable jury verdict in their favor as to any theory that Hill's marketing of PD products deceives consumers to believe that the prescription requirement is imposed by law, the motion for summary judgment is granted as to that issue.

### B. PetSmart's and Hill's[11] Motion for Summary Judgment on Vanzant's Deceptive Practices Claim

PetSmart argues that Vanzant's purchases of PD after she filed this lawsuit vitiate the theory of causation underlying her deception claim. Numerous cases have found post-filing purchases to undermine a consumer fraud claim on the causation issue, but Vanzant claims that they are distinguishable. The Court is not convinced.

In *Siegel*, the Seventh Circuit found that the plaintiff could not establish harm because he testified, among other things, that he continued to purchase gasoline from defendants even after he filed his lawsuit challenging gasoline pricing under ICFA. 612 F.3d at 937 (affirming summary judgment against plaintiff). Vanzant attempts to distinguish *Siegel* on the basis that that plaintiff continued to regularly purchase defendants' product for convenience (i.e., as opposed to for a sick pet), but *Siegel* did not consider the reason the plaintiff continued to purchase products after filing a lawsuit as relevant to the deception inquiry.

---

[11] Hill's joins PetSmart's argument in Section I.A.2 on page 5 of PetSmart's motion that Plaintiff Vanzant's purchases of PD after she filed this lawsuit vitiates the theory of materiality and causation underlying her deception claim but does not join its arguments in Section I.A.1 on pages 3–4 of PetSmart's motion that there is no evidence that PetSmart or the MedCard caused any deception that was material to Plaintiff's purchasing decision.

In *Kremers*, the court found that the plaintiff's testimony that she had known for many years that "Classic" Coke contained high fructose corn syrup (and thus was not the "Original Formula" for Coke) "defeats totally any inference that Coca–Cola's conduct in marketing 'Classic' Coke as Coke's 'Original Formula' caused [her] to purchase Coca–Cola's product." 712 F. Supp. 2d at 774 (citations omitted) (finding plaintiff failed to set forth sufficient evidence creating a genuine issue of material fact that "but for" Coca-Cola's unfair conduct, she would not have purchased "Classic" Coke). Vanzant argues that *Kremers* is distinguishable because there the plaintiff admitted to years of pre-suit knowledge of the alleged deceit and continued purchases, and otherwise argues that simply because Vanzant purchased PD after learning the truth does not mean she was not deceived for years before 2016.

But here, like in *Kremers*, the undisputed evidence shows that Vanzant purchased PD products despite knowing the truth: that PD does not contain drugs and that a prescription was not legally required. This totally defeats any inference that PetSmart's allegedly deceptive conduct—marketing and selling Hill's PD products pursuant to a prescription requirement and failing to disclose the material facts that a prescription was not legally required for PD and that PD contains no drugs—caused Vanzant to purchase PD. In other words, no reasonable juror could find that but for PetSmart's alleged deception, she would not have purchased PD products, when her actions show the opposite.

Vanzant argues that her post-2016 PD purchases do not defeat causation as a matter of law because she did not learn that *all* PD products do not contain medicine; rather, she learned that PD *c/d* does not contain medicine, whereas she bought PD *k/d* in 2017 before confirming it has no medicine, and her two other PD purchases in 2017 and 2019 were desperate, unsuccessful attempts to stave off her cats' deaths. The Court previously considered a similar argument by

Vanzant at the class certification stage, and its concern then is similarly applicable now at the summary judgment stage: "[T]his argument only undermines the theory of materiality and causation at the heart of Plaintiffs' deceptive practices claims: namely, that it is the prescription requirement, universally applied to all PD products, that misleads a reasonable consumer into believing that PD products contain medicine and that a purchaser would have acted differently (i.e., not purchased the product) knowing the truth." (Mem. Opinion and Order 11, ECF No. 314.) Further, it is undisputed that Vanzant purchased PD k/d after learning that PD k/d did not contain drugs.

The Court discerns no issue for a jury as to whether but for Defendants' alleged deception, Vanzant would not have been damaged (i.e. she would not have purchased PD products). Vanzant lacks proximate cause as a matter of law and so summary judgment is granted on Vanzant's claim for deceptive practices in this case. This finding applies to Vanzant's deceptive practices claims against PetSmart as well as Hill's. The Court need not consider the remaining issues raised by the parties with respect to Vanzant's deceptive practices claims.

III.  **Unjust Enrichment**

The parties agree that an unjust enrichment claim fails if the ICFA claims fail as a matter of law. *Siegel*, 612 F.3d at 937 ("A claim of unjust enrichment 'is not a separate cause of action that, standing alone, will justify an action for recovery.'" (quoting *Martis v. Grinnell Mut. Reinsurance Co.,* 905 N.E.2d 920, 928 (Ill. App. Ct. 2009))). Therefore, because Vanzant's ICFA claim and Plaintiffs' unfair practices claim against Defendants fails as a matter of law, so too do any unjust enrichments claim based on that conduct. However, Plaintiffs' unjust enrichment claim survives with respect to the remaining ICFA claims and summary judgment is denied in this respect.

28

## Conclusion

Defendant PetSmart LLC's Motion for Summary Judgment [359] is granted. Counts II and IV are dismissed in full. Defendant Hill's Pet Nutrition, Inc.'s Motion for Summary Judgment [363] is granted in part and denied in part. Summary judgment is granted as to Count I with respect to Vanzant's deceptive practices and unfair practices claims, Nevius's unfair practices claim, and Nevius's deceptive practices claim to the extent that it is based on the theory that the marketing of PD products misleadingly suggests that a prescription is legally required. Summary judgment is denied as to Count I with respect to Nevius's deceptive practices claim against Hill's, to the extent it is based on the theory that the marketing of PD products misleadingly suggests that they are or contain pharmaceutical drugs or medicine, and Count III with respect to Nevius's unjust enrichment claim against Hill's. PetSmart's unopposed motion to seal [360] and Hill's' unopposed motion to seal [395] are both granted for the reasons set forth therein. The Court sets a status hearing for February 6, 2025 at 9:30 a.m. and directs the parties to file a joint status report by three business days prior to the status hearing.

**SO ORDERED.**                                    **ENTERED: January 24, 2024**

 

_____

**HON. JORGE ALONSO**
**United States District Judge**

29